**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE DIAL CORPORATION,<br>HENKEL CONSUMER GOODS INC.<br>H.J. HEINZ COMPANY,<br>H.J. HEINZ COMPANY LP,<br>FOSTER POULTRY FARMS,<br>SMITHFIELD FOODS, INC.,<br>HP HOOD LLC,<br>BEF FOODS, INC.,<br>SPECTRUM BRANDS, INC.<br><br>Individually and On Behalf of<br>Similarly Situated Companies,<br><br>          Plaintiffs,<br><br>v.<br><br>NEWS CORPORATION,<br>NEWS AMERICA INC.,<br>NEWS AMERICA MARKETING FSI L.L.C.,<br>NEWS AMERICA MARKETING IN-STORE<br>SERVICES L.L.C.,<br><br>          Defendants. | Case No. 13 Civ. 06802 (WHP)<br>ECF Case<br><br>**JURY TRIAL DEMANDED** |

## FOURTH AMENDED COMPLAINT

Lewis LeClair
Tex. Bar No. 12072500
McKool Smith, PC
300 Crescent Court, Suite 1500
Dallas, Texas 75201
(214) 978-4984
EMAIL: lleclair@mckoolsmith.com

Daniel Goldman
NY Bar No. DG-4503
Paul Hastings LLP
75 East 55th Street
New York, NY 10022
(212) 318-6024
EMAIL: dangoldman@paulhasting.com

James T. Southwick
Tex. Bar No. 2338531
Susman Godfrey
1000 Louisiana, Suite 1500
Houston, TX 77002
(713) 653-7811
EMAIL: jsouthwick@susmangodfrey.com

R. Stephen Berry
D.C. Bar No. 234815
Berry Law PLLC
1717 Pennsylvania Avenue, NW
Suite 450
Washington, DC 20006
(202) 296-3020
EMAIL: sberry@berrylawpllc.com

Steven F. Benz
DC Bar No. 428026
Kellogg, Huber, Hansen, Todd, Evans,
  & Figel, PLLC
1615 M Street, NW - Suite 400
Washington, DC 20036
(202) 326-7900
EMAIL: sbenz@khhte.com

***Counsel to Plaintiffs***

## TABLE OF CONTENTS

I. NATURE OF THE ACTION ................................................................................................ 1

    A. Monopolization of the Relevant Market for ISPs ...................................................... 2

        1. Exclusive Contracts Denying Competitors Access to Distribution
        Through Retail Chains ....................................................................................... 2

        2. Exclusive Contracts Also Deny Competitors Access to Purchasers ................. 4

    B. News' Monopolization of the Sale of FSIs ................................................................ 5

        1. Long-term, Exclusive Contracts Denying Competitors Access to
        Purchasers .......................................................................................................... 5

        2. Unlawful Tying or Bundling of FSIs ............................................................... 6

    C. Injury to Competition ................................................................................................. 6

II. PARTIES .......................................................................................................................... 7

III. JURISDICTION AND VENUE ...................................................................................... 9

IV. CLASS ACTION ALLEGATIONS ............................................................................... 10

V. RELEVANT MARKETS .................................................................................................. 14

    A. Relevant Product Market for Third-Party ISPs ......................................................... 14

    B. Relevant Geographic Market for the Sale of ISPs ..................................................... 15

    C. News' Market Power in the In-Store Relevant Market ............................................... 15

    D. Relevant Product Market for FSIs Placed in Newspapers ......................................... 16

    E. Relevant Geographic Market for the Sale of FSIs ..................................................... 18

    F. News' Market Power in the FSI Relevant Market ...................................................... 18

VI. NEWS' MONOPOLIZATION OF THE IN-STORE RELEVANT MARKET ............ 19

    A. Long-Term, Exclusive Contracts Denying Competitors Access to Distribution ........ 19

    B. Practices Enhancing Competitor Exclusion from Distribution ................................... 21

        1. Hacking into Floographics' Computerized Customer Lists and
        Marketing Materials ........................................................................................... 21

2. Staggering the Terms of Exclusive Contracts..................................................22

3. Aggressive Enforcement of Shelf Exclusivity.................................................22

4. Use of Cash Guarantees to Derail Competitor Contracts ...............................23

5. Disparaging Competitors' Compliance Rates...................................................24

6. Defacing Competitor Advertisements and Disparaging Their Products..........25

7. Disparaging Competitor Financial Viability....................................................25

C. Long-Term, Exclusive Contracts Also Denying Competitors Substantial
Access to CPGs........................................................................................................26

D. Entering Into Agreements With Competitors That Reduce Competition ...................27

VII. MONOPOLIZATION OF FSIs.......................................................................................28

A. Exclusive Contracts Also Denying Competitors Access to Purchasers.....................28

B. Unlawful Tying or Bundling of FSIs .......................................................................28

VIII. INJURY TO COMPETITION.......................................................................................30

### COMPLAINT FOR DAMAGES AND
### INJUNCTIVE RELIEF AND JURY DEMAND

Plaintiffs The Dial Corporation ("Dial"), Henkel Consumer Goods Inc. ("Henkel"), H. J. Heinz Company, H. J. Heinz Company, L.P. (collectively, "Heinz"), Foster Poultry Farms, a California corporation ("Foster Farms"), Smithfield Foods, Inc. ("Smithfield"), HP Hood LLC ("HP Hood"), BEF Foods, Inc. ("Bob Evans"), and Spectrum Brands, Inc. ("Spectrum"), on behalf of themselves and similarly situated companies, allege as follows:

### I.  NATURE OF THE ACTION

1.      In two relevant markets, the multifaceted and pervasive exclusionary strategies of Defendants ("News") have violated the antitrust laws of the United States prior to and during the statutory damage period in this matter.  News has suppressed competitive promotion of a massive number of consumer goods in 40,000 retail stores, and scores of newspapers nationwide, to acquire and maintain two unlawful monopolies and earn large monopoly profits at the expense of its purchasers which have paid unlawful, above-competitive prices.

2.      News' unlawful purposes could not be more transparent.  For example, in a sales meeting Paul Carlucci, then News America Inc.'s Chief Operating Officer, illustrated News' desire for the ultimate in competitive suppression with a video from *The Untouchables,* in which Al Capone serves as a sales role model as he cudgels a competitive enemy to death with a baseball bat.  Mr. Carlucci has vowed to "destroy" News' competitors, describing his boss, Rupert Murdoch, as a man "who has to have it all."

3.      Mr. Carlucci threatened to fire any News employee who did not support exclusive control by News of shelves in retail accounts, *i.e.*, those "concerned about doing the right thing."

4.      Mr. Carlucci and his employer have achieved their goals. News has severely injured competition in two relevant markets for the sale of in-store promotion services ("ISPs")

1

and free-standing-insert co-op coupons ("FSIs") in newspapers and has violated well-established antitrust law.

5.      News rewarded Mr. Carlucci's unlawful achievements by a promotion to Chairman and Chief Executive Officer of News America Marketing, Inc.

## A.   Monopolization of the Relevant Market for ISPs

6.      The purchase of ISPs allows consumer-packaged-goods companies ("CPGs") such as Plaintiffs to promote their products to shoppers in retail chains of grocery stores, drugstores, mass retailers, home improvement stores, and bargain stores throughout the United States.  News acts as a middleman to place these services in the chains.

7.      News has unlawfully maintained a monopoly over the relevant market for these third-party services from approximately 2004 through the present and has violated the antitrust laws before and during the statutory damage period.

8.      To do so, News has used, and continues to use, two sorts of long-term, exclusive contracts. The first sort forecloses access by its competitors to the retail chains they need to distribute ISPs.

