UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE DIAL CORPORATION,
HENKEL CONSUMER GOODS INC.
H. J. HEINZ COMPANY,
H. J. HEINZ COMPANY, L.P.,
FOSTER POULTRY FARMS,          Civ. Action No. 13-CV-06802 (WHP)
SMITHFIELD FOODS, INC.,
HP HOOD LLC,
BEF FOODS, INC.,
SPECTRUM BRANDS, INC.

Individually and On Behalf of
Similarly Situated Companies

      Plaintiffs,

v.

NEWS CORPORATION,
NEWS AMERICA INC.,
NEWS AMERICA MARKETING FSI LLC,
NEWS AMERICA MARKETING IN-STORE
SERVICES, LLC

      Defendants.

MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION

# REDACTED VERSION

# ORIGINAL FILED UNDER SEAL

# TABLE OF CONTENTS

Page

INTRODUCTION .................................................................................................................. 1

BACKGROUND AND FACTS ............................................................................................ 3

1.  Parties and Procedural History .................................................................................. 3

2.  The market for third party in-store promotions is discrete and well defined ........... 3

    A.  Third party in-store promotions are uniquely effective at incentivizing consumers to buy products .................................................................................. 4

    B.  Trade promotions are not substitutes for News's in-store promotions ................. 5

    C.  Econometric analysis underscores the conclusion that the market for third party in-store promotions is discrete and well defined ........................................ 6

3.  News has unlawfully obtained and maintained monopoly power over the third party in-store promotions ................................................................................. 7

    A.  News controls prices ........................................................................................... 7

    B.  News has excluded competition to obtain and maintain monopoly power .......... 8

        1.  News excludes competition through exclusive retailer contracts .............. 9

        2.  News excludes competition through staggered retailer contracts ........... 12

ARGUMENT ......................................................................................................................... 13

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997)..............................................................................................18

*Amgen Inc. v. Ct. Ret. Plans & Trust Funds,*
    133 S. Ct. 1184 (2013)..................................................................................13, 14

*Arden Architectural Specialties, Inc. v. Wash. Mills Electro Minerals Corp.,*
    No. 95-CV-7574 (CJS), 2002 U.S. Dist. LEXIS 21506 (W.D.N.Y. Sept. 17, 2002)..............21

*Augustin v. Jablonksky (In re Nassau Cnty. Strip Search Cases),*
    461 F.3d 219 (2d Cir. 2006)................................................................................17

*Brown v. Kelly,*
    609 F.3d 467 (2d Cir. 2013).................................................................................18

*Cass Student Adver., Inc. v. Nat'l. Educ. Adver. Serv., Inc.,*
    407 F. Supp. 520 (N.D. Ill. 1976), *aff'd,* 537 F.2d 282 (7th Cir. 1976) ..................19

*Comcast Corp. v. Behrend,*
    *133 S. Ct., 1426 at 1433 (2013)* .......................................................................20, 23

*Cordes & Co. Financial. Services v. A.G. Edwards & Sons, Inc.,*
    502 F.3d 91 (2d Cir. 2007)...................................................................................18

*Fleischman v. Albany Med. Ctr.,*
    728 F. Supp. 2d 130 (N.D.N.Y 2010) ....................................................................21

*Glatt v. Fox Searchlight Pictures Inc.,*
    293 F.R.D. 516 (S.D.N.Y. 2013) ..........................................................................16

*Hawaii v. Standard Oil Co.,*
    405 U.S. 251 (1972)............................................................................................13

*In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,*
    276 F.R.D. 364 (C.D. Cal. 2011) .........................................................................24

*In re Currency Conversion Fee Antitrust Litigation,*
    264 F.R.D. 100 (S.D.N.Y. 2010) .................................................................. passim

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
    No. M 02-1486 (PJH), U.S. Dist. LEXIS 39841 (N.D.Cal. June 5, 2006) ....................23, 24

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*In re Electronic Books Antitrust Lit.,*
No. 11 MD 2293(DLC) (S.D.N.Y. March 28, 2014).........................14, 18, 19, 20, 21

*In re Flat Glass Antitrust Litig.,*
191 F.R.D. 472 (W.D. Pa. 1999) ...........................................................24

*In re High–Tech Empl. Antitrust Litig.,*
289 F.R.D. 555 (N.D. Cal. 2013)............................................................20

*In re Initial Public Offerings Securities Litigation,*
471 F.3d 24 (2d Cir. 2006).............................................................13, 14

*In re NASDAQ Market-Makers Antitrust Litig.,*
169 F.R.D. 493 (S.D.N.Y. 1996) ............................................................20

*In re Nexium (Esomeprazole) Antitrust Litig.,*
296 F.R.D. 47 (D. Mass. 2013)..............................................................24

*In re Playmobil Antitrust Litig.,*
35 F. Supp. 2d 231 (E.D.N.Y. 1998) .......................................................15

*Insignia Systems, Inc. v. News America Marketing In-Store, Inc.,*
661 F. Supp. 2d 1039 (D. Minn. 2009).................................................4, 10

*J. Truett Payne v. Chrysler Motors Corp.,*
451 U.S. 557 (1981).........................................................................20

*Miles v. Merrill Lynch & Co. In re Initial Public Offerings Securities Litigation),*
471 F.3d 24 (2d Cir. 2006).............................................................13, 14

*Reiter v. Sonotone Corp.,*
442 U.S. 330 (1979).........................................................................13

*Ross v. Am. Express Co. (In re Currency Conversion Fee Antitrust Litig.),*
264 F.R.D. 100 (S.D.N.Y. 2010) (Pauley, J.) ...........................................13

*State of New York v. Hendrickson Bros.,*
840 F.2d 1065 (2d Cir. 1988)..............................................................20

*Techreserves Inc. v. Delta Controls, Inc.,*
No. 13 Civ. 752 (GBD), 2014 U.S. Dist. LEXIS 47080 (S.D.N.Y. Mar. 31, 2014) ...........6

*Tops Markets, Inc. v. Quality Markets, Inc.,*
142 F.3d 90 (2d Cir. 1998)..................................................................7

## TABLE OF AUTHORITIES
(continued)

Page(s)

*Valassis Commc'ns., Inc. v. News Am. Inc.,*
  2:13-cv-14654-RHC-LJM (E.D. Mich.) ................................................................2

