UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| THE DIAL CORPORATION,<br>HENKEL CONSUMER GOODS INC.,<br>H. J. HEINZ COMPANY,<br>H. J. HEINZ COMPANY, L.P.,<br>FOSTER POULTRY FARMS,<br>SMITHFIELD FOODS, INC.<br>HP HOOD LLC,<br>BEF FOODS, INC., and<br>SPECTRUM BRANDS, INC.,<br>Individually and On Behalf of<br>Similarly Situated Companies,<br><br>                Plaintiffs,<br><br>            v.<br><br>NEWS CORPORATION,<br>NEWS AMERICA INC.,<br>NEWS AMERICA MARKETING FSI L.L.C.,<br>and NEWS AMERICA MARKETING IN-<br>STORE SERVICES L.L.C.,<br>                Defendants. | Civil Action No. 13-CV-06802-WHP<br><br>ECF Case |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC  20006-1047
Tel: (202) 223-7300
Fax: (202) 223-7420

1285 Avenue of the Americas
New York, NY  10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

*Counsel for Defendants*

**REDACTED VERSION – UNREDACTED VERSION FILED
UNDER SEAL PURSUANT TO COURT ORDER**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

COMPLAINT ALLEGATIONS ............................................................................... 4

ARGUMENT ......................................................................................................... 5

I.      Plaintiffs' Motion Fails as a Matter of Law Under *Comcast*. ............................ 6

II.     Plaintiffs Fail to Establish Common Proof of Antitrust Injury and Damages
        Because ISP Prices Are Determined by Highly Individualized Factors. ........................ 8

        A.      ISP Prices Vary Greatly Based on a Large Number of Individualized Factors. ...... 9

        B.      Plaintiffs Fail to Establish Classwide Injury By Common
                Proof Because They Fail to Account for the Benefits of
                NAM's Alleged Conduct to Some Class Members. ............................................. 11

        C.      Dr. MacKie-Mason's Regression Fails to Show That Impact Can
                Be Established by Common, Rather than Individualized, Proof. ........................ 15

        D.      Plaintiffs Have Not Shown that Increased Competition in the But-For
                World Would Lead to Lower ISP Prices for Any or All Class Members. ............ 18

III.    Dr. MacKie-Mason's "Benchmark" Model Fails as a Matter of Law. ............................ 19

        A.      Dr. MacKie-Mason's Model Fails to Establish Comparability. ........................... 20

        B.      Dr. MacKie-Mason's Model Fails to Account for Significant
                Differences Between the Benchmark Companies and NAM. ............................. 22

        C.      Dr. MacKie-Mason Improperly Uses Averages in His Benchmark. ................... 23

IV.     Plaintiffs Do Not Satisfy Other Requirements of Rule 23 ................................................. 24

V.      The Proposed Injunctive Relief Class Cannot Be Certified Under Rule 23(b)(2). ............ 25

CONCLUSION ............................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Allied Orthopedic Appliances, Inc.* v. *Tyco Healthcare Grp. L.P.*,
    247 F.R.D. 156 (C.D. Cal. 2007) .................................................................................... passim

*Arden Architectural Specialties, Inc.* v. *Wash Mills Electro Minerals Corp.*,
    2002 WL 31421915 (W.D.N.Y. Sept. 17, 2002) ....................................................................21

*Bell Atl. Corp.* v. *AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ................................................................................................6

*Blades* v. *Monsanto Co.*,
    400 F.3d 562 (8th Cir. 2005) ................................................................................................8

*Blue Cross & Blue Shield United of Wis.* v. *Marshfield Clinic*,
    152 F.3d 588 (7th Cir. 1998) ..............................................................................................22

*Cannon* v. *BP Prods. N. Am., Inc.*,
    No. 3:10-CV-00622, 2013 WL 5514284 (S.D. Tex. Sept. 30, 2013) ....................................23

*Comcast* v. *Behrend*,
    133 S. Ct. 1426 (2013) ........................................................................................... passim

*Cont'l Orthopedic Appliances, Inc.* v. *Health Ins. Plan of Greater N.Y., Inc.*,
    198 F.R.D. 41 (E.D.N.Y. 2000) ............................................................................................5

*In re ConAgra Foods, Inc.*, No. 11-cv-5379 MMM,
    2014 WL 4104405 (C.D. Cal. Aug. 1, 2014) ........................................................................6

*Cordes & Co. Fin. Servs.* v. *A.G. Edwards & Sons*,
    502 F.3d 91 (2d Cir. 2007) ...................................................................................................5

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*,
    No. M 02-1486 (PJH), 2006 WL 1530166 (N.D. Cal. June 5, 2006) ..............................16, 17

*El Aguila Food Prods., Inc.* v. *Gruma Corp.*,
    131 F. App'x 450 (5th Cir. 2005) ........................................................................................21

*In re Elec. Books Antitrust Litig.*,
    No. 11 MD 2293, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014) ....................................16, 17

*Eleven Line, Inc.* v. *N. Tex. State Soccer Ass'n*,
    213 F.3d 198 (5th Cir. 2000) ..............................................................................................24

*Exhaust Unlimited, Inc.* v. *Cintas Corp.*,
    223 F.R.D. 506 (S.D. Ill. 2004) ...........................................................9

*In re Global Crossing, Ltd. Sec. Litig.*,
    471 F. Supp. 2d 338 (S.D.N.Y. 2006)...............................................25

*In re Graphics Processing Units Antitrust Litig.*,
    253 F.R.D. 478 (N.D. Cal. 2008).......................................................16

*Harris Wayside Furniture Co.* v. *Idearc Media Corp.*,
    No. 06-cv-392, 2008 WL 7109357 (D.N.H. Dec. 22, 2008) .....................20, 21, 22

*Home Placement Serv. Inc.* v. *The Providence Journal Co.*,
    819 F.2d 1199 (1st Cir. 1987)............................................................20

*In re Initial Pub. Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).....................................................5, 17, 21

*Kottaras* v. *Whole Foods Mkt., Inc.*,
    281 F.R.D. 16 (D.D.C. 2012)...............................................................9

*Kottler* v. *Deutsche Bank AG*,
    No. 05 Civ. 7773 (PAC), 2010 WL 1221809 (S.D.N.Y. Mar. 29, 2010) ..............25

*In re Live Concert Antitrust Litig.*,
    863 F. Supp. 2d 966 (C.D. Cal. 2012) ...............................................22

*In re NASDAQ Market-Makers Antitrust Litig.*,
    169 F.R.D. 493 (S.D.N.Y. 1996) .......................................................21

*In re Optical Disk Drive Antitrust Litig.*,
    No. 10-md-2143, 2014 WL 4965655 (N.D. Cal. Oct. 3, 2014).....................18

*Picket* v. *Iowa Beef Processors*,
    209 F.3d 1276 (11th Cir. 2003) .......................................................12

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013).....................................................7, 19

*Turnbow* v. *Life Partners, Inc.*,
    Civil Action No. 3:11-cv-1030-M, 2013 WL 3479884 (N.D. Tex. July 9, 2013)..........6

*Wal-Mart Stores, Inc.* v. *Dukes*,
    131 S. Ct. 2541 (2011)........................................................5, 21, 25

**STATUTES**

Fed. R. Civ. P. 23 ............................................................................................................5, 24

**OTHER AUTHORITIES**

Daniel L. Rubinfeld, *Antitrust Damages*, *in* Research Handbook on the Economics
    of Antitrust Law (Einer Elhauge ed., 2012)..............................................................20, 21, 22

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust
    Principles and Their Application (3d ed. 2007) .......................................................20

Herbert H. Hovenkamp, *Economic Experts in Antitrust Cases*, *in* 5 Modern Scientific
    Evidence: The Law and Science of Expert Testimony
    (Dennis L. Faigman, *et al.*, eds., 2013-14) ..............................................................22

## PRELIMINARY STATEMENT

Discovery has confirmed that this action is unsuited for class action treatment.  The putative class members are sophisticated consumer packaged goods ("CPG") firms that buy different in-store promotions ("ISP") products from NAM, at different prices, under individually-negotiated contracts with materially different terms.  Confronted with these facts, plaintiffs responded in two ways: first, by attempting to avoid the Court's consideration of entire categories of conduct alleged in the complaint, ignoring their own allegations that prices were affected by the many different types of alleged conduct that even they now acknowledge cannot possibly be addressed on a classwide basis; and second, by asking their expert to paper over these fundamental differences with a defective regression analysis and "average" profit margin "benchmarks" that do not remotely qualify as reliable under controlling precedent.  Plaintiffs also abandoned any effort to certify an entire class of purchasers of NAM's free-standing insert ("FSI") products, which they alleged in the complaint but do not mention in their moving papers.  These machinations only confirm that the motion for class certification should be denied.

