UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                :

DIAL CORPORATION, *et al.*,

                          Plaintiffs,

          -against-

NEWS CORPORATION, *et al.*,

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

13cv6802

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

        Plaintiffs The Dial Corporation, Henkel Consumer Goods Inc., H.J. Heinz

Company, H.J. Heinz Company, L.P., Foster Poultry Farms, Smithfield Foods, Inc., HP Hood

LLC, BEF Foods, Inc., and Spectrum Brands, Inc. (collectively, "Plaintiffs") are consumer

packaged goods firms ("CPGs").  They allege that Defendants News Corporation, News America

Inc., News America Marketing FSI L.L.C., and News America Marketing In-Store Services

L.L.C. (collectively, "News Corp.") maintain a monopoly in the market for in-store promotion

("ISP") services, and extract artificially high prices from their customers.  Plaintiffs move to

certify a class of CPGs that have "directly purchased in-store promotions from News [Corp.] at

any time on or after April 5, 2008[.]"  For the following reasons, Plaintiffs' motion for class

certification under Rule 23(b)(3) is granted.

BACKGROUND

        News Corp. serves as a middleman in the ISP market between CPGs on the one

hand, and groceries, drug stores, and other mass retailers on the other.  Plaintiffs purchase a wide

variety of ISPs, including print and electronic signage, end-of-aisle displays, shelf-mounted

displays, freezer displays, and floor signage from News Corp.  Those ISPs allow Plaintiffs to

promote their products inside retail stores.  (Fourth Amended Complaint (hereinafter, "FAC") ¶ 54.)  ISPs are a key component of Plaintiffs' marketing because they reach consumers at the point of purchase, unlike other promotional tools, such as media advertising, which occur outside of the store.

News Corp. entered the ISP business in 1996 and gained a significant foothold by purchasing Heritage Media for $1.3 billion dollars the following year.  Thereafter, News Corp. acquired FLOORgraphics, Inc. along with its retail network.  News Corp. later settled a lawsuit with another competitor, Insignia, and etched a deal to distribute Insignia's services through News Corp.'s retail network.  (FAC ¶ 61.)  Currently, News Corp. controls approximately 80% of the ISP market and is defending against monopolization claims by its only remaining competitor, Valassis, in the Eastern District of Michigan.

News Corp.'s network of 52,500 retail stores is the only "one-stop shop" for nationwide access to a wide variety of ISPs.  (FAC ¶ 57.)  Access to retailers is essential to News Corp.'s success.  Plaintiffs allege that to maintain its monopoly and erect barriers to competitive entry, News Corp. enters into long-term contracts with retailers for exclusive access to their stores.  For example, if News Corp. provides at-shelf coupon dispensers for a retailer, News Corp.'s agreement prohibits that retailer from contracting with others to place at-shelf coupon dispensers elsewhere in the store.  News Corp. also enters into exclusive, long-term contracts with CPGs to advertise their products.  For example, News Corp. offers a specific "tactic" (i.e., shelf coupons) for a fixed period of time to only one CPG for a particular product category (i.e., cereal).

Plaintiffs allege that News Corp. maintains its monopoly by using these long-term, exclusive contracts with retailers and CPGs.  (FAC ¶¶ 10–17, 74–85, 108–15.)  Plaintiffs

also allege that News Corp. engages in additional anti-competitive conduct by: hacking into computerized customer lists and marketing materials of its competitor, FLOORgraphics; staggering the terms of exclusive contracts; enforcing shelf exclusivity; using cash guarantees to derail competitor contracts; defacing competitor advertisements; and disparaging competitors' compliance rates and their financial viability. (FAC ¶¶ 86–104.)

In addition to ISPs, Plaintiffs purchase free-standing-insert coupons ("FSIs") from News Corp. for placement in newspapers nationwide. (FAC ¶ 66.) Plaintiffs allege that News Corp. also maintains market power in the FSI product market through similar long-term, exclusive contracts. (FAC ¶ 120.)

## DISCUSSION

I. Class Certification

Plaintiffs' definition of the proposed class has morphed since they filed their Fourth Amended Complaint. Back then, Plaintiffs defined two separate classes: (1) the "News In-Store Class"; and (2) the "News FSI Class." More recently, in their class certification motion, they abandoned the "News FSI Class," and defined the "News In-Store Class" as follows:

> Persons residing in the United States who have directly purchased in-store promotions from News Corp. at any time on or after April 5, 2008, and have not purchased these services under News Corp. contracts with mandatory arbitration clauses.

(ECF No. 141.) But that definition seems overbroad given the focus of the parties' arguments on the certification motion. The issue presented is whether the proposed class plaintiffs are representative of CPGs. And in their reply papers, Plaintiffs offer a further refinement of the proposed class definition to exclude "retail purchasers of ISP." For the purposes of the following discussion, this Court defines the proposed class as follows:

Non-retailer consumer packaged goods firms residing in the United States which have directly purchased in-store promotions from News Corp. at any time on or after April 5, 2008, and were not subject to mandatory arbitration clauses.

a.  Requirements of Rule 23(a)

A party seeking class certification must first show that the proposed class meets the requirements of Federal Rule of Civil Procedure 23(a), which "requires that a proposed class action (1) be sufficiently numerous, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class." Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010).  "The party must also satisfy through evidentiary proof at least one of the provisions of Rule 23(b)." Comcast v. Behrend, 133 S. Ct. 1426, 1432 (2013).  Here, Plaintiffs rely on Rule 23(b)(3), which "requires the party seeking certification to show that 'questions of law or fact common to class members predominate over any questions affecting only individual members' and that class treatment would be superior to individual litigation." Myers, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)).

Rule 23 "does not set forth a mere pleading standard." Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011).  Rather, "[t]he party seeking class certification must affirmatively demonstrate compliance with the Rule, and a district court may only certify a class if it is satisfied, after a rigorous analysis, that the requirements of Rule 23 are met." In re Am. Int'l Grp., Inc. Sec. Litig., 689 F.3d 229, 237–38 (2d Cir. 2012).  Plaintiffs must show compliance with Rule 23's requirements by a preponderance of the evidence. Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 202 (2d Cir. 2008).

i.  Numerosity

Numerosity is presumed when a class consists of forty or more members.  See Consol. Rail v. Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995).  News Corp. does not contest numerosity.

ii.  Commonality

A party seeking certification must show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).  "That language is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" Wal-Mart, 131 S. Ct. at 2551 (quoting Richard A. Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U. Law Rev. 97, 131–32 (2009)).  However, class claims "must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 131 S. Ct. at 2551.  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Wal-Mart, 131 S. Ct. at 2551 (emphasis in original) (quoting Nagareda, supra, at 132).

Because "the predominance criterion is far more demanding" than the commonality requirement, when plaintiffs move for certification of a class pursuant to Rule 23(b)(3), "Rule 23(a)(2)'s 'commonality' requirement is subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement" of predominance. Amchem Prods, Inc. v. Windsor, 521 U.S. 591, 609, 624 (1997).

Here, there are several questions common to the class and capable of resolution

through common proof, including: (1) News Corp.'s liability under the Sherman Act and the Clayton Act; (2) the definitions of the relevant geographic and product markets; and (3) News Corp.'s market power in the relevant market. And the majority of News Corp.'s alleged predatory conduct involves its dealings with competitors and retailers, not the putative class members. This suggests that resolution is capable through common proof for the class. Plaintiffs have met the requirements of Rule 23(a)(2). Cf. Wal-Mart, 131 S. Ct. at 2556 ("We quite agree that for purposes for Rule 23(a)(2), even a single common question will do[.]") (internal quotations and citations omitted).

iii. Typicality

Typicality "requires that the claims of the class representative[] be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)). "The commonality and typicality requirements tend to merge into one another." Marisol, 126 F.3d at 376. "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." Bolanos v. Norwegian Cruise Lines Ltd., 212 F.R.D. 144, 155 (S.D.N.Y. 2002). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." Robidoux v. Celani, 987 F.2d 931, 936–37 (2d Cir. 1993).

News Corp. asserts that Plaintiffs are not representative of the class. Specifically, BEF Foods and Spectrum did not purchase ISPs over the last several years. Other Plaintiffs

differ in whether they purchase ISPs across the entire News Corp. network.  For instance, HP Hood focuses its marketing in New England, while Foster Farms markets to West Coast retailers. And Dial's spending on ISPs fluctuates rather dramatically.  Accordingly, News Corp. argues that these Plaintiffs cannot be typical of a nationwide class of ISP purchasers.

However, Plaintiffs demonstrate that all class representatives made some ISP purchases during the damages period.  Differences in amounts or characteristics of the class representatives' purchases do not defeat typicality.  See In re Sumitomo Copper Litig., 182 F.R.D. 85, 92 (S.D.N.Y. 1998) ("[T]he simple fact that Class members may have purchased and sold copper futures at different times, for different purposes" does not defeat typicality).

> iv.  Adequacy

"Adequacy 'entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation.'"  In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 35 (2d Cir. 2009) (quoting Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir. 2000)).  "The fact that plaintiffs' claims are typical of the class is strong evidence that their interests are not antagonistic to those of the class."  Damassia v. Duane Reade, Inc., 250 F.R.D. 152, 158 (S.D.N.Y. 2008).  News Corp. does not contest adequacy.

> b.  Requirements of Rule 23(b)

> > i.  Predominance

News Corp. contends that Plaintiffs do not meet Rule 23(b)(3)'s predominance requirement.  Rule 23(b)(3) is an "'adventuresome innovation' . . . framed for situations 'in which class-action treatment is not as clearly called for.'"  Wal-Mart, 131 S. Ct. at 2558 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 614–15 (1997)).  "Class-wide issues

predominate if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." Moore v. PaineWebber, Inc., 306 F.3d 1247, 1252 (2d Cir. 2002).  Courts are required "to take a 'close look' at whether common questions predominate over individual ones." Comcast, 133 S. Ct. at 1432 (quoting Amchem, 521 U.S. at 615).

 To certify a class in an antitrust action, Plaintiffs must demonstrate that the elements of their underlying claims can be proven by common evidence.  Those elements include: "(1) a violation of antitrust law; (2) injury and causation; and (3) damages[.]" Cordes & Co. Fin Servs. v. A.G. Edwards & Sons, 502 F.3d 91, 105 (2d Cir. 2007) (quotations omitted). Each element is analyzed in turn.

### a.  Violation of Antitrust Laws

 The issues relevant to proving a violation of the antitrust laws in this case include the geographic market definition, the product market definition, News Corp.'s monopoly power, the extent of News Corp.'s exclusionary conduct, and causation.  These liability issues can be proven through class-wide, common evidence because they focus on News Corp.'s conduct, not on the actions of putative class members.  See In re Flonase Antitrust Litig., 284 F.R.D. 207, 219 (E.D. Pa. 2012).  Indeed, if each class member pursued its claims individually, the class member would have to prove the same antitrust violations using the same documents, witnesses, and other evidence.  A violation of the antitrust laws is capable of common proof.

### b.  Antitrust Injury

 To satisfy the Rule 23(b)(3) predominance requirement, Plaintiffs must demonstrate that class-wide injury or "impact" is capable of proof at trial through evidence that

is common to the class rather than individual to its members.  See Comcast, 133 S. Ct. at 1430.

Plaintiffs attempt to show that common, class-wide proof exists that all putative class members

paid more than they would have in the but-for world.  Because each putative class member

negotiated with News Corp. sales staff and purchased one or more of 12 different ISP products

for placement in one or more of 52,500 retail stores, News Corp. contends that the substantial

variation in News Corp.'s ISP prices across customers precludes class-wide proof.  While

Plaintiffs acknowledge that prices may differ, they counter that those prices depend,

predominantly, on common and observable factors, and all CPGs would face lower prices in the

but-for world.

### 1.  Plaintiffs' Model

To support their argument, Plaintiffs rely on Dr. MacKie-Mason, Dean of the

School of Information at the University of Michigan.  Dr. MacKie-Mason's analysis employs a

regression model that correlates News Corp.'s transaction prices to product attributes, contract

attributes, and product costs—such as regional coverage, time period, placement frequency—to

determine class-wide impact.  (MacKie-Mason Report at 74, 79.)  Dr. MacKie-Mason's model

uses transaction data provided by News Corp. that tracks third party ISP sales from 2000 through

2014.  (MacKie-Mason Report at 75.)  His regression analysis concludes that 72% of the price

variation in News Corp.'s transaction data can be explained using only common attributes.

(MacKie-Mason Report at 79.)  According to Plaintiffs, although the highest actual price paid by

a putative class member was $90, and the lowest was $4, prices are largely determined by

common, observable characteristics of the products, the quantities purchased, and the geographic

market.  (MacKie-Mason Rebuttal at 18–19.)

Plaintiffs also advance documentary evidence and deposition testimony to support

their statistical showing that antitrust injury is capable of common proof.  For example, until at least 2011, News Corp. used rate cards that refer to attributes such as tactic, cycle, sales category, trade class, geography, and store count, to provide a matrix of ISP prices.  (MacKie-Mason Report at 74; MacKie-Mason Rebuttal at 20–21.)  Rate cards were the starting point for negotiations to help customers understand ISP price differences.  News Corp.'s commitment letters also tracked the same characteristics that were factored into rate cards.  (MacKie-Mason Rebuttal at 21.)

News Corp. counters with an expert report by Dr. Jerry Hausman, Professor of Economics at Massachusetts Institute of Technology.  Unsurprisingly, Dr. Hausman's statistical analysis is at odds with that of Dr. MacKie-Mason.  Dr. Hausman insists that common factors explain only a "small fraction in the variation in ISP prices" and that Dr. MacKie-Mason's regression analysis suffers from "omitted variable bias" because Dr. MacKie-Mason failed to include customer-specific variables.  (Hausman Report at 61.)  Thus, Dr. Hausman contends that Dr. MacKie Mason's methodology causes him to overstate that portion of the ISP price variation explained by common attributes.  (Hausman Report at 58, 61.)  Performing an eponymous "Hausman specification test" to account for the bias, and "correcting" Dr. MacKie-Mason's regression analysis, Dr. Hausman's results suggest that customer-specific factors account for 76% of ISP prices and "common attributes explain a lot less than what Dr. MacKie-Mason thought."  (Hausman Report at 62; Hausman Dep. Tr. at 85.)

Courts may not shy away from a "battle of the experts" at the class certification stage.  See, e.g., In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 224, 255 (D.C. Cir. 2013) (noting that Rule 23 requires courts to take a "hard look at the soundness of statistical models that purport to show predominance[.]").  To support class certification, Plaintiffs must

advance a workable methodology to demonstrate that antitrust injury can be proven on a class-wide basis.  See In re Currency Conversion Fee Antitrust Litigation, 224 F.R.D. 555, 565 (S.D.N.Y. 2004); In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig., 256 F.R.D. 82, 100 (D. Conn. 2009) ("The real question . . . is whether the plaintiffs have established a workable multiple regression equation, not whether plaintiffs' model actually works[.]"); see also In re Elec. Books Antitrust Litig., No. 11 MD 2293 (DLC) 2014 WL 1282293, at *14 (S.D.N.Y. Mar. 28, 2014) (accepting a regression analysis which explained "90% of the variance" among pricing).

The differences between the parties' regression analyses raise some alarms.  But courts may consider regression models if they include variables accounting for the major factors. See In re Urethane Antitrust Litig., 768 F.3d 1245, 1260–61 (10th Cir. 2014); see also Koger v. Reno, 98 F.3d 631, 637 (D.C. Cir. 1996) ("[C]ourts have taken the view that a defendant cannot undermine a regression analysis simply by pointing to variables not taken into account that might conceivably have pulled the analysis's sting."); cf. Bazemore v. Friday, 478 U.S. 385, 400 (1986) ("Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.").  It appears that Dr. MacKie-Mason's model takes account of the significant variables affecting price.  Indeed, Dr. Hausman acknowledges that Dr. MacKie-Mason's model includes important product variables including volume and number of stores.  (See Hausman Dep. Tr. at 94–95.)

When measured against Dr. Hausman's critique, Dr. MacKie-Mason's regression analysis may be of diminished probative value.  See Bazemore, 478 U.S. at 400.  Nevertheless, Plaintiffs' model suggests that pricing is capable of proof on a class-wide basis when combined with the deposition testimony, and documentary evidence such as the rate cards and commitment

letters.[1]  Although prices may differ on an individual level in both the actual and but-for worlds,

Plaintiffs' evidence suggests that prices are systematic and, thus antitrust injury is measurable

with common proof.

## 2.  Applicability of Comcast

Seizing on the Supreme Court's holding in Comcast v. Behrend, 133 S. Ct. 1426

(2013), News Corp. argues that Plaintiffs' motion fails to satisfy Rule 23(b)(3)'s predominance

requirement.  In Comcast, plaintiffs alleged that Comcast's acquisition of competitor cable

television providers in sixteen counties clustered around Philadelphia violated the Sherman Act.

In support of their claims, the Comcast plaintiffs offered four theories of antitrust injury or

impact, i.e., four explanations for Comcast's ability to charge higher prices.  The district judge

concluded that only one theory was susceptible to class-wide proof:  Comcast's clustering

around Philadelphia reduced competition from "overbuilders," that is, competitors who build

competing cable networks where incumbent cable providers already exist.[2]  Comcast, 133 S. Ct.

at 1430–31.

Writing for the majority, Justice Scalia held that the plaintiffs' expert opinion

could not withstand the "rigorous analysis" necessary for the Rule 23(b)(3) predominance test

because plaintiffs were entitled only to damages on a single theory of injury.  Comcast, 133 S.

Ct. at 1433.  Because the damages model proposed by plaintiffs' expert was not based solely on

---

[1]       News Corp. relies on the reasoning in Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P, to
support its argument that Plaintiffs have not shown common proof of antitrust impact.  247 F.R.D. 156 (C.D. Cal.
2007).  Unlike Dr. MacKie-Mason, the experts in Allied made no statistical showing that the prices paid by the
putative class members were determinable by common factors.
[2]       The other three theories of injury were that Comcast's clustering:  (1) permitted it to withhold local sports
programming from satellite competitors, thereby reducing competitor market penetration; (2) "reduced the level of
'benchmark' competition on which cable customers rely to compare [provider] prices"; and (3) "increased
Comcast's bargaining power relative to content providers."  Comcast, 133 S. Ct. at 1430–31.

the "overbuilder" theory of injury certified by the district court, Comcast, 133 S. Ct. at 1433–34, the Supreme Court concluded that "Rule 23(b)(3) cannot authorize treating [cable] subscribers within the Philadelphia cluster as members of a single class." Comcast, 133 S. Ct. at 1435. But Justices Ginsburg and Breyer in a vigorous dissent cautioned that "[t]his Court's ruling is good for this day and case only." Comcast, 133 S. Ct. at 1437 (Ginsburg & Breyer, dissenting). And the Second Circuit read Comcast narrowly in Roach v. T.I. Cannon Corp., 778 F.3d 401 (2d Cir. 2015). There, the Court of Appeals maintained that class certification need not hinge on a class-wide damages model to meet Rule 23(b)(3):

> Comcast, then did not hold that a class cannot be certified under Rule 23(b)(3) simply because damages cannot be measured on a classwide basis . . . . The Court did not hold that the proponents of class certification must rely upon a classwide damages model to demonstrate predominance.

Roach v. T.I. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015); see also Sykes v. Mel S. Harris and Assocs. LLC, 780 F.3d 70, 87–88 (2d Cir. 2015).

News Corp. argues that Dr. MacKie-Mason's regression model fails for the same reason as the plaintiffs' model in Comcast. Plaintiffs set forth at least nine categories of News Corp.'s allegedly exclusionary conduct in the Complaint. (See FAC ¶¶ 10–17, 74–85, 86–104, 108–15.) The "primary anticompetitive conduct alleged" by Plaintiffs is the "exclusion of News [Corp.'s] competitors from access to an essential input," i.e., News Corp.'s exclusionary contracts with retailers. (See MacKie-Mason Report at 72.) In his rebuttal report, Dr. MacKie-Mason acknowledges that "News [Corp.] acquired its monopoly in in-store promotions through

the cumulative effect of a number of exclusionary acts[.]"[3]  (MacKie-Mason Rebuttal at 5.)  And

as a result of these activities, News Corp. overcharged its customers.  Dr. MacKie-Mason's

model assumes that in a but-for world of competitive pricing, none of those exclusionary

strategies would exist.  (MacKie-Mason Tr. at 158:3–159:4.)

       News Corp. points out that Dr. MacKie-Mason's model does not attempt to

isolate the effects of any one (or more) of the nine categories of News Corp.'s exclusionary

conduct in its damages model.  This, News Corp. argues, is the model's fatal flaw, since under

Comcast, damages must be tethered to plaintiffs' theory, or theories, of liability.  See Comcast,

133 S. Ct. at 1433.  As in Comcast, News Corp. argues that Dr. MacKie-Mason's model cannot

disaggregate or distinguish injuries attributable to the nine theories that Plaintiffs assert are

appropriate for class treatment (the primary theory being News Corps. exclusionary contracts

with retailers).

       However, News Corp. does not contend that only one of the nine theories of

liability had an impact on prices.  Cf. Behrend v. Comcast Corp., 264 F.R.D. 150, 166 (E.D. Pa.

2010) aff'd, 655 F.3d 182 (3d Cir. 2011) rev'd, 133 S. Ct. 1426 (2013) (noting that Comcast

argued that the other three theories of liability, i.e., the rejected theories, had no impact on

prices.)  In fact, Plaintiffs argue the opposite—that News Corp. acquired its monopoly in ISPs

through the "cumulative effect" of a number of related exclusionary acts, including News

Corp.'s exclusive contracts with retailers, the terms of those contracts, and use of cash

guarantees.  (MacKie-Mason Rebuttal at 5.)  Based on the evidence presented, this Court

---

[3]      Aside from News Corp.'s contracts with retailers and CPGs, Plaintiffs also allege that News Corp. engages
in additional anti-competitive conduct by hacking into computerized customer lists and marketing materials of its
competitor, FLOORgraphics; staggering the terms of exclusive contracts; enforcing shelf exclusivity; using cash
guarantees to derail competitor contracts; disparaging competitors' compliance rates; defacing competitor
advertisements; and disparaging competitor financial viability.  (FAC ¶¶ 86–104.)

declines to reject any of the exclusionary acts as incapable of common proof.  To establish that News Corp. committed any (or all) of these exclusionary acts will require Plaintiffs to put forth the same evidence for all members of the class.  Indeed, these exclusionary acts were allegedly committed by News Corp. in its interactions with retailers and competitors, and are thus capable of common proof.

In Comcast, the Supreme Court noted that if all four types of anticompetitive injury had been approved for certification by the district court, the plaintiffs' damages methodology "might have been sound, and might have produced commonality of damages." Comcast, 133 S. Ct. at 1434.  Because this Court declines to reject any of the theories of anticompetitive injury set forth in the Complaint, Plaintiffs' damages model is consistent with Comcast.

        c.  Damages

Plaintiffs must also show that the damages resulting from the antitrust injury are measurable on a class-wide basis through use of common methodology.  Comcast, 133 S. Ct. at 1430.  It used to clearly be the case that individual damages determinations would not defeat class certification.  See Seijas v. Republic of Arg., 606 F.3d 53, 58 (2d Cir. 2010).  But, as discussed above, in Comcast, the Supreme Court decertified a class where the plaintiffs' damages model "[fell] far short of establishing that damages are capable of measurement on a classwide basis." 133 S. Ct. at 1433.  After Comcast, courts in this District and elsewhere have struggled with whether the predominance requirement can ever be met if individual damages calculations are required.

Several courts found that Comcast requires class-wide damages determinations as a prerequisite to class certification.  See Jacob v. Duane Reade, Inc., 293 F.R.D. 578, 583–84

(S.D.N.Y. 2013) (discussing cases and granting partial class certification).  But, barring class actions where individual damages determinations are necessary would have been a dramatic shift in the law.  Indeed, before Comcast, "[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) [was] well nigh universal."  Comcast, 133 S. Ct. at 1437 (Ginsburg & Breyer, dissenting).  And even after Comcast, the Second Circuit held that individual damage determinations will not necessarily defeat class certification under Rule 23(b)(3).  Roach, 778 F.3d at 407; see also Sykes, 780 F.3d at 87–88.

### 1.   Plaintiffs' Model

Dr. MacKie-Mason employs a "benchmarking" or "yardstick" technique to calculate overcharges and antitrust damages, which he argues are capable of determination through common proof.  The "yardstick" method for calculating damages is an accepted means of measuring damages in an antitrust action.  See, e.g., In re NASDAQ Market-Makers Antitrust Litigation, 169 F.R.D. 493, 521 (S.D.N.Y. 1996).  Dr. MacKie-Mason's model accounts for variations in the News Corp. promotions purchased by individual CPGs, including whether the transaction was a list price or the product of a separate negotiation, the class of CPG customer, and the method of purchase.  His analysis identifies benchmark competitive margins for firms similar to News Corp. in terms of capitalization and other factors.  Averaging these competitive margins, he estimates how News Corp.'s monopoly pricing would have shifted downward if News Corp. had earned a competitive margin instead of a monopoly margin, with a concomitant savings for the CPGs.  (MacKie-Mason Report at 82–85.)

Specifically, Dr. MacKie-Mason calculates News Corp.'s monopoly profit margin for its in-store promotions.  (MacKie-Mason Report at 80–82.)  He then identifies benchmark firms by surveying the companies likely to be as profitable as News Corp. in a market unaffected

by monopolization. Dr. MacKie-Mason chose the benchmarks based on their capital intensity, rate of growth, size and the competitiveness of the market. (MacKie-Mason Report at 82–85.) Next, he used the average of these benchmark margins for each year in the damages period to estimate declines in News Corp.'s monopoly pricing. Dr. MacKie-Mason estimates that if News Corp. earned the competitive benchmark margin, prices would have declined by 40%. For the years 2008-2013, he estimates that News Corp. monopoly overcharges would vary from 31% and 43%. (MacKie-Mason Report at 85.) Dr. MacKie-Mason then proposes to apply that monopoly overcharge to prices paid by individual putative class members to calculate individual damages.

News Corp. contends that the benchmark firms Dr. MacKie-Mason chose are not similar to News Corp. in significant ways, including product, firm, and market comparability. News Corp. also disputes Dr. MacKie-Mason's use of the average benchmark firms' profit margin, as opposed to margins at the high or low end of the spectrum.

However, Dr. MacKie-Mason's selection of benchmark firms is appropriate given the limitations inherent in this case. Because News Corp. has allegedly maintained a monopoly in the market for ISPs since at least 2000, creating a benchmark using News Corp.'s prices during a time of "robust competition" is not feasible. (MacKie-Mason Rebuttal at 29.) And as Plaintiffs point out, the selection of perfectly comparable benchmark firms aside from News Corp. is impossible where News Corp.'s alleged monopoly prevents comparable firms from operating within its market. Indeed, the twenty benchmark firms selected by Dr. MacKie-Mason were not chosen arbitrarily: he chose the firms based on their capital intensity, growth, and size. (See MacKie-Mason Rebuttal at 29–31.)

Plaintiffs' damages model is sufficient to show that damages are measurable

through use of a common methodology.  Although characterized as a dispute over the feasibility

of Plaintiffs' damages model, News Corp. essentially argues that Plaintiffs' model does not

prove what they claim it proves—class-wide damages.  See In re EPDM Antitrust Litig., 256

F.R.D. at 100 ("In essence, the defendants are asking the court to determine which regression

model is most accurate, which is ultimately a merits decision.") (emphasis in original).  To the

extent that Dr. Hausman proposes an alternative damages model using different methodology

and different benchmark firms, he is free to do so at the merits stage.

2.   Benefits to Putative Class Members

News Corp. maintains that class certification under Rule 23(b)(3) is inappropriate

because increased competition in the market for ISPs may actually harm certain putative class

members, while benefitting others, in varying degrees.  Dr. Hausman characterizes the ISP

industry as "two-sided . . . with network effects."  (Hausman Report at 32.)  The industry is

"two-sided" because ISP providers compete by negotiating with retailers on one hand, and CPGs

on the other.  The industry has "network effects" because CPGs may place more value on a

larger network.  As a result, "enhanced competition for retailer space will, other things equal,

reduce the value of that space to CPGs and raise third-party ISP providers' costs."  (Hausman

Report at 30-31.)  News Corp.'s network may be less valuable to CPGs because it is smaller, and

the "reduction in value will be larger for CPGs who place a higher value on the ability to use a

large, national network."  (Hausman Report at 31.)  The existence of these "network effects" are

contested by Plaintiffs.  (MacKie-Mason Rebuttal at 5–9.)  And, as Plaintiffs point out, News

Corp.'s former CEO has previously testified that such network effects may not "necessarily"

exist.  (See Briody Decl. Ex. 25.)

News Corp. also argues that the steep discounts on ISPs offered to buyers when

-18-

bundled with FSI would not exist in the but-for world. (See FAC ¶¶ 122–26.) For some members of the putative class, those discounts may be greater than the overcharges calculated by Dr. MacKie-Mason. Indeed, according to News Corp., nearly 20% of its customers receive ISP discounts in the actual world that are greater than the alleged overcharges. This fact alone, News Corp. contends, is fatal to a showing of predominance. Plaintiffs disagree and argue that discounts on bundled offerings would exist to some extent in the but-for world. (MacKie-Mason Rebuttal at 10.)

Finally, News Corp. argues that putative class members may benefit from News Corp.'s network in other ways such as lower transaction costs due to the convenience of buying from a single supplier, rather than multiple suppliers, the ability to schedule placements of ISPs in advance, and category exclusivity. (Hausman Report at 49–51.) Plaintiffs dispute the existence of these benefits.

News Corp.'s suggestion that any alleged anticompetitive conduct benefits class members in varying degrees presents a nettlesome and unsettled question of law. Compare Kohen v. Pacific Inv. Management Co. LLC, 571 F.3d 672, 677 (7th Cir. 2009) ("[A] class will often include persons who have not been injured by the defendant's conduct[.]") with In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.2d 244, 252 (D.C. Cir. 2013) (vacating a district court's certification of a class where plaintiffs could not prove "through common evidence, that all class members were in fact injured"). On June 8, 2015, the Supreme Court granted certiorari in Tyson Foods, Inc. v. Bouaphakeo to address whether a class may be certified or maintained under Rule 23(b)(3) when the class consists of uninjured class members. In Tyson, the Eighth Circuit affirmed a lower court's certification of a class of employees, at least 212 of whom were uninjured because they did not work any unpaid overtime. See Tyson Foods, Inc. v.

Bouaphakeo, 14 Civ. 1146, 2015 WL 1285369 (8th Cir. March 19, 2015).  A decision by the

Supreme Court may provide some guidance through the predominance thicket.

   In this case, the existence of "network effects," bundled discounts, and other

ancillary benefits are questions of fact subject to common proof at trial.  These benefits may

affect the amount of damages incurred by certain putative class members, not necessarily

whether they were injured.  But even assuming News Corp.'s theory that discounts and benefits

negate injury, the fact that some putative class members may be uninjured does not automatically

defeat predominance.  See In re Currency Conversion Fee Antitrust Litigation, 264 F.R.D. 100,

117 (S.D.N.Y. 2010); see also In re Elec. Books Antitrust Litig., No. 11 MD 2293 (DLC) 2014

WL 1282293, at *22 (S.D.N.Y. Mar. 28, 2014) (rejecting the notion that a plaintiff must prove

that all class members were in fact injured at the class certification stage).  Damages calculations

may require individual determinations.

   ii. Whether Predominance is Satisfied

   The predominance inquiry requires a "qualitative assessment" of the relative

importance of issues in a case.  Butler v. Sears, Roebuck and Co., 727 F.3d 796, 801 (7th Cir.

2013).  "The mere existence of individual issues will not be sufficient to defeat certification.

Rather, the balance must tip such that these individual issues predominate."  Sykes v. Mel S.

Harris and Assocs. LLC, 780 F.3d 70, 87 (2d Cir. 2015).  "An issue 'central to the validity of

each one of the claims' in a class action, if it can be resolved 'in one stroke,' can justify class

treatment."  Butler, 727 F.3d at 801 (quoting Wal-Mart, 131 S. Ct. at 2551).

   These important questions, at least, are common:  (1) whether News Corp.

violated the antitrust laws; (2) whether, assuming Plaintiffs paid supra-competitive prices, that

payment was caused by News Corp.'s pattern of exclusionary conduct stemming from, inter alia,

exclusionary contracts with retailers, staggering the terms of those contracts, and cash guarantees; and (3) whether the injury suffered by Plaintiffs is an antitrust injury. News Corp. disputes that it is a monopolist (see Dec. 12, 2014 Tr. at 20), and Plaintiffs will need to proffer complex expert testimony to prove their theories. Additionally, the definitions of the relevant geographic and product markets are also questions common to the class.

    This Court recognizes that even if News Corp. is liable under the antitrust laws, individual issues may exist as to damages. However, proving damages pales in comparison to the central questions regarding liability, which are susceptible to common proof. As the Second Circuit has acknowledged, individual damages determinations do not defeat class certification. See Roach, 778 F.3d at 407; Sykes, 780 F.3d at 88 ("Comcast did not rewrite the standards governing individualized damage considerations: it is still clear that individualized monetary claims belong in Rule 23(b)(3).") (citations omitted). Comcast requires Plaintiffs to show that their damages stem from News Corp.'s actions that created the legal liability. See Sykes, 780 F. 3d at 88. Plaintiffs make that showing here.

    To the extent that individual issues arise, they can be addressed as this litigation unfolds. See In re Visa Check/MasterMoney Antitrust Litigation, 280 F.3d 124, 141 (2d Cir. 2001), overruled on other grounds by In re IPO, 471 F.3d 24 (2d Cir. 2006) (listing possible "management tools" available to a district court to address individualized damages issues). With looming issues regarding damages, a liability-only class, or the creation of subclasses, may be the most efficient vehicle to move this action forward. See Butler v. Sears, Roebuck and Co., 727 F.3d 796, 779–802 (7th Cir. 2013) (noting that "the district judge might decide to create subclasses" but "this possibility [is] not an obstacle to certification of a single mold class at the outset"). Dr. Hausman suggests that the putative class members who purchased ISP from News

Corp. can be divided into one of three categories: (1) customers who purchase ISP from News Corp. and do not purchase FSI from News Corp. or Valassis; (2) customers who purchase ISP and FSI from News Corp. under a "right of first refusal" or share contract; and (3) customers who purchase ISP from News Corp. but purchase FSI from Valassis under a "right of first refusal" or share contract. (Hausman Report at 43–44.) While this may offer a template for a later stage in this litigation, predominance under Rule 23(b)(3) is satisfied for purposes of this class certification motion.

        iii.   <u>Superiority</u>

In determining whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," a court must consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Here, there is little interest in class members bringing their own actions. In most cases, a class member's potential recovery would be outweighed by the costs of litigation. Class relief is superior where, as here, class-wide litigation of common issues will reduce litigation costs and promote judicial efficiency. <u>Cf.</u> <u>In re IndyMac Mortgage-Backed Sec. Litig.</u>, 286 F.R.D. 226, 243 (S.D.N.Y. 2012). Accordingly, the superiority requirement is met.

       c.   <u>Certification Under Rule 23(b)(2)</u>

Plaintiffs also seek to certify an injunctive relief class under Rule 23(b)(2). But they do so in passing. They raise this point in a single footnote in their opening brief and one paragraph in their reply brief. Those perfunctory references are insufficient to present this issue

for serious consideration at this time.  In re Global Crossing, Ltd. Sec. Litig., 471 F. Supp. 2d

338, 351 n.13 (S.D.N.Y. 2006).

II.   Appointment of Class Counsel

Finally, Plaintiffs ask this Court to appoint five law firms as class counsel,

without offering any justification as to why appointing five firms is appropriate under Rule

23(g).  (See Briody Decl. Exs. 13, 19–22.)  While this Court appreciates the desire of counsel to

represent their respective clients, class certification is intended to streamline proceedings and

introduce efficiencies into case management.  This Court is not convinced that those objectives

will be furthered with five law firms representing the class.  See In re Crude Oil Commodities

Futures Litig., 11 Civ. 3600, 2012 WL 569195, at *2 (S.D.N.Y. Feb. 14, 2012) ("[T]his Court

must balance the[] desire to create a 'dream team' against the competing considerations of

efficiency and economy."); see also Manual for Complex Litig., § 10.221 (4th ed. 2004).

Accordingly, counsel are directed to confer to decide who among them will act as lead Plaintiffs'

counsel.  Plaintiffs should propose no more than two law firms to serve as co-lead counsel.

Failing an agreement among Plaintiffs' counsel, this Court will entertain applications for

appointment of lead counsel.

CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification under Rule

23(b)(3) is granted.  This Court certifies a class of:

> Non-retailer consumer packaged goods firms residing in the United States
> which have directly purchased in-store promotions from News Corp. at any
> time on or after April 5, 2008, and were not subject to mandatory
> arbitration clauses.

Counsel for Plaintiffs are directed to confer regarding the appointment of lead counsel and advise

this Court of any agreement they reach consistent with this Memorandum & Order by June 26,

2015.  The Clerk of Court is directed to terminate the motion pending at ECF No. 141.

Dated: June 18, 2015
      New York, New York

                                        SO ORDERED:

                                          WILLIAM H. PAULEY III
                                             U.S.D.J.

*All Counsel of Record.*