UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE DIAL CORPORATION, HENKEL CONSUMER GOODS, INC., KRAFT HEINZ FOODS COMPANY, H.J. HEINZ COMPANY, L.P., FOSTER POULTRY FARMS, SMITHFIELD FOODS, INC., HP HOOD LLC, BEF FOODS, INC., and SPECTRUM BRANDS, INC., Individually and On Behalf of Similarly Situated Companies,<br><br><br><br>Plaintiffs,<br><br><br>v.<br><br>NEWS CORPORATION, NEWS AMERICA, INC., NEWS AMERICA MARKETING FSI L.L.C., and NEWS AMERICA MARKETING IN-STORE SERVICES L.L.C.,<br><br>Defendants. | Civil Action No. 13-CV-06802-WHP |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
2001 K Street, N.W.
Washington, DC  20006-1047
Tel: (202) 223-7300
Fax: (202) 223-7420

1285 Avenue of the Americas
New York, NY  10019-6064
Tel: (212) 373-3000
Fax: (212) 757-3990

*Counsel for Defendants*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

RELEVANT BACKGROUND ............................................................................................... 6

THE FOURTH AMENDED COMPLAINT ........................................................................ 12

LEGAL STANDARD........................................................................................................... 13

ARGUMENT ........................................................................................................................ 13

I.      SUMMARY JUDGMENT SHOULD BE GRANTED
        DISMISSING THE EXCLUSIVE DEALING CLAIMS................................................. 14

        A.      NAM's Contracts with Retailers Did Not Foreclose Competition ...................... 15

        B.      NAM's Agreements with CPGs Were Not Exclusive .......................................... 27

II.     SUMMARY JUDGMENT SHOULD BE GRANTED
        DISMISSING THE MONOPOLIZATION CLAIM ......................................................... 27

        A.      The Alleged Business Torts Did Not Harm Competition .................................... 28

        B.      The Alleged Agreements with Competitors Were Not Anticompetitive .............. 32

III.    NAM IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS
        NO EVIDENCE NAM HAD POWER IN A RELEVANT PRODUCT MARKET ........ 33

IV.     SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE
        PLAINTIFFS CANNOT PROVE ANTITRUST INJURY OR DAMAGES.................. 39

V.      THE STATE LAW CLAIMS SHOULD BE DISMISSED............................................. 40

CONCLUSION.................................................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AD/SAT, Div. of Skylight, Inc.* v. *Assoc. Press,*
    181 F.3d 216 (2d Cir. 1999)............................................................................34

*Am. Prof'l Testing Serv., Inc.* v. *Harcourt Brace Jovanovich Legal & Prof'l Publ'ns Inc.,*
    108 F.3d 1147 (9th Cir. 1997) ........................................................................29

*In re "Apollo" Air Passenger Computer Reservation Sys. (CRS),*
    720 F. Supp. 1068 (S.D.N.Y. 1989)................................................................27

*Astra Media Grp., LLC* v. *Clear Channel Taxi Media, LLC,*
    414 F. App'x 334 (2d Cir. 2011) ....................................................................25

*Balaklaw* v. *Lovell,*
    14 F.3d 793 (2d Cir. 1994)..................................................................16, 17, 20

*Barry Wright Corp.* v. *ITT Grinnell Corp.,*
    724 F.2d 227 (1st Cir. 1983) (Breyer, J.)........................................................16

*Bayou Bottling, Inc.* v. *Dr. Pepper Co.,*
    725 F.2d 300 (5th Cir. 1984) ..........................................................................25

*Belfiore* v. *The N.Y. Times Co.,*
    826 F.2d 177 (2d Cir. 1987)............................................................................38

*Berkey Photo, Inc.* v. *Eastman Kodak Co.,*
    603 F.2d 263 (2d Cir. 1979)................................................................29, 31, 39

*Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.,*
    509 U.S. 209 (1993)........................................................................3, 29, 31, 33

*Buffalo Courier-Express, Inc.* v. *Buffalo Evening News, Inc.,*
    601 F.2d 48 (2d Cir. 1979)........................................................................24, 25

*Capital Imaging Assocs.* v. *Mohawk Valley Med. Assocs., Inc.,*
    996 F.2d 537 (2d Cir. 1993)........................................................................14, 32

*Cargill, Inc.* v. *Monfort of Colo., Inc.,*
    479 U.S. 104 (1986)........................................................................................26

*CDC Techs., Inc.* v. *Idexx Labs., Inc.,*
    186 F.3d 74 (2d Cir. 1999)........................................................................14, 22, 27

*City of Groton* v. *Conn. Light & Power Co.,*
    662 F.2d 921 (2d Cir. 1981)............................................................................33

*Colo. Interstate Gas Co.* v. *Natural Gas Pipeline Co.*,
    885 F.2d 683 (10th Cir. 1989) ................................................................29

*Concord Boat Corp.* v. *Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ................................................................27

*United States* v. *Continental Can*,
    378 U.S. 441 (1964).................................................................................37

*United States* v. *E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956).........................................................................34, 37

*Eatoni Ergonomics, Inc.* v. *Research in Motion Corp.*,
    826 F. Supp. 2d 705 (S.D.N.Y. 2011).............................................33, 40

*El Aguila Food Prods., Inc.* v. *Gruma Corp.*,
    131 F. App'x 450 (5th Cir. 2005) ...........................................................39

*Emigra Grp., LLC* v. *Fragomen, Del Rey, Bernsen & Loewy, LLP*,
    612 F. Supp. 2d 330 (S.D.N.Y. 2009).............................................33, 38

*Ferguson* v. *Greater Pocatello Chamber of Commerce, Inc.*,
    848 F.2d 976 (9th Cir. 1988) ...........................................................17, 20

*Fleer Corp.* v. *Topps Chewing Gum, Inc.*,
    658 F.2d 139 (3d Cir. 1981)............................................................21, 23

*Franconero* v. *UMG Recordings, Inc.*,
    542 F. App'x 14 (2d Cir. 2013) ...............................................................39

*Global Disc. Travel Svcs., LLC* v. *Trans World Airlines, Inc.*,
    960 F. Supp. 701 (S.D.N.Y. 1997).........................................................37

*United States* v. *Grinnell Corp.*,
    384 U.S. 563 (1966).................................................................................28

*Indeck Energy Servs., Inc.* v. *Consumers Energy Co.*,
    250 F.3d 972 (6th Cir. 2000) ...........................................................16, 17

*Insignia Sys., Inc.* v. *News Am. Mktg. In-Store, Inc.*,
    661 F. Supp. 2d 1039 (D. Minn. 2009)...........................................31, 32, 36

*Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*,
    466 U.S. 2 (1984)............................................................................14, 22

*K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*,
    61 F.3d 123 (2d Cir. 1995)..............................................................22, 26

*Konik* v. *Champlain Valley Physicians Hosp. Med. Ctr.*,
   733 F.2d 1007 (2d Cir. 1984).........................................................................15, 16

*Little Caesar Enters., Inc.* v. *Smith*,
   895 F. Supp. 884 (E.D. Mich. 1995)........................................................................40

*Mathias* v. *Daily News, L.P.*,
   152 F. Supp. 2d 465 (S.D.N.Y. 2001)........................................................................38

*Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*,
   475 U.S. 574 (1986)....................................................................................13, 14

*MCI Commc'ns Corp.* v. *AT&T Co.*,
   708 F.2d 1081 (7th Cir. 1983) .............................................................................40

*Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*,
   238 F. Supp. 2d 1024 (N.D. Ill. 2003) .......................................................................38

*Menasha Corp.* v. *News Am. Mktg. In-Store Servs., Inc.*,
   354 F.3d 661 (7th Cir. 2004) ....................................................................... passim

*Morgan* v. *Ponder*,
   892 F.2d 1355 (8th Cir. 1989) ..............................................................................25

*Nat'l Ass'n of Pharm. Mfrs., Inc.* v. *Ayerst Labs.*,
   850 F.2d 904 (2d Cir. 1988).................................................................................31

*Ne. Tel. Co.* v. *Am. Tel. & Tel. Co.*
   651 F.2d 76 (2d Cir. 1981).................................................................................33

*NicSand, Inc.* v. *3M Co.*,
   507 F.3d 442 (6th Cir. 2007) ...........................................................................16, 17

*NYNEX Corp.* v. *Discon, Inc.*,
   525 U.S. 128 (1998)....................................................................................1, 29

*Ocean State Physicians Health Plan, Inc.* v. *Blue Cross & Blue Shield*,
   883 F.2d 1101 (1st Cir. 1989)...............................................................................22

*In re Omnicom Grp., Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008)........................................................................39

*Pac. Bell Tel. Co.* v. *Linkline Commc'ns, Inc.*,
   555 U.S. 438 (2009).......................................................................................39

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
   114 F. Supp. 2d 243 (S.D.N.Y. 2000).........................................................................13

*PepsiCo, Inc.* v. *Coca-Cola Co.*,
  315 F.3d 101 (2d Cir. 2002)...........................................................................passim

*Reed Const. Data Inc.* v. *McGraw Hill Cos.*,
  49 F. Supp. 3d 385 ..............................................................................................32

*Spectrum Sports, Inc.* v. *McQuillan*,
  506 U.S. 447 (1993)............................................................................................34

*Spinelli* v. *Nat'l Football League*,
  No. 13 Civ. 7398, 2015 WL 1433370 (S.D.N.Y. Mar. 27, 2015) ..................passim

*Stop & Shop Supermarket Co.* v. *Blue Cross Blue Shield*,
  373 F.3d 57 (1st Cir. 2004)..................................................................................19

*Superior Production P'ship* v. *Gordon Auto Body Parts Co.*,
  784 F.3d 311 (6th Cir. 2015) ...............................................................................26

*S.W.B. New England, Inc.* v. *R.A.B. Food Grp., LLC.*, No. 06 Civ. 15357,
  2008 WL 540091 (S.D.N.Y. Feb. 27, 2008)........................................................29

*Tampa Elec. Co.* v. *Nashville Coal Co.*,
  365 U.S. 320 (1961)..................................................................................14, 19, 27

*Ticketmaster Corp.* v. *Tickets.Com, Inc.*,
  No. CV99-7654, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003) .....................18, 21

*Ticketmaster Corp.* v. *Tickets.Com, Inc.*,
  127 F. App'x 346 (9th Cir. 2005) .........................................................................18

*Tops Mkts., Inc.* v. *Quality Mkts., Inc.*,
  142 F.3d 90 (2d Cir. 1998)..............................................................................13, 14

*U.S. Healthcare, Inc.* v. *Healthsource, Inc.*,
  986 F.2d 589 (1st Cir. 1993).................................................................................22

*Verizon Commc'ns Inc.* v. *Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)..............................................................................................28

*Viacom Int'l Inc.* v. *Tele-Comm'cns, Inc.*,
  No. 93 Civ. 6658, 1994 WL 561377 (S.D.N.Y. Oct. 12, 1994) ..........................26

*Westman Commc'n Co.* v. *Hobart*,
  796 F.2d 1216 (10th Cir. 1986) ...........................................................................38

*Weyerhaeuser Co.* v. *Ross-Simmons Hardwood Lumber Co.*,
  549 U.S. 312 (2007)........................................................................................passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a) ....................................................................................................................13

Areeda & Hovenkamp, Antitrust Law (3d ed. 2008)..................................................25, 29, 32, 40

Richard A. Posner, Antitrust Law: An Economic Perspective 214–15 (2d ed. 2001)..................22

## PRELIMINARY STATEMENT

Summary judgment should be granted because Plaintiffs have offered no evidence that Defendants' alleged conduct harmed the competitive process.  After wide-ranging discovery, the undisputed facts demonstrate that competitors to News America Marketing In-Store Services L.L.C. ("NAM") have had the opportunity to compete for the business of consumer packaged goods companies ("CPGs") and retail chains.  Virtually all of the contracts with CPGs and retail chains have been available for competitive bidding during the relevant time period and NAM won its share of the business by outbidding its competitors to secure profitable, above-cost contracts.  That is what the antitrust laws require and are intended to promote.

"In the context of antitrust cases . . . summary judgment is particularly favored because of the concern that protracted litigation will chill pro-competitive market forces."  *PepsiCo, Inc.* v. *Coca-Cola Co.*, 315 F.3d 101, 104 (2d Cir. 2002).  Here, this is a real concern as Plaintiffs are trying to use decade-old, immaterial statements and a gerrymandered market definition to get to a jury (or coerce a large settlement), even though the material undisputed facts show that the competitive process is working.  In this case, therefore, an order granting summary judgment would protect and promote the competitive process.

Plaintiffs assert antitrust claims for exclusive dealing and monopolization.  Both require a showing of harm to "the competitive process itself," not just to one or more competitors.  *NYNEX Corp.* v. *Discon, Inc.*, 525 U.S. 128, 137–39 (1998).  Summary judgment is warranted because Plaintiffs have no evidence that NAM's alleged conduct caused such harm.

Plaintiffs' primary allegation is that NAM used "long-term, exclusive contracts"—with CPGs and with retail chains—to foreclose competition in an alleged market for third-party-provided in-store promotions ("ISP").  Their claim as to CPG contracts fails because there is no evidence those contracts were exclusive.  Their claim as to retailer contracts fails because

competitors were not foreclosed from competing to obtain those contracts.  Plaintiffs attack three particular features of the retailer contracts.  None raises a genuine issue of material fact:

- Plaintiffs contend that NAM's contracts were too long.  But it is undisputed that the average length was only ███████████████████████.  When, as here, there is competition to obtain exclusive contracts, courts have found that contracts with exclusivity periods of no more than three years "do not foreclose competition and are not anticompetitive as a matter of law."  *Spinelli* v. *Nat'l Football League*, No. 13 Civ. 7398, 2015 WL 1433370, at *26 (S.D.N.Y. Mar. 27, 2015).

- Plaintiffs contend that NAM "staggered" its contract expiration dates to make it harder for competitors to win business.  It is undisputed that NAM's contracts were staggered:  as would be expected, not all of the contracts expire on the same day or in the same year.  But it also is undisputed that the staggering of expiration dates did not foreclose opportunities for competition:  each year, between ████████████ of NAM's contracts expired and were available for competitive bidding, and virtually all NAM's contracts expired at least once during the relevant period.  Thus, there is no evidence that the effect of staggering was to exclude competitors from competing for those contracts.

- Plaintiffs contend that NAM paid retailers too much for access to their stores.  But it is undisputed that NAM's payments to retailers were never so high that they resulted in NAM selling ISP products below cost.  Absent evidence of below-cost pricing on the product line as a whole, the complaint that NAM's payments were "too high" is really a just complaint that competitors lost and NAM won the competitive bidding to obtain retail contracts—not that competition was eliminated.  The Supreme Court has held "[t]here is nothing illicit" about the kind of competitive bidding Plaintiffs seek to challenge here.  *Weyerhaeuser Co.* v.

*Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 323 (2007).  "Indeed, this sort of <u>high bidding is essential to competition</u> . . . ."  *Id.* at 323–24 (emphasis added).

In short, Plaintiffs have no evidence that NAM's contracts with retailers or CPGs foreclosed others from competing for those deals.  That NAM won the business of CPGs and retailers far more often than its competitors is not evidence of an antitrust violation.  There are always winners and losers in a competitive process.  And, as the Supreme Court has recognized, the fact that NAM could pay more than its competitors for access to retail space, while still successfully competing for CPGs' business by offering attractive, above-cost prices, shows that it is the more efficient competitor.  *See Weyerhaeuser*, 549 U.S. at 323–24.  This is the sort of pro-competitive market outcome the antitrust laws are supposed to promote rather than discourage.

Lacking evidence that NAM's contracts prevented competitive bidding, Plaintiffs point to mostly decade-old documents that they say are evidence of NAM's *intent* to harm competitors.  But an intent to harm a competitor is not evidence of a Sherman Act violation absent a showing of anticompetitive *effect*.  Given the undisputed fact that competitors had the opportunity to compete for CPG and retailer contracts, NAM's intent is immaterial at summary judgment.  The Supreme Court has held:  "Even an act of pure malice by one business competitor against another does not, without more, state a claim under the federal antitrust laws."  *Brooke Grp. Ltd.* v. *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 225 (1993).  The "more" that is missing in this case is evidence that a substantial share of NAM's retail contracts were so long that they froze competitors out of an opportunity to bid or were priced so high that NAM regularly sold ISP below cost.  Such evidence does not exist.

For the same reason, Plaintiffs' decade-old accusations of tortious conduct—which they allege to try to bolster their monopolization claim—do not create a genuine issue for trial.  There is no proof that any of it harmed competition during the damages period.  Plaintiffs' own expert admitted that he did no analysis, and has no evidence, to demonstrate such harm.

Not only do Plaintiffs fail to show that NAM's conduct harmed the competitive process, they cannot show that NAM actually has market power in a properly defined antitrust market.  This is an independent basis for granting summary judgment on all claims.

Plaintiffs try to create the appearance that NAM had market power by carving out in the area of marketing and advertising an artificially narrow antitrust "market" consisting only of a handful of "pre-checkout," "third-party" ISP placed in the aisles of retail stores.  The two primary products that comprise this alleged market are, not surprisingly, the two best-selling ISP products NAM offers—at-shelf coupon dispensers and at-shelf promotional signs.  Plaintiffs improperly exclude from their alleged market, for example, all in-store products that retailers themselves (*i.e.*, not "third parties") offer—spending on which dwarfs NAM's ISP sales by several orders of magnitude.   They also exclude competing in-store coupons on the grounds that they are dispensed at checkout rather than in the aisle because, again, NAM would have no power if checkout coupons were counted.  This contrived market definition finds no support in law or common sense, and is concededly reverse engineered for this litigation.

In a prior antitrust case against NAM where a competitor alleged a similarly narrow market (for at-shelf coupon dispensers, one of two primary products in the "market" alleged here), the Seventh Circuit affirmed summary judgment for NAM and asked:  "What would lead a reasonable person to think that the leading supplier of one form of coupon has the power to drive up price, given the plethora of substitutes?"  *Menasha Corp.* v. *News Am. Mktg. In-Store Servs.,*

*Inc.*, 354 F.3d 661, 663 (7th Cir. 2004).  The answer to that question then was, "nothing."  That remains the answer today.

In support of their narrow antitrust market, Plaintiffs offer the inadmissible testimony of a paid marketing professor to say that at-shelf promotional signs installed directly *by retailers* for CPGs are not a substitute for *exactly the same types of signs* installed *by NAM* for CPGs—even though they are displayed at precisely the same location and the shoppers to be influenced by the signs cannot tell them apart.  This defies common sense.  If NAM tried to raise its prices to CPGs, those companies could substitute essentially identical in-store signs offered by the retailers themselves.  Plaintiffs also offer the inadmissible testimony of a paid economist to say that if NAM were to try raise prices, more than 90% of its lost ISP sales could go to products other than third-party ISP—and yet those other products somehow are not substitutes for NAM's.  If a Toyota model car were to lose 90% of its sales to a Honda model, would anyone seriously contend the cars did not compete in the same market as substitutes?  The Court is not required to credit this kind of testimony at summary judgment just because it comes packaged as "expert."  These so-called "expert" opinions are the subject of *Daubert* motions:  the testimony cannot be squared with the case law on what it means to define a market.

Finally, Plaintiffs' antitrust claims all require a showing of injury and damages caused by the alleged antitrust violation.  Even if there were any evidence that NAM's conduct harmed competition in a relevant market (which there is not), there is no evidence that Plaintiffs were overcharged as a result.  This is another independent basis for granting summary judgment.  Plaintiffs' expert admitted he did not calculate damages caused by any particular form of alleged anticompetitive conduct.  Instead, he merely observed that NAM earns margins on its ISP business that are higher than the average of margins earned by a group of completely different

firms in completely different businesses.  Based on that observation he made two unsupported, and unsupportable, *assumptions*:  (1) that the difference in margins was entirely attributable to NAM's alleged monopoly power in his contrived market, and (2) that absent the alleged anticompetitive conduct, NAM's prices to CPGs would have been lower.  This is not expert testimony, it is sleight of hand.  On the central element of his analysis, he does nothing more than assume the answer to the question he was supposed to address with real economic analysis. He does nothing to distinguish between higher profit margins attributable to greater efficiency (lower costs or greater revenue production) or different market conditions, on the one hand, and illegal conduct, on the other hand.  No legal or economic authority suggests this is a valid way to calculate damages in an antitrust case.

Because there are no disputed issues of fact that require a determination by a jury, and because the only disputed issues of fact raised by Plaintiffs are immaterial as a matter of law, summary judgment should be granted.

## RELEVANT BACKGROUND[1]

Plaintiffs are six large CPGs suing on behalf of a class of CPGs.  56.1 ¶ 1.  NAM's products include ISP, which provides one way for CPGs to market their products to consumers in retail stores.  *See id.* ¶ 2.  ISP includes shelf signs—printed signs promoting a CPG's product as, for example, "New and Improved!" that are displayed on the shelf next to the product being promoted.  ISP also includes coupon machines—plastic dispensers from which shoppers can take coupons offering discounts on the product.  *Id.* ¶ 3.

---

[1] The relevant undisputed facts are set forth in further detail in the accompanying Statement of Undisputed Material Facts pursuant to Local Civil Rule 56.1 (cited herein as "56.1 ¶ __"). Citations to "Ex. __" refer to the accompanying Declaration of William B. Michael.

**NAM competes for access to retail stores, with limited exclusivity.**  To sell ISP to CPGs, NAM and its competitors must first enter into contracts with retailers that permit them access to place the ISP in retailers' stores.   These agreements typically provide a limited exclusivity:  NAM or Valassis, for example, is designated the "exclusive" third-party provider of particular ISP products in particular stores.  *See* 56.1 ¶¶ 16, 27.

Unsurprisingly, many retailers demand exclusivity (both from NAM and from its competitors), and benefit from it.[2]  No retailer has testified that NAM coerced it to enter into an exclusive agreement.

**CPGs demand category exclusivity**.  Exclusivity in retailer contracts is necessary for ISP providers to be able to offer "category exclusivity"—a major benefit to CPGs.  Category exclusivity means that when a CPG purchases an ISP product, it is guaranteed to be the only CPG with that particular ISP product in a particular section of the store at a particular time.  *Id.* ¶ 13.  In a prior antitrust case against NAM—where a competitor complained it was being harmed by exclusive agreements with retailers, and had its claims dismissed on summary judgment—the Seventh Circuit explained the benefit of category exclusivity to CPGs as follows:  "The retailers most attractive to manufacturers are those that have signed exclusive contracts, for then when Nabisco places at-shelf [coupon] dispensers for Oreo cookies it knows that there will not be another dispenser on the adjoining shelf promoting Procter & Gamble's sandwich cookies." *Menasha*, 354 F.3d at 662.  The testimony in this case confirms that benefit:  as a representative

---

[2] 

of Plaintiff Smithfield explained, "obviously you don't want . . . a bunch of competitors up competing—having signs up competing with your signage at the same time." 56.1 ¶ 14.

**NAM's contracts with retailers regularly come up for bid.**  While NAM's retailer contracts have been of different durations, they have averaged only ██ years in length. 56.1 ¶ 40.  Given their limited durations, a significant percentage of the contracts come up for competitive bidding every year.  During the class period, ██% to ██% of NAM's retailer network (██% on average) came up for bid every year.   Between 2010 and 2014, rivals had the opportunity to bid to be the ISP provider at ██% of all retailers in NAM's network.  56.1 ¶¶ 40, 60–63.[3]

**Retailers demand multi-year deals with guaranteed payments.**  Retailers often demand multi-year contracts because, ████████████████████████████████████

████████████████ 56.1 ¶¶ 74–77.   Retailers also often demand guaranteed payments—as opposed to payments per placement—for access to their stores.   Guaranteed payments offer retailers a certain and predictable revenue stream. *Id.* ¶ 75.  According to the ██████ representative: ████████████████████████████████████

███████ *Id.* ¶ 81.

**NAM's payments to retailers have always been profitable.**  NAM's payments to retailers have never been so high that they resulted in NAM's sales of ISP being unprofitable.

---

[3] These figures understate the opportunities for NAM's competitors to compete for retailer contracts.  First, they are limited to NAM's own network, so they exclude all of the retailers with which competitors (like Valassis) actually won contracts. ████████████████████████████████ ████████████████████████████, and thus were always open to competitive bidding.  56.1 ¶ 42.  Third, competitors also could compete for retailers *not* in NAM's network or a competing network.  These include some of the largest retailers in the country such as Wal-Mart, Target, Meijer, and Whole Foods.  Such retailers can and do change their minds about whether to contract with a third-party ISP provider.  For example, NAM was the first third-party ISP provider in ████████.  ████████ later signed an exclusive contract with ████, in response to a competitive offer.  56.1 ¶¶ 66–67.

*Id.* ¶ 68.   Out of hundreds of contracts that NAM entered into during the relevant period, Plaintiffs have identified only one contract that NAM projected, *ex ante*, would not be profitable (the ███████ contract); and they have identified only one contract that was, *ex post*, not actually profitable (the ███████ contract).[4]   NAM's revenue from ███████████ combined for the entire class period accounted for only 2.05% of NAM's total ISP revenue.  *Id.* ¶¶ 70–71.[5]

**NAM's contracts with CPGs are not exclusive.**   NAM also enters into contracts with some CPGs for the sale of ISP.  These contracts do not require CPGs to purchase ISP exclusively from NAM.  Nor do they prohibit CPGs from purchasing ISP from NAM's competitors.  The contracts are effectively no more than price lists:  they offer CPGs the *option* of buying ISP products at a contractually guaranteed price.  As a representative of Plaintiff Smithfield testified, for example, nothing in Smithfield's agreement with NAM requires Smithfield to actually purchase any ISPs from NAM.  *Id.* ¶¶ 9–10.  Nor does the agreement prevent Smithfield from purchasing ISPs from other vendors.  *Id.*

**Valassis entered the business in 2010.**   Valassis, having had no existing contracts with retailers, entered the ISP business in 2010 and ████████████████.  *Id.* ¶¶ 21–23, 25.  By 2014, it was able to amass a network of more than ████ retail stores nationwide—███ ███████ the number of retailers in NAM's network.  Valassis's network included several major

---

[4] NAM's expert identified five retailers in addition to ████ where NAM was unprofitable over the class period, despite projecting profitability.  *See* 56.1 ¶ 72.  Those five retailers together account for only 0.37% of NAM's revenues during the class period.  *Id.*

[5] While not material to this motion, NAM expected the ████ contract to be profitable, and the undisputed facts show that ████ business subsequently went into a steep decline, resulting in the closing of more than ██ stores and limiting NAM's opportunities to sell ISP in ████ stores.  Ex. 3 at Ex. 20a.  As a result, NAM's ISP revenues were far lower than projected, and it lost money.  Ex. 24 at 55:5–58:3; Ex. 28 at 130:19–131:15; *see* Ex. 169.  As for ████, it operated in a new class of trade (████████████), and reliable estimates for placements were unavailable at the time of the projection.  Ex. 3 ¶¶ 115, 117.

retailers that previously had contracts with NAM—such as ████████████████

████████████████████████████████████. *Id.* ¶¶ 24, 31.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████. *Id.* ¶¶ 40, 41.

In 2014, Valassis exited the grocery segment of the ISP business, though it remains a competitor in the drug and dollar store segments. *Id.* ¶ 33.[6]

**ISP faces intense competition.**   The evidence in this case demonstrates that NAM's ISP products compete with many other forms of marketing that Plaintiffs allege are outside the relevant market.  As discussed in <u>Section III</u> below, Plaintiffs must come forward with specific facts to show there is a genuine issue for trial on their alleged product market, and their failure of proof on this issue is an independent reason why summary judgment is required.

Plaintiffs concede that the goal of all marketing and promotion is to "increase[e] profits for the CPG by increasing sales of the CPG's product."  Ex. 4 at 29.  The undisputed evidence demonstrates that CPGs seek to increase sales through a wide variety of marketing products

---

[6]   While the reasons Valassis exited the grocery segment are not material to this motion, the undisputed facts show that Valassis, even though it had the exclusive right to sell ISPs in several major retailers, ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████.  By May 2013, Valassis's CEO stated on an investor call that Valassis was not selling enough placements per store to be profitable:  "We need to get better at selling more tactics.  We need more ads.  We need more coupons in the store. . . .  We are not doing as good a job on selling tactics as we had anticipated."  Ex. 168 at 1.  He added:  "we may have gotten a little bit complacent on the sales side of the business."  *Id.* ████████████████████████████████████████████████████ ████████████████████████████████████

other than ISP, all of which Plaintiffs exclude from their alleged market definition. These include: TV and radio ads, billboards, magazine ads, Internet and digital display ads, free samples, in-store demonstrations, digital coupons, coupons distributed with a Sunday newspaper (called free-standing inserts or "FSIs"), coupons distributed in store circulars, coupons distributed in or on product packaging, and "checkout" coupons distributed with receipts at the cash register (which are primarily provided by a company called Catalina). 56.1 ¶ 82. CPGs' options continue to expand with the rise of digital technologies, and the ability to reach consumers directly (in and out of stores) through mobile devices. *Id.* ¶¶ 110–113.

Most tellingly, even within the four walls of retail stores, NAM ISP is not the only, or even primary, way that CPGs promote their products. CPG spending with NAM is less than ██—just ██%—of the approximately $164 billion that CPGs spend on promotions in retail stores each year. *Id.* ¶ 88. Most of that money is spent on "retailer trade promotions," which involve CPGs paying retailers directly to promote their products in stores through discounts and sales, end-of-the-aisle ("end cap") displays, signs, coupons, and other forms of marketing. *Id.* ¶¶ 87–88. The signs and coupons placed by retailers are often so similar to the signs and coupons placed by NAM that shoppers cannot tell them apart. Plaintiffs' own economist expert (MacKie-Mason) could not distinguish between a NAM shelf sign and a retailer shelf sign. Ex. 24 at 281:10–283:14. Plaintiffs' marketing expert (Farris) conceded that shoppers "might not care or react differently to a sign that was erected by a [NAM] employee compared to one installed by the retailer or the CPG sales force." 56.1 ¶ 89.

The undisputed facts demonstrate that CPGs routinely substitute between third-party ISP and other forms of marketing that Plaintiffs exclude from the alleged market, including but not limited to retailer in-store trade promotions. *Id.* ¶¶ 91, 98, 101, 105, 108, 111–112. While

CPGs' total advertising spending increased during 2010–2013, their spending on ISP offered by ████████████████████ decreased. *Id.* ¶ 86. Many CPGs—including, in certain years, some of *the named Plaintiffs*—chose to buy ████ from NAM. *Id.* ¶ 11. Plaintiff ████████████, for example, ██████████████████████████ from 2011 to 2012; at the same time, █ ████████████████████████████████████████

████ *Id.* ¶ 101a. Plaintiff ██████, similarly, ███████████████████████ ████████ between 2010 and 2011, while almost █████████████████████. *Id.* ¶ 101b. An internal analysis prepared by ██████ marketing department recommended that █████████ ████████████████████████████████████████ ████████████████████████████ *Id.* ¶ 105c. NAM's ISP products compete with these and other forms of advertising and promotion for limited funds in CPGs' marketing budgets. *Id.* ¶¶ 90, 92, 97, 99, 103–104, 109.

## THE FOURTH AMENDED COMPLAINT

In their Fourth Amended Complaint ("FAC"), Plaintiffs allege exclusive dealing under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act. Plaintiffs assert that NAM entered into "long-term exclusive contracts" with retailers and CPGs, which foreclosed the alleged market. Ex. 1 ¶¶ 148–153 (Count III). As set forth in <u>Section I</u> below, Plaintiffs cannot show that NAM's contracts with CPGs or retailers substantially foreclosed competitors from an opportunity to compete for the business of retailers and CPGs.

Plaintiffs also allege monopolization under Section 2 of the Sherman Act. Plaintiffs allege that NAM obtained a monopoly through its "long-term exclusive contracts" with retailers and CPGs (Ex. 1 ¶¶ 10–11, 15–17); alleged business torts, such as "disparaging" competitors (Ex. 1 ¶¶ 86–107); and two allegedly anticompetitive agreements with competitors (Ex. 1

¶¶ 116–119) (Count I).  As set forth in <u>Section II</u> below, Plaintiffs cannot show that any of these alleged acts impaired competitors' opportunity to compete for business with retailers and CPGs.

The exclusive dealing and monopolization claims both are premised on NAM having excluded competition in a purported market consisting only of pre-checkout, "third-party" ISP. Ex. 1 ¶¶ 54–57.  For the reasons set forth in <u>Section III</u> below, this market definition is not supported by law or the evidence, and cannot withstand summary judgment.

Plaintiffs seek to recover alleged overcharges on their purchases of ISP, relying on the testimony of their expert (MacKie-Mason).  MacKie-Mason's injury and damages theory is contrary to law and cannot form the basis of a jury award in this case.  *See* <u>Section IV</u>.

Finally, Plaintiffs assert state law claims for exclusive dealing (Count VII) and monopolization (Count V), which fail for the same reasons as the federal claims.  *See* <u>Section V</u>.

All other counts in the FAC already have been dismissed with prejudice.  ECF No. 281.

## <u>LEGAL STANDARD</u>

Summary judgment should be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Tops Mkts., Inc.* v. *Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir. 1998).  NAM, as the moving party, "does not bear the burden of disproving an essential element of [Plaintiffs'] case."  *PepsiCo, Inc.* v. *Coca-Cola Co.*, 114 F. Supp. 2d 243, 247 (S.D.N.Y. 2000), *aff'd*, 315 F.3d 101 (2d Cir. 2002). Rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* (citing *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 325 (1986)).  To defeat summary judgment, Plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586

(1986).  They "must come forward with specific facts showing that there is a *genuine issue for trial*."  *Id.* at 587 (emphasis in original, quotation marks omitted).

Summary judgment is "particularly favored" in antitrust cases "because of the concern that protracted litigation will chill pro-competitive market forces."  *PepsiCo*, 315 F.3d at 104; *see Matsushita*, 475 U.S. at 593–94; *Tops*, 142 F.3d at 95.  "In the context of antitrust litigation the range of inferences that may be drawn from ambiguous evidence is limited; the non-moving party must set forth facts that tend to preclude an inference of permissible conduct."  *Capital Imaging Assocs.* v. *Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 542 (2d Cir. 1993).

## ARGUMENT

### I.    SUMMARY JUDGMENT SHOULD BE GRANTED DISMISSING THE EXCLUSIVE DEALING CLAIMS

Exclusive dealing usually benefits competition.  *See Tampa Elec. Co.* v. *Nashville Coal Co.*, 365 U.S. 320, 333–35 (1961).  The benefits of exclusive contracts include "ensuring stable markets and encouraging long term, mutually advantageous business relationships."  *Jefferson Parish Hosp. Dist. No. 2* v. *Hyde*, 466 U.S. 2, 46 (1984) (O'Connor, J. concurring).  It therefore is not among the "handful of practices" (such as price fixing) that the antitrust laws treat as *per se* illegal.  *CDC Techs., Inc.* v. *Idexx Labs., Inc.*, 186 F.3d 74, 79 (2d Cir. 1999).

Rather, given these procompetitive benefits, Plaintiffs "bear[] the initial burden of showing that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market."  *Capital Imaging*, 996 F.2d at 543.  To prevail on an exclusive dealing claim, Plaintiffs must prove that the agreements they challenge foreclose competition in a "substantial share of the relevant market."  *Tampa Elec.*, 365 U.S. at 328.  "Exclusive dealing is an unreasonable restraint on trade only when a significant fraction of buyers or sellers are frozen out of a market by the exclusive deal" in ways that harm the market's competitiveness.  *Jefferson*

14

*Parish*, 466 U.S. at 45 (O'Connor, J. concurring).  Because there is no evidence that NAM's agreements with retailers or CPGs foreclosed competition from a substantial share of the relevant market, even assuming *arguendo* Plaintiffs' definition of that market, NAM is entitled to summary judgment on Plaintiffs' exclusive dealing claims.

### A.      NAM's Contracts with Retailers Did Not Foreclose Competition

Plaintiffs challenge three aspects of NAM's contracts with retailers that they contend have foreclosed competition:  (1) their length; (2) their "staggered" expiration dates; and (3) the amount NAM paid for access to retailers' stores.  Plaintiffs do *not* contend, however, that consumers would be better off if ISP providers contracted with retailers on a *non*-exclusive basis. They concede that in a "but-for world"—*i.e.*, a world without the supposed anticompetitive conduct—exclusive contracts for the placement of ISPs in retail stores would continue to exist and continue to be the industry standard.  Ex. 4 at 93.  As the Seventh Circuit summarized in *Menasha*:  "That retailers and manufacturers *like* exclusive deals implies that they serve the interests of these, the consumers of couponing services."  354 F.3d at 663.

Plaintiffs cannot survive summary judgment on their exclusive dealing claims without evidence that the conceded benefits of exclusive retailer contracts are outweighed by those agreements' alleged anticompetitive effects.  No such evidence exists.  The undisputed facts about the structure of NAM's contracts negate any possible finding that the three challenged features of the contracts—(1) their length, (2) "staggered" expiration dates, and (3) the amount NAM paid for access to retailers' stores—froze competitors out of an opportunity to compete.

### 1.    The Length of NAM's Retailer Contracts Has Averaged Less Than Three Years and Has Not Foreclosed Competitive Bidding

It "is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract."  *Spinelli*, 2015 WL 1433370, at *26.  Competition

for exclusive contracts "may actually encourage, rather than discourage, competition, because the incumbent and other [competitors] . . . have a strong incentive continually to improve the [services] and prices they offer in order to secure the exclusive positions." *Balaklaw* v. *Lovell*, 14 F.3d 793, 799 (2d Cir. 1994); *see also Konik* v. *Champlain Valley Physicians Hosp. Med. Ctr.*, 733 F.2d 1007, 1015 (2d Cir. 1984). In the specific context of competition for exclusive agreements with retailers for placement of ISP, the Seventh Circuit observed: "[C]ompetition for the contract is a vital form of rivalry, and often the most powerful one, which the antitrust laws encourage rather than suppress." *Menasha*, 354 F.3d at 663.

That NAM's competitors did not actually *win* certain contracts does not change the antitrust analysis. "[I]t is the nature of competition that at some point there are winners and losers, and the losers are excluded." *Konik*, 733 F.2d at 1015; *see also Indeck Energy Servs., Inc.* v. *Consumers Energy Co.*, 250 F.3d 972, 978 (6th Cir. 2000) ("Theoretically, any selection of a competitor in the marketplace will cause some economic harm to the entities not chosen for the provision of goods of services."). Such evidence cannot establish an antitrust violation. *See CDC*, 186 F.3d at 77, 80–81 (affirming summary judgment for defendant where plaintiff had opportunity to compete for exclusive contracts, even though plaintiff "remained a minor player in the market"); *Barry Wright Corp.* v. *ITT Grinnell Corp.*, 724 F.2d 227, 236 (1st Cir. 1983) (Breyer, J.) ("[V]irtually every contract to buy 'forecloses' or 'excludes' alternative sellers from some portion of the market, namely the portion consisting of what was bought.").

Consistent with these principles, exclusive contracts of limited duration do not violate the antitrust laws because they do not foreclose competitors from competing for the contract. As another court in this District recently held, where opportunities exist to bid on exclusive contracts at the conclusion of their terms, contracts with exclusivity periods that last no longer

than three years "<u>do not foreclose competition and are not anticompetitive as a matter of law</u>."
*Spinelli*, 2015 WL 1433370, at *26 (emphasis added); *see also Balaklaw*, 14 F.3d at 799.  Other
courts have upheld exclusive contracts lasting even longer than three years, where competitors
had the opportunity to bid at the start and end of the contracts.  *See, e.g.*, *NicSand, Inc.* v. *3M
Co.*, 507 F.3d 442, 453 (6th Cir. 2007) (dismissing claim that "multi-year" exclusive contracts,
assumed to be 3–5 years long, were anticompetitive); *Indeck*, 250 F.3d at 977–78 (upholding 5–
10 year exclusive contracts because "customers were free to seek other [suppliers] at the
conclusion of the contracts"); *Ferguson* v. *Greater Pocatello Chamber of Commerce, Inc.*, 848
F.2d 976, 982 (9th Cir. 1988) (upholding 6 year exclusive contracts).

Here, it is undisputed that the average length of NAM's retailer contracts during the
relevant period was only ▇▇ years.  56.1 ¶ 40.  This is without even factoring in that many of
NAM's retailer contracts have ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  *See id.* ¶ 42.  It also is
undisputed that contracts with virtually *every retailer in NAM's network* came up for competitive
bidding at least once during the class period.  *Id.* ¶ 63.  On average, approximately 40% of
NAM's network was open to competition in any given year.  *Id.* ¶ 60.

Competitors not only had the opportunity to bid for NAM's contracts, they *did* bid for the
contracts—and often won them.  Valassis, for example, entered the ISP business in 2010, having
no existing contracts.  *Supra* at 9–10.  By 2014, it had amassed a network of exclusive contracts
with more than ▇▇▇▇ retail stores nationwide.  *Id.* ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇  *Id.*

In the face of these undisputed facts, Plaintiffs cannot establish "market foreclosure and
harm to competition stemming from the challenged agreements."  *Spinelli*, 2015 WL 1433370, at

*26; *see also NicSand*, 507 F.3d at 453 (no harm to competition from multi-year exclusive agreements where competitors "could have competed for the exact same multi-year agreements"). *Ticketmaster Corp.* v. *Tickets.Com, Inc.*, No. CV99-7654, 2003 WL 21397701, (C.D. Cal. Mar. 7, 2003), *aff'd*, 127 F. App'x 346 (9th Cir. 2005), is on point. That case involved two firms competing to provide ticket services for entertainment venues nationwide. *Id.* at *1. The defendant, Ticketmaster, had "exclusive contracts which cover 75% of the tickets sold." *Id.* at *2. The contracts were "long term, usually between three and ten years, and average six years"—*i.e.*, <u>twice as long</u> as NAM's contracts with retailers. *Id.* These contracts came up for bid at a rate of "about 20% per year"—*i.e.*, <u>half as frequently</u> as NAM's contracts. *Id.* at *5. Ticketmaster often made large upfront payments to venues to secure the contracts. *Id.*

The district court granted summary judgment for Ticketmaster on plaintiffs' Sherman Act Section 1 and 2 claims, and the Ninth Circuit affirmed, based on the following undisputed facts: (1) "the venues themselves prefer long term exclusive contracts for their own reasons"; (2) "no venues have complained about long term contracts or felt forced into them against their desires"; (3) both major competitors "use the long term exclusive contract to accommodate their customers' desires"; and (4) "[a]bout 20% or more of the contracts come up for renewal each year," which "ought to be sufficient to give [plaintiff] a chance to show that it can provide a better product, service, or price than can [defendant]." *Id.* at *5. In these circumstances, the court held, the "evidence does not support the argument that long term exclusive contracts are an unreasonable drag on real competition in the industry." *Id.*; *see* 127 F. App'x at 347–48.

The undisputed evidence supporting summary judgment for NAM is even more persuasive: NAM's agreements with retailers are not "long term," averaging only ▮ years; retailers prefer multi-year exclusive contracts for their own reasons; no retailers have complained

about the contracts; NAM and its competitors ███████████ used multi-year exclusive agreements to accommodate retailers' desires; and approximately ██% of the contracts came up for renewal each year—providing ██████, or any other competitor, a more-than-sufficient chance to show it could provide a better product, service or price than NAM. *Supra* at 8.

Plaintiffs are likely to respond by pointing to two specific retailer contracts—out of nearly ████ total—with longer terms than the others. These are NAM's 2004 agreement with ██████, which had a ██████ term, and its 2006 agreement with █████, which had a ██████ term. The fact that these two contracts lasted longer than two or three years does not create a genuine issue for trial regarding foreclosure in the alleged market as a whole, *see Tampa Elec.*, 365 U.S. at 328, for two independent reasons.

<u>First</u>, even if, contrary to the facts, one were to assume the worst about the ██████ and ██████ contracts—*i.e.*, that they totally foreclosed competition for those retailers—these two contracts would not support an exclusive dealing claim because Plaintiffs are required to prove that NAM's contracts foreclosed competition in a "<u>substantial</u> share of the relevant market." *Tampa Elec.*, 365 U.S. at 328 (emphasis added). As a matter of law, "foreclosure levels are unlikely to be of concern where they are <u>less than 30 or 40 percent</u>." *Stop & Shop Supermarket Co.* v. *Blue Cross Blue Shield*, 373 F.3d 57, 68 (1st Cir. 2004) (emphasis added) (citing *Jefferson Parish*, 466 U.S. at 45–46); *see, e.g.*, *Spinelli*, 2015 WL 1433370, at *26 ("Foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent . . . ." (quoting *Sterling Merch., Inc.* v. *Nestle, S.A.*, 656 F.3d 112, 123–24 (1st Cir. 2011)). ██████ and ██████ accounted for only 3.8% and 6.7% of retailer business, respectively. 56.1 ¶¶ 43, 53. Such "low numbers make dismissal easy." *Stop & Shop*, 373 F.3d at 68.[7]

_____

[7] Even if ███████████ shares were measured as a percentage of only those retailers that have existing contracts with ██████ or ██████ for third-party ISP (an artificially narrow

Second, the undisputed facts demonstrate that NAM's contracts with ███████ and ███████ did not prevent rivals from competing "to secure the exclusive positions" even with those particular retailers. *Balaklaw*, 14 F.3d at 799.



NAM's competitors thus had an "opportunity to bid" for contracts with ███████ and ███████ at the start and end of those contracts. *Ferguson*, 848 F.2d at 982.  The fact that NAM was successful in competing for these contracts is consistent with the conclusion that these

approach, but one which Plaintiffs' expert has proposed), they would account for just ██% (███████) and ██% (███████) of the "market."  *See* 56.1 ¶¶ 43, 53.  Thus, by any measure, the alleged foreclosure levels were below 30–40%.

retailers believed NAM offered "the better deal, not only in terms of price, but also in terms of reliability and ability to do a competent job." *Ticketmaster*, 2003 WL 21397701, at *4.

> ### 2. The "Staggered" End Dates of NAM's Retailer Agreements Do Not Substantially Foreclose Competition

Unable to show that NAM's contracts foreclosed competition by their duration, Plaintiffs add the allegation that NAM intentionally "staggered" the expiration dates of its retailer contracts so that not all contracts come up for bid at the same time.  Ex. 1 ¶¶ 14, 90.

As the Seventh Circuit explained in rejecting a virtually identical antitrust claim against NAM:  "One might think that staggered expiration dates make entry easier; [rivals] can sign up chains as their exclusives expire, without having to enroll the entire retail industry at one go." *Menasha*, 354 F.3d at 663.  The only other court of appeals to address the issue also rejected a claim that exclusive contracts containing "long terms with staggered termination dates" violate the antitrust laws.  *Fleer Corp.* v. *Topps Chewing Gum, Inc.*, 658 F.2d 139, 149 (3d Cir. 1981).

This case illustrates why.  The undisputed facts show that the "staggered" end dates of NAM's contracts did not deny competitors the opportunity to compete for retailer contracts.  To the contrary, staggering provided *more* competitive opportunities than if all contracts had come up for bid at the same time only once every two or three years.  Plaintiffs have not adduced any evidence that the huge parts of NAM's network available for competitive bidding each year (approximately ██ %) were not sufficient for competition to occur.  When asked at his deposition whether he had "offered an opinion that quantifies a percentage of retailer agreements that need to be available in a single year or over a period of years in order to permit a competitor to achieve critical mass," MacKie-Mason testified he had not.  Ex. 24 at 111:8–17.

Instead of addressing the actual features of NAM's contracts and their effect on the competitive process, Plaintiffs focus on the effects that NAM allegedly *intended* its contracts to

have on competitors.  *E.g.*, Ex. 1 ¶ 90; Ex. 4 at 59.  Given the undisputed record establishing the *actual structural effects* of the so-called staggering, such allegations are immaterial and cannot defeat summary judgment or create an issue for trial.  "[E]vidence of defendants' intent, even belief that what they were doing might be unlawful, is unavailing in the absence of evidence of anti-competitive effect."  *K.M.B. Warehouse Distribs., Inc.* v. *Walker Mfg. Co.*, 61 F.3d 123, 130 (2d Cir. 1995); *see U.S. Healthcare, Inc.* v. *Healthsource, Inc.*, 986 F.2d 589, 596 (1st Cir. 1993) ("Absent a compelling showing of foreclosure of substantial dimensions, we think there is no need for us to pursue any inquiry into [defendant's] precise motives for the [exclusivity] clause."); *Ocean State Physicians Health Plan, Inc.* v. *Blue Cross & Blue Shield of R.I.*, 883 F.2d 1101, 1113 (1st Cir. 1989) ("[T]he desire to crush a competitor, standing alone is insufficient to make out a violation of the antitrust laws. . . .  As long as [defendant's] course of conduct was itself legitimate, the fact that some of its executives hoped to see [the competitor] disappear is irrelevant."); *see also* Richard A. Posner, Antitrust Law: An Economic Perspective 214–15 (2d ed. 2001) ("Especially misleading is the inveterate tendency of sale executives to brag to their superiors about their competitive prowess, often using metaphors of coercion that are compelling evidence of predatory intent to the naïve.").  Exclusive agreements are anticompetitive "<u>only when</u> a significant fraction of buyers or sellers are frozen out of a market."  *Jefferson Parish*, 466 U.S. at 45 (emphasis added).

Thus, for example, the Second Circuit in *CDC* affirmed summary judgment for the defendant based on a lack of evidence that competition actually was foreclosed, despite evidence that defendant's exclusive contracts were intended to "Block [competitors' products] at [the] Distribution Channel," "Erect Barriers to Entry," and "Create an Environment Hostile to Competitive Entry."  186 F.3d at 76 (some alterations omitted).  The Third Circuit in *Fleer*

22

likewise rejected a challenge to the defendant's use of staggered exclusive contracts with baseball players for publicity rights, despite evidence that defendant was engaged in an "assiduous program of obtaining exclusive license agreements with every major and minor league baseball player."  658 F.2d at 149.  Because the contracts did not foreclose opportunities for rivals to compete as the contracts expired, their "long terms" and "staggered termination dates" did not violate the antitrust laws; and the defendants' intent could not change that result. *Id.* at 149–51.

> ### 3.   NAM's Above-Cost Payments to Retailers Do Not Foreclose Competition as a Matter of Law

Plaintiffs' final attempt to show that NAM's contracts foreclosed competition is based on the allegation that NAM makes "unjustified payments to retailers to exclude competitors from the in-store relevant market."  Ex. 1 ¶ 101.  But Plaintiffs mischaracterize the law, and present no evidence that NAM's payments reflect anything other than lawful *competitive* conduct.

"Just as sellers use output prices to compete for purchasers, buyers use bid prices to compete for scarce inputs."  *Weyerhaeuser*, 549 U.S. at 323.  The "scarce inputs" here are retail store space.  *See* 56.1 ¶ 18.  The "bid prices" are the amounts that NAM and its competitors are willing to pay for that space.  *See id*.  As the Supreme Court has explained, "[t]here are myriad legitimate reasons—ranging from benign to affirmatively procompetitive—why a buyer might bid up input prices."  *Weyerhaeuser*, 549 U.S. at 323.  The legitimate reasons include "bid[ding] up input prices to acquire more inputs as part of a procompetitive strategy to gain market share in the output market."  *Id.*

Recognizing that increased bid prices are a sign of competition, not its suppression, the Supreme Court has held "[t]here is nothing illicit about these bidding decisions.  Indeed, this sort of high bidding is essential to competition and innovation on the buy side of the market."  *Id*. at

323–24 (emphasis added).   Accordingly, the Supreme Court has expressed a high degree of skepticism regarding "predatory bidding" claims—*i.e.*, claims that one competitor's bid prices are "too high."  *See id.*  Such claims can succeed only if Plaintiffs satisfy a stringent two-part test.  Plaintiffs must prove (1) "that the alleged predatory bidding led to below-cost pricing of [NAM's] outputs" (the ISPs it sells to its CPG customers); and (2) that NAM "has a dangerous probability of recouping the losses incurred in bidding up input prices through the exercise of monopsony power."  *Id.* at 325.  These standards mirror the test for predatory pricing claims—*i.e.*, claims that the defendant's output prices are too low.  *Id.*  "As with predatory pricing, the exclusionary effect of higher bidding that does not result in below-cost output pricing 'is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate' procompetitive conduct."  *Id.* (quoting *Brooke Grp.*, 509 U.S. at 223).

Plaintiffs have not even tried to meet these standards, and the undisputed evidence demonstrates they cannot meet them.  ███████████████████████████████████████ ███████████████████████████████████████████████████████.  56.1 ¶ 68.   Indeed, Plaintiffs complain the profits are too high.  That alone is sufficient to defeat any allegation that NAM's payments to retailers led "to below-cost pricing in the relevant output market."  *Weyerhaeuser*, 549 U.S. at 325.  There is no evidence to suggest that NAM's payments to retailers "would produce even a short-term loss for [NAM's] operations taken as a whole."  *Buffalo Courier-Express, Inc.* v. *Buffalo Evening News, Inc.*, 601 F.2d 48, 55 (2d Cir. 1979).  To the contrary, ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████.  56.1 ¶¶ 70–72.

After extensive discovery, Plaintiffs have identified only a single example of an unprofitable contract, out of the hundreds NAM entered into during and before the class period:

NAM's 2011 contract with ████, which accounted for less than 2% of NAM's total ISP revenues.  56.1 ¶ 72.   Such isolated instances of below-cost pricing are immaterial, since they do not amount to predation in the market "as a whole," and thus cannot lead to elimination of competition from the market as a whole.  *Buffalo Courier*, 601 F.2d at 55; *see Astra Media Grp., LLC* v. *Clear Channel Taxi Media, LLC*, 414 F. App'x 334, 336 (2d Cir. 2011) (finding that underpricing a single contract amongst many was insufficient to allege predation); *Morgan* v. *Ponder*, 892 F.2d 1355, 1361–62 (8th Cir. 1989) ("[T]he basic question [is] whether the alleged predatory act poses a genuine threat to the *overall* competition").

For the same reasons, Plaintiffs cannot establish predatory overbidding by pointing to evidence that NAM lost money on specific ISP tactics in specific retailers.  As a matter of law, evidence of below-cost pricing on individual products out of a full line is insufficient to establish predation.  *See Morgan*, 892 F.2d at 1362 ("Courts have been wary of plaintiffs' attempts to prove predatory pricing through evidence of a low price charged for a single product out of many. . . ."); *Bayou Bottling, Inc.* v. *Dr. Pepper Co.*, 725 F.2d 300, 305 (5th Cir. 1984); Areeda & Hovenkamp, Antitrust Law ¶ 742c1 (3d ed. 2008) (predation claims should "require a showing that the full product line was sold at below the relevant cost measure, not simply one or a small subset of products").  Plaintiffs and their expert contend, for example, that NAM "overpaid" ████, but the only evidence they have identified is that NAM lost money on sales of its ████ product in ████ stores.  They admit that NAM's contract with ████ as a whole was profitable.  56.1 ¶ 73a.  They also admit that below-cost pricing of ████ did *not* exclude competition in the alleged market as a whole.  MacKie-Mason conceded:  "Valassis entered the market as a full-line supplier of in-store promotion;" therefore, "Valassis could not be weakened or excluded by targeting single tactics."  Ex. 48 at 37.

Lacking any economic evidence to meet the relevant standards for predation, Plaintiffs and their expert try to manufacture a triable issue by falling back on allegations about NAM's intent. MacKie-Mason opines, for example, that "[w]hen News was unlikely to win a retailer, it would submit a bid for the express purpose of driving up [a rival's] costs." Ex. 4 at 82.[8] That NAM's higher bidding for contracts was intended to (or did) make it more difficult or less profitable for competitors to win business away from NAM only underscores that such bidding is a reflection of *competition*. As the *Menasha* court observed, "higher payments to retailers" are, in terms of their effect on competition, equivalent to "reducing price." 354 F.3d at 666. "Just as a firm cannot claim antitrust injury from nonpredatory price competition on the asserted ground that it is ruinous, [plaintiff] cannot claim antitrust injury from defendants' participation in [a competitive bidding] auction on the ground that it raised [plaintiff's] costs." *Viacom Int'l Inc.* v. *Tele-Comm'cns, Inc.*, No. 93 Civ. 6658, 1994 WL 561377, at *6 (S.D.N.Y. Oct. 12, 1994); *see also Cargill, Inc.* v. *Monfort of Colo., Inc.*, 479 U.S. 104, 114–116 (1986) (holding that the threat of a loss of profitability to a competitor from above-cost price competition does not violate the antitrust laws). Accordingly, courts have rejected as "flatly contrary to law" arguments that "aggressive" pricing or bidding constitutes an antitrust violation, absent evidence of predation. *Superior Production P'ship* v. *Gordon Auto Body Parts Co.*, 784 F.3d 311, 324–25 (6th Cir. 2015); *see also Weyerhaeuser*, 549 U.S. at 325. And, "absen[t] evidence of anti-competitive effect," evidence of NAM's *intent* is "unavailing." *K.M.B. Warehouse Distribs.*, 61 F.3d at 130.[9]

---

[8] As set forth in Defendants' Motion to Exclude Portions of the Testimony of Dr. MacKie-Mason ("MacKie-Mason Mot."), MacKie-Mason's "expert" testimony about NAM's intent is inadmissible. Regardless, such testimony is immaterial at summary judgment. *See supra* at 21–22.

[9] Unable to show that the terms or structure of NAM's retailer agreements foreclosed competition, Plaintiffs' expert has suggested another theory, found nowhere in the Complaint— that NAM foreclosed competition by approaching retailers about renewing contracts prior to

**B.     NAM's Agreements with CPGs Were Not Exclusive**

NAM's agreements with CPGs cannot give rise to an exclusive dealing claim, for a simple reason:   there is no evidence that NAM employed "exclusive, right-of-first-refusal or requirement contracts with CPGs to exclude its in-store . . . competitors."  Ex. 1 ¶ 108.

The undisputed facts show that NAM's contracts do not require CPGs to buy all, or any portion, of their ISP "requirements" from NAM.  56.1 ¶ 10.  *See, e.g.*, *Tampa Elec.*, 365 U.S. at 321–23.  Nor do they prohibit CPGs from buying ISP from NAM's competitors.  56.1 ¶ 9.  *See, e.g.*, *Concord Boat Corp.* v. *Brunswick Corp.*, 207 F.3d 1039, 1058–59 (8th Cir. 2000).  In short, there is no evidence that NAM's contracts with CPGs for the purchase of ISP were exclusive or exclusionary, and thus no evidence that such contracts could foreclose competition.[10]

**II.     SUMMARY JUDGMENT SHOULD BE GRANTED
          DISMISSING THE MONOPOLIZATION CLAIM**

To establish a monopolization claim, Plaintiffs must prove "(1) the possession of monopoly power in [the] relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product,

---

their expiration.  Ex. 4 at 78–79.  It is not improper to approach counterparties about extending or agreeing upon new contracts—regardless of the timing—where nothing stops or limits the retailer from seeking better terms or entertaining or soliciting a competing offer from a rival.  *See In re "Apollo" Air Passenger Computer Reservation Sys. (CRS)*, 720 F. Supp. 1068, 1077 (S.D.N.Y. 1989) (granting summary judgment where defendant pursued policy seeking "early renewals" of allegedly exclusive contracts such that "only 41 out of [] 7,000 contracts" ever expired because defendant's customers were free to "demand discounts or improved terms" or "take advantage of lower prices offered in the area").  Indeed, Plaintiffs' expert acknowledged that early renewal negotiations are not "inherently anticompetitive," Ex. 24 at 148:4–9, that nothing prevented NAM's competitors from making contemporaneous offers to retailers, *id.* at 153:21–155:5, and that he did not seek to identify "instance by instance" which negotiations allegedly occurred too early, *id.* at 162:14–163:6.  It is also undisputed that ██████████ ████████████████████████  56.1 ¶ 30.

[10]  Plaintiffs' inability to prove that NAM's agreements with retailers and CPGs foreclosed competition means that their exclusive dealing claims fail under Sherman Act Sections 1 and 2 and Clayton Act Section 3.  *See Tampa Elec.*, 365 U.S. at 335; *CDC*, 186 F.3d at 79, 81.

business acumen, or historic accident." *United States* v. *Grinnell Corp.*, 384 U.S. 563, 570–71 (1966). Even assuming *arguendo* Plaintiffs' definition of relevant market, summary judgment should be granted because there is no evidence that NAM engaged in any "anticompetitive conduct." *Verizon Commc'ns Inc*. v. *Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004).

Plaintiffs base their monopolization claim on the same alleged contracts as their exclusive dealing claims. Those contracts are not anticompetitive as a matter of law, for the reasons set forth above, and therefore cannot support a Sherman Act Section 2 claim. *Supra* at 15–27. Plaintiffs also allege that NAM committed various alleged business torts, Ex. 1 ¶¶ 86–107, and entered into agreements with competitors, including lawsuit settlements, *id*. ¶¶ 116–119. Plaintiffs cannot prove that any of these alleged acts had an anticompetitive effect.

### A.      The Alleged Business Torts Did Not Harm Competition

Plaintiffs repeat various complaints about tortious conduct made by NAM's competitors—most of which are at least a decade old and supported only by inadmissible hearsay—and assert that they add up to a claim that NAM illegally maintained a monopoly and overcharged CPG customers beginning in 2008. *See* Ex. 1 ¶¶ 87–89, 92–93, 102–107. But Plaintiffs cannot prove that any of this alleged conduct (even if they had admissible evidence that it occurred) harmed competition during the relevant period. As set forth in Section I, the undisputed facts establish that even after all of NAM's alleged conduct occurred, the structure of its contracts and the market allowed competitors an opportunity to compete for the business of CPGs and retailers and NAM did not prevent the competitive process from occurring. That should be the end of the inquiry under the antitrust laws.

The Supreme Court and Second Circuit have warned, repeatedly, against "transform[ing] cases involving business behavior that is improper for various reasons . . . into treble-damages

antitrust cases." *NYNEX*, 525 U.S. at 137.  "The Sherman Act is not a panacea for all evils that may infect business life." *Berkey Photo, Inc.* v. *Eastman Kodak Co.*, 603 F.2d 263, 288 n.41 (2d Cir. 1979).  As Judge Lynch summarized: "Employing tactics that undermine one's competitors—even unfairly—does not violate the antitrust laws." *S.W.B. New England, Inc.* v. *R.A.B. Food Grp., LLC.*, No. 06 Civ. 15357, 2008 WL 540091, at *6 (S.D.N.Y. Feb. 27, 2008). The antitrust "laws do not create a federal law of unfair competition or purport to afford remedies for all torts committed by or against persons engaged in interstate commerce." *Brooke Grp.*, 509 U.S. at 225 (internal quotation omitted).

Consistent with these warnings, the authors of the leading antitrust treatise have written, and several courts have held:  "The antitrust court must . . . insist on a preliminary showing of significant and more than temporary harmful effects on competition (not merely on a competitor or customer) before considering a tort as an exclusionary practice."  Areeda & Hovenkamp ¶ 782a1; *see, e.g.*, *Am. Prof'l Testing Serv., Inc.* v. *Harcourt Brace Jovanovich Legal & Prof'l Publ'ns Inc.*, 108 F.3d 1147, 1151 (9th Cir. 1997); *Colo. Interstate Gas Co.* v. *Natural Gas Pipeline Co.*, 885 F.2d 683, 697 & n.26 (10th Cir. 1989).  "In the absence of such a preliminary showing, the defendant should win summary judgment."  Areeda & Hovenkamp ¶ 782a1.

On the undisputed facts, Plaintiffs cannot show that the alleged business torts had such significant effects on competition, for three independent reasons:

First, Plaintiffs' claims are based entirely on alleged conduct that took place many years ago before the relevant period for this case.  Plaintiffs allege, for example, that NAM "hacked" into a competitor's website in 2003-2004, Ex. 1 ¶¶ 14, 89; "disparage[ed]" competitors' compliance rates in a letter to customers in 2003, *id.* ¶¶ 102–103; and "defaced" competitors' advertisements in 2003, *id.* ¶ 105.

Plaintiffs have not identified any evidence of tortious conduct occurring after 2008, the start of the damages period in this case.  56.1 ¶ 122.  Nor have they adduced any evidence that the old conduct (assuming they have any admissible evidence that it occurred) had a "significant and more than temporary harmful effect" that persisted into the damages period.  The undisputed facts show the opposite is true.  NAM's expert (Murphy) has explained:  "As a matter of economics, the challenged conduct that occurred before the alleged class period could only have an effect that persisted into the class period if rivals would have been unable to enter at the beginning of the class period even if the challenged conduct stopped."  Ex. 3 ¶ 228.  The undisputed facts are that entry *did* occur during the class period, and was not prevented by the challenged conduct.[11]  MacKie-Mason admitted he did no analysis that even purports to show that the alleged tortious conduct from before the damages period harmed competition during the damages period.  56.1 ¶¶ 124–125; *see also* Ex. 24 at 271:12–272:13.  In his rebuttal report, he did not even try to address Murphy's showing that there were no such effects.  *Id.* at 329:9–25.  As a result, Murphy's testimony is undisputed.

Second, Plaintiffs have no evidence that the alleged business torts harmed competition in *any* time period.  MacKie-Mason devoted one paragraph, of a 122-page report, to the alleged tortious conduct.  Ex. 4 at 91.  He conducted no analysis and offered no substantive opinion on the effects of this conduct.  Rather, he presented only the following conclusory assertion:  "If plaintiffs demonstrate that News engaged in this conduct, then these acts, too, contributed to the maintenance of News's monopoly."  *Id.*  Pressed in his deposition on this issue, he admitted that

---

[11]  Regardless of anything NAM allegedly did in 2003 to harm other competitors (*e.g.*, Floorgraphics), it is undisputed that Valassis was able to enter the in-store business in 2010 and quickly sign up contracts with ████████████ of retail stores.  56.1 ¶¶ 21, 24. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

he had no "understanding as to the amount of business that was lost or how it impaired another competitor's business." Ex. 24 at 275:9–12. He testified: "I have not done an independent study of how much harm occurred or how it occurred." *Id.* at 267:6–8.

That is tantamount to saying that tortious conduct, if it occurs, *must* be anticompetitive. More than three decades of Supreme Court and Second Circuit case law holds to the contrary. *Supra* at 28–30. MacKie-Mason's naked assertion that the alleged business torts contributed to maintenance of a monopoly, therefore, does not create a genuine issue for trial. "When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp.*, 509 U.S. at 242. Plaintiffs offer no other evidence to raise a genuine issue of material fact.

<u>Finally</u>, in addition to there being no evidence of significant effects on competition, Plaintiffs' allegations that NAM maintained a monopoly by disparaging certain competitors are subject to "a presumption that the effect on competition of such a practice was *de minimis*." *Berkey Photo*, 603 F.2d at 288 n.41. To overcome this presumption, Plaintiffs must prove that the representations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible to neutralization or other offset by rivals." *Nat'l Ass'n of Pharm. Mfrs., Inc.* v. *Ayerst Labs.*, 850 F.2d 904, 916 (2d Cir. 1988). Courts in this Circuit apply the presumption even in cases "where there are only two firms in the relevant market and one of them is dominant." *Reed Const. Data Inc.* v. *McGraw Hill Cos.*, 49 F. Supp. 3d 385, 420 (S.D.N.Y. 2014).[12]

---

[12] On this basis, the court in *Reed* distinguished a decision from the District of Minnesota denying summary judgment for NAM in a prior antitrust case brought by a competitor, *Insignia*

Plaintiffs cannot overcome the presumption in this case.   Indeed, Plaintiffs have not alleged or sought to prove that they themselves—large, sophisticated CPGs who spend millions annually on marketing—or any other CPGs were misled by the alleged disparagement.   Given Plaintiffs' failure of proof, "the presumption that [NAM's] conduct had a *de minimis* effect on competition holds, and [NAM] is entitled to summary judgment." *Id.* at 422.

## B.      The Alleged Agreements with Competitors Were Not Anticompetitive

Plaintiffs next allege that NAM "enhance[d]" its monopoly by entering into agreements with two competitors—Insignia and Floorgraphics.   Ex. 1 ¶¶ 118–119.   To show that an acquisition or non-compete agreement violated Section 2, Plaintiffs must show that the agreement harmed competition itself.   *Capital Imaging*, 996 F.2d at 543.   This is a rare and "idiosyncratic" kind of allegation—typically "[a]n acquisition deters no one from entering the market . . . ."   Areeda & Hovenkamp ¶ 701b.

**Insignia**.   Plaintiffs have no evidence that NAM's distribution agreement with Insignia was anticompetitive.   The undisputed record shows that the agreement *increased* competition.   In 2011, Insignia and NAM entered into an agreement to allow Insignia to sell its signs through NAM's network of retailers.   Insignia now boasts a network of 23,000 retailers (compared to only 9,000 in 2007) and its revenue has increased every year between 2011 and 2013.   56.1 ¶ 36. In its own words, Insignia "continue[s] to compete for advertising dollars with News America's other at-shelf advertising and promotional signage offerings."   Ex. 45 at 4.   It thus described its agreement with NAM as providing "additional opportunities to compete."   *Id.*

MacKie-Mason conducted no analysis to show that the distribution agreement harmed competition.   Ex. 24 at 247:13–249:22.   He did not, for example, examine whether the agreement

---

*Systems, Inc.* v. *News America Marketing In-Store, Inc.*, 661 F. Supp. 2d 1039 (D. Minn. 2009), as being inconsistent with Second Circuit law.   *Reed*, 49 F. Supp. 3d at 420.

has had any effect on Insignia's prices, costs, or outputs.  *Id.* at 249:7–22.  His mere speculation

that Insignia is "no longer independently competing" with NAM, *id.* at 243:15–24, does not

create a triable issue of fact.  *E.g.*, *Brooke Grp.*, 509 U.S. at 242.

     **Floorgraphics**.  Plaintiffs also fail to offer evidence that NAM's 2009 acquisition of

some Floorgraphics retailer contracts was anticompetitive.  ███████████████████

███████████████████████████████████████████████.  Ex. 4 at Ex. 50.

In 2009, NAM acquired some, but not all, of its remaining retailer contracts, as part of a lawsuit

settlement.  56.1 ¶ 39.  MacKie-Mason performed no analysis of the acquisition's effect on

competition in the alleged market as a whole.  Nor did he show that the acquisition prevented

Valassis's contemporaneous entry into the ISP business—including with its own floor product—

which it obviously did not.  *Id.* ¶ 127.[13]

## III.  NAM IS ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE NAM HAD POWER IN A RELEVANT PRODUCT MARKET

     The previous two sections assumed Plaintiffs' definition of the relevant market *arguendo*.

But in fact, there is no evidence in the record to support that definition.  This provides another,

independent basis for granting summary judgment to NAM on both the exclusive dealing and

monopolization claims.  *PepsiCo*, 315 F.3d at 106.  Courts in this Circuit "approve[] summary

judgment dismissing antitrust cases for failure to come forward with sufficient evidence to define

and raise a genuine issue of fact material to the definition of a relevant market."  *Emigra Grp.,*

*LLC* v. *Fragomen, Del Rey, Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 359 (S.D.N.Y. 2009);

---

[13] Because Plaintiffs cannot establish that any of NAM's alleged actions were anticompetitive, they cannot defeat summary judgment by asserting that those actions taken together amounted to an anticompetitive "course of conduct."  *City of Groton* v. *Conn. Light & Power Co.*, 662 F.2d 921, 928–29 (2d Cir. 1981); *Ne. Tel. Co.* v. *Am. Tel. & Tel. Co.* 651 F.2d 76, 95 n.28 (2d Cir. 1981); *Eatoni Ergonomics, Inc.* v. *Research in Motion Corp.*, 826 F. Supp. 2d 705, 709–10 (S.D.N.Y. 2011) (Pauley, J.), *aff'd*, 486 F. App'x 186 (2d Cir. 2012).

*see also Spectrum Sports, Inc.* v. *McQuillan*, 506 U.S. 447, 455–56 (1993) ("Without a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition.") (quotations omitted).

A properly defined market must include all "products that have reasonable inter-changeability for the purposes for which they are produced—price, use and qualities considered." *United States* v. *E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404 (1956). "Products or services need not be identical to be part of the same market." *AD/SAT, Div. of Skylight, Inc.* v. *Assoc. Press*, 181 F.3d 216, 227 (2d Cir. 1999). Rather, products are considered "reasonably interchangeable if consumers treat them as 'acceptable substitutes.'" *PepsiCo*, 315 F.3d at 105. "In economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand. Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." *AD/SAT*, 181 F.3d at 227.

Plaintiffs here allege a market consisting exclusively of "pre-checkout" "third-party" ISP. Ex. 1 ¶ 54. Plaintiffs specifically include certain ISP products NAM offers, such as coupon dispensers, floor decals and shelf signs. *Id.* ¶ 57. But they *exclude* all "'trade promotion' arrangements where individual CPGs have contracts [directly] with individual retailers to promote their products" in stores, as well as all forms of out-of-store and digital marketing and product promotion. *Id.* ¶ 56. They even exclude promotional products offered in the front of the store, at checkout. *See, e.g.*, Ex. 79 ¶ 24. There is no evidence in the record on which a reasonable jury could find that the relevant market is as narrow as Plaintiffs allege.

The fundamental flaws in Plaintiffs' proposed market definition are the same flaws that led the Seventh Circuit to affirm summary judgment for NAM in a prior antitrust action. In

*Menasha*, the plaintiff (a competing ISP supplier) alleged that NAM monopolized a market for "at-shelf coupon dispensers." 354 F.3d at 661. The district court granted summary judgment, and the Seventh Circuit affirmed, finding: "The number of ways to promote a product is large, and even a stranglehold over at-shelf coupon dispensers would affect only a tiny portion of those means." *Id.* at 664. While the market alleged in this case is slightly broader, Plaintiffs' inability to prove that market is the result of the same problem Menasha faced. According to Plaintiffs' experts, at-shelf coupon dispensers, together with at-shelf shelf signs, account for ■% of NAM's ISP sales and form the core of the third-party ISP "market." Ex. 4 at 1. As "customer attractants," however, coupon dispensers and other third-party ISP products compete against numerous forms of marketing that Plaintiffs artificially omit from their market definition. *See Menasha*, 354 F.3d at 664. Competing products include, among many other things, "end caps (product racks at the end of aisles), sales, coupons included on (or in) the product's package, coupons distributed at the checkout counter," as well as "the traditional coupons distributed by mail or newspaper"—all of which Plaintiffs here, as in *Menasha*, have alleged are outside the relevant market. *Id.*; *see* 56.1 ¶ 82. As Judge Easterbrook observed: "What would lead a reasonable person to think that the leading supplier of one form of coupon has the power to drive up price, given the plethora of substitutes?" *Menasha*, 354 F.3d at 664.

Plaintiff's experts in *Menasha* failed to offer any real economic evidence to answer that question. *Id.* at 664–66. Plaintiffs' expert testimony here is no better. They adduce no evidence to show that other marketing and promotional products are not treated as "acceptable substitutes." *PepsiCo*, 315 F.3d at 105; *see Menasha*, 354 F.3d at 666. They did not examine, for example, the relationship between output of third-party ISP and "the price of promotional services." *Menasha*, 354 F.3d at 664. Nor did they analyze the "covariance of prices" for

marketing products by examining "whether the prices of different promotional devices move together." *Id.*[14]

Given the panoply of alternative promotional options available to CPGs, *see supra* at 10–11, there is no reason to assume—and Plaintiffs have no evidence to prove—that NAM could exercise market power by raising the price or cutting the output of coupon machines or other ISP products.  "Any given firm may cut its own output, but rivals will increase production in response." *Menasha*, 354 F.3d at 663.  If NAM were to reduce output, CPGs could turn to countless other forms of marketing and promotions as substitutes. *Id.*; *see* 56.1 ¶¶ 91, 98, 101, 105, 108, 111–112.[15]

Lacking empirical or econometric analysis to support their claims, Plaintiffs can muster no more than pointing out qualitative differences between NAM's products and other forms of marketing.  They argue, for example, that third-party ISP providers are the only "single point of contact from which to purchase a national sales promotion across a collection of retailers," Ex. 4

---

[14] *See* Ex. 24 at 143:12–15 ("Q. Did you do an analysis of the covariance of price between in-store products on the one hand and any other products?  A. No.").  MacKie-Mason's purported "critical loss analysis" is not a substitute for economic evidence that can be used to define a relevant market.  That analysis is meaningless and its results do not support a viable market definition under Second Circuit law.  MacKie-Mason admitted that he did not calculate the amount of substitution to products outside the alleged market that would occur if NAM increased its prices. *Id.* at 139:13–24.  Nonetheless, he concluded based on his critical loss analysis that third-party ISP constitutes a relevant market even if as much as 94% of NAM's lost sales in response to a price increase would be diverted to products purportedly outside that market.  No legal authority supports that conclusion. *See* MacKie-Mason Mot. at 23–24.

[15] In 2009, a district court in Minnesota denied summary judgment to NAM regarding the existence of a similar (though not identical) alleged market—for "third-party at-shelf advertising." *Insignia*, 661 F. Supp. 2d at 1058–60.  Nothing about that decision suggests that the record there contained, as it does here, overwhelming evidence that non-ISP products constrain NAM's pricing or that CPGs in fact substitute between ISP and many other products.  Moreover, to the extent that the *Insignia* court based its decision entirely on qualitative product distinctions and customer preferences, without examining whether there was evidence that those distinctions and preferences would prevent customers from substituting other products in response to an increase in the price of "third-party at-shelf in-store advertising," *cf. id.* at 1058–59, the decision cannot be reconciled with *Menasha* or Second Circuit law. *See also supra* n.12.

at 37–38, and that NAM "is the only one-stop shop for a CPG to obtain access to a wide variety of ISPs nationwide." Ex. 1 ¶ 57. They also contend that ISPs appeal uniquely to certain types of consumers—namely, "impulse shoppers." Ex. 4 at 34; Ex. 79 ¶ 67.[16]

The reason Plaintiffs place so much emphasis on these distinctions is obvious. Each eliminates a different set of competitors from the alleged and contrived market which, if they were included, would make it impossible for Plaintiffs to claim that NAM has market power: retailers (which sell billions of dollars of in-store advertising to CPGs) are excluded because they are not "third parties" and do not offer "one-stop shopping"; Catalina (a bigger company than NAM that sells hundreds of millions of dollars of at-register coupons annually in over ▮▮▮ retail stores) is excluded because the coupons are distributed at checkout, rather than before; and all forms of media and out-of-store couponing (on which CPGs spend billions each year) are excluded because they are not physically inside the store.

Courts have rejected these very types of product distinctions as having no legal significance. The Supreme Court held in *United States* v. *Continental Can*, 378 U.S. 441, 456–57 (1964) that it is "not sufficient" for the proponent of an antitrust market to rely on "different characteristics" of products—there, glass and metal containers—even where such characteristics "may disqualify one or the other [product] . . . from this or that particular use" or there "may be some end uses for which glass and metal do not and could not compete." *Id.*; *see Menasha*, 354 F.3d at 664. If there are "market alternatives that buyers may readily use for their purposes, illegal monopoly does not exist merely because the product said to be monopolized differs from others." *E.I. du Pont*, 351 U.S. at 394; *see also Global Disc. Travel Svcs., LLC* v. *Trans World*

---

[16] Defendants have moved to exclude the market definition opinions of Plaintiffs' experts on this basis, among others. *See* Farris Mot. at 16–23; MacKie-Mason Mot. at 25.

*Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (Sotomayor, J.) (rejecting proposed market premised on "features that enhance the enjoyment of the product").

Thus, for example, Plaintiffs' contention that third-party provision of ISPs sets a limit on the market has been rejected by decisions holding that "[t]he existence of one-stop shopping, and a group of customers with a preference or even demand for it, is insufficient to define a relevant market." *Emigra Grp.,* 612 F. Supp. 2d at 355; *see PepsiCo*, 315 F.3d at 106 (rejecting proposed market defined by preference for "one-stop shopping" for soda distribution); *Westman Commc'n Co.* v. *Hobart*, 796 F.2d 1216, 1220–21 (10th Cir. 1986) ("[T]he fact that 'one-stop distribution' is an effective or even superior way to compete does not mean that the relevant market is limited to those who use that method of competition."). Likewise, Plaintiffs cannot define a market by reference to distinctions between third-party ISP and other promotional products that rely on supposed characteristics of shoppers—such as suggesting ISPs are better at targeting "impulse" shoppers. "Attributes of shoppers do not identify markets." *Menasha*, 354 F.3d at 665; *see Belfiore* v. *The N.Y. Times Co.*, 826 F.2d 177, 180 (2d Cir. 1987) (rejecting proposed market defined by a newspaper's appeal to "upscale readers"); *cf. Mathias* v. *Daily News, L.P.*, 152 F. Supp. 2d 465, 482 (S.D.N.Y. 2001) (observing that newspaper's "unique local features and exclusive writers," were "virtually meaningless in a reasonable interchangeability analysis").

Plaintiffs' approach is, in short, "an awkward and forced attempt to 'define the elements of the relevant market to suit [their] desire for high market share, rather than letting the market define itself.'" *Menasha Corp.* v. *News Am. Mktg. In-Store, Inc.*, 238 F. Supp. 2d 1024, 1033 (N.D. Ill. 2003) (quoting *PepsiCo, Inc.* v. *Coca-Cola Co.*, 114 F. Supp. 2d 243, 249 (S.D.N.Y. 2000)). Summary judgment is therefore warranted. *PepsiCo*, 315 F.3d at 106, 109.

**IV.    SUMMARY JUDGMENT SHOULD BE GRANTED BECAUSE
        PLAINTIFFS CANNOT PROVE ANTITRUST INJURY OR DAMAGES**

NAM is entitled to summary judgment on all Plaintiffs' antitrust claims for the
independent reason that Plaintiffs cannot prove injury or damages.

Plaintiffs rely entirely on their expert, MacKie-Mason, for evidence of injury and
damages.  As set forth in NAM's accompanying motion to exclude, his methods are unreliable
and inadmissible.  If the Court excludes his benchmark model, then NAM is entitled to summary
judgment because Plaintiffs have no admissible evidence of injury or damages.  *See El Aguila
Food Prods., Inc.* v. *Gruma Corp.*, 131 F. App'x 450, 453–54 (5th Cir. 2005) (affirming
summary judgment where plaintiff's expert was excluded and "plaintiffs did not present
additional evidence sufficient to prove damages"); *cf. In re Omnicom Grp., Inc. Sec. Litig.*, 541
F. Supp. 2d 546, 554 (S.D.N.Y. 2008) (Pauley, J.), *aff'd*, 597 F.3d 501 (2d Cir. 2010).[17]

Even if MacKie-Mason's benchmark model were admissible, NAM is entitled to
summary judgment for two additional, independent reasons.

First, MacKie-Mason's model purports to calculate a generalized "monopoly profit," *not*
overcharge damages that flow from anticompetitive conduct.  "Simply possessing monopoly
power and charging monopoly prices does not violate § 2."  *Pac. Bell Tel. Co.* v. *Linkline
Commc'ns, Inc.*, 555 U.S. 438, 447–48 (2009).  Under the Second Circuit's decision in *Berkey
Photo*, Plaintiffs may "recover only for the price increment that 'flows from' the distortion of the
market caused by the monopolist's anticompetitive conduct."  603 F.2d at 297 (emphasis added).
MacKie-Mason's benchmark model fails to meet that standard because all it measures is NAM's

---

[17]  In this event, the Court should not afford Plaintiffs another chance to present damages
evidence.  "[C]ourts will not admit supplemental expert evidence following the close of
discovery" when "designed to fill a significant and logical gap in the first report."  *Franconero* v.
*UMG Recordings, Inc.*, 542 F. App'x 14, 16 (2d Cir. 2013).

profit margins relative to the average margins of other firms in other industries. He never even *attempted* to measure any overcharge that "flows from" the alleged anticompetitive conduct. *See* Ex. 13 at 170:10–171:24, 175:25–176:23. Without that assessment, Plaintiffs have no proof that antitrust damages should be awarded at all.

Second, MacKie-Mason's benchmark model is deficient because it assumes that all the challenged conduct was anticompetitive, and he has admitted that the model "can't sort out" the effects of any particular form of conduct. *Id.* at 158:3–159:4, 171:2–4, 175:25–176:23. If, contrary to that assumption, any one of the nine forms of challenged conduct is found *not* to be anticompetitive—on summary judgment or at trial—the model will provide no reasonable basis for the jury to assess damages caused by the remaining conduct. Such a model cannot serve as the basis for a jury verdict. *See, e.g.*, *MCI Commc'ns Corp.* v. *AT&T Co.*, 708 F.2d 1081, 1161–63 (7th Cir. 1983) (ordering new trial where plaintiff's expert failed to distinguish "only the losses directly attributable to unlawful competition"). "If the plaintiff's expert's damage study cannot segregate lawful from unlawful practices, then no damages may be awarded on the basis of that study." Areeda & Hovenkamp ¶ 657b1.

## V.     THE STATE LAW CLAIMS SHOULD BE DISMISSED

Plaintiffs assert state law claims under the New York Donnelly Act and the Michigan Antitrust Reform Act for exclusive dealing (Count VII) and monopolization (Count V). Ex. 1 ¶¶ 161–165, 172–177. These claims should be dismissed for all the reasons stated above because they are based on the same factual allegations, and because the relevant state law provisions are interpreted in the same manner as their federal counterparts. *See Eatoni*, 826 F. Supp. 2d at 708; *Little Caesar Enters., Inc.* v. *Smith*, 895 F. Supp. 884, 898 (E.D. Mich. 1995).

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted.

Dated:  September 30, 2015

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP

By:  *Kenneth A Gallo*

      Kenneth A. Gallo (kgallo@paulweiss.com)
      Jane B. O'Brien (jobrien@paulweiss.com)
2001 K Street, NW
Washington, D.C.  20006-1047
(202) 223-7300

William B. Michael (wmichael@paulweiss.com)
1285 Avenue of the Americas
New York, NY  10019-6064
(212) 373-3000

*Counsel for Defendants*