9.      The second sort impedes its competitors' access to the CPGs, as they attempt to sell competitive services.

### 1.   Exclusive Contracts Denying Competitors Access to Distribution Through Retail Chains

10.     CPGs buy ISPs for use in retail chains as a national sales tool.  Often simultaneously, they seek to put their promotions in front of millions of consumers in more than 40,000 stores nationwide.  Therefore, to be competitive, News' competitors require access to substantial national retail distribution networks comparable in scope to that of News.  News has

denied its competitors this access by employing long-term, exclusive contracts to lock them out of the retail chains.

11.     Over the last several years, including without limitation the statutory damage period, exclusive, anticompetitive contracts have prevented News' only two significant competitors, Floorgraphics Inc. (now essentially defunct) and Insignia Systems Inc. ("Insignia"), from building comparable networks.  The marginalization of News' competitors in turn prevented the two entities from building out their businesses and product lines in a manner that would allow them to act as a competitive constraint against News' monopoly power.  These competitors have been confined to offering niche in-store services such as floor advertising or shelf signs with brand price messaging (Insignia's POPSign).

12.     In addition, as described more fully below, News has resolved separate lawsuits brought by its major competitors by acquiring them, or entering into distribution agreements with them.  By further consolidating the ISP market and enhancing its control over the distribution of services, News has solidified and expanded its monopoly power to the detriment of consumers.

13.     Internally, News has acknowledged that it has sought to build contract barriers to these competitors to make it difficult for them to compete.

14.     The exclusionary effectiveness and durability of News' anticompetitive contracts designed to defeat competitors' distribution of competitive services have been reinforced by seven additional exclusionary News actions over several years prior to and during the statutory damage period including:

- Hacking into Floographics' computers to obtain customer lists and other marketing materials to solicit its accounts and lock Floorgraphics' customers into News long-term and exclusive contracts;

- Staggering the terms of the exclusive contracts so that, in any given year, a News competitor could not substantially expand its competitive retail distribution network;

- Enforcing aggressively contractual shelf exclusivity by removing competitors' services and telling customers that their promotions with competitors would not appear;

- Using large cash guarantees unjustified by potential ISP revenues to derail competitor contracts with retailers, a practice expressly designed to exclude competitors from these chains;

- Disparaging and misrepresenting competitors' ISP compliance rates, which are important to CPGs when they select a vendor;

- Disparaging competitors' financial capacity and ability to pay the retail chains for necessary access; and

- Defacing competitors' in-store advertisements and then disparaging the quality of the defaced promotions to the retail chains.

### 2. Exclusive Contracts Also Deny Competitors Access to Purchasers

15.     Prior to and during the statutory damage period News has also employed long-term, exclusive, right-of-first-refusal or requirement contracts with CPGs to exclude its competition from substantial market opportunities.

16.     These long-term contracts often start with two-, three-, or four-year terms and then are routinely extended by News to make the contracts effectively exclusive for longer periods.  Some contracts last a decade or more.  These are high and stout barriers that stand in the way of competitive bidding for News' business and that aid News in maintaining its in-store monopoly.  These exclusionary contracts continue until this day.

17.     Thus, over the last several years News' competitors are suppressed at both ends of the chain of distribution: they are impaired pervasively as they seek access to customers, and their distribution is largely blocked by News' exclusionary contracts with retail chains.

**B. News' Monopolization of the Sale of FSIs**

**1. Long-term, Exclusive Contracts Denying
Competitors Access to Purchasers**

18.     FSIs are distributed on behalf of CPGs in newspapers nationwide by News and its competitor, Valassis Communications, Inc. ("Valassis").  News has acquired and maintained market power over this relevant market and willfully monopolized this distinct relevant market.

19.     Insert coupons are a markedly different advertising medium than in-store services. The coupon medium is more conducive to conveying a sales story (unlike in-store shelf or floor promotions), and coupons create demand in all stores, not merely those stores targeted by particular ISPs.  Also, because coupons are redeemed, the effectiveness of coupon advertising in creating demand can be traced.

20.     To monopolize this relevant market News has made further use of long-term, exclusive, right-of-first-refusal, or requirements contracts prior to and during the statutory damage period to impair its coupon competitors' access to purchasers in a distinct relevant market for the sale of FSIs in the United States.  Here, News has effectively purchased contractual exclusivity for its FSIs by discounting pricing offered to CPGs.

21.     Long-term FSI contracts, like those covering ISPs, often have started with two-, three-, or four-year terms, which News routinely extends to render the contracts exclusive for multiple additional years.

5

## 2. Unlawful Tying or Bundling of FSIs

22.     Until its conduct was enjoined by this Court in early 2011, News also used its ISP monopoly to monopolize the FSI market.  It has offered CPGs discounts from its monopolistic in-store prices only if they purchased all their FSIs from News.

23.     This tying or bundling of the sale of products suppressed competition from News' remaining competitor of any size, Valassis.  Because Valassis historically has not competed in the in-store relevant market, News' deep, in-store discounting forced Valassis into an anticompetitive Hobson's choice.  It could sell to a customer by pricing its FSIs near or below cost (by matching News' in-store discounts as well as any discounts offered by News on FSIs), or it could lose the account altogether to News.  Whatever choice Valassis made, it was suppressed and weakened as a competitor.

24.     In 2011, the United States District Court for the Eastern District of Michigan issued an Order prohibiting such practices.  *Valassis Communications, Inc. v. News America Inc.*, No. 2:06-CV-10240, 2011 WL 2420048 (E.D. Mich. June 24, 2011) (Tarnow, J.) (Dkt. No. 413).

## C. Injury to Competition

25.     News' unlawful conduct has injured competition and enabled it to acquire and maintain market power in the two relevant markets for the sale of ISPs and FSIs.  News has used this market power to charge Plaintiffs and other CPGs monopoly prices for these services and coupons throughout the statutory damage period (which commenced in early 2008).  These monopoly prices are substantially higher than the competitive pricing that would have prevailed in the absence of News' unlawful conduct in both relevant markets.

26.     News' anticompetitive conduct both in the years before the commencement of the statutory damage period and during the damage period violates antitrust laws.  Plaintiffs may

recover for all such acts violating antitrust laws if those acts contribute to monopoly power and price injury accruing within the damage period.

27.     Four News competitors in both relevant markets have already obtained over $625 million in lost-profit antitrust remedies for News' antitrust violations of the sort alleged herein. Such recompense has been in the form of a judgment, or the settlement of litigation just before the commencement of a trial against News.

28.     This lawsuit seeks recompense to CPGs for the monopoly overcharges that they paid for News' services. For more than 100 years, the United States Supreme Court has repeatedly recognized that direct purchasers, such as Plaintiffs, have a "preferred position" under antitrust law over other litigants precisely because their injury—paying higher prices—is the direct, foreseeable, and anticipated product of efforts to monopolize a market.

## II. PARTIES

29.     Plaintiff The Dial Corporation is a CPG organized under the laws of Delaware and headquartered in Scottsdale, Arizona. It sells personal care and household cleaning products in part under the Dial, Right Guard, Purex, and Renuzit trademarks.

30.     Plaintiff Henkel Consumer Goods Inc. is the direct parent of The Dial Corporation and is a CPG organized under the laws of Delaware and headquartered in Scottsdale, Arizona. In part it sells products for home care, body care, and cosmetics.

31.     Plaintiff H. J. Heinz Company is a CPG organized under the laws of Pennsylvania and headquartered in Pittsburgh, Pennsylvania. It sells in part under the Heinz, Classico, Ore-Ida, and Lea & Perins trademarks. Its affiliate H. J. Heinz Company, L.P. is the Heinz entity that contracts with News for the services and products at issue.

32.     Plaintiff Foster Poultry Farms, a California corporation, is a CPG headquartered in Livingston, California.  It was founded in 1939 and sells chicken and turkey products, as well as lunch meats and franks, under the Foster Farms brand.

33.     Smithfield Foods, Inc. is a CPG organized under the laws of Virginia and headquartered in Smithfield, Virginia.  It sells through its subsidiary corporations, The Smithfield Packing Company, Inc., Armour-Eckrich Meats, LLC, John Morrell & Co., Patrick Cudahy, Inc., Curly's Foods, Inc. and Farmland Foods, Inc.  Smithfield has executed directly master contracts with News, and Smithfield's subsidiaries have ordered the relevant products and services directly from News under such contracts.  The Smithfield claims include Smithfield direct purchases with News and those of its subsidiaries.

34.     HP Hood LLC is a CPG organized under the laws of Delaware and headquartered in Lynnfield, Massachusetts.  It sells in part under the Heluva Good, Maggio, and Lactaid trademarks.

35.     BEF Foods, Inc. is a wholly-owned subsidiary of Bob Evans Farms, LLC.  It is a CPG organized under the laws of Delaware and headquartered in Columbus, Ohio.  It sells under the Bob Evans trademark.

36.     Spectrum Brands, Inc. is a CPG organized under the laws of Delaware and headquartered in Madison, Wisconsin.  It sells in part under the Black & Decker, Farberware, and Repel trademarks.

37.     News Corporation, and its successors, which may include Twenty-First Century Fox, Inc., and a separate entity called News Corporation, is a Defendant and is organized under the laws of Delaware and is the ultimate parent entity of subsidiaries selling ISPs and FSIs in the United States.

38.     News America Inc., and its successors, which may include 21st Century Fox America, Inc., is a Defendant and at relevant times was a subsidiary of News Corporation that had the responsibility of managing the sale of ISPs and FSIs through its then-subsidiaries News America Marketing In-Store Services, L.L.C., and News America Marketing FSI, L.L.C.

39.     Defendant subsidiaries News America Marketing In-Store Services, L.L.C. and News America Marketing FSI, L.L.C. have the responsibilities of managing the sale of ISPs and FSIs, respectively.  All News entities are collectively referred to herein as "News."

### III.  JURISDICTION AND VENUE

40.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question), as this action arises under Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2, Section Three of the Clayton Act, 15 U.S.C. § 14, and Sections Four and Sixteen of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.  This Court has supplemental jurisdiction over state-law claims pursuant to 28 U.S.C. § 1367.

41.     Venue is proper because Defendants reside within this judicial district as provided in 28 U.S.C. § 1391(b) and (c), and as provided in Sections Four and Twelve of the Clayton Act (15 U.S.C. §§ 15 and 22).

## IV.  CLASS ACTION ALLEGATIONS

### News In-Store Class

### Federal Rule of Civil Procedure 23(a) Prerequisites

42.     Plaintiffs The Dial Corporation, Henkel Consumer Goods Inc., H. J. Heinz

Company, H. J. Heinz Company, L.P., Foster Poultry Farms, Smithfield Foods, Inc, HP Hood

LLC, BEF Foods, Inc., and Spectrum Brands, Inc. ("Class Representatives"), are representatives

of a class of persons residing in the United States who have directly purchased ISPs from News

at any time on or after April 5, 2008, and have not purchased these services under News

contracts with mandatory arbitration clauses ("News In-Store Class").

43.     Prosecution of the claims of the Class as a class action is appropriate because the

prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is at least several hundred, and the

members of the Class are therefore so numerous that joinder of all members of the Class is

impracticable.  Joinder is also impracticable because of the geographic diversity of the members

of the Class, the need to expedite judicial relief, and the Class Representatives' lack of

knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of

Defendants' anticompetitive conduct which are common to the members of the Class.  These

include, but are not limited to, common issues as to (1) whether Defendants have engaged in

prohibited anticompetitive conduct including monopolization; and (2) whether Defendants'

anticompetitive conduct has caused at least some price or overcharge injury to members of the

Class under the Sherman Act.  In addition, there are common issues as to the nature and extent of

the injunctive and monetary relief available to the members of the Class.

44.     The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class.  The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

45.     The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class.  There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the Representatives' claims and those of the members of the Class.

### Federal Rule of Civil Procedure 23(b)(3) Prerequisites

46.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

### Federal Rule of Civil Procedure 23(b)(2) Prerequisites

47.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## News FSI Class

### Federal Rule of Civil Procedure 23(a) Prerequisites

48.     Plaintiffs The Dial Corporation, Henkel Consumer Goods Inc., H. J. Heinz Company, H. J. Heinz Company, L.P., Foster Poultry Farms, Smithfield Foods, Inc., HP Hood LLC, BEF Foods, Inc., and Spectrum Brands, Inc. ("Class Representatives") are representatives of a class of persons residing in the United States who have directly purchased FSIs from News at any time on or after April 5, 2008 ("News FSI Class") and have not purchased these services under News contracts with mandatory forum selection clauses.  Also excluded from class damages are class members' purchases of News FSIs as part of News' predatory bundling or tying contracts alleged herein.

49.     Prosecution of the claims of the Class as a class action is appropriate because the prerequisites of Rule 23(a) of the Federal Rules of Civil Procedure are met:

(a)     The number of persons in the Class is at least several hundred, and the members of the Class are therefore so numerous that joinder of all members of the Class is impracticable.  Joinder is also impracticable because of the geographic diversity of the members of the Class, the need to expedite judicial relief, and the Class Representatives' lack of knowledge of the identity and addresses of all members of the Class.

(b)     There are numerous questions of law and fact arising from the pattern of Defendants' anticompetitive conduct which are common to the members of the Class.  These include, but are not limited to, common issues as to (1) whether Defendants have engaged in prohibited anticompetitive conduct including monopolization; and (2) whether Defendants' anticompetitive conduct has caused at least some price, or overcharge, injury to members of the

Class under the Sherman Act.  In addition, there are common issues as to the nature and extent of the injunctive and monetary relief available to the members of the Class.

50.     The claims of the Class Representatives are typical of the claims of the members of the Class and fairly encompass the claims of the members of the Class.  The Class Representatives and the members of the Class are similarly or identically harmed by the same systematic and pervasive concerted action.

51.     The Class Representatives and their counsel will fairly and adequately protect the interests of the members of the Class.  There are no material conflicts between the claims of the Class Representatives and the members of the Class making class certification inappropriate. Counsel for the Class will vigorously assert the Representatives' claims and those of the members of the Class.

**Federal Rule of Civil Procedure 23(b)(3) Prerequisites**

52.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(3) is appropriate because:

(a)     The questions of law or fact common to the members of the Class predominate over any questions affecting only its individual members; and

(b)     A class action is superior to other methods for the fair and efficient resolution of the controversy.

**Federal Rule of Civil Procedure 23(b)(2) Prerequisites**

53.     In addition, the prosecution of the claims of the Class as a class action pursuant to Rule 23(b)(2) is appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the Class as a whole.

## V.  RELEVANT MARKETS

### A.  Relevant Product Market for Third-Party ISPs

54.    News sells and Plaintiffs purchase in a relevant product market for third-party promotion services ("in-store relevant product market").  News serves as a middleman between Plaintiffs (and other CPGs) and retail chains.  These companies purchase ISPs from News, which allow them to promote their products on shelves and elsewhere in chain stores.  News executes contracts with the retailers, which allows News to place these promotions in the retailers' stores.

55.    The ISP programs include print and electronic signage, end-of-aisle displays, freezer displays, floor signage, and cart advertising, all designed to persuade shoppers to buy the product at the moment of decision.

56.    The product market does not include "trade promotion" arrangements where individual CPGs have contracts with individual retailers to promote their products.  In part, this segment of in-store advertising is distinct from the relevant product market because such one-to-one relationships do not allow the CPGs to make pervasive and simultaneous national or regional promotional launches.  By contrast, the contracts with News allow CPGs to place advertisements across as many as 40,000 stores and multiple retail chains.

57.    News offers shelf-mounted machines that dispense coupons or rebates (SmartSource Coupon Machines and SmartSource Shelf Take One), floor decal advertisements (FloorTalk), and shopping cart advertisements (SmartSource Carts).  News also promotes two "at-shelf" signage programs: Shelftalk, which is an "at-shelf" sign with a brand message and Price Pop Guaranteed ("Price Pop"), which is an at-shelf sign with product prices.  News is the only market participant with a complete array of these ISP programs and well-developed national contracts with retailers.  Thus, News is the only one-stop shop for a CPG to obtain access to a wide variety of ISPs nationwide.

14

**B.  Relevant Geographic Market for the Sale of ISPs**

58.    Plaintiffs and other CPGs can reasonably turn to purchase third-party ISPs from competitors of News in an area encompassing the United States ("in-store relevant geographic market").  The relevant market (including the product and geographic markets as defined) is the relevant market for the sale of third-party ISPs in the United States ("in-store relevant market").

**C.  News' Market Power in the In-Store Relevant
Market**

59.    News has unlawfully acquired and maintained market power in the in-store relevant market.

60.    This market power is evidenced by either direct or circumstantial evidence.  As alleged herein News has demonstrated that, by virtue of its long-term, exclusive contracts and related conduct, it has the power to exclude its competitors from substantial competitive opportunities.

61.    There is also significant circumstantial evidence of News' market power.  News has a large share of the market and has erected barriers to competitive entry and expansion in order to protect its monopoly.  By 2009, News had achieved $391,792,000 of in-store annual revenues in the United States, which amounted to 84 percent of the market.  Its last remaining significant competitor, Insignia, has an approximate 7 percent share.  Moreover, Insignia's business is concentrated in the brand, price messaging niche alone.  (It provides the "POPSign" at-shelf advertising program, which incorporates both brand messaging and product price.)  It does not compete in any substantial way with News' core coupon machine and shelf-talk programs.  Moreover, Insignia and News have entered into a distribution agreement whereby Insignia's product is distributed through News' retail network, which has the effect of further

increasing News' market power in the in-store relevant market.  News has been successful in containing Insignia and not allowing it to achieve competitive "critical mass."

62.    Twelve remaining in-store competitors now share only approximately nine percent of the market among them.

63.    Until 2009, Floorgraphics was News' only other substantial in-store competitor. Floorgraphics primarily sold floor decals.  It effectively went out of business in early 2009 and its assets were bought by News as part of a settlement of Floorgraphics' unfair competition lawsuit against News.

64.    Thus, News now is the only significant company in the in-store relevant market with Insignia and other small competitors offering minor competition and no meaningful constraint on pricing.

65.    This in-store monopoly is protected by multiple high and expensive barriers to entry and expansion facing competitors.  First, to enter the market, a competitor must be able to offer a wide range of in-store services to match those of News.  Second, as set out below, News' long-term, exclusive contracts with retailers lock competitors out of approximately 85 percent of the retail distribution they need to compete nationally with News.  Third, any potential competitor must make investments in promotional offerings and retail distribution must be made well before it can generate any revenue.

### D.  Relevant Product Market for FSIs Placed in Newspapers

66.    Plaintiffs have purchased FSIs in the form of coupons in books from News for placement in newspapers across the country (typically on Sundays).  Such coupons are sold in a separate relevant product market ("FSI relevant product market") from the relevant product market for the sale of third-party ISPs (and markets for other advertising).

67.     FSI, as used in this complaint, does not include direct advertising, custom inserts, or other insert advertising.

68.     The market for FSIs is distinct in part because insert coupons are a markedly different advertising medium.  FSIs are more conducive to conveying a sales story (unlike in-store shelf or floor promotions) and they create demand in all stores, not merely those stores targeted by particular ISPs.  Also, because coupons are redeemed, the effectiveness of coupon advertising in creating demand can be traced.  Further, CPGs can use coupons to target the type of buyer who prepares in advance of shopping by selecting those items which he or she intends to purchase, and is thereby induced to seek out a particular item in the store based upon the coupon.  ISPs allow for no such targeting.

69.     Dr. Paul Farris, a professor at the Darden School of Business of the University of Virginia, put it this way:

> Q.     In marketing either from the academic point
> of view or from the consumer product goods[]
> manufacturer's point of view, [is] the FSI business
> the same or [a] different business than the in-store
> promotion[] businesses?
>
> A.     They are quite different . . . the FSIs are great for new
> products, they are great to get a message across to a
> broad audience.  The in-store attention devices are
> great to be sure that you remind people of that mess-
> age or draw attention to the product just as they were
> making the decision.

Trial Transcript (6/3/09) 22:14-25, *Valassis Communications, Inc. v. News America Marketing Inc.*, No. 07-706645-CZ (Mich. Cir. Ct. Wayne Cnty.) (hereinafter "Valassis Tr.").

### E.  Relevant Geographic Market for the Sale of FSIs

70.     Plaintiffs and other CPGs can reasonably purchase FSIs from competitors of News in an area encompassing the United States ("FSI relevant geographic market").  The relevant market (including the product and geographic markets as defined) is the relevant market for the sale of FSIs in the United States ("FSI relevant market").

### F.  News' Market Power in the FSI Relevant Market

71.     News has acquired and maintained market power in the FSI relevant product market.  Direct evidence of its ability to control price and exclude competition is the pervasive suppressive effects of its use of long-term exclusionary contracts with CPGs as alleged herein.  In addition, News has demonstrated the ability to exclude competition by virtue of its capacity to extend its market power from the in-store relevant market into the FSI relevant market using exclusionary tying or bundling of the sale of FSIs with ISPs.

72.     Circumstantial evidence confirms News' market power.  News unlawfully maintains a market share in the relevant market of at least 80 percent or more.

73.     As with the in-store relevant market, the FSI relevant market is characterized by high barriers to entry and expansion that face News' competitors.  These make any News exclusionary conduct significantly more likely to exclude effective price and quality competition.  First, it takes a competitor many years to build the relationships with the CPGs that buy the coupons and the newspapers distributing the coupons throughout the United States.  Second, it takes years to develop the necessary printing and distribution infrastructure and operations needed.  Third, certain economies of scale are necessary to control costs and operate competitively with a competitor as large as News.

## VI.  NEWS' MONOPOLIZATION OF THE IN-STORE RELEVANT MARKET

### A.  Long-Term, Exclusive Contracts Denying Competitors Access to Distribution

74.     CPGs buy ISPs in grocery store and drugstore chains as a national sales tool. They seek to put their promotions in front of millions of consumers in more than 40,000 stores nationwide and News' competitors need to have extensive retail distribution networks comparable to those of News to be attractive alternatives.  News' actual and potential competitors have been unable to obtain such scope due to News' long-term, exclusive contracts with chains.  Thus, News' competitors have been denied substantial competitive opportunities prior to and during the statutory damage period.

75.     Internally, News has frankly acknowledged that it has sought to build contractual barriers to make it difficult for competitors to compete.  Valassis Tr. (6/25/09) 46:11-13.

76.     News developed this exclusive, national network of retail chains in order to control a large percentage of ISPs and to forestall competition.  Valassis Tr. (6/17/09) 173:24-174:12.  Former News account manager Robert Emmel has testified that 100 percent of his retail accounts in the southeast United States had exclusivity clauses.  *Id.*

77.     News has used Al Capone in *The Untouchables* as a role model—where he forcefully extinguishes competition (with a baseball bat).[1]  Mr. Carlucci, Chief of News Operations, has vowed to "destroy" his competitors, referring to his boss, Rupert Murdoch, as an executive "who has to have it all."[2]

---

[1] Peter Lattman, *Marketing with Muscle*, Forbes, Oct. 31, 2005, at 66 (Vol. 176, No. 9), *available at* 2005 WLNR 17625245.

[2] Joseph Rosenbloom, *High Noon in Aisle Five*, Inc.com, Jan. 1, 2004, at 88, *available at* http://www.inc.com/magazine/20040101/highnoon.html.

78.     Approximately 85 percent of News' in-store revenues come from its "core portfolio," including its SmartSource Coupon Machines and Shelftalk brand messaging. Valassis Tr. (6/25/09) 53:11-25.  Its goal is to make sure that it has exclusivity for all kinds of shelf messaging of any kind.  Valassis Tr. (6/17/09) 176:5-177:14.

79.     News "used the over broad term shelf messaging in [its] contracts so that [it] could, in essence, deny anything that would go on the shelf as being a violation of the contract . . . ." *Id.*

80.     News has aggressively obtained "letters of authorization" from the management of retail chains to show to store managers, which allow it to remove promotions of competitors. Valassis Tr. (6/17/09) 177:15-25; (6/25/09) 48:15-49:7.

81.     Mr. Carlucci has emphasized repeatedly that News "can't let [Insignia and Floorgraphics] get critical mass, can't let them get any bigger . . . we have to stop them where they are, not get into – most importantly . . . our core portfolio [coupon machines and shelf messaging]."  Valassis Tr. (6/17/09) 172:17-173:4.

82.     In mid-2001, on a conference call with personnel managing in-store accounts, Mr. Carlucci "expressed his extreme displeasure" with the performance of the News group managing the Floortalk floor advertising program (which was competitive with the Floorgraphics' service) and the Price Pop program placing brand price messaging on the shelf (which was competitive with Insignia's service).  He gave "a call to action for the group to perform more effectively." Valassis Tr. (6/18/09) 43:3-44:12.

83.     Soon after the call, Mr. Carlucci announced new "aggressive tactics" by News against its competitors, and also retail chains.  News' "aggressive tactics" include offering "a plethora of new items that were going to be introduced into the marketplace."  Mr. Carlucci

stated that he did not want any retailers informed in advance of these new tactics.  Instead, News' plan was going to "assume" under retailer contracts that it had exclusive control of all the shelves in its retail chain accounts.  As then-Chief Operating Officer, Mr. Carlucci concluded that "if there was any one [on staff] who was a bed wetting liberal [and] concerned about doing the right thing, they should speak up at that point, and he would arrange for human resources to work with that person and they would exit the company."  *Id*.

84.     As a consequence News' two significant competitors were not able to expand successfully beyond the niche provision of in-store services such as floor advertising or shelf signs with brand price messaging (Insignia's POPSign).

85.     Today, to obtain the necessary nationwide coverage, CPGs have to deal with one middleman, News, the only vendor with pervasive national access to retail chains by virtue of its exclusive contracts.

**B.  Practices Enhancing Competitor Exclusion from Distribution**

86.     News has enhanced the effectiveness and durability of its anticompetitive exclusive contracts by seven additional exclusionary actions implemented prior to and during the statutory damage period.

**1.  Hacking into Floographics' Computerized Customer Lists and Marketing Materials**

87.     From 2000 to 2003, there was a concerted effort at News to develop its brand price messaging product (Price Pop) to compete with the Insignia product (POPSign), as well as to develop its Floortalk product to compete with that of Floorgraphics.

88.     In early 2003, News implemented "Operation Retailer Freedom" to usurp all Floorgraphics contracts by soliciting accounts on its customer lists.  News persisted with this strategy for several years.  Valassis Tr. (6/17/09) 176:2-177:14.

89.     Floorgraphics alleged that News hacked into its password protected accounts at least 11 times in 2003 and 2004 to obtain its customer lists (and other marketing materials).  If true, these actions would have facilitated News' strategy of usurping Floorgraphics' customer relationships.

## 2.  Staggering the Terms of Exclusive Contracts

90.     Prior to and during the damage period News has strengthened the exclusive effect of its contracts with retailers by staggering their terms so that, in any one year, the opportunities for competitors to expand and underbid News' monopoly pricing are limited.  Its officers have acknowledged internally and frankly that, by staggering exclusive contracts, News has increased the barrier to competition.  Valassis Tr. (6/25/09) 46:16-48:1.

91.     News' practice of staggering exclusive contract terms with retailers ensures that it will take a competitor many years to build up a network comparable to that of News and offer meaningful price competition.  *Id.*  This has strengthened the barriers to entry.

## 3.  Aggressive Enforcement of Shelf Exclusivity

92.     News has reinforced the contract barrier to competition by enforcing exclusivity clauses vigorously.  Prior to and during the statutory damage period, News has executed a strategy whereby senior management of retail chains have issued letters authorizing in-store managers to remove products of News' competitors.  Valassis Tr. (6/25/09) 48:15-49:7.

93.     News has told the CPGs not to deal with its competitors because they "would be throwing money away" on promotions which would not appear.

### 4.  Use of Cash Guarantees to Derail Competitor
### Contracts

94.     A "very important part" of News' decision to offer a cash guarantee to a retail

chain (regardless of the amount of News revenues generated there) has been whether a

competitor was already entrenched with the retailer and News wanted to displace it.  Valassis Tr.

(6/17/09) 151:6-15.

95.     In this regard, at "town meetings" in various sales offices around the country

between 2000 and 2006, Mr. Carlucci emphasized that the company "was spending a

considerable amount of money to prevent not only Floorgraphics' success in floors," but also to

take away the opportunity for it to expand into the "core business of News," that is, coupon

machines, shelf products, etc.  He was seeking to protect News' "very profitable multi-portfolio

business."  Valassis Tr. (6/18/09) 45:7-46:15.

96.     For example, in early 2002, News paid a large guarantee to Eckerd Corporation,

in part because Insignia was negotiating a contract with Eckerd at the time, and News believed in

"no way" could Insignia match the guarantee News offered.  Valassis Tr. (6/17/09) 154:13-

156:11.

97.     Mr. Emmel saw no economic justification for the guarantee based on anticipated

revenues from Eckerd placements.  He believes Eckerd was paid to preclude Insignia, and as part

of a larger corporate "blocking move," to damage Insignia.  News wanted to prevent Insignia

from obtaining "critical mass" in the drug sector, because RiteAid had already moved to

Insignia.  News paid $4.5 million over a three-year term to Eckerd.  Valassis Tr. (6/17/09) 155:6-

156:11.  Eckerd later confided to Mr. Emmel that the guarantee was two or three times what it

thought it could obtain.  Valassis Tr. (6/17/09) 156:14-23.

98.     Mr. Emmel found the payment to Eckerd "outlandish" because it was a guarantee covering only the News brand price messaging program (Price Pop) (in competition with Insignia's POPSigns), and not News' core coupon machine and shelf programs, where its revenues were much greater.  In his view, the guarantee was targeted only at Insignia's attempt to take over this account, not revenue generation.  Valassis Tr. (6/17/09) 157:13-161:17.

99.     According to Mr. Emmel, in early 2003, News gave similar unjustified guarantees to Ahold in response to Ahold's simultaneous negotiations with Insignia and Floorgraphics. Valassis Tr. (6/17/09) 168:22-169:10.

100.    Dominic Porco, a long-term News officer, told Mr. Emmel that although the Ahold guarantees cost the company a "tremendous amount of money there was a great feeling of relief" because the cost to the company in lost profits would be far greater if either one of them became "a viable entity" and obtained "critical mass" necessary to expand their portfolio and challenge News' core shelf and coupon machine businesses.  Valassis Tr. (6/17/09) 169:24-171:8.  As Mr. Carlucci put it, "We've got to keep them . . . where they are."  Valassis Tr. (6/17/09) 171:9-172:3.

101.    On information and belief, News has continued to make unjustified payments to retailers to exclude competitors from the in-store relevant market.

### 5.  Disparaging Competitors' Compliance Rates

102.    Of considerable importance to CPGs is the "compliance rate" of vendors of ISPs —that is, the percentage of the retailers' stores promised in which an advertising campaign is actually placed.

103.    In a letter widely circulated to CPGs in February 2003, Dominic Porco claimed News delivered compliance rates of 90 to 95 percent, and Floorgraphics' and Insignia's compliance rates were less than 50 percent and 20 percent, respectively.  Valassis Tr. (6/17/09)

188:17-189:2, 189:16-24, 190:5-15.  News continued thereafter to use these compliance figures in sales and marketing.  *Id.*  Mr. Emmel testified that none of these claims was correct.  Valassis Tr. (6/17/09) 189:12-15, 190:5-10.

104.    In Mr. Emmel's view, News has attempted to control in-store advertising in as many of the stores as possible and asserted low competitor compliance rates of its competitors with a view to frustrating their access to CPGs' business.  Valassis Tr. (6/17/09) 192:4-193:4.  Inside News it was considered a "brilliant strategy" to "attack the competitor."  Valassis Tr. (6/17/09) 186:10-14, 187:4-11.

### 6.  Defacing Competitor Advertisements and Disparaging Their Products

105.    Mr. Emmel recalls that, in 2003, his supervisors instructed him whenever possible to take photos of ripped or torn Floorgraphics advertisements and bring them to the retailer's attention.  He was also told to deface Floorgraphics' advertisements, and he was aware that other News employees vandalized competitors' advertisements before taking photos for the retailers.  Valassis Tr. (6/18/09) 62:9-63:14.

### 7.  Disparaging Competitor Financial Viability

106.    News account representatives were told to tell retailers that Floorgraphics was having difficulty meeting its contractual payments to retailers for promotional access.  Valassis Tr. (6/18/09) 63:21-25, 64:13-25.  Of course, Floorgraphics' access to these retail chains was essential to its survival.

107.    Mr. Emmel has testified that he regularly disparaged Insignia's financial viability in his conversations with retail chains.  Valassis Tr. (6/17/09) 183:2-16.

## C.  Long-Term, Exclusive Contracts Also Denying
### Competitors Substantial Access to CPGs

108.    News has also employed long-term, exclusive, right-of-first-refusal or requirement contracts with CPGs to exclude its in-store and FSI competitors from substantial competitive opportunities prior to and during the statutory damage period.

109.    These exclusionary agreements are multiple-year contracts.  They start with two-, three-, or four-year terms.  The contracts are extended routinely by News for multiple years (without intervening competitive bidding under a request for proposal process).

110.    By way of example, Plaintiff Dial's News contract for the purchase of both ISPs and FSIs beginning in 2002 was extended without competitive bidding through 2009 for an effective term of seven years.

111.    By way of example, Plaintiff BEF Foods, Inc. had a News FSI contract effectively extending six years (2009-2015).

112.    By way of example, Plaintiff Heinz had News FSI contracts effectively extending four years (between 2006-2010) and three years (2010-2013).

113.    By way of example, S.C. Johnson and Son, Inc., a large purchaser of News FSIs and ISPs, had a contract effectively extending for nine years (2004-2013), and an in-store contract extending for six years (2004-2010).

114.    The durability of these exclusive, right-of-first-refusal or requirement contracts prevents and discourages competitors from providing vigorous price and quality competition for News in the provision of ISPs and FSIs both prior to and during the statutory damage period.

115.    Thus, News to the present time has suppressed competitors with exclusionary contracts at both ends of the chain of distribution.  News' competitors are contractually blocked from serving many purchasers and, when they do secure accounts, their distribution is crippled.

This latter impairment in turn feeds back to further disadvantage News' competitors' ability to sell to CPGs because News' distribution network cannot be matched.

### D. Entering Into Agreements With Competitors That
### Reduce Competition

116.    News has also entered into agreements with various competitors, often in conjunction with the settlement of lawsuits brought by those competitors, which have the anticompetitive effect of reducing competition in the in-store relevant market.

117.    In or around 1997, News acquired Heritage Media, one of its then-major competitors in the in-store relevant market, which resulted in News controlling approximately 90 percent of the relevant market.

118.    In 2011, News settled a lawsuit with Insignia, a provider of ISP, including shelf signs.  News paid Insignia $125 million in the settlement, and agreed in exchange for $4 million from Insignia to permit Insignia to be the exclusive distributor of a particular kind of shelf sign—InsigniaPOPS—through News' network of retailers.  Upon information and belief, the settlement and distribution agreement operates an effective non-compete between these two competitors on point-of-purchase products with price advertising.  Insignia continues to make payments to News for limited product retailer access.  This has benefitted both competitors to the detriment of competition and CPGs.

119.    News' acquisitions and agreements with competitors serve to further reduce competition and enhance the barriers to entry in the in-store relevant market.  News has eliminated competitors through those acquisitions, and has marginalized, weakened, and controlled the competitors that remain by entering into agreements with them to provide ISPs.

## VII.  MONOPOLIZATION OF FSIs

### A.  Exclusive Contracts Also Denying Competitors
### Access to Purchasers

120.    In the relevant market for the sale of FSIs, News has likewise pervasively used

long-term exclusive, right-of-first-refusal, or requirement contracts to impair its competitors'

access to purchasers both prior to and during the statutory damage period.  A CPG is encouraged

and incentivized to give all its coupon business (or a set percentage) to News in exchange for

discounted coupon prices.  News thereby buys exclusivity.

121.    News' long-term contracts in this market, like those covering ISPs, often start

with two-, three-, or four-year terms which News routinely extends to make them effectively

exclusive for multiple additional years.  Moreover, many contracts employed by News contain

evergreen and automatic renewal clauses that make it difficult for CPGs to terminate or not

renew.  These contracts build a wall protecting News' monopoly over FSIs.  *Supra* ¶¶ 110-113

(examples).

### B.  Unlawful Tying or Bundling of FSIs

122.    Further, in conjunction with long-term, exclusive contracts, News has parlayed its

monopoly and monopoly pricing in the in-store relevant market to monopolize the relevant

market for FSIs.

123.    Pricing of ISPs is often tied to or contingent upon a CPG entering into a right-of-

first-refusal agreement with News for FSIs.  Should the CPG not provide all of its FSI business

to News, News threatens punitive pricing for these needed monopolized ISPs.

124.    Generally, Valassis has not sold in the relevant market for in-store services or, if it

has, its share of the market has been very small.  Thus, by way of example, if Valassis

discounted its FSI pricing to match both News' in-store (and any additional FSI) discounts,

28

Valassis would be selling FSIs at a loss.  If it did not offer these debilitating discounts, it would lose the business to News.  In either case, Valassis was substantially weakened or suppressed as a competitor.

125.    This method of exclusion employed by News was a potent exclusionary weapon because the companies had to walk away from large sums to take Valassis coupons.  Valassis Tr. (6/25/09) 72:10-24, 89:23-90:17, 100:16-101:2, 106:4-11, 120:6-15, 129:13-130:7.

126.    CPGs using News' ISP SmartSource coupon machines, without getting their coupons from News, paid a price as much as 64 percent higher for these machines than those who bought News FSIs.  Valassis Tr. (6/25/09) 89:7-11.

127.    If such a company used the News Shelf Talk product, but dealt with Valassis for FSIs, it had to pay to News from 24 to 67 percent more for Shelf Talk, depending on the year. Valassis Tr. 6/25/09 89:23-90:17.

128.    In multiple speeches by the head of News' FSI business and its chief financial officer News expressed the "hope" that this strategy would "push" Valassis "to the brink of utter desperation" or "extinction."  Valassis Tr. (7/9/09) 139:13-143:9.

129.    Thus, by offering pricing terms that effectively force companies to purchase News' FSIs, News has used its ISP dominance to erect a highly effective barrier to its FSI competition.  Because buyers need national ISPs from News—because essentially it is the only provider of such services—they have a huge financial incentive to buy News' FSIs to the exclusion of those of Valassis.

130.    Internally, officers of News admitted that they were leveraging News' dominance over the ISP market by playing the "in-store card" in the FSI market.  Valassis Tr. (6/25/09) 95:17-96:3, 96:7-12.

131.     News told ConAgra that it charged CPGs that did not take News' FSIs 54 percent more than those that did.  Valassis Tr. (6/25/09) 120:6-15.

132.     These News practices were not enjoined by the United States District Court for the Eastern District of Michigan until early 2011, nearly three years into the statutory damage period.

133.     Upon information and belief, News continues to engage in many of these enjoined practices to this day.

## VIII.  INJURY TO COMPETITION

134.     Because of News' exclusionary and unlawful conduct, competition in the relevant markets has been severely constrained.  News has been able to achieve monopoly power and charge CPGs supra-competitive prices for FSIs and ISPs during the applicable damages period that they would not otherwise pay in a competitive market.

135.     News' anticompetitive conduct prior to and during the statutory damage period beginning in early 2008 violates the antitrust laws.  Plaintiffs may recover for such conduct contributing to monopoly power and price injury accruing within the damage period.

136.     As a consequence, Plaintiffs and other CPGs have suffered antitrust price injury and damages.  News continues to maintain monopoly pricing in both the in-store and FSI relevant markets and its liability continues to accrue to purchasers for supra-competitive pricing (whether or not one or more of its exclusionary acts alleged herein has ceased).

## COUNT I

### Monopolization

**(Section Two of the Sherman Act)**

137.    All foregoing paragraphs are incorporated herein by reference.

138.    News has monopolized the relevant market for the sale of ISPs in the United

States in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

139.    News has willfully acquired or maintained market power in this relevant market.

This market power is protected by high barriers to competitive entry and expansion.

140.    News' long-term, exclusive contracting and its other conduct enhancing

competitive exclusion, including without limitation its agreements with its competitors, taken as

a whole, have unlawfully excluded or suppressed competition.

141.    News has injured competition and its suppression of competition has allowed it to

charge Plaintiffs and other CPGs unlawful monopoly pricing throughout the damage period

beginning in early 2008.

## COUNT II

### Monopolization

**(Section Two of the Sherman Act)**

142.    All foregoing paragraphs are incorporated herein by reference.

143.    News has monopolized the relevant market for the sale of FSIs in the United

States in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

144.    News has willfully acquired or maintained market power in this relevant market.

This market power is protected by high barriers to competitive entry and expansion.

31

145.    News' use of long-term, exclusive contracts and unlawful bundling, taken as a whole, have excluded or suppressed competition.

146.    News' bundling of ISPs and FSIs is unlawful because, after allocating all News discounts and rebates applicable to products in the bundle to the price of its FSIs, News has sold its FSIs below their incremental cost.  Incremental cost includes the sum of the following for each unit of output: (1) costs of goods sold in accounting usage; (2) marketing and/or distribution costs reasonably attributable to FSIs; (3) research and development costs reasonably attributable to FSIs, if relevant; and (4) other costs shown to be directly avoidable if a unit of output of FSIs were not produced.

147.    With its exclusive contracts and bundling News has injured competition, and the exclusion of competition has allowed it to charge Plaintiffs and other CPGs unlawful monopoly pricing throughout the damage period beginning in early 2008 during periods they did not purchase under the predatory bundling or tying contracts alleged herein.

## COUNT III

## Exclusive Dealing

### (Sections One and Two of the Sherman Act and Section Three of the Clayton Act)

148.    All foregoing paragraphs are incorporated herein by reference.

149.    With its long-term exclusive contracts with retail chains and CPGs, News has unlawfully restrained trade, and acted in concert to monopolize, in violation of Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section Three of the Clayton Act, 15 U.S.C. § 14, in the relevant market for the sale of ISPs and the relevant market for the sale of FSIs.

150.    News has willfully acquired or maintained market power in these relevant markets.  This market power is protected by high barriers to competitive entry and expansion.

151.   The anticompetitive effects of these contracts far outweigh their procompetitive benefits, if any.

152.   News' contracts have denied News' competitors substantial competitive opportunities under Section Two of the Sherman Act and foreclosed at least 30-40% of each market under Section One of the Sherman Act and Section Three of the Clayton Act.

153.   News' exclusive contracts implemented prior to and during the statutory damage period have injured competition and excluded competition.  As a consequence, News has charged Plaintiffs and other CPGs unlawful, supra-competitive pricing throughout the damage period beginning in early 2008.

## COUNT IV

### Tying

**(Section One of the Sherman Act)**

154.   All foregoing paragraphs are incorporated herein by reference.

155.   In violation of Section One of the Sherman Act, 15 U.S.C. § 1, News has unlawfully tied products by either (a) expressly refusing to sell ISPs except on the condition that a CPG also purchased all of its FSIs from News; or (b) pricing FSIs and ISPs when purchased separately such that, in terms of price and quality considerations, the CPG has no economically practical option other than to participate in the tying arrangement.

156.   FSIs (the tied product) and ISPs (the tying product) are sold in separate relevant markets and are different products or services.

157.   News has market power in the relevant market for the sale of ISPs, the tying product.  This market power is protected by high barriers to competitive entry and expansion.

158.   A substantial amount of United States interstate commerce is affected in the tied product, the sale of FSIs.

159.   News' unlawful tying is a *per se* violation of the antitrust laws or, in the alternative, is an unreasonable restraint of trade.

160.   News has injured competition and the exclusion of competition has allowed it to charge Plaintiffs and other CPGs unlawful monopoly pricing for FSIs during the period they did not purchase under the predatory bundling or tying contracts alleged herein.

**PENDENT CLAIMS**

**COUNT V**

**Monopolization**

**(Section Three of the Michigan Antitrust Reform Act
and Section 340(1) of the New York Donnelly Act)**

161.   All foregoing paragraphs are incorporated herein by reference.

162.   News has monopolized the relevant market for the sale of ISPs in the United States in violation of Section Three of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.773 and N.Y. GEN. BUS. LAW § 340(1).

163.   It has willfully acquired or maintained market power in this relevant market.  This market power is protected by high barriers to competitive entry and expansion.

164.   Its long-term, exclusive contracting and its other conduct enhancing competitive exclusion, including without limitation its agreements with its competitors, taken as a whole, have unlawfully excluded or suppressed competition.

165.   News has injured competition and its suppression of competition has allowed it to charge Plaintiffs and other CPGs unlawful monopoly pricing throughout the statutory damage period.

34

## COUNT VI

### Monopolization

**(Section Three of the Michigan Antitrust Reform Act
and Section 340(1) of the New York Donnelly Act)**

166.   All foregoing paragraphs are incorporated herein by reference.

167.   News has monopolized the relevant market for the sale of FSIs in the United

States in violation of Section Three of the Michigan Antitrust Reform Act, Mich. Comp. Laws

Ann. § 445.773 and N.Y. GEN. BUS. LAW § 340(1).

168.   News has willfully acquired or maintained market power in this relevant market.

This market power is protected by high barriers to competitive entry and expansion.

169.   News' use of long-term, exclusive contracts and unlawful bundling, taken as a

whole, have excluded or suppressed competition.

170.   News' bundling of ISPs and FSIs is unlawful because, after allocating all News'

discounts and rebates applicable to products in the bundle to the price of its FSIs, News has sold

its FSIs below their incremental cost.  Incremental cost includes the sum of the following for

each unit of output: (1) costs of goods sold in accounting usage; (2) marketing and/or distribution

costs reasonably attributable to FSIs; (3) research and development costs reasonably attributable

to FSIs, if relevant; and (4) other costs shown to be directly avoidable if a unit of output of FSIs

were not produced.

171.   With its exclusive contracts and bundling News has injured competition, and the

exclusion of competition has allowed it to charge Plaintiffs and other CPGs unlawful monopoly

pricing throughout the damage period beginning in early 2008 and during periods they did not

purchase under the predatory bundling or tying contracts alleged herein.

## COUNT VII

### Exclusive Dealing

**(Section Two of the Michigan Antitrust Reform Act
and Section 340(1) of the New York Donnelly Act)**

172.    All foregoing paragraphs are incorporated herein by reference.

173.    With its long-term exclusive contracts with retail chains and CPGs, News has unlawfully restrained trade, and acted in concert to monopolize, in violation of Sections Two and Three of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. §§ 445.772 and 445.773 and N.Y. GEN. BUS. LAW § 340(1), in the relevant market for the sale of ISPs and the relevant market for the sale of FSIs.

174.    News has willfully acquired or maintained market power in these relevant markets.  This market power is protected by high barriers to competitive entry and expansion.

175.    The anticompetitive effects of these contracts far outweigh their pro-competitive benefits, if any.

176.    News' contracts have denied News' competitors substantial competitive opportunities.

177.    News' exclusive contracts have injured competition and excluded competition. As a consequence, News has charged Plaintiffs and other CPGs unlawful, supra-competitive pricing throughout the damage period beginning in early 2008.

## COUNT VIII

### Tying

**(Section Two of the Michigan Antitrust Reform Act
and Section 340(1) of the New York Donnelly Act)**

178.    All foregoing paragraphs are incorporated herein by reference.

179.   In violation of Section Two of the Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.772 and N.Y. GEN. BUS. LAW § 340(1), News has unlawfully tied products by either (a) expressly refusing to sell ISPs except on the condition that a CPG also purchased all of its FSIs from News; or (b) pricing FSIs and ISPs when purchased separately such that, in terms of price and quality considerations, the CPG has no economically practical option other than to participate in the tying arrangement.

180.   FSIs (the tied product) and ISPs (the tying product) are sold in separate relevant markets and are different products or services.

181.   News has market power in the relevant market for the sale of ISPs, the tying product.  This market power is protected by high barriers to competitive entry and expansion.

182.   A substantial amount of United States interstate commerce is affected in the tied product, the sale of FSIs.

183.   News' unlawful tying is a *per se* violation of the antitrust laws or, in the alternative, is an unreasonable restraint of trade.

184.   News has injured competition and the exclusion of competition has allowed it to charge Plaintiffs and other CPGs unlawful monopoly pricing for FSIs during the statutory damage period beginning in early 2008 and during periods they did not purchase under the predatory bundling or tying contracts alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that:

A.   This Court declare that News' conduct constitutes:

   (1)   Violations of Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section Three of the Clayton Act, 15 U.S.C. § 14; and

(2)     Violations of Sections Two and Three of the Michigan Antitrust Reform

Act, Mich. Comp. Laws Ann. §§ 445.772 and 445.773 and N.Y. GEN.

BUS. LAW § 340(1).

B.     This Court permanently enjoin Defendants and their agents and employees from

continuing their unlawful actions set forth herein;

C.     Plaintiffs recover treble actual damages;

D.     Plaintiffs recover their reasonable attorneys' fees and costs as allowed by law;

E.     Plaintiffs recover pre-judgment and post-judgment interest at the highest rate

allowed by law; and

F.     Plaintiffs be granted such other and further relief as the Court deems just and

equitable.

## JURY DEMAND

Plaintiffs request a trial by jury in this matter.

Dated: April 4, 2014                        Respectfully submitted,

                                            BY:   *s/ Steven F. Benz*_____

                                            KELLOGG, HUBER, HANSEN,
                                            TODD, EVANS & FIGEL, P.L.L.C.
                                            Steven F. Benz (*pro hac vice*)
                                            D.C. Bar No. 428026
                                            Justin M. Presant (*pro hac vice*)
                                            Mich. Bar No. P74252
                                            D.C. Bar No. 1013252
                                            1615 M Street, N.W.
                                            Suite 400
                                            Washington, D.C. 20036
                                            Telephone:  (202) 326-7900
                                            Email: sbenz@khhte.com
                                                       jpresant@khhte.com

BERRY LAW PLLC
R. Stephen Berry (*pro hac vice*)
D.C. Bar No. 234815
1717 Pennsylvania Ave. NW
Suite 450
Washington, DC 20006
Telephone:  (202) 296-3020
Email: sberry@berrylawpllc.com


MCKOOL SMITH, PC
Lewis T. LeClair (*pro hac vice*)
Tex. Bar No. 12072500
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4984
Email: lleclair@mckoolsmith.com

John C. Briody
NY Bar No. 4231270
James H. Smith
NY Bar No. 4610853
One Bryant Park, 47th Floor
New York, NY 10036
(212) 402-9400
Email: jbriody@mckoolsmith.com
          jsmith@mckoolsmith.com


PAUL HASTINGS LLP
Daniel B. Goldman
N.Y. Bar No. DG-4503
Samer M. Musallam (*pro hac vice*)
D.C. Bar No. 986077
75 East 55th Street
New York, NY 10022
Telephone: (212) 318-6024
Email: dangoldman@paulhastings.com
          samermusallam@paulhastings.com

SUSMAN GODFREY L.L.P.
James T. Southwick
Tex. Bar No. 2338531
Richard W. Hess (*pro hac vice*)
Tex. Bar No. 24046070
Ryan V. Caughey (*pro hac vice*)
Tex. Bar No. 24080827
1000 Louisiana
Houston, TX 77002
Telephone: (713) 653-7811
Email:  jsouthwick@susmangodfrey.com
        rhess@susmangodfrey.com
        rcaughey@susmangodfrey.com

*Counsel to Plaintiffs*

**<u>Certificate of Service</u>**

I, Steven F. Benz, hereby certify that a copy of the foregoing Fourth Amended Complaint has been served via ECF upon counsel for Defendants on April 4, 2014.

*s/ Steven F. Benz*
Steven F. Benz

41