*Valassis Commc'ns., Inc. v. News Am. Inc.,*
  No. 2:06-cv-10240, 2011 U.S. Dist. LEXIS 66672 (E.D. Mich. Jan. 24, 2011) ......................2

*Valassis Communications, Inc. v. News America Marketing, Inc.,*
  No. 07-706645-CZ (Mich. Cir. Ct. Wayne Cty) ..........................................................9

*Virgin Atl. Airways Ltd. v. British Airways PLC,*
  872 F. Supp. 52 (S.D.N.Y. 1994) ......................................................................18

*Wal–Mart Stores, Inc. v. Dukes,*
  131 S. Ct. 2541, 2551 (2011) ...............................................................13, 14

**RULES**

Fed. R. Civ. P. 23 ...........................................................................*passim*

**STATUTES**

15 U.S.C.§ 1 .................................................................................................2

15 U.S.C.§ 2 .................................................................................................2

15 U.S.C.§ 14 ...............................................................................................2

**OTHER AUTHORITIES**

*Department of Justice and Federal Trade Commission Merger Guidelines* (2010) ......................6

# INTRODUCTION

For at least 15 years, Defendants (collectively, "News"), have engaged in a swath of anticompetitive tactics to obtain and maintain an illegal monopoly in the market for third party, in-store promotions and extract monopoly prices from its customers—consumer packaged goods companies ("CPGs"), the Plaintiffs in this case.

News's staggered, long-term, cash guaranteed, exclusive agreements with retailers locked up the primary channels for placement of third party in-store promotions and forestalled any rival from becoming a meaningful competitive check on News's pricing. The anticompetitive impact of these exclusionary agreements has been magnified by News's other anticompetitive acts, which are well documented in multiple prior antitrust and unfair competition litigations brought by News's former and remaining competitors over the past decade.

After being crippled by News, for example, former competitor Floorgraphics sued News in 2004 for hacking into password protected computers and stealing customer lists. Fourth Amended Complaint ("FAC") ¶¶ 14, 89.[1] Days into a jury trial, News settled the lawsuit for several millions of dollars. Days later, News bought out Floorgraphics and acquired its retail network. *Id.* at ¶ 63. Competitor Insignia sued News in 2004 for monopolizing the in-store promotions market stemming from News's exclusive agreements with retailers. Years later, News settled the lawsuit for $125 million and cut a deal to insert itself into, share profits from, and oversee Insignia's narrow segment of services. *Id.* at ¶ 118. Valassis, also a competitor, sued News on multiple occasions concerning News's anticompetitive bundling of in-store promotions with the sale of free-standing-insert coupons ("FSI"). In 2010, News paid

---

[1] The FAC also is attached to the Declaration of John C. Briody as Ex. 1. Unless otherwise noted, all references to Exhibits refer to documents attached to the Declaration of John C. Briody in Support of Plaintiffs' Motion for Class Certification.

$500 million to settle with Valassis following a $300 million jury verdict in Michigan state court. *Id.* at ¶ 24. But despite a court order enjoining News's conduct in 2010,[2] News's anticompetitive conduct continued. As a result, Valassis has only been able to manage a small share of the in-store market and has filed a new lawsuit also alleging monopolization of the in-store market. *See Valassis Commc'ns, Inc. v. News Am. Inc.*, 2:13-cv-14654-RHC-LJM (E.D. Mich.). The record in each of these cases is clear: News is a sophisticated entity that implemented a deliberate plan to "destroy" its competition and dominate the market for third party in-store promotions. It succeeded. ███████████████████████

News's destruction of competition has allowed it to extract monopoly overcharges from its customers, the CPGs. This lawsuit is being brought on behalf of those CPGs, all of which have been injured by News's monopolistic conduct. Accordingly, Plaintiffs respectfully move for certification of a class of United States CPGs that have purchased in-store promotions from News at any time on or after April 5, 2008. Plaintiffs allege News illegally monopolizes the third party in-store promotions market in violation of Section 2 of the Sherman Act and has entered into agreements that unreasonably restrain trade in violation of Section 1 and Section 3 of the Sherman Act and Clayton Act, respectively. *See* 15 U.S.C. §§ 1, 2; 15 U.S.C. § 14.

The Court should certify the proposed class. Every class member purchased News's in-store promotions, and every class member has the same legal claims against News based on those purchases. News's improper efforts to exclude its competitors and erect and maintain artificial barriers to entry affect all members of the putative class. As established by an economic model using regression analysis, News has used its market power to charge all class

---

[2] *See Valassis Commc'ns, Inc. v. News Am. Inc.*, No. 2:06-cv-10240, 2011 U.S. Dist. LEXIS 66672 (E.D. Mich. Jan. 24, 2011).

members supra-competitive prices for their purchases of in-store promotions.  For these reasons and others set forth herein, the class should be certified.

## BACKGROUND AND FACTS

**1.    Parties and Procedural History.**

Plaintiffs are consumer packaged goods companies that sell their products in grocery stores, drug stores, and mass market stores nationwide.  FAC ¶¶ 10, 29-36, 54, 58; Ex. 2, Tr. of H. Hendrix (Dial/Henkel 30(b)(6)) at 63:2-5.  Defendant News has several lines of businesses, but this Motion addresses News's monopoly over the placement of third party in-store promotions.  *See* FAC ¶¶ 1-10.

Merits discovery is ongoing.  The parties have exchanged a significant number of documents and data, and depositions have begun and will continue through the fall.  To date, Plaintiffs have, in total produced over 2.9 million documents (over 10 million pages) and have presented eight witnesses for depositions.  Ex. 3, Decl. of R. Stephen Berry ¶ 15.  The deadline for completion of discovery is December 29, 2014.[3]

**2.    The market for third party in-store promotions is discrete and well defined.**

CPGs in the proposed class have engaged News, as an intermediary, to place in store promotions in News's network of nationwide retail chains.  FAC ¶ 10.  News has contracts with these retailers which prohibit the placement of any in-store promotions by other third party vendors.  FAC ¶¶ 8, 10-13, 74.  News's in-store products include at-shelf signs and coupon machines; floor advertising decals; shopping cart signs; pricing signage; new-product displays; and shelf-based video displays.  News is the only third party that can provide CPGs with a

---

[3] Plaintiffs do not seek certification of a class alleged of CPGs purchasing News FSI coupons for newspaper distribution of their state law claims.  CPGs with mandatory arbitration clauses in their in-store contracts with News are not included in the Class sought to be certified.

3

complete array of in-store programs and an extensive network of large retailers.  FAC ¶ 57; Ex. 2 at 336:17-337:14; Ex. 4, Tr. of M. Findlay (Heinz 30(b)(6)) at 109-110; Ex. 5, Tr. of K. Welch (Dial/Henkel 30(b)(1)) at 230:12-20.

The market for the sale of third party in-store promotions is a discrete and well-defined relevant product market in which News is the dominant player.  *See* FAC ¶¶ 54–57.[4]  In further support of this market definition, Plaintiffs set forth facts in this section and sponsor the expert opinions of Dr. Jeff MacKie-Mason, Professor of Economics and Public Policy at the University of Michigan, and Dr. Paul Farris, Professor of Business Administration at University of Virginia's Darden School of Business.

**A.    Third party in-store promotions are uniquely effective at incentivizing consumers to buy products.**

Third party in-store promotions are a crucially significant marketing tactic because they reach consumers at the point of purchase — the moment when consumers are most likely to be influenced by promotional activity. ███████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████ In contrast, out-of-store

---

[4] Notably, a similar issue has already been litigated and decided.  In *Insignia Systems, Inc. v. News America Marketing In-Store, Inc.*, 661 F. Supp. 2d 1039 (D. Minn. 2009), Insignia alleged that News had monopolized the "third-party at-shelf in-store advertising." *Id.* at 1058. After five years of discovery, News moved for summary judgment on the issues of market definition and monopoly power.  The Court denied News's motion, finding an issue of material fact, and that Insignia had "carefully delineated the import of point-of-purchase advertising, as contrasted with out-of-store advertising." *Id.* at 1059.   Shortly thereafter, News settled the Insignia lost-profit claims for $125 million.   Margaret Cronin Fisk, *News Corp. Pays $125 million to Settle Insignia Suit, Ending Federal Trial*, Bloomberg News, Feb. 9, 2011, available at http://        http://www.bloomberg.com/news/2011-02-09/news-corp-pays-125-million-to-settle-insignia-suit-ending-federal-trial.html.

tactics, which includes media advertising and other traditional consumer promotions, such as FSI coupons, which are placed in newspapers, TV and radio advertisements, billboards, print media, and digital coupons, do not reach the consumer at the point of purchase and are thus typically aimed at building strong brand loyalty rather than encouraging point of purchase sales. Ex. 8, Expert Report of Dr. Paul Farris ("Farris Report") at ¶¶ 21-26, 48-53. █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ *see e.g.,* Ex. 5 at 21:4-18 (explaining that Heinz specifically uses in-store promotions at the "first moment of truth, which when you are at retail when 70 percent of your decisions are made").

**B.     Trade promotions are not substitutes for News's in-store promotions.**

From the perspective of CPG purchasers in the class, third party in-store promotions accomplish a different purpose than "trade promotions." Trade promotions are largely used as a form of price discounting to, among other purposes, persuade retailers or wholesalers (*i.e.,* "the trade") to stock a product and to merchandise that product more aggressively to the consumer. Although trade promotions appear in the store, CPGs view them only as complementary to third party in-store promotions because the latter have several advantages not shared with the former. First, when CPGs use third party in-store promotions they do not have to provide price discounts to the trade (which may or may not be passed on to the consumer). Ex, 8 (Farris Report) ¶¶ 31-33, 74, 75. Second, to use trade promotions CPGs have to engage in costly, time consuming, and inefficient one-on-one negotiations with retailers on a promotion-by-promotion basis rather than dealing with one purveyor to access thousands of stores at once. *Id.* ¶ 75. This makes it difficult

and costly to roll out a simultaneous, nationwide trade promotions. Third, CPGs do not have to deal with calendar complexity in set-up when they use third party in-store promotions, which have reliable advance schedules. *Id.* ¶¶ 74. Fourth, with third party in-store promotions the CPGs can control the precise signage used and do not need the assistance of a salesforce or broker to ensure implementation. *Id.* at ¶¶ 33, 76.



### C.   Econometric analysis underscores the conclusion that the market for third party in-store promotions is discrete and well-defined.

Building on Dr. Farris's analysis, Dr. MacKie-Mason has used econometric analysis to demonstrate that News's in-store promotions are part of a relevant product market that encompasses only third party in-store promotions, and further that there are no substitutes available to CPGs. Relevant markets are defined in terms of both a product (a good or service) and a geographic region. *See, e.g., Techreserves Inc. v. Delta Controls, Inc.*, No. 13 Civ. 752 (GBD), 2014 U.S. Dist. LEXIS 47080, at * 14-15 (S.D.N.Y. Mar. 31, 2014).

One widely accepted way to define a relevant market for purposes of antitrust law is to identify the smallest market in which a hypothetical monopolist could profitably charge above-competitive prices for a non-transitory period — that is, a "small but significant and non-

transitory increase in pricing" or "SSNIP." *See, e.g., Department of Justice and Federal Trade Commission Merger Guidelines* (2010).[5]

To apply the SSNIP test in this case, Dr. MacKie-Mason uses the "critical loss method," which involves price elasticity analysis, to measure the loss in quantity demanded of all third party in-store promotions sold in the hypothetical relevant market (by News and its remaining small competitors) if the pricing of all these promotions were raised by a SSNIP. *See* Ex. 9, Expert Report of Dr. Jeff MacKie-Mason at 34-38; *see also* FAC ¶ 58. Dr. MacKie-Mason's econometric analysis strongly supports a finding that third party in-store promotions alone comprise the relevant product market here. Ex. 9 at 36-38.

Dr. MacKie-Mason has also concluded that the relevant geographic market is the United States. This conclusion is based upon News' network of national retailers, the national structure of most demand, the conduct alleged is national, and the prices it alleged affects are predominantly for national placements. *Id.* at 38-43.

**3. News has unlawfully obtained and maintained monopoly power over the market for third party in-store promotions.**

News has monopoly power in the in-store market. Direct evidence shows that News exercises actual control over prices and excludes competition; ████████████████ ████████████, which has high barriers to entry and expansion. *See id.* at 45; *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (market share of over 70% is "usually strong" circumstantial evidence of monopoly power).

---

[5] Available at http://www.ftc.gov/sites/default/files/attachments/merger-review/100819hmg.pdf.

## A.     News controls prices.

The result is that News is able to control pricing for in-store promotions.  For example, in the context of discussing a strategy to bundle sales of in-store promotions and FSI, ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████

## B.     News has excluded competition to obtain and maintain monopoly power.

Since at least 2000, News pursued various exclusionary strategies to willfully exclude competition to obtain and maintain its monopoly power.  FAC ¶¶ 74–107.  This exclusionary conduct caused CPGs to suffer antitrust price injury during the damages period.

News's unlawful exclusionary conduct has been pervasive and brazen, and it has filtered from News's senior executives down to its sales force.  For example, in a sales meeting, Paul Carlucci, then News America Inc.'s Chief Operating Officer, illustrated News's desire to suppress competition with a video from *The Untouchables,* in which Al Capone serves as a role model for News's sales force as he cudgels a competitive enemy to death with a baseball bat.

8

FAC ¶ 77.[6] Further, Mr. Carlucci has vowed to "destroy" News's competitors, describing his boss, Rupert Murdoch, as a man "who has to have it all." *Id.*[7] Mr. Carlucci also threatened to fire any News employee who did not support News's exclusive control of retailers' shelves; Mr. Carlucci's News has no room for those "concerned about doing the right thing." Ex. 12, Tr. of *Valassis Commc'ns, Inc. v. News America Marketing, Inc.,* No. 07-706645-CZ (Mich. Cir. Ct. Wayne Cty) ("Valassis Tr.") (6/18/09) at 43:3–44:12.[8]

    1.    **News excludes competition through exclusive retailer contracts**.

A primary way that News maintains its market power is through exclusive retailer contracts. Without access to retailers, a third party provider of in-store promotions has nothing to offer to potential customers. *See, e.g.,* Ex. 13 at SMITHFIELD0500212 (CPG stating that the "approved Retailer list is the key" to assessing a third party provider of in-store promotions), In other words, because CPGs value the ability to place their promotions simultaneously in tens of thousands of stores nationwide, to be competitive, providers of third party in-store promotions must maintain a sufficiently large retail network. *See* Ex. 9 at 39-40; FAC ¶¶ 74–85. But that competition is exactly what News tries to prevent. Indeed, News works ruthlessly to keep its competitors from amassing significant retailer networks. Among other tactics, News prevents its other providers from competing by executing long-term, exclusive contracts with retailers that lock competitors out of retail chains. FAC ¶¶ 74-85. News's strategy is deliberately designed to

---

[6] Peter Lattman, *Marketing with Muscle*, Forbes, Oct. 31, 2005, at 66 (Vol. 176, No.9) available at 2005 WLNR 17625245.

[7] Joseph Rosenbloom, *High Noon in Aisle Five,* Inc. com, Jan. 1, 2004, at 88, available at http://www.inc.com/magazine/20040101/highnoon.html.

[8] Here a judgment of $300 million after a jury trial was entered against News for in part leveraging its monopoly control of a relevant antitrust market for the sale of third party in-store promotions to monopolize a relevant product market for FSI coupons. Ex. 12, Valassis Tr. (7/23/09) at 9:22-10:1.

block competitors, raise entry barriers and extract monopoly profits. ████████

████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

News's tactics have been successful in blocking competition; Dr. MacKie-Mason has demonstrated that News has substantially foreclosed access to retailers. Ex. 9 at 60-64.

Of course, exclusivity does not come for free. As such, News has used piles of cash and other compensation to purchase the retailer exclusivity it values so dearly. And this cash is not used just to maintain News's network. To the contrary, a "very important part" of News's decision to offer a cash guarantee to a retail chain (regardless of the amount of News revenues generated there) has been whether a competitor was already entrenched with the retailer and News wanted to displace it. Ex. 12, Valassis Tr. (6/17/09) at 151:6–15. Furthermore, News enforces its exclusivity clauses vigorously. For example, News has obtained "letter[s] of authorization" from management of retail chains to force store managers to remove promotions of its competitors. Ex. 12, Valassis Tr. (6/17/09) at 177:15-25, (6/25/09) at 48:15-49:7; ████

████████████████████████████████████████████████████████

████████████████████████████████████████

News does not and cannot deny its use of these tactics. In prior litigation, News did not "dispute that its contracts with retailers often incorporate retail-exclusivity clauses to secure

[News as] the exclusive provider of particular categories of in-store advertising tactics." *Insignia Systems, Inc. v. News America Marketing In-Store, Inc.*, 661 F. Supp. 2d 1039, 1048 (D. Minn. 2009*).* On this basis, in 2009 the District of Minnesota "conclude[d] that evidence of [News's] exclusive contracts with retailers adequately raise[d] a fact issue about whether [News's] conduct excluded competition in an effort to acquire or maintain monopoly power." *Id.*



Similarly, News Chief Operating Officer Mr. Carlucci has emphasized that News "can't let [its main in-store competitors] get critical mass, can't let them get any bigger . . . we have to stop them where they are, not get into – most importantly . . . our core portfolio [coupon machines and shelf messaging]." Ex. 12, Valassis Tr. (6/17/09) at 172:17-173:4. To this end, Mr. Carlucci instructed his sales force that, "if there was any one [on staff] who was a bed wetting liberal [and] concerned about doing the right thing, they should speak up at that point, and he would arrange for human resources to work with that person and they would exit the company." *Id.*, Valassis Tr. (6/18/09) at 43:3-44:12.

As News has long recognized, excluding competitors from access to retail space would create a barrier to entry in the market and suppress competition. By way of example, before News bought Floorgraphics' assets by way of settlement of an unfair competition lawsuit, News

11

competed with Floorgraphics (one of News's last-remaining competitors) █████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████ News's only arguable

rival, Insignia, is held in check by an arrangement with News that renders Insignia incapable of

serving as a true, viable alternative to News's monopoly pricing.  FAC ¶ 61.  CPGs simply do

not see Insignia as providing meaningful competition to News for third party in-store services.

Ex. 5 at 238:14-239:17; Ex. 2 at 336:17-337:7; Ex. 18, Tr. of M. Dietz (Smithfield 30(b)(1)) at

175:12-17.

### 2.   News excludes competition through staggered retailer contracts.

The anticompetitive impact of News's long-term exclusive retailer contracts is

exacerbated by News's strategy of contract staggering.  Staggering excludes competition by

preventing competitors from acquiring a critical mass of retailer affiliates that would make their

services attractive to CPGs.  Ex. 9 at 47-50; FAC ¶¶ 90-91.  In any one year, competitors'

opportunities to enter the market or grow market share are very limited.  Without an extensive

network, aspiring competitors cannot capture market share from News or constrain News's

monopoly pricing.  News's officers have recognized this dynamic, explaining under oath that

staggered retailer contracts ensures that it will take a competitor many years to build a

sufficiently large retailer network and offer meaningful price competition.  Ex. 12, Valassis Tr.

(6/25/09) at 46:16–48:1; ████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████

████████████████ Accordingly, "a[ny] competitor who wants to develop critical mass for their

12

network would have to dedicate a lot of money over a considerable amount of time in order to break into the in-store game in any significant way." Ex. 12, Valassis Tr. (5/29/09) at 52:21-53:17–48:1.

With the conduct described above, and with other reinforcing exclusionary conduct,[9] News has achieved a nearly complete monopoly in the relevant market and faces no meaningful constraint on its monopoly pricing to CPGs in the proposed class during the damage period.

## ARGUMENT

*The Proposed Class of CPG Purchasers Damaged by News Should Be Certified.*   This Court has broad discretion to certify the proposed class to remedy the damages caused by News's anticompetitive conduct and monopoly pricing. *See Miles v. Merrill Lynch & Co. (In re Initial Pub. Offering Sec. Litig.)*, 471 F.3d 24, 40–41 (2d Cir. 2006) ("*IPO*"). The Supreme Court has long recognized that class actions serve a valuable role in the enforcement of antitrust laws. *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979); *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 266 (1972). , The trial court may certify a class only if it "is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *IPO*, 471 F.3d at 33; *see also Ross v. Am. Express Co. (In re Currency Conversion Fee Antitrust Litig.)*, 264 F.R.D. 100, 110–11 (S.D.N.Y. 2010) (Pauley, J.) ("*Currency Conversion*").

This rigorous analysis may require some overlap with the merits of the claims. *Amgen Inc. v. Ct. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194 (2013) (quoting *Wal–Mart Stores,*

---

[9] To exclude competition further News (a) hacked into Floographics' computers to obtain customer lists and other marketing materials to solicit its accounts and lock Floorgraphics' customers into long-term and exclusive contracts with News; (b) disparaged and misrepresented competitors' in-store promotion compliance rates, which are important to CPGs when they select a vendor; (c) disparaged competitors' financial capacity and ability to pay the retail chains for necessary access; and (d) defaced competitors' in-store advertisements and then disparaged the quality of the de-faced promotions to the retail chains. FAC ¶¶ 87, 102-107.

*Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011)); *Currency Conversion*, 264 F.R.D. at 111. Nevertheless, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen*, 133 S. Ct. at 1194–95. "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* at 1195. The Court must "'receive enough evidence ... to be satisfied that each Rule 23 requirement has been met.'" *In re Elec. Books Antitrust Litig.*, No. 11 MD 2293 (DLC), 2014 U.S. Dist. LEXIS 42537 at *33 (S.D.N.Y. March 28, 2014) (Cote, J). This case satisfies the requirements of Rule 23(a).

*Ascertainability (Rule 23(a)).* Rule 23(a) contains an implicit requirement that Plaintiffs show the existence of an ascertainable class. *See IPO*, 471 F.3d. at 31 (noting an ascertainable class must be "objectively determinable"). The CPG direct purchasers in the relevant market during the damage period can be identified from News's revenue databases. Ex. 9 at 85.

*Impracticability of Joinder (Rule 23(a)(1)).* The class should be certified if it would be difficult or inconvenient to join all its members. *See Currency Conversion*, 264 F.R.D. at 111. The number of CPGs that purchased third-party in-store promotions from News in the damage period is at least a thousand. Ex. 9 at 2. Numerosity is presumed when a class consists of forty or more members. *See Currency Conversion*, 264 F.R.D. at 114.

*Commonality (Rule 23(a)(2)).* Commonality requires that there is at least one question of law or fact be common to the class. Violation issues are typically found to be common. *See Currency Conversion*, 264 F.R.D. at 111. Demonstrating commonality assures that class claims "can productively be litigated at once." *Dukes*, 131 S. Ct. at 2551 ("[C]laims must depend upon a common contention. . . . [that] must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the

14

validity of each one of the claims in one stroke."). Here, there are common contentions as to monopolization, including the definitions of the relevant product and geographic markets, News's market power in the relevant market, the use of long-term exclusionary agreements with retailers to unreasonably restrain trade, and other exclusionary conduct to obtain and maintain monopoly power. These central issues will be resolved "in one stroke" because those issues are the same for each class member. *See id.* Thus, the commonality requirement is easily satisfied.

*Typicality (Rule 23(a)(3)).* "To establish typicality under Rule 23(a)(3), the party seeking certification must show that each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *Id.* "Typicality refers to the nature of the claims of the representative, not the individual characteristics of the plaintiff." *Id.* (internal quotations and citation omitted). Here, each proposed class representatives' claims are typical of the claims of the entire class: each class representative has suffered the same antitrust price injury cause by the same long-term exclusionary agreements and monopolization of the relevant market as other members of the proposed class. FAC ¶¶ 44, 134–36. Further, each proposed class representative has the same need for injunctive relief. *Id.* ¶ 47.

While individual characteristics of each proposed class representative itself may vary, even greatly, between class representatives, such variance does not preclude typicality or class certification. *See, e.g., In re Playmobil Antitrust Litig.*, 35 F. Supp. 2d 231, 242 (E.D.N.Y. 1998) ("Differences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification."). The named Plaintiffs in this lawsuit represent a broad spectrum of at least a thousand consumer packaged goods companies in the United States, which themselves have disparate annual revenue (and thus different advertising

budgets).  For the same reason, one may expect similar variation in class representatives' negotiations with News for its products and services.  Class representatives also purchase different mixes of News marketing tactics, and pay different prices for those tactics.

Plaintiffs' individual characteristics do not threaten commonality or typicality.  As demonstrated in Dr. MacKie-Mason's Report, all class members suffered common impact.  Ex. 9 at 72-88.  News entered into long-term exclusionary agreements and created and maintained entry barriers that allowed News to exclude competitors, accumulate market power, and exercise that power directly to raise the prices for in-store promotions paid by all CPGs.  *Id.* at 43-57. Dr. MacKie-Mason has demonstrated by regression analyses that the variation in prices paid by class members can be explained using evidence common to the class.  *Id.* at 73-79.  ████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████  Thus the class representatives can demonstrate that class members suffered a common impact from News's anticompetitive conduct, that the proof of that conduct is common to all members, and that through its conduct News charged above-competitive prices for in-store promotions.

*Adequacy of Representation (Rule 23(a)(4)).* "Adequacy entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct this litigation." *Currency Conversion*, 264 F.R.D. at 111–12 (quotation marks and citation omitted); *see also Glatt v. Fox Searchlight Pictures Inc.*, 293 F.R.D. 516, 537 (S.D.N.Y. 2013) (Pauley, J.).  The class representatives' interests are not antagonistic to other class members, all of whom have been harmed by News's overcharges.  Furthermore, the discovery record shows that the class

representatives are well-suited to pursue the class's claims; to date, Plaintiffs have collectively produced over 2.9 million documents (totaling ten million pages) and presented eight witnesses for depositions—the majority of which lasted for an entire business day.  Ex. 3 ¶ 15.  The class representatives and counsel have investigated and prosecuted the action vigorously for over five years.  Counsel are qualified to conduct the litigation and have had extensive experience in antitrust, class, and other complex litigation.  *See* Exs. 3, 19-22 (Declarations of R. Stephen Berry, Steven F. Benz, Lewis T. LeClair, Daniel B. Goldman, and James T. Southwick).

In addition to meeting the requirements of Rule 23(a), the proposed class's claims also meet the standards of Rule 23(b)(3):

*Superiority  (Rule 23(b)(3).*   Use of class relief will be the most fair and efficient ("superior") method of resolving the thousands of CPG claims under Rule 23(b)(3). "In analyzing that question, courts consider four nonexclusive factors: (1) the interest of the class members in maintaining separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action." *Augustin v. Jablonksky (In re Nassau Cnty. Strip Search Cases)*, 461 F.3d 219, 230 (2d Cir. 2006).  Here a class action is the manifestly superior method of adjudicating CPG claims.  Many of the class members' claims will be small relative to the high costs of maintaining individual antitrust actions.  Streamlining collective claims in this one forum will avoid inconsistency and simplify the process of resolving the CPGs' claims.  Thus, conservation of judicial resources warrants a class action on all issues.  Finally, the size of the class should not present management

difficulties as demonstrated by the empirical work on common impact and proof of actual damages by Dr. MacKie-Mason.

 *Predominance (Rule 23(b)(3))*.  Predominance analysis focuses on "the legal or factual questions that qualify each class member's case as a genuine controversy" in order to determine "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "[W]here plaintiffs [are] allegedly aggrieved by a single policy of the defendants, and there is a strong commonality of the violation and the harm, this is precisely the type of situation for which the class action device is suited." *Elec. Books Antitrust Litig.*, 2014 U.S. Dist. LEXIS 42537 at *39 (internal quotations omitted) (quoting *Brown v. Kelly,* 609 F.3d 467, 484 (2d Cir. 2010)).

 Plaintiffs' class claims can be summarized as follows.  To show a violation of Section 2 of the Sherman Act, Plaintiffs must prove (1) a violation of the antitrust laws, (2) the antitrust injury they suffered as a result of the violation, and (3) an estimated measure of damages. *See Currency Conversion*, 264 F.R.D. at 114; *Cordes & Co. Financial. Services v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007).  The second element is "antitrust 'impact'" which is also referred to as the "fact of damage" resulting from the violation. *Currency Conversion*, 264 F.R.D. at 115-116.  Under Section 1 of the Sherman Act and Section 3 of the Clayton Act, Plaintiffs must generally prove an agreement that unreasonably restrained trade in the relevant product market. *Virgin Atl. Airways Ltd. v. British Airways PLC*, 872 F. Supp. 52, 65 (S.D.N.Y. 1994).

 Common issues predominate with respect to Plaintiffs' causes of action.  Common issues include the definitions of the relevant product and geographic relevant markets, News's monopoly power in the relevant market, and News's anticompetitive actions in the relevant

market—including the use of long-term exclusive retailer agreements[10] and market consolidating acquisitions. None of these issues require individualized proof.

The Report of Dr. MacKie-Mason identifies and defines the relevant product and geographic markets with the assistance of marketing expert Dr. Farris. Ex. 9 at 21-43. News's widespread conduct in excluding its competitors from those markets establishes the violation, all of which will be demonstrated using common proof. And News's methods of achieving its monopoly power are also common to all of the putative class members — in particular, its use of long-term, staggered retailer contracts —are unlawful exclusionary agreements that also function as barriers to entry that allow News to maintain it monopoly.

Because of News's anticompetitive conduct, competition in the relevant market has been severely suppressed and News has been able to achieve monopoly power allowing it to charge CPGs supra-competitive prices for its promotions. FAC ¶ 134. As a consequence, the class CPGs have suffered antitrust price injury or impact as well as actual damages.

"Where the but-for [competitive price] is uncertain, the plaintiff's burden of proving damages is, to an extent, lightened, for 'the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. Indeed, the Supreme Court has long taught that damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." *Elec. Books Antitrust Litig.*, 2014 U.S. Dist. LEXIS 42537 at *50 (internal quotations omitted) (quoting *New York v. Hendrickson Bros, Inc.,* 840 F.2d 1065, 1077-78 (2d Cir. 1988)); *see also J. Truett Payne v. Chrysler Motors Corp.*, 451 U.S. 557, 565 (1981);

---

[10] The agreements are of the type that the Seventh Circuit has found, under very similar facts, to violate Section 1. *Cass Student Adver., Inc. v. Nat'l. Educ. Adver. Serv., Inc.*, 407 F. Supp. 520, 523 (N.D. Ill. 1976), *aff'd*, 537 F.2d 282, 283 (7th Cir. 1976) (finding exclusive agreements by advertising intermediary unlawful under Section 1 of the Sherman Act because, *inter alia*, the intermediary possessed monopoly power and its exclusive agreements "effectively tied up access to the bulk of the market, and eliminated competition for much of the business").

*accord Comcast Corp. v. Behrend,* 133 S. Ct., 1426 at 1433 (2013) (noting, in antitrust case, that damage "[c]alculations need not be exact"). For this reason, "it does not come with very good grace for the wrongdoer to insist upon specific and certain proof of the injury which it has itself inflicted." *J. Truett Payne,* 451 U.S. at 566 (citation omitted).

In this case, Dr. MacKie-Mason's Report demonstrates that there is common proof of class wide antitrust price injury. Indeed, even the actual damages for each class member can be formulaically calculated using the model set out in the MacKie-Mason Report. *See* Ex. 9 at 79-88. In particular, Dr. MacKie-Mason provides rigorous econometric analysis demonstrating that formulaic means will be available at trial to show that the class CPGs have been injured by class-wide monopoly overcharges imposed by News. The standard governing class wide proof of common impact "expressly refuses to impose extraordinary burdens on a plaintiff to construct the but for [estimated competitive] price" used to show overcharging. *See Elec. Books Antitrust Litig.,* 2014 U.S. Dist. LEXIS 42537 at *50. Although plaintiffs must advance a plausible methodology demonstrating this proof, they need not prove the amount of damages at the class certification stage. *See Currency Conversion,* 264 F.R.D. at 115*; In re High–Tech Empl. Antitrust Litig.,* 289 F.R.D. 555, 582 (N.D. Cal. 2013).

The econometric analysis supplied by Dr. MacKie-Mason employs a "benchmarking" or "yardstick" technique widely used by economists and the courts for calculating overcharges (and antitrust damages). *See In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 521-22 (S.D.N.Y. 1996) (holding that the yardstick approach, which "compares profits earned or prices paid by the plaintiff with the corresponding data for a firm or in a market unaffected by the violation" is available as a means to calculate class damages and has been cited in decisions granting class certification); *Fleischman v. Albany Med. Ctr.,* 728 F. Supp. 2d 130, 148

(N.D.N.Y 2010) (allowing use of benchmark "but for" wage model to calculate damages caused by conspiracy to depress nurse wages while noting that "[a] benchmark need not be perfect to allow for [a] reasonable estimate of damages."); *Arden Architectural Specialties, Inc. v. Wash. Mills Electro Minerals Corp.*, No. 95-CV-7574 (CJS), 2002 U.S. Dist. LEXIS 21506, at *34 (W.D.N.Y. Sept. 17, 2002) (holding that "the 'yardstick' method for calculating damages, which 'compares profits earned or prices paid by the plaintiff with the corresponding data for a market unaffected by the violation' is an accepted means of measuring damages in an antitrust action.").

The analysis identifies benchmark competitive margins for firms that are similar to News in terms of capitalization and other factors but sell outside the relevant market. It then uses an average of these competitive margins to estimate how the structure of News monopoly pricing (which reflects the individual buying characteristics of each CPG customer) would have shifted downward if News had earned these competitive margins rather than its monopoly margins and resulted in varying dollar savings depending upon the CPG's buying characteristics. Ex. 9 at 82-85.

Initially Dr. MacKie-Mason calculates News's monopoly profit margin for its in-store promotions. *Id.* at 80-82. He then identifies twenty competitive benchmark firms by surveying companies likely to be as profitable as News in the relevant market unaffected by monopolization. These companies are similar to News in terms of capital intensity, rate of growth, size and the competitiveness of their market (and whether it is likely to be similar to the "but for" in-store relevant market). *Id.* at 82-85.

Next, Dr. MacKie-Mason uses the average of these benchmark margins for each year of the damage period ████████████████████ to estimate declines in News's monopoly pricing. *Id.* at 84. By way of example, for 2010, News's monopoly margin is ██

21

and the benchmark average margin is ▮▮. If News earned the competitive benchmark margin, its pricing would have declined ▮▮. *Id.* at 84-85. For the years 2008-2013 he estimates News monopoly overcharges to vary between ▮▮▮▮▮▮. *Id.*

Dr. MacKie-Mason then shows the impact of these price overcharge percentages (which vary by year of the damage period) on each class member's various annual purchases of particular News in-store promotions. Here he employs hedonic regression analysis to estimate News's monopoly pricing for all of the individual transactions for each in-store promotion for each year of the damage period between 2008-2013. This pricing is obtained from comprehensive News transaction databases. *Id.* at 75-76. This equation concludes that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 79. The only difference between this monopoly pricing for a particular CPG's buying characteristics, and the pricing in the estimated "but for" competitive world, is the cessation of News's exclusion and monopolization and its ability to charge monopoly pricing and earn monopoly margins. For each year in the damage period Dr. MacKie-Mason opines, that, to estimate competitive pricing prevented by News's monopolization, it is economically reasonable to posit that the pricing structure for each bundle of News promotion products purchased by a CPG would have shifted downward with competition by the percentage identified by the well-established benchmark analysis described above. *Id.* at 82-83. Thus, he is able to show common price injury across all individual bundles of CPG transactions in a given year, even though the dollar amount of this injury will vary by particular CPGs depending upon their buying characteristics. *See id.* at 85.

Importantly, Dr. MacKie-Mason's pricing regressions carefully take into account for each year of the damage period variation in the News promotions purchased by individual CPGs, all their transactions whether or not the transaction is off a list price or negotiated, the class of CPG

customer or its method of purchase, among other things. *See id.* at 73-79. This is sufficient to show common impact. For example in *Elec. Books Antitrust Litig.*, 2014 U.S. Dist. LEXIS 42537, at *42-45, Defendant Apple contended that each of 150 million e-book purchases has its own unique history and had to be evaluated separately and prevented a showing of class wide common price impact. Judge Cote found that plaintiff expert's "multivariate regression analysis has disentangled the effect of [price fixing] collusion on e-book prices, generating a model that explains 90% of the variance among titles' pricing." *Id.* at *42. The court further explained that "an abstract argument that each transaction is 'unique' or that some number of class members made very few purchases … does not cast doubt on[the] model." *Id.* "Moreover, antitrust jurisprudence … expressly refuses to impose extraordinary burdens on a plaintiff to construct the but-for [competitive] price. Where the but-for price is uncertain, the plaintiff's burden of proving damages is, to an extent, lightened for the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Id.* at *50 (internal quotations and citations omitted), *accord Comcast,* 133 S. Ct. at 1433.

Similarly in *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, No. M 02-1486 (PJH), U.S. Dist. LEXIS 39841, at *42-44 (N.D.Cal. June 5, 2006), defendants attacked a price regression model sponsored by plaintiffs' economic expert. They "contend[ed] that the complexity of the DRAM [memory] market, and the diversity of DRAM products and prices present therein, makes common proof of impact impossible." *Id.* at 43. Specifically, defendants argued that variations among the different types of the product and various customer categories utilizing different types of DRAM, and the existence of both negotiated and spot pricing as making a showing of common impact impossible. *Id.* at 43-44. Judge Hamilton rejected these defense arguments noting that plaintiff's expert had presented a "plausible [regression]

methodology to demonstrate that antitrust injury can be proven on a class-wide basis," in certifying a damage class. *Id.* at 45. She found that plaintiff's expert had shown that the violation (there price fixing) set a 'benchmark' price which influenced all pricing. *Id.* Judge Hamilton relied on "a number of price-fixing cases . . . where plaintiffs have alleged that defendants conspired to set an artificially inflated base - or 'benchmark' price - from which all other prices are triggered. *Id. Accord In re Nexium (Esomeprazole) Antitrust Litig.,* 296 F.R.D. 47, 47-58 (D. Mass. 2013) ("The Defendants' focus on the variations in purchase price among the putative class members...does not weaken their assertion of common impact... [A]ntitrust impact occurs the moment the purchaser incurs an overcharge."); *In re Aftermarket Auto. Lighting Prods. Antitrust Litig.,* 276 F.R.D. 364, 369 n.3 (C.D. Cal. 2011) ("Thus, even if there were instances where class members separately negotiated prices on occasion, it would not necessarily preclude class certification"); *In re Flat Glass Antitrust Litig.,* 191 F.R.D. 472, 486 (W.D. Pa. 1999) ("[E]ven though some plaintiffs negotiated prices, if plaintiffs can establish that the base price from which these negotiations occurred was inflated, this would establish at least the fact of damage, even if the extent of the damage by each plaintiff varied."). For these reasons, Dr. MacKie-Mason's formulaic, merits analysis meets the most rigorous common proof standard for demonstration at trial of common class wide antitrust price injury.

Furthermore, this price impact flows directly from the monopolization alleged. *See Comcast,* 133 S. Ct. at 1433–35. Plaintiffs have alleged and demonstrated how News's exclusion of competition has allowed it to obtain and maintain enormous monopoly power which in turn has allowed it to charge monopoly pricing that directly injures the CPGs. Ex. 9 at 88; FAC ¶¶ 134, 136, 141.[11]

---

[11] Further, because News "has acted, or refused to act, on grounds generally applicable to

*Appointment of Firms as Class Counsel.*  The undersigned counsel also request that they be appointed class counsel. Fed. R. Civ. P. 23(c)(1)(B), 23(g)(1).  The court must consider the work counsel has done in identifying or investigating potential claims in the action, counsel's experience in handling potential claims in the actions, counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the present action, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class. *See* Fed. R. Civ. P. 23(g)(1)(C).

The undersigned counsel respectfully submit they meet these criteria.   The firms collectively have devoted thousands of hours and prosecuting the claims since 2010.  Ex. 3 ¶ 16. All firms have deep experience with complex antitrust litigation.  *See generally* Exs. 3, 19-22.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the proposed class be certified pursuant to Fed. R. Civ. P. 23(b)(3) and 23(b)(2) and that undersigned counsel be appointed counsel to the class.

---

the class, thereby making appropriate final injunctive relief, or corresponding declaratory relief, for the class as a whole," Fed. R. Civ. P. 23(b)(2), the injunctive class alleged should be certified as well.  To the extent News maintains monopoly power by its exclusionary conduct, all this conduct should be enjoined.  News has acted on grounds generally applicable to the proposed Class.

25

Dated: August 11, 2014                Respectfully submitted,


By:

MCKOOL SMITH, PC
Lewis T. LeClair (*pro hac vice*)
Tex. Bar No. 12072500
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Telephone: (214) 978-4984
Email: lleclair@mckoolsmith.com

John C. Briody
NY Bar No. 4231270
James H. Smith
NY Bar No. 4610853
One Bryant Park, 47th Floor
New York, NY 10036
(212) 402-9400
Email: jbriody@mckoolsmith.com
         jsmith@mckoolsmith.com

BERRY LAW PLLC
R. Stephen Berry (*pro hac vice*)
D.C. Bar No. 234815
1717 Pennsylvania Ave. NW
Suite 450
Washington, DC 20006
Telephone: (202) 296-3020
Email: sberry@berrylawpllc.com

KELLOGG, HUBER, HANSEN,
TODD, EVANS & FIGEL, P.L.L.C.
Steven F. Benz (*pro hac vice*)
D.C. Bar No. 428026
Justin M. Presant (*pro hac vice*)
Mich. Bar No. P74252
D.C. Bar No. 1013252
1615 M Street, N.W.
Suite 400
Washington, D.C. 20036
Telephone: (202) 326-7900

26

Email: sbenz@khhte.com
      jpresant@khhte.com

PAUL HASTINGS LLP
Daniel B. Goldman
N.Y. Bar No. DG-4503
Samer M. Musallam (*pro hac vice*)
D.C. Bar No. 986077
75 East 55th Street
New York, NY 10022
Telephone:  (212) 318-6024
Email: dangoldman@paulhastings.com
      samermusallam@paulhastings.com

SUSMAN GODFREY L.L.P.
James T. Southwick
Tex. Bar No. 2338531
Richard W. Hess (*pro hac vice*)
Tex. Bar No. 24046070
Ryan V. Caughey (*pro hac vice*)
Tex. Bar No. 24080827
1000 Louisiana
Houston, TX 77002
Telephone: (713) 653-7811
Email: jsouthwick@susmangodfrey.com
      rhess@susmangodfrey.com
      rcaughey@susmangodfrey.com

*Counsel to Plaintiffs*

27

**Certificate of Service**

I, John C. Briody, hereby certify that a redacted copy of the foregoing has been served via this Court's ECF upon counsel for Defendants on August 11, 2014 and an unredacted copy of the foregoing has been served on Defendants' counsel via electronic mail.

John C. Briody