Most fundamentally, plaintiffs do not even purport to show that most of the anticompetitive conduct alleged in the complaint caused classwide antitrust injury, and they fail to show that they have a reliable method for measuring the impact of the one form of conduct that they do claim caused such injury.  The complaint alleges a complex stew of at least nine different forms of conduct that contributed to the alleged injury and claimed overcharges.  But plaintiffs' expert admits that he has done *no analysis* and has *no opinion* on whether the impact of any of the conduct other than NAM's contracts with retailers would be common or individualized.  He further concedes that his "but-for" world and the resulting pricing model is based on the assumption that none of the nine forms of allegedly actionable conduct are present, but his model *cannot distinguish* between the impact of NAM's retailer contracts, which

plaintiffs contend affected the class as a whole, and the impact of any of the other alleged

conduct.  For this reason alone, plaintiffs' motion for class certification should be denied under

the Supreme Court's decision in *Comcast* v. *Behrend*, 133 S. Ct. 1426 (2013).

A related but independent problem is that some forms of conduct alleged in the complaint

(and ignored by plaintiffs' motion) benefit large numbers of class members by providing them

lower prices on ISP products than they would pay if plaintiffs got the relief they are seeking.  For

example, plaintiffs allege that many putative class members received price discounts *on ISP*

*products* of ███████████████████ for buying "bundles" of products from NAM.  Those

price discounts—which plaintiffs and their expert assert would not be offered in the but-for

world—greatly exceed the overcharge that NAM allegedly imposed on *all* members of the class.

Even assuming plaintiffs' theory is to be believed, simple arithmetic shows that purchasers who

lose those discounts in the but-for world would end up paying higher prices for ISP than they

paid in the real world, while other purchasers would pay lower prices.

Other conduct alleged in the complaint also clearly impacts different customers in

different ways.  For example, absent the "long-term, exclusive" contracts with retailers that

plaintiffs attack, NAM would not be able to offer CPG customers the option of purchasing

exclusive rights to multiple ISP products, sometimes in multiple product categories, for multiple

years, as it does today.  While some ISP purchasers may be indifferent to the inability to enter

such contracts, others—who prefer longer-term, exclusive arrangements covering multiple ISP

products and/or product categories—may be left worse off.  Even if one assumes that prices

would be lower for all customers, there is no way to determine on a classwide basis that

customers with a preference for longer-term, exclusive deals would benefit from the relief

plaintiffs are seeking.

Plaintiffs try to avoid judicial scrutiny of the huge disparities in prices, product offerings, and preferences among the putative class members by advancing a theory that assumes that, absent NAM's alleged anticompetitive conduct, *average* ISP prices—paid only by fictional "average" purchasers—would go down.  But the Court is not being asked to certify a class of *average* purchasers, it is being asked to certify a class of *individual* purchasers, each of whom has its own unique preferences for retailer exclusivity or not, single or multiple ISP products, bundled or unbundled products, and single-year or multi-year contracts.  Most of these purchasers pay different prices depending on their bargaining power and other *individualized* factors.  As set forth in the Report of Dr. Jerry Hausman of MIT, the impact of NAM's conduct therefore must be assessed on an individualized basis to determine whether ISP purchasers would be better off, worse off, or unaffected in the absence of the allegedly unlawful conduct.

There are numerous other problems with plaintiffs' request for class certification, discussed in further detail below.  They include fundamental defects in the regression analysis and "benchmark" model that plaintiffs' expert performed to try to establish common proof of antitrust price injury and damages.  The defects in those analyses make them unreliable, and only confirm that class treatment of the claims in this action is impossible.

Finally, given the heterogeneity of this marketplace, it should come as no surprise that the named plaintiffs' claims are not typical.  Current and former named plaintiffs act in ways that directly undercut the allegations of the putative class.  For example, while the putative class alleges it has no choice but to buy ISP products from NAM, in several years BEF Foods and Spectrum Brands bought none of those products—zero.  In addition, the adequacy of proposed class counsel to represent absent class members is called into question by the fact that counsel is currently suing an absent class member (Kraft Foods) over attorneys' fees that Kraft declined to

pay because it was "[u]nconvinced by [counsel]'s evaluation that the claims were meritorious." *See Berry Law PLLC* v. *Kraft Foods Group, Inc.*, No. 1:13-cv-475 (RBW) (D.D.C., filed June 5, 2013) (Doc. 9). The named plaintiffs do not have claims that are typical and properly addressed on a classwide basis; rather, they are simply firms that, unlike Kraft and doubtless others, agreed to join this lawsuit.

## COMPLAINT ALLEGATIONS

The Fourth Amended Complaint ("FAC") alleges that defendants (collectively, "NAM") engaged in at least nine different types of conduct to acquire and maintain a monopoly in markets for third-party ISP and FSI. In the ISP market, NAM allegedly entered into "two sorts of long-term, exclusive contracts": (1) with retailers; and (2) with CPGs. (FAC ¶¶ 8–9, 17.) The FAC further alleges a broader "pattern of Defendants' anticompetitive conduct" in the ISP market (*id.* ¶ 43), including: (3) hacking into a competitor's computers (*id.* ¶¶ 87–89); (4) aggressive enforcement of "shelf exclusivity" (*id.* ¶¶ 92–93); (5) using cash guarantees to derail competitors' contracts (*id.* ¶¶ 94–101); (6) disparaging competitors' compliance rates (*id.* ¶¶ 102–104); (7) defacing competitors' products (*id.* ¶ 105); (8) disparaging competitors' financial viability (*id.* ¶¶ 106–107); and (9) entering into agreements with competitors that reduce competition (*id.* ¶¶ 116–119). The FAC alleges that NAM extended its power from the ISP market into the FSI market by offering substantial discounts on ISP prices to customers who also bought FSI from NAM. (*Id.* ¶¶ 122–133.)[1]

In stark contrast, plaintiffs' motion focuses on just one form of conduct—NAM's purported "long-term," "staggered" exclusive contracts with retailers—which they now claim is the "primary" way in which NAM maintained a monopoly. (Mot. at 9, 12.) Plaintiffs never

---

[1]   While NAM disputes all of these contentions, including as to market definition, we address here only those issues relevant to the Court's class certification analysis.

attempt to show that *any* of the other forms of conduct alleged had a common impact—

presumably because they know they cannot make such a showing.  Plaintiffs also allege in their

complaint that they "are representatives of a class of persons . . . who . . . purchased FSIs" from

NAM (FAC ¶ 48); but they have abandoned any effort to have that class certified.

## ARGUMENT

Plaintiffs must *prove* that their proposed class satisfies all the requirements of Rule 23(a)

and at least one provision of Rule 23(b).  *Comcast*, 133 S. Ct. at 1432; *Wal-Mart Stores, Inc.* v.

*Dukes*, 131 S. Ct. 2541, 2551 (2011).  Here, plaintiffs seek certification under Fed. R. Civ. P.

23(b)(3), which requires proof of both the predominance of common issues and the superiority of

a class action.  A district court's "rigorous analysis" of these prerequisites will "frequently entail

overlap with the merits of the plaintiff's underlying claim."  *Comcast*, 133 S. Ct. at 1432; *see

also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) ("*In re IPO*").

To certify a class in an antitrust case, plaintiffs must prove that all the elements of their

underlying claims "can be proven by common evidence."  *Cont'l Orthopedic Appliances, Inc.* v.

*Health Ins. Plan of Greater N.Y., Inc.*, 198 F.R.D. 41, 44–45 (E.D.N.Y. 2000).  Those elements

include: "(1) a violation of antitrust law; (2) injury and causation; and (3) damages . . . ."  *Cordes

& Co. Fin. Servs.* v. *A.G. Edwards & Sons*, 502 F.3d 91, 105 (2d Cir. 2007) (quotations omitted).

The second element—"antitrust impact"—poses the crucial question of whether common

evidence proves that all class members have been injured by the allegedly illegal activity.  *Id.* at

106 (citing *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  "[C]lass

certification is precluded where plaintiffs have not shown that the fact of injury element can be

proven for all class members with common evidence."  *Allied Orthopedic Appliances, Inc.* v.

*Tyco Healthcare Grp. L.P.*, 247 F.R.D. 156, 165 (C.D. Cal. 2007).  The third element requires

plaintiffs to demonstrate that the quantum of damages can be shown by common proof. *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 306–07 (5th Cir. 2003).

## I.  <u>Plaintiffs' Motion Fails as a Matter of Law Under *Comcast.*</u>

Plaintiffs rely on the report of Dr. MacKie-Mason to try to establish that antitrust injury and the quantum of damages can be shown with common proof (Mot. at 19–23), but his proposed model fails as a matter of law under the Supreme Court's *Comcast* decision.

*Comcast* involved a monopolization claim brought by a putative class of cable subscribers.  Plaintiffs asserted four theories of "antitrust impact."  The district court found that three of the four theories did not have a sufficiently common impact to qualify for class treatment, but certified the class on a fourth theory.  133 S. Ct. at 1430–31.  Comcast argued that class certification was improper because the plaintiffs' expert proposed a model that assumed the illegality of all four theories and failed to disaggregate damages resulting from the only theory that plaintiffs had shown could be proven on a classwide basis.  *Id.* at 1431.  The Supreme Court held that Rule 23(b)(3) cannot be satisfied with a model that "calculates supra-competitive prices regardless of the type of anticompetitive conduct."  *Id.*  Rather, plaintiffs must be able "to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to" anticompetitive conduct shown to have a classwide impact.  *Id.* at 1435.  "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)."  *Id.* at 1433.[2]

---

[2]    In the wake of *Comcast*, courts in a variety of contexts have denied certification where plaintiffs fail to offer a reliable model for tracing classwide injury and damages to the particular theory of liability being pursued by the putative class.  *See, e.g.*, *In re ConAgra Foods*, Inc., No. 11-cv-5379 MMM, 2014 WL 4104405, at *31 (C.D. Cal. Aug. 1, 2014) (denying certification in deceptive marketing action where plaintiffs' expert failed to "isolate the price premium associated with misleading consumers in th[e] particular fashion" alleged to have affected the class); *Turnbow* v. *Life Partners, Inc.*, No. 3:11-cv-1030-M, 2013 WL 3479884, at *17 (N.D. Tex. July 9, 2013) (denying certification in contract action where

Dr. MacKie-Mason's "benchmark" model—by which he attempts to measure the antitrust impact of NAM's alleged conduct on the class—fails for the same reasons as the expert's model in *Comcast*. Plaintiffs' complaint alleges that NAM engaged in nine different exclusionary strategies to acquire or maintain monopoly power. *See supra* at 4. Dr. MacKie-Mason's model expressly assumes that in a but-for world of competitive pricing, *none* of those nine forms of conduct would exist. (Ex. 2, MacKie-Mason Tr. ("MM Tr.") 158:3–159:4; 171:2–4.)[3] Yet, plaintiffs and Dr. MacKie-Mason have not even tried to show that much of the alleged conduct had a common, classwide impact. Rather, they only purport to show that *one* of NAM's alleged actions had such an impact—NAM's contracts with retailers. (*See* MM Rpt. at 72–79; *see also* Mot. at 9–13, 16.) With respect to the *other* conduct alleged—including disparagement, defacing competitors' advertisements, and entering into "long-term, exclusive" contracts with CPGs—Dr. MacKie-Mason admits that he did *no analysis* and has *no opinion* about whether their impact was common or individualized. (Ex. 2, MM Tr. 14:11–25; 157:2–12; 13:17–14:6.)

Critically, Dr. MacKie-Mason also admits that his econometric model *cannot distinguish* the impact of NAM's retailer contracts from the impact of NAM's other alleged conduct. (*Id.* at 176:11–23, 170:10–171:4.) In his report, he calls that alleged overcharge calculation—which, as noted above, assumes the absence of *all* the anticompetitive conduct alleged in the complaint— "a calculation of class-wide antitrust price injury." (MM Rpt. at 79.) But at his deposition he admitted that his model "can't sort out" how much of the supposed overcharge was due to

---

"Plaintiffs' proposed damages model does not measure damages resulting from the particular injury on which Plaintiffs' liability action is premised"). *See also In re Rail Freight Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("Predicating class certification on a model divorced from the plaintiffs' theory of liability . . . indicates a failure to conduct the rigorous analysis demanded by Rule 23.").

[3]   Citations in the form of "Ex. __" refer to exhibits to the Declaration of William B. Michael, dated October 10, 2014. Citations in the form of "MM Rpt." refer to the expert report of Dr. Jeffrey MacKie-Mason, which is attached as Exhibit 9 to the Declaration of John C. Briody in Support of Plaintiffs' Motion for Class Certification. (Doc. 143.)

conduct that allegedly had a common impact and how much was due to conduct that did not. (Ex. 2, MM Tr. 175:25–176:23; *see also* Ex. 1, Expert Report of Jerry Hausman ¶¶ 197–200.)

Under *Comcast*, such a model—which "can't sort out" impact alleged to be common from impact that is not—fails to satisfy Rule 23(b)(3). Just like the plaintiffs' expert in *Comcast*, Dr. MacKie-Mason's model for measuring the difference between actual prices and but-for prices assumes the validity of all of the theories of antitrust liability that plaintiffs have alleged. *See* 133 S. Ct. at 1434. Just like the plaintiffs in *Comcast*, plaintiffs here cannot demonstrate that all such theories can be proven on a classwide basis through common evidence; indeed, these plaintiffs have not even tried to show that they can. *See id.* at 1431, 1434. Just like the model rejected in *Comcast*, Dr. MacKie-Mason's model cannot disaggregate or distinguish injuries attributable to the one theory that plaintiffs say is appropriate for class treatment from the impact of all the others that are not. *See id.* at 1434–35. Dr. MacKie-Mason's model therefore is unable "to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable" to the one theory of antitrust liability that plaintiffs assert is common to the class. *Id.* at 1435. Accordingly, just like in *Comcast*, class certification under Rule 23(b)(3) should be denied. *Id.* at 1433, 1435.

## II.    Plaintiffs Fail to Establish Common Proof of Antitrust Injury and Damages Because ISP Prices Are Determined by Highly Individualized Factors.

Plaintiffs' failure to identify or account for the impacts of the various forms of business conduct alleged in the complaint leads to another, independent basis to deny class certification: plaintiffs cannot establish by common proof that all class members suffered antitrust injury because ISP prices are determined by highly individualized factors, and because several forms of conduct attacked in the complaint—including NAM's alleged "long-term, exclusive" retailer contracts—provide *benefits* to individual class members. *See, e.g.*, *Blades* v. *Monsanto Co.*, 400

F.3d 562, 574 (8th Cir. 2005) (finding that individual issues predominated "because of the variety of [products] and the varying factors affecting list prices").[4]  Plaintiffs do not even purport to account for these benefits or to show that they can be balanced on a classwide basis against the antitrust injuries that plaintiffs allege.

**A.  ISP Prices Vary Greatly Based on a Large Number of Individualized Factors.**

In prior litigation (when he was not a paid class certification expert), Dr. MacKie-Mason testified ██████████████████████████████████████████████████

████████████████ (Ex. 3, Defs.' Ex. 221, at 152:1–7.) ██████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ (*Id*. at 37:3–13.)

Dr. MacKie-Mason was correct that ISP prices must be assessed product by product and customer by customer.  NAM offers at least twelve ISP products, each with substantially different prices, for placement in a network of some or all of approximately 52,000 retail stores in different geographic regions across the country.  (Ex. 1 ¶¶ 25–29.)  Some CPGs buy ISP under a contract with NAM; others buy in one-off installments.  Some contracts set prices for ISP; others do not.  During the damages period, NAM entered into contracts with hundreds of different customers.  (*See id.* ¶ 27 & n.14.)  These contracts have different terms, different pricing, and different durations.  Some are with customers like Procter & Gamble, enormous companies with substantial buying power and negotiating leverage, while others are with small

---

[4]   *See also Kottaras* v. *Whole Foods Market, Inc.*, 281 F.R.D. 16, 25 (D.D.C. 2012) ("Since benefits must be offset against losses, it is clear that widespread injury to the class simply cannot be proven through common evidence."); *Exhaust Unlimited, Inc.* v. *Cintas Corp.*, 223 F.R.D. 506, 513–14 (S.D. Ill. 2004) ("With customers so diverse and dispersed, and with prices established in decentralized negotiations, [] individualized inquiries would be especially necessary . . . ," particularly where "customers who received compensating discounts or offsets, such as for ordering in bulk, likely benefitted or were not affected by [the alleged conduct].").

businesses like Milo's Tea Company.  After contract prices are negotiated, class members

sometimes negotiate further discounts from NAM below contractual rates.  (*Id.* ¶¶ 29, 34–35 &

n.34, 80-81, 121.)[5]  In addition, NAM's ISP products are often—but not always—sold at a price

discount when purchased together with NAM's FSI products, as plaintiffs themselves allege.

(FAC ¶ 127; *see also* Ex. 1 ¶¶ 45, 59, 62, 66, 69, 73, 76, 81, 123–133 & Ex. 18.)[6]

CPGs make individual purchasing decisions at the brand level.  They buy different ISP

products for different branded products—from Tide detergent to frozen mashed potatoes—at

different times and different prices.  And one CPG may own hundreds of different brands.  Each

brand has its own competitors, its own marketing strategy, and its own particular marketing goals

which may vary over time.  (Ex. 1 ¶¶ 82–86, 116-117.)  Some CPGs and brands value using the

entirety of NAM's nationwide network,[7] while others place ISP only in retailers in a particular

geographic region.[8]  Some brands value category exclusivity so that their ISP product promotion

is the only one in a particular product category (frozen turkey) at a particular store (Kroger) at a

particular time (just before Thanksgiving)—while others do not.[9]  According to plaintiffs, some

of NAM's ISP products faced competition during the damages period that constrained NAM's

pricing power, while other products allegedly did not.  (Ex. 2, MM Tr. 295:4–296:11.)

---

[5]   For example, BEF Foods negotiated additional 50% discounts for space rates on coupon
     machines on multiple occasions.  (*See, e.g.*, Ex. 4, BEF00000027.)  HP Hood, by contrast,
     generally paid contractual space rates.  (*See, e.g.*, Ex. 5, HOOD0119879.) (*See* Ex. 1 ¶ 34.)
[6]   Dr. MacKie-Mason conceded that these discounts are on the ISP price, and not the price of
     the entire bundle.  (*See* Ex. 2, MM Tr. 194:22–197:16.)
[7]   (*See, e.g.*, Ex. 6, Findlay Tr. 189:9–189:15 (Heinz); Ex. 7, Welch Tr. 312:15–314:13 (Dial).)
[8]   (*See, e.g.*, Ex. 8, Gilreath Tr. 106:07–106:21 ("The key retailers for the Hood brand would
     typically be in New England"); Ex. 9, NAM-CPG-008206320 ("We're particularly interested
     in west coast stores.").)
[9]   While Dr. MacKie-Mason suggests that all CPGs value category exclusivity (Ex. 2, MM Tr.
     98:21–99:2), a senior marketing manager at H.P. Hood testified that H.P. Hood was
     indifferent to it.  (*See* Ex. 10, Maguire Tr. 28:24–30:02.)  And H.J. Heinz's corporate
     designee testified that the value of exclusivity varies by brand depending on the
     competitiveness of the category.  (*See* Ex. 6, Findlay Tr. 127:17–128:09; 182:10–21.)

As a result of these factors and others, different CPGs pay different prices even for the same products.  The median price for NAM's ISP coupon machine in 2013, for example, was ███, but some CPGs paid less than ███████████████, while others paid more than ████████████████.  (Ex. 1 ¶ 35 & Exs. 5–6.)

Dr. Hausman's statistical analysis confirms that differences among CPGs in terms of their product preferences, the geographic areas in which they promote their products, and other factors are not mere variations within a common pricing structure, as plaintiffs contend (Mot. at 15–16, 22).  Rather, the effect of these different factors on NAM's ISP prices varies from CPG to CPG, making individualized analysis essential to determine the impact of NAM's conduct on putative class members.  (*See* Ex. 1 ¶¶ 78–86, 109–111, 117–122, 164–167, 170–190.)

**B.     Plaintiffs Fail to Establish Classwide Injury by Common Proof Because They Fail to Account for the Benefits of NAM's Alleged Conduct to Some Class Members.**

Numerous specific differences among putative class members confirm the need to use individualized evidence to determine whether particular class members would be better off in the but-for world—especially because some of NAM's alleged anticompetitive conduct clearly *benefited* certain members of the putative class, an issue plaintiffs and their expert fail to address.

1.     Class Members Who Received Price Discounts on ISP
in the Real World May Be Worse Off in the But-For World.

Dr. MacKie-Mason asserts that class members may pay approximately ███ less for ISP in the but-for world.  Even assuming he is correct about a ███ overcharge, his analysis ignores the fact that many CPGs received discounts on ISP in excess of ███ in the real world—which they would lose in the but-for world.  Individualized proof is therefore necessary to assess whether each class member would be better or worse off due to the loss of such discounts.

The FAC alleges that NAM offered steep ISP price discounts when ISP buyers also purchased FSI from NAM.  (FAC ¶¶ 122–126.)  It cites examples of discounts on ISP ranging

from ████████ (*Id.* ¶ 127; *see also* MM Rpt. at 54–57.)  Dr. Hausman and Dr. MacKie-Mason agree that in the but-for world such discounts would not exist.  (Ex. 1 ¶ 123; Ex. 2, MM Tr. 179:16–180:18.)[10]  Arithmetic says that class members who received ISP price discounts in the real world in excess of the alleged ████ overcharge would be worse off in the but-for world when both the alleged overcharge and the discounts disappeared.  (Ex. 1 ¶¶ 123–127.)

This is no small issue.  About ████████ of NAM's ISP sales are to customers that also purchase FSI from NAM.  Almost ████ of NAM customers received ISP discounts in the actual world that were greater than the alleged ████ percent overcharge.  (*Id.* ¶¶ 132–133 & Ex. 19.)  If the alleged overcharge were shown to be less than ████—and, indeed, Dr. MacKie-Mason's own calculations indicate that in certain years the alleged overcharge may be far lower than ████, even as low as ████ in 2013—then many more class members would have received discounts greater than the overcharge, and would be harmed by the loss of such discounts.  (Ex. 1 ¶ 133; *see also* MM Rpt. Ex. 55.)  Thus, individualized assessment is needed because even if NAM's alleged conduct "foreclosed competitors and resulted in higher *average* price in the actual world, many individual class members may have benefited from discounts and deals . . . that would be *unavailable to them in the but-for world*."  *Allied*, 247 F.R.D. at 168–69.

---

[10]   Indeed, plaintiffs demand that NAM be enjoined from offering so-called predatory price discounts on ISP when a customer also buys FSI.  (FAC ¶¶ 178–184.)  This demand also shows that the class representatives cannot adequately represent the interests of the class as a whole.  They seek to enjoin a practice that *benefits* a significant portion of the proposed class and which many absent class members not only willingly accept but actively seek.  *See Picket* v. *Iowa Beef Processors*, 209 F.3d 1276, 1280–81 (11th Cir. 2000) ("Plaintiffs could not possibly provide adequate representation to a class that includes those producers who willingly entered into forward contracts . . . as well as those who complain of and claim harm from the practice.").  "No circuit approves of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class, let alone where some *named* plaintiffs derive such a benefit."  *Allied*, 247 F.R.D. at 177.

2.   Class Members Would Be Purchasing Different ISP Products
With Different Value Propositions in the But-For World.

Even if ISP prices were to decrease in the but-for world as Dr. MacKie-Mason posits, individual inquiries would be necessary to assess injury because plaintiffs' theory implies that, in such a world, NAM (and other third-party ISP providers) would be offering very different products.  For example, Dr. MacKie-Mason posits that in the but-for world ISP providers (including NAM) would enter into "annual" contracts, limited to certain "real estate" within each retailer.  (MM Rpt. at 71.)  These limitations on NAM's contracting would place corresponding limitations on the products it could offer.  If NAM could not contract with retailers for longer than a year, class members could no longer reserve ISP placements more than a year in advance.  (Ex. 1 ¶ 137.)  If "real estate" were divided, class members who wanted to buy ISP in several sections of the store (deli, frozen food, etc.) or different tactics (shelf edges, carts, etc.) would have to do business with several providers, increasing transaction costs and potentially frustrating their ability to reserve different placements at the same time.  (*Id.* ¶¶ 134–150.)

For some CPGs, these disadvantages may be outweighed by any lower prices.  For others, a reduction in prices may not compensate for the loss of product attributes they value and are willing to pay for.  (*See id.* ¶ 134.)  Discovery has confirmed, for example, that CPGs often compete to reserve ISP space more than a year in advance.[11]   And many CPGs purchase "category buyouts" that provide exclusivity across multiple ISP products in multiple product categories for multiple years, a combination NAM would not be able to offer in the but-for world. ████████████████████████████████████████████████

████████████████████████████████████████████████

---

[11]   (*E.g.*, Ex. 11, HOOD0143177 (explaining that HP Hood could not place ShelfTalk or coupon machines for coffee creamers at Kroger for the next 18 months because "a competitor made a large upfront purchase of the Shelftalk and Coupon Machine through the end of 2014.  The coffee creamer category is particularly competitive in-store."); *see also* Ex. 1 at Ex. 3.)

██████ (*See* Ex. 12, NAM-CPG 011958910; Ex. 1 ¶¶ 148–150.)  Dr. MacKie-Mason even admitted: "[I]n the but-for world, there might be somewhat different product configurations that are available, some of those might be more or less preferred product configurations, *some might be better for* ██████, *some might be worse.*"  (Ex. 2, MM Tr. at 271:9–13 (emphasis added).)

Dr. MacKie-Mason further admits that if enough CPGs like ██████ are willing to pay for category buyouts, then the limitations on category exclusivity in the proposed but-for world might disappear due to market demand.  (Ex. 2, MM. Tr. at 277:22-25.)  This just confirms that plaintiffs have failed to tie their theory of impact to their theory of liability.  *Cf. Comcast*, 133 S. Ct. at 1433, 1435.  If plaintiffs concede that, in the but-for world, CPGs could still purchase exclusive category buyouts across tactics for multiple years from a single supplier, then they cannot also claim that NAM's alleged long-term, exclusive contracts with retailers—which make such category buyouts possible—should be held unlawful.

3. If Retailer Purchasers of ISP Are in the Class, Individualized Proof Is Required Because Retailers May Be Worse Off in the But-For World.

Plaintiffs' class definition, on its face, includes all "persons" that directly purchased ISP from NAM.  (Doc. 141.)  That includes not only CPGs, but also retailers who purchase millions of dollars of ISP per year to promote their private-label products.  (Ex. 1 ¶¶ 36, 122 & Exs. 7, 17.)  Common evidence cannot show injury to CPGs and retailers alike because in the but-for world, retailers would give up numerous unique benefits, including multi-year contracts with NAM and the ability to contract with a single ISP provider.  (*Id.* ¶ 122; Ex. 13 ¶¶ 5–6; Ex. 14 ¶¶ 7–8.)  *See Allied*, 247 F.R.D. at 168–69.[12]

---

[12] Without explanation, Dr. MacKie-Mason includes only CPG ISP purchases in his regression, and excludes retailer purchases.  (MM Rpt. at 77 n.272; Ex. 2, MM Tr. 56:16–25.)  Thus, his regression does not even purport to show that common factors predominantly determine ISP prices across the entire class as it is defined in the complaint and in plaintiffs' motion.

**C.    Dr. MacKie-Mason's Regression Fails to Show That Impact Can Be Established by Common, Rather than Individualized, Proof.**

Plaintiffs' only proposed answer to the abundant evidence of individualized pricing is that Dr. MacKie-Mason performed a regression analysis that purports to show that most of the variability in NAM's prices can be explained by "common factors."  (MM. Rpt. at 75.)  Plaintiffs argue that it is therefore "economically reasonable to posit" that in the absence of the alleged anticompetitive conduct *all* of NAM's prices "would have shifted downward."  (Mot. at 22.)  The problem is that this is demonstrably wrong.

First, Dr. MacKie-Mason's regression analysis does not even purport to address the issue before the Court, namely, whether *NAM's allegedly illegal conduct* had a common impact on ISP prices.  (Ex. 2, MM Tr. 112:17–25, 113:8–18.)  Dr. MacKie-Mason's regression does not and cannot answer that question because it does not test whether the alleged conduct resulted in higher prices for all class members, or whether increased competition in the but-for world would result in lower prices for all class members.  (*See* Ex. 1 ¶¶ 18–24, 168–190, 199.)  Nor does his regression account for the loss of ISP price discounts and other benefits of NAM's alleged conduct or test whether such losses would be common or individualized.  Rather, his regression only purports to address whether differences in NAM's ISP prices can be explained by common factors *other* than the alleged illegal conduct, without examining whether the impact of that conduct on prices was common or individualized.  (MM Rpt. at 75.)  This defect alone is fatal.

Second, the regression itself is so flawed that it does not even accomplish its limited (and largely irrelevant) goal.  By comparing NAM pricing data to a set of purportedly "common" variables (*id.* at 75–79), Dr. MacKie-Mason concludes that most (72%) of the variation in NAM's pricing is explained by common factors (*id.* at 79).  But that conclusion is meaningless because the regression does not include any variable designed to test whether customer-specific

15

factors—such as differences in bargaining power—*also* play a role in determining pricing.  (*Id.* at Ex. 46.)  The failure to include such an obvious and essential variable completely undermines the reliability of the outcome.  (Ex. 1 ¶¶ 170–177); *In re Graphics Processing Units Antitrust Litig.,* 253 F.R.D. 478, 496 (N.D. Cal. 2008) ("Without incorporating such variables, it is impossible to account for the diversity in products and purchasers here.").

Tacitly acknowledging the weakness in this approach, Dr. MacKie-Mason runs another regression, in which he adds a variable purportedly to account for customer-specific differences (which he terms "client fixed effects").  Dr. MacKie Mason admits that such differences have a "statistically significant" effect on prices.  (Ex. 2, MM Tr. 144:4–7.)  But he never ran a test to determine *how much* of an effect, or to find out whether customer-specific factors outweigh common factors in determining ISP prices.  (*Id.* at 145:25–146:12.)  When Dr. Hausman performs the test that Dr. MacKie-Mason failed to do, he shows that individualized factors are *at least* as important as common factors.  (Ex. 1 ¶¶ 175–177.)  Thus, for plaintiffs to "posit" that all ISP prices would have shifted downward but for NAM's alleged conduct is not only speculative but contrary to all the evidence, which indicates that NAM's pricing is highly individualized.[13]

Plaintiffs try to compare Dr. MacKie-Mason's regression analysis to expert analyses presented in two other cases, *In re Electronic Books Antitrust Litigation*, No. 11 MD 2293, 2014 WL 1282293 (S.D.N.Y. Mar. 28, 2014), and *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M 02-1486 (PJH), 2006 WL 1530166 (N.D. Cal. June 5, 2006).  Those cases are completely inapposite.  To begin with, both cases involved alleged price fixing, a per se violation.  By contrast, plaintiffs here have alleged an array of different conduct, none of which is per se illegal and all of which requires a balancing of pro-competitive benefits and anti-

---

[13]   Dr. Hausman's regression analysis shows that even "common" factors that Dr. MacKie-Mason purports to identify affect different CPGs' prices differently.  (Ex. 1 ¶¶ 175–190.)

competitive effects to determine the impact, if any, on customers.  That difference is particularly important at class certification because "an illegal price fixing agreement that directly inflates prices is far more persuasive to show that injury can be proven on a classwide basis, than an alleged array of anti-competitive conduct having an *indirect effect* on, among other things, the general price level of the products at issue."  *Allied*, 247 F.R.D. at 166 (quotation omitted).

Moreover, in *DRAM*, the court refused to consider objections to plaintiffs' expert's analysis because it determined as a matter of law that it could not "weigh in on the merits of plaintiffs' substantive arguments, and must avoid engaging in a battle of expert testimony." 2006 WL 1530166 at *9.  That was not the law in this Circuit at the time *DRAM* was decided. *See In re IPO*, 471 F.3d at 42.  Today, after *Comcast*, it is not the law in any federal court.

In *Electronic Books*, the plaintiffs' expert, Dr. Noll, presented a regression analysis that is nothing like Dr. MacKie-Mason's regression.  Dr. Noll's damages model compared the prices *before* the alleged conspiracy to fix prices of e-books with the prices *after*.  *See* 2014 WL 1282293, at *9.  Dr. MacKie-Mason, by contrast, compared NAM's ISP margins to a benchmark consisting of the average margin earned by companies that make completely different products from NAM.  "Noll controlled for a host of other factors that might influence an e-book's price" by running a regression "to separate out these effects" from the effect of the alleged conspiracy. *Id.* at *9, 31.  Dr. MacKie-Mason did *nothing* to control for the "host of other factors" that might account for the difference in margins that he uses to calculate damages, and his regression does not even purport to measure the effect of the alleged anticompetitive conduct, let alone disentangle it from other factors influencing prices.  (*See infra* at 19-24.)  Based on differences in pricing identified, Noll "divid[ed] the e-books purchased by the putative class into 502 categories and calculat[ed] the effect of collusion on each category."  *Id.*  Dr. MacKie-Mason assumes that

the *same* overcharge percentage can be applied to *all* NAM ISP customers, notwithstanding vast

differences in their purchasing patterns.  (Ex. 2, MM Tr. 289:22–293:11; Ex. 1 ¶¶ 215-218.)

**D.**   **Plaintiffs Have Not Shown that Increased Competition in the But-For**
        **World Would Lead to Lower ISP Prices for Any or All Class Members.**

Even if Dr. MacKie-Mason's regression could show that common factors explain the

differences in NAM's ISP pricing, his regression does not even purport to show that increased

competition among ISP providers will lead to lower prices for all CPGs.  Instead he just *assumes*

that conclusion.  (*See* Ex. 2, MM Tr. 242:13–243:23; Ex. 1 ¶ 178.)  *See In re Optical Disk Drive*

*Antitrust Litig.*, No. 10-md-2143, 2014 WL 4965655, at *9 (N.D. Cal. Oct. 3, 2014) (denying

certification where plaintiffs' expert's regression "makes no attempt to establish, but instead

simply assumes, class-wide impact").  While such an assumption might be appropriate in a per se

price fixing case, it is not valid given the dynamics of the ISP marketplace, where prices are

determined by a complex interaction of factors.  (*See* Ex. 1 ¶¶ 13, 34–35, 107–108, 178–190.)

Initially, Dr. MacKie-Mason fails to account for the fact that NAM operates in a two-

sided network industry.  (*See id.* ¶¶ 95–111 & nn.141–44.)  NAM not only sells ISP to class

members (on one side of the industry), it also buys space from retailers (on the other side).  So,

assuming (as plaintiffs do) that more ISP providers entered the market in the but-for world, the

increased competition among ISP providers to acquire retail space may cause their cost to

acquire that space to increase as they bid against each other.  (*Id.* ¶ 107.)  Those higher costs may

be passed through to CPGs in the form of higher—not lower—prices for ISP.  (*Id.*)

In this context, plaintiffs must *prove*, rather than assume, the effect of increased

competition.  They do not even attempt to do so.  Dr. MacKie-Mason admitted that he "ha[d]n't

given . . . a lot of thought" to whether NAM operated in a two-sided market.  (Ex. 2, MM Tr.

226:5–8.)  His only support for the assumption that competition would lower prices to all CPGs

18

is that, after NAM acquired Floorgraphics in 2009, prices for NAM's Floortalk product began to increase.  (MM Rpt. at 73.)  But his claim is based on faulty data that double-counted category rights reservations.  (Ex. 1 ¶ 154 & n.188; *see* Ex. 2, MM Tr. 259:3–7.)  Fixing the error, Dr. Hausman confirms no statistically significant price increase after NAM's acquisition of Floorgraphics.  (Ex. 1 ¶ 155 & Ex. 22.)

Dr. Hausman also explains that the effects of increased competition in the but-for world would vary from CPG to CPG.  (*Id.* ¶¶ 109–122, 166.)  Where several ISP providers construct different networks of retailers, their retailers will not overlap.  CPGs that view different retailers (or ISP products) as substitutes may be better off, while CPGs that do not may be worse off.  (*Id.* ¶¶ 120-121.)  Only an individualized analysis can distinguish between them.

### III.   Dr. MacKie-Mason's "Benchmark" Model Fails as a Matter of Law.

Plaintiffs' effort to show that common issues predominate over individual ones fails for another independent reason.  Plaintiffs rely on Dr. MacKie-Mason's "benchmark" model *both* as common proof of antitrust price injury to class members *and* as a method to quantify the amount of damages each class member has suffered.  Dr. MacKie-Mason's model compares NAM's actual profitability to the "profitability of other firms as a yardstick to estimate a benchmark for the profit margin [NAM] would have earned in the but-for world."  (MM Rpt. at 79.)  He says NAM's real world profit margin exceeds the average ███ profitability of the benchmark firms and that all of the excess is a measure of NAM's profits attributable to anticompetitive conduct.

As explained below, this "benchmark" model is defective as a matter of law for three fundamental reasons.  Where, as here, plaintiffs rely on an expert's model for proof of classwide injury and the model cannot withstand scrutiny, "that is not just a merits issue. . . .  *No damages model, no predominance, no class certification.*"  *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) (emphasis added).

A.      **Dr. MacKie-Mason's Model Fails to Establish Comparability.**

"The central idea behind the yardstick approach is to find a firm that is comparable in all important respects" to the firm to which it is compared.  Areeda & Hovenkamp, Antitrust Law ¶ 392f (3d ed. 2007); *see also Home Placement Serv. Inc.* v. *The Providence Journal Co.*, 819 F.2d 1199, 1206 (1st Cir. 1987) ("Central to this so-called 'yardstick' approach to proving antitrust damages is the requirement the plaintiff identify a sufficiently comparable firm (the 'yardstick') against which it can measure its quantum of damages.").  The "burden of proving comparability lies entirely with the plaintiff."  *Harris Wayside Furniture Co.* v. *Idearc Media Corp.*, No. 06-cv-392, 2008 WL 7109357, at *2 (D.N.H. Dec. 22, 2008).

Dr. MacKie-Mason has not even tried to demonstrate that his benchmark firms are comparable to NAM in any of the ways that courts have held are important, including "product, firm, and market comparability."  *Home Placement*, 819 F.2d at 1206; *see also Harris Wayside*, 2008 WL 7109357, at *2.[14]  Dr. MacKie-Mason admits that he performed *no analysis* to try to determine whether his proposed benchmark companies were similar to NAM, or to each other, in *any* of these significant respects.  (Ex. 2, MM Tr. 37:22–38:10, 38:15–21, 44:23–47:2, 49:23–50:11.)[15]  Moreover, Dr. MacKie-Mason's analysis does not even purport to show that the three

---

[14]   Though a "yardstick can come from a different but related product market" to the one allegedly affected by the defendant's antitrust violation, "[i]deally, the comparable market product should reflect the <u>same</u> degree of competition, the <u>same</u> costs, and the <u>same</u> demand conditions that would have prevailed in the market at issue had there been no wrongful behavior."  Daniel L. Rubinfeld, *Antitrust Damages*, *in* Research Handbook on the Economics of Antitrust Law 380 (Einer Elhauge ed., 2012) (emphasis added).

[15]   Dr. MacKie-Mason proffered five "alternative" benchmarks that he used to "evaluate the sensitivity" of the criteria used in selecting his primary benchmark.  (MM Rpt. at 85.)  None cures the flaws in his methodology.  Four of the five alternative benchmarks merely present different accounting methodologies to derive his purported control on capital intensity.  (*Id.* at 85–87.)  The last alternative benchmark consists of firms identified as offering products "similar" to NAM by the computer database used by Dr. MacKie-Mason.  (*Id.* at 87.)  Yet Dr. MacKie-Mason did no independent analysis of these firms and thus could not explain

factors he did consider in constructing his benchmark—size, growth rate, and capital intensity (MM Rpt. at 82)—can reliably predict a firm's profitability.  (*See* Ex. 2, MM Tr. 24:4–25:7, 62:8–63:19.)  Dr. Hausman's analysis demonstrates that they cannot.  (*See* Ex. 1 ¶¶ 197–214.)

Tellingly, plaintiffs assert that Dr. MacKie-Mason showed that the benchmark firms are similar to NAM in terms of "the competitiveness of their market [*sic*] (and whether it is likely to be similar to the 'but for' in-store relevant market)."  (Mot. at 21.)  But that is false.  Dr. MacKie-Mason did no analysis to ascertain the competitiveness of any of the benchmark markets—even though he admitted this is among the "most important" factors in determining profitability.  (Ex. 2, MM Tr. 44:23–46:2; 50:24–51:8.)  *Cf.* Rubinfeld, *supra*, at 380.

In place of a comparability analysis, Dr. MacKie-Mason *assumed* that the benchmark firms would be "representative of the supply and demand conditions in U.S. publicly traded industries."  (Ex. 2, MM Tr. 46:19-20; *see id.* 72:2–73:11.)  He further *assumed* that, in the but-for world, NAM's margins would resemble the average margins of the benchmark firms.  (*Id.* 73:22–74:23.)  Courts routinely reject such models, which merely assume comparability of the benchmark, as insufficient.  *See, e.g.*, *El Aguila Food Prods., Inc.* v. *Gruma Corp.*, 131 F. App'x 450 (5th Cir. 2005); *Harris Wayside*, 2008 WL 7109357, at *2–3.[16]

---

how the group of them —which includes Worldwide Wrestling Entertainment—bears any actual similarity to NAM's business. (Ex. 2, MM Tr. 39:9–44:22.)

[16]  None of the "yardstick" cases that plaintiffs cite supports the idea that comparability can be established based on only the three criteria Dr. MacKie-Mason considers in his report.  (*Cf.* Mot. at 20–21.)  Plaintiffs' reliance on *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. 493 (S.D.N.Y. 1996) and *Arden Architectural Specialties, Inc.* v. *Wash Mills Electro Minerals Corp.*, 2002 WL 31421915 (W.D.N.Y. Sept. 17, 2002) is misplaced, because both cases rely on outdated Rule 23 standards.  *In re NASDAQ* held that it was "sufficient to note at this stage that there are methodologies available" to determine impact, without considering the reliability or application of those methodologies.  169 F.R.D. at 522.  In *Arden Architectural*, the court believed that it was forbidden from "weigh[ing] conflicting expert evidence" at the class certification stage.  2002 WL 31421915, at *10 (quotation omitted).  The Supreme Court and the Second Circuit subsequently have rejected such standards.  *See Comcast*, 133 S. Ct. at 1433; *Wal-Mart*, 131 S. Ct. at 2553–55; *In re IPO*, 471 F.3d at 42.

**B.     Dr. MacKie-Mason's Model Fails to Account for Significant
          Differences Between the Benchmark Companies and NAM.**

Dr. MacKie-Mason's model also fails to control for differences—having nothing to do

with NAM's alleged anticompetitive conduct—that could explain the difference in margins that

he observes.  (*See generally* Ex. 1 ¶¶ 197–214.)  "Statistical studies that fail to correct for salient

factors, not attributable to the defendant's misconduct, that may have caused the harm of which

the plaintiff is complaining do not provide a rational basis for judgment."  *Blue Cross & Blue*

*Shield United of Wisconsin* v. *Marshfield Clinic*, 152 F.3d 588, 593 (7th Cir. 1998); *see also In*

*re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 976 (C.D. Cal. 2012) (failure to account for

a "major factor" that may explain the disparity between prices in a yardstick comparison renders

the "analysis so incomplete as to be inadmissible as irrelevant") (quotation omitted).

Among the many "salient factors" that Dr. MacKie-Mason's model ignores are:

- **Different Products.**  The firms in Dr. MacKie-Mason's benchmark are completely
  different from NAM, as well as from each other, in terms of the products they offer.
  *See, e.g.*, *Marshfield Clinic*, 152 F.3d at 593; *Harris Wayside*, 2008 WL 7109357, at
  *2; *In re Live Concert*, 863 F. Supp. 2d at 976.  The benchmark companies include,
  for example, an issuer of high-risk automobile insurance policies, a manufacturer of
  heavy-duty towing vehicles, and a maker of canoes and camping equipment.  (*See*
  MM Rpt. Ex. 55; Exs. 15, 16, 17; *see also* Ex. 1 ¶¶ 203-205 & Ex. 28.)

- **Different Geographies.**  Dr. MacKie-Mason's model also fails to account for
  differences between NAM and the benchmark firms in terms of geography.  *See*
  *Harris Wayside*, 2008 WL 7109357, at *2; Rubinfeld, *supra*, at 380.  Plaintiffs allege
  that the relevant geographic market is the United States of America, while Dr.
  MacKie-Mason's benchmark includes companies that, for example, sold computer
  chips mostly in Asia (Ex. 18, at 4) and lumber mostly in Canada (Ex. 19, at 2).

- **Different Pricing and Cost Structures.**  Dr. MacKie-Mason's model fails to control
  for differences between NAM and his benchmark firms in terms of pricing and cost
  structures.  The "'yardstick' method . . . requires the expert to . . . make[] suitable
  adjustments for any cost differentials between the two markets" before comparing
  prices or margins.  Herbert H. Hovenkamp, *Economic Experts in Antitrust Cases*, *in* 5
  MOD. SCI. EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY § 46.8 (Dennis
  L. Faigman, *et al.*, eds., 2013-14); *see also* Rubinfeld, *supra*, at 380.  But Dr.
  MacKie-Mason did not even attempt to make such adjustments.

In addition, as noted, Dr. MacKie-Mason's model fails to control for differences in competitive conditions between the alleged but-for world of ISP services and the markets in which his benchmark firms operate.  (*See* Ex. 2, MM Tr. 51:9–52:2.)  This failure is especially significant as he admits that ISP services are a "network industry."  (*Id.* at 100:3–11.)  Wholly apart from any anticompetitive conduct, firms that compete in network industries may earn higher margins and face fewer competitors than firms in non-network industries.  (*See* Ex. 1 ¶¶ 207–209.)  Dr. MacKie-Mason fails to account for this obvious alternative explanation for the difference between NAM's margins and the benchmark average.  (*Id.*)

Plaintiffs have failed to show that there is *any* benchmark model by which they could reliably measure classwide antitrust injury or calculate damages.  Accordingly, they have not established that these elements of their claims are susceptible to common *proof.  See, e.g.*, *Cannon* v. *BP Prods. N. Am., Inc.*, No. 3:10-CV-00622, 2013 WL 5514284, at *12 (S.D. Tex. Sept. 30, 2013) (denying certification due to expert's flawed damages model and rejecting plaintiffs' argument that "they can fix the model at the merits stage").

## C.    Dr. MacKie-Mason Improperly Uses Averages in His Benchmark.

Dr. MacKie-Mason relies on average margins to avoid accounting for differences he cannot explain and that do not fit his theory.  In fact, there is no "competitive" margin in Dr. MacKie-Mason's model to which NAM's actual margins can be meaningfully compared.  The margins of the benchmark firms vary wildly.  For example, in 2010, their margins ranged from ███████████████████ (MM Rpt. Ex. 55; *see also* Ex. 1 ¶ 211.)  Dr. MacKie-Mason admits that he does not know, and his model cannot explain, the reasons for these differences.  (Ex. 2, MM Tr. 32:23–34:2; 36:13–24, 108:16–110:15, 115:4–19, 173:6–14.)

Dr. MacKie-Mason's model thus fails to explain why, in the but-for world, NAM would be expected to earn a ████ margin, the *average* earned by the benchmark firms, as opposed to

23

margins at the high (or low) end of the spectrum—especially as his benchmark firms purportedly "represent a normal range of [competitive] conditions." (Ex. 2, MM Tr. 46:2–10.) Indeed, some of the firms in Dr. MacKie-Mason's alternative benchmarks had margins *higher* than NAM's supposed "monopoly" margins in the actual world. (MM Rpt. Ex. 59.) As the Fifth Circuit held in rejecting a benchmark model that, like Dr. MacKie-Mason's, failed to establish comparability and relied on averaging—"an average of unknowns is also an unknown." *Eleven Line, Inc.* v. *N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 208–09 (5th Cir. 2000).

## IV. Plaintiffs Do Not Satisfy Other Requirements of Rule 23.

Rule 23(a)(3) requires that the claims of named plaintiffs be "typical" of the claims of the proposed class. Fed. R. Civ. P. 23(a)(3). Plaintiffs cannot establish typicality where even "as between the [ ] named Plaintiffs there is sufficient heterogeneity to indicate proof that one Plaintiff was overcharged is not probative of whether other class members were overcharged." *Allied*, 247 F.R.D. at 178. Here, as in *Allied*, fundamental differences preclude a finding of typicality and the certification of a class. Two are dispositive.

*First*, BEF Foods, Spectrum and Dial are not representative of a class that purports to have no choice but to buy ISP from NAM. BEF Foods and (former named plaintiff) Spectrum purchased no ISP whatsoever from NAM in several years. (Ex. 1 ¶ 82.) Similarly, Dial's spending on ISP fluctuated from as high as ▮▮▮▮▮ in 2010 to under ▮▮▮▮▮ in 2008. (Ex. 1 ¶ 71 & Ex. 12) This evidence undermines plaintiffs' theory that NAM has monopoly power in a market for third-party ISP and that "there are no substitutes available to CPGs." (Mot. at 6.)[17]

---

[17] (*See also, e.g.*, Ex. 11, Maguire Tr. 209:02–210:15 (HP Hood purchases ISP from Valassis); Ex. 8, Gilreath Tr. 84:22–87:22, 90:19–93:03 (HP Hood purchases from Catalina and Insignia); Ex. 20, Hendrix Tr. 47:08–48:13 (Henkel places end caps or corrugated displays, which are not offered by NAM, in stores); Ex. 21, Dietz Tr. 165:12–166:08, 135:20–136:18 (Smithfield uses shippers, half pallet displays, bins, pre-loaded strip clips, and refrigerated bunker displays—which are not offered by NAM—to market its products in stores).)

*Second*, the named plaintiffs differ in whether they purchase ISP across the entire NAM retail network or only a portion of it.  Plaintiffs' antitrust theory *depends* on their assertion that ISP providers cannot effectively compete with NAM because CPGs need access to a *nationwide* network of retailers.  (FAC ¶ 74; MM Rpt. at 41).  But HP Hood focuses its marketing efforts on New England, and Foster Farms on the west coast.[18]  They are not typical of a class of purchasers who contend that the lack of a nationwide ISP network impedes competition.

A class action also is not a superior method for adjudicating the controversy, Fed. R. Civ. P. 23(b)(3), because plaintiffs and absent class members alike have sufficient resources to pursue their own claims, if they choose to.[19]  *See, e.g.*, *Kottler* v. *Deutsche Bank AG*, No. 05 Civ. 7773 (PAC), 2010 WL 1221809, at *4–5 (S.D.N.Y. Mar. 29, 2010).

### V.   The Proposed Injunctive Relief Class Cannot Be Certified Under Rule 23(b)(2).

Nor should plaintiffs' proposed injunctive relief class be certified.  Plaintiffs never explain: (i) exactly which NAM conduct should be enjoined; (ii) why the alleged illegality of such conduct is susceptible of classwide proof; (iii) what the scope of an injunction would be; or (iv) why a "single injunction" would provide relief to all class members.  *See Wal-Mart*, 131 S. Ct. at 2557.  Rather, they request (b)(2) certification only in a conclusory, two-sentence footnote (Mot. at 24–25 & n.11), which is insufficient to present the issue.  *See, e.g.*, *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 351 n.13 (S.D.N.Y. 2006) (Lynch, J.).

### CONCLUSION

For the foregoing reasons, class certification should be denied.

---

[18]   (*See, e.g.*, Ex. 8, Gilreath Tr. 106:07-106:21; Ex. 22, HOOD0476616; Ex. 23, Corsiglia-Keim Tr. 59:5–22; Ex. 9, NAM-CPG-008206320; Ex. 1 ¶¶ 85, 110, 188-190.)

[19]   Most named plaintiffs are larger than NAM, which had 2013 revenues of ▮▮▮▮▮ (MM Rpt. at Ex. 8).  Heinz had 2013 global revenues of $11.5 billion; Henkel had €16.5 billion; and Smithfield had $11.8 billion in the U.S.  (Ex. 1 ¶¶ 65, 68, 75.)  Absent class members include giant manufacturers such as Procter & Gamble, Nestle, and Kraft.  (*Id.* Ex. 21.)

Dated:  October 10, 2014

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP

By:  /s/ Kenneth A. Gallo
    Kenneth A. Gallo (kgallo@paulweiss.com)
    Jane B. O'Brien (jobrien@paulweiss.com)
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300

William B. Michael (wmichael@paulweiss.com)
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

*Counsel for Defendants*