USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 1/15/16

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DIAL CORPORATION, *et al.*,

               Plaintiffs,

      -against-

NEWS CORPORATION, *et al.*,

               Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

:    13cv6802

:    MEMORANDUM & ORDER

:

:

:

WILLIAM H. PAULEY III, District Judge:

        Defendants News Corporation, News America Inc., News America Marketing FSI

L.L.C., and News America Marketing In-Store Services L.L.C. (collectively, "News Corp.")

move for summary judgment dismissing this antitrust action. News Corp. also moves in limine

to exclude the testimony of Dr. Jeffrey MacKie-Mason and Dr. Paul Farris. For the following

reasons, News Corp.'s motions are denied.

## BACKGROUND

        On June 18, 2015, this Court certified a class of non-retailer consumer packaged

goods firms ("CPGs") residing in the United States that have directly purchased in-store

promotions from News Corp. at any time on or after April 5, 2008. See Dial Corp., et al. v.

News Corp. et al., 13 Civ. 6802, 2015 WL 4104624 (S.D.N.Y. June 18, 2015). The Dial

Corporation, Henkel Consumer Goods Inc., H.J. Heinz Company, Foster Poultry Farms,

Smithfield Foods, Inc., HP Hood LLC, and BEF Foods, Inc. (collectively, "Plaintiffs") represent

a class of CPGs who manufacture food and other consumer products. Defendant News Corp.

sells in-store promotions ("ISP") like at-shelf signage, coupon distribution, and sampling

products. The nuances of the business are described at length in this Court's prior memorandum

and order granting class certification and are not repeated here.  See Dial Corp., et al., 2015 WL
4104624.

   At various times over the last 15 years, News Corp. has competed with
Floorgraphics, Insignia, and Valassis in the third-party ISP market.  By 2009, News Corp. had a
90.5% share of the revenue generated in that market.  In 2014, News Corp.'s sole remaining
competitor, Valassis, abandoned its third-party ISP business.

   Plaintiffs contend that News Corp. engages in exclusive dealing, and acquired and
maintained a monopoly over the third-party ISP market in violation of Sections One and Two of
the Sherman Act, Section Three of the Clayton Act, the New York Donnelly Act, and the
Michigan Antitrust Reform Act.

I.   NEWS CORP.'S MOTION FOR SUMMARY JUDGMENT

   Summary judgment is warranted when a moving party shows that "there is no
genuine dispute as to any material fact" and that the party "is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); De Sole v.
Knoedler Gallery LLC, 12 Civ. 2313, 2015 WL 5918458, at *13 (S.D.N.Y. Oct. 9, 2015).  "A
dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is
such that a reasonable jury could decide in the non-movant's favor."  Beyer v. Cnty. of Nassau,
524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).
"'[W]here the non[-] moving party will bear the burden of proof at trial, Rule 56 permits the
moving party to point to an absence of evidence to support an essential element of the party's
claim.'"  Lesavoy v. Lane, 02 Civ. 10162, 2008 WL 2704393, at *7 (S.D.N.Y. July 10, 2008)
(quoting Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991)).

   In the context of antitrust cases, summary judgment may be appropriate because

protracted litigation chills pro-competitive market forces.  PepsiCo, Inc. v. Coca-Cola Co., 315 F.3d 101, 104 (2d Cir. 2002).  All inferences drawn in favor of the non-movant "must be reasonable in light of competing inferences of acceptable conduct."  See Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 95 (2d Cir. 1995).

DISCUSSION

A.  New Corp.'s Exclusive Contracts with Retailers

An exclusive dealing arrangement is unlawful under Section One of the Sherman Act if its "probable effect" is to substantially lessen competition in the relevant market.  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327–29 (1961).  Exclusive dealing arrangements are often entered for entirely pro-competitive reasons, generally posing little threat to competition.  ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 270 (3d Cir. 2012).  But "[e]xclusive dealing can have adverse economic consequences by allowing one supplier of goods or services unreasonably to deprive other suppliers of a market for their goods[.]"  Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 45 (1984) (O'Connor, J., concurring), abrogated on other grounds by Ill. Tool Works Inc. v. Indep. Ink, Inc., 547 U.S. 28 (2006).

It is undisputed that the majority of News Corp.'s contracts with retailers provide News Corp. with the exclusive right to be the in-store third-party provider of ISP products. (News Corp. 56.1 ¶¶ 7, 16, 17.)  Payments to retailers under these contracts are often guaranteed on a quarterly or yearly basis.  (News Corp. 56.1 ¶ 19.)  Plaintiffs present evidence that News Corp.'s exclusive deals locked up at least 73% of participating retail stores during the damages period.  (Pl. 56.1 Opp. ¶ 134.)  And among grocers, Plaintiffs contend News Corp. had more than 80% of the participating retail store volume under exclusive contract.  (Pl. 56.1 Opp. ¶ 134.)

Plaintiffs highlight three aspects of News Corp.'s contracts with retailers as anticompetitive:  (1) the length of the exclusive agreements; (2) the "staggered" expiration dates of the exclusive agreements; and (3) the guarantees News Corp. paid for access to retailers' stores.  Plaintiffs argue that News Corp. deploys these three structural features to deter competition.  As former News America Marketing CEO Paul Carlucci noted in 2004, it is "also an incredible deterrent, both the length of the contract, the fact that we can stagger the contracts at our own discretion and the payment they would have to come [up with], [for] a competitor to really get back into the marketplace."  (Caughey Decl. Ex. 169, at 20.)  News Corp. counters that the undisputed facts negate a finding that any of these three challenged features of its agreements substantially lessen competition in the market.

       i.      <u>Length of Retailer Contracts</u>

The parties spar over the average length of retailer contracts during the damages period and both sides rummage through the data.  Under News Corp.'s analysis, the average term length of its retailer contracts was 2.7 years during the damages period.  (News Corp. Ex. 3, Murphy Rpt. ¶ 14; Ex. 8.)  News Corp. argues that where, as here, opportunities exist to bid on exclusive contracts at the end of their terms, exclusivity periods of three years' duration or less "do not foreclose competition and are not anticompetitive as a matter of law."  <u>Spinelli v. Nat'l Football League, LLC</u>, 96 F. Supp. 3d 81, 117 (S.D.N.Y. 2015).

But <u>Spinelli</u> is not dispositive because that case dealt with licensing agreements having durations no longer than three years.  <u>Spinelli</u>, 96 F. Supp. 3d at 117.  Here, News Corp. entered into exclusivity agreements with retailers that were far longer.  For instance, News Corp. had five-year agreements with Albertson's, Winn Dixie, Food Lion, Ahold, and Schnucks.  None

of those agreements were included in News Corp.'s calculation of its 2.7 year average. (See Pl. 56.1 Opp. ¶ 144.)

Plaintiffs challenge News Corp.'s analysis, and calculate the average contract length at 3.9 years across the entire market, and even higher—at 5.1 years—when medium and large grocery stores are considered. (Pl. 56.1 Opp. ¶ 143.)[1] Plaintiffs point out that News Corp. omits its ten-year contract with Safeway from its 2.7 year average calculation. (News Corp. Ex. 3, Murphy Rpt., Ex. 8 n.1 (Safeway and News Corp. entered into a contract on 7/17/2004 with a ten-year term, which was omitted from this analysis).) News Corp. also excludes its seven-year contract with Kroger. (Plaintiffs' Ex. 106 (noting that the effective date of the Kroger contract was 2/1/2006).)[2] In 2012, Safeway and Kroger accounted for 10.5% of the total retail volume of all grocery, drug, and mass retailers in the country. (News Corp. 56.1 ¶¶ 43, 53.) And together, their third-party ISP contracts represented nearly 19% of existing contracts during the damages period. (News Corp. 56.1 ¶¶ 43, 53.)

News Corp. also argues that the Safeway and Kroger contracts came up for re-bid during the damages period. But Plaintiffs respond that News Corp.'s only remaining competitor—Valassis—had already exited the third-party ISP business when the Safeway contract came up in 2014. (See Oral Arg. Tr. 46–48.) And that News Corp. negotiated an

---

[1]     Plaintiffs' economist, MacKie-Mason, did not dispute News Corp.'s 2.7 year average in his expert reports. He also offered no opinion or analysis that the average contract length was different or longer than News Corp.'s estimation. (See News Corp. Ex. 24, MacKie-Mason Dep. Tr. 67:13—19.) For the first time during briefing of this motion, Plaintiffs' submit a declaration from MacKie-Mason in which he performs a new analysis to rebut News Corp.'s 2.7 year average. (See Pl. Ex. 3, Declaration of Jeffery MacKie-Mason in Support of Opposition to Summary Judgment.)

[2]     Plaintiffs contend that News Corp.'s average excludes contracts entered into before 2008 but ran during the damages period. (Caughey Decl. Ex. 3, Declaration of Jeffrey MacKie-Mason in Support of Opposition to Summary Judgment at ¶ 19.)

extension of the Kroger contract before a request for proposal was ever issued.  (Caughey Decl. Exs. 126, 136; Oral Arg. Tr. 46–48.)

News Corp. also relies on Ticketmaster Corp. v. Tickets.com, Inc., 99 Civ. 7654, 2003 WL 21397701 (C.D. Cal. Mar. 7, 2003), aff'd, 127 F. App'x 346 (9th Cir. 2005), where the district judge granted summary judgment dismissing Sherman Act claims involving exclusive contracts ranging from three to ten years in duration.  But News Corp.'s primary competitor in Ticketmaster had the "opportunity to bid for the contracts" and "did so."  Ticketmaster Corp., 2003 WL 21397701, at *7.  By contrast, Plaintiffs offer evidence that News Corp.'s competitors were not afforded the opportunity to compete for significant contracts.  (See, e.g., Caughey Decl. Ex. 56, Dial Purchasing Manager, Karen Welch, Deposition Tr. at 239:7–17 ("Q: Have you ever done . . . an RFP for in-store services?  A: No. . . . Because . . . when I look at in-store services, there's—aside from News America, there's nobody else that I could put in side-by-side against News America and run an effective auction.").)

      ii.    Contract Expiration Dates

With respect to the expiration dates of News Corp.'s retailer contracts, the parties, yet again, have differing views of the evidence.  News Corp. contends that approximately 40% of its retail network, on average, expired each year during the damages period.  Further, contracts covering 98% of retailer volume expired over the whole period.  (News Corp. 56.1 ¶¶ 60, 63.) As a matter of law, News Corp. argues that these exclusive retailer contracts do not substantially foreclose competition.  See, e.g., Ticketmaster Corp., 2003 WL 21397701, at *5 (granting summary judgment for defendant on Sherman Act Section One and Two claims where exclusive contracts came up for bid at a rate of "about 20% per year").  And when Valassis entered the third-party ISP business, it won exclusive contracts with several significant retailers including

SuperValu, Redner's, Winn Dixie, Family Dollar, Rite Aid, and Roundy's. (News Corp. 56.1 ¶¶ 21, 27–29, 60.)

Plaintiffs slice the data differently to focus on medium and large-sized food retailers—specifically, the top 28. From that perspective, the number of retailer contracts available to News Corp.'s competitors drops to less than 25% in each year from 2008 through 2012, and falls as low as 18.7%. (News Corp. Ex. 48, MacKie-Mason Rpt. at 41; Pl. 56.1 Opp. ¶ 182.) Plaintiffs argue that focusing on the largest customers is necessary because "capturing nothing but the small retailers is not a viable entry strategy[.]" (News Corp. Ex. 48, MacKie-Mason Rpt. at 41.) And as News America Marketing's former CEO, Marty Garofalo noted, "[a] big part of being successful with the package goods clients is having the critical mass to deliver promotions that move volume." (Caughey Decl. Exs. 21, 169.) Further, although the average of News Corp.'s retail network up for renewal on a yearly basis was 40%, News Corp.'s own analysis reveals that the rate ranged from 28% to 46% over the class period. (News Corp. 56.1 ¶ 61.) And by 2014, News Corp.'s only remaining competitor, Valassis, lost its key contracts and exited the third-party ISP business. (Pl. 56.1 Opp. ¶ 210.)

Plaintiffs also offer evidence that News Corp. intentionally staggered the end dates of key contracts to prevent competitors from acquiring a "critical mass" of retail distribution. (Pl. 56.1 Opp. ¶¶ 149, 152, 153, 155, 156, 157.) See Insignia Sys. v. News America Marketing In-Store, 661 F. Supp. 2d 1039, 1064–65 (D. Minn. 2009) (denying motion for summary judgment in view of "staggering" allegations); see also Sunbeam Television v. Nielsen Media Research, 763 F. Supp. 2d 1341, 1346 (S.D. Fla. 2011), aff'd, 711 F.3d 1264 (11th Cir. 2013) ("A policy or practice of intentionally staggering contract terms may, under some circumstances, constitute anticompetitive conduct . . . ."). According to Marty Garofalo:

> Th[e] winning formula . . . starts with staggered retail deals . . . *News America Marketing intentionally staggers the time of major retail deals to minimize the risk of losing a major number of stores in any short time period . . . . [T]his strategy serves as a deterrent to other major companies from joining the In-Store fray*—because they know that it will be a long—hard fought drawn out process to develop the critical mass necessary to be successful in this arena.

(Pl. 56.1 Opp. ¶ 150) (emphasis added).

    iii.    <u>Guarantees to Retailers</u>

News Corp. contends that its guarantees to retailers do not foreclose competition as a matter of law under the "price-cost" test enumerated in <u>Weyerhaeuser Co v. Ross-Simmons Hardwood Lumber Co.</u>, 549 U.S. 213 (2007). To succeed on a challenge to a defendant's input pricing practices under the "price-cost" test, a plaintiff must prove "that the [defendant's] prices are below an appropriate measure of [the defendant's] costs." <u>Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.</u>, 509 U.S. 209, 222 (1993). News Corp. contends that Plaintiffs fail to satisfy the "price-cost" test for predatory bidding. Plaintiffs identify only one contract—the KMART contract—on which News Corp. lost money. While News Corp. lost $4.3 million on that contract in 2013 (Pl. 56.1 Opp. ¶ 170), its third-party ISP business has been profitable every year from 1999 to the present (News Corp. 56.1 ¶ 68).

Nevertheless, relying on <u>ZF Meritor, LLC</u>, 696 F.3d at 268–69, Plaintiffs contend that the "price-cost" test is not dispositive of exclusive dealing claims. In contrast to <u>Weyerhauser</u>, where pricing operated as the lone exclusionary tool, see <u>ZF Meritor</u>, 696 F.3d at 276–77, the prices paid by News Corp. in their contracts with retailers are not the clearly predominant method of exclusion. Rather, the length of the exclusive contracts and their staggered terms may also foreclose competition. See <u>ZF Meritor, LLC</u>, 696 F.3d at 277.

Further, Plaintiffs offer evidence suggesting that News Corp. pays retailers fixed commissions that "guarantee revenue even if the activity does not support it." (Pl. 56.1 Opp. ¶ 159.) And those commissions increased dramatically when Valassis entered the third-party ISP market. (Pl. 56.1 Opp. ¶ 159.) In early 2009, News Corp. and Valassis competed for KMART's retailer network. (Pl. 56.1 Opp. ¶ 164.) In response to each of Valassis' bids, News Corp. countered with increasingly larger guarantees—finally offering $4,615 per store, approximately $6 million overall, and a $1.1 million signing bonus in exchange for a three-year renewal. (Pl. 56.1 Opp. ¶ 167.) In choosing News Corp. over Valassis, KMART noted that News Corp. was trying to "send Valassis a message" with its "over-the-top" offer. (Pl. 56.1 Opp. ¶ 168.) As Larry Berg of Valassis testified:

> [News Corp. was] sending a strong message that no more growth [sic], because at that point we started to grow our footprint . . . . News [Corp.] was trying to send a message to Valassis that they are not going to let us secure, not only KMART, but also send a pretty strong message to us across the board.

(Pl. 56.1 Opp. ¶ 169.)

### B. Exclusive Dealing Under Section One of the Sherman Act

While there is no precise formula for evaluating the legality of an exclusive dealing agreement, antitrust law generally requires: "substantial foreclosure" from the relevant market, Tampa Elec. Co., 365 U.S. at 327–29; United States v. Microsoft Corp., 253 F.3d 34, 69 (D.C. Cir. 2001); contracts of sufficient duration to prevent meaningful competition by rivals, CDC Techs., Inc. v. IDEXX Labs., Inc., 186 F.3d 74, 81 (2d Cir. 1999); Omega Envt'l., Inc. v. Gilbarco, Inc., 127 F.3d 1157, 1163 (9th Cir. 1997); and an analysis of likely or actual anticompetitive effects considered in light of any pro-competitive effects, ZF Meritor, LLC, 696 F.3d at 271–72.

Contracts that foreclose competition in a "substantial share" of the market may be unlawful under Section One of the Sherman Act.  See Tampa Elec. Co., 365 U.S. at 327; see also Stop & Shop Supermarket Co. v. Blue Cross Blue Shield, 373 F.3d 57, 68 (1st Cir. 2004) (noting that foreclosure levels "are unlikely to be of concern where they are less than 30 or 40 percent."). Plaintiffs present evidence that only 18.7% to 25% of News Corp.'s total volume became available for bid each year between 2008 and 2012.  (Pl. 56.1 Opp. ¶ 182.)  Coupled with the broad market coverage of News Corp.'s retailer contracts—upwards of 73%—and the guarantees offered to retailers like KMART, a significant portion of the market may have been foreclosed to competitors.  Viewing the duration of the contracts, their staggered end dates, and the guarantees as a whole, plaintiffs raise material questions of fact as to whether the effect of these contracts was to "substantially foreclose" rivals from obtaining a toehold in the third-party ISP marketplace.  Such questions should be resolved by a jury.  See Insignia Sys., Inc., 661 F. Supp. 2d at 1064–65 (noting that Insignia's evidence that News Corp. has substantially foreclosed competition was sufficient to withstand summary judgment given that News Corp.'s retailer contracts foreclosed competitors' abilities to contract with retailers in 80 to 90 percent of grocery store opportunities, as well as the duration of News Corp.'s contracts, and News Corp.'s strategy to stagger its contracts).

Indeed, News Corp.'s dealings with competitors like Valassis raise questions about whether News Corp.'s contracts foreclosed competition in a substantial share of the market.  Plaintiffs assert that while Valassis entered into several retailer agreements (Pl. 56.1 Opp. ¶ 204), it never had the opportunity to bid on key retailers such as Safeway and Kroger (Pl. 56.1 Opp. ¶¶ 206, 208), and finally gave up trying to compete in the third-party ISP business.

(Pl. 56.1 Opp. ¶ 210.)[3] Within months, News Corp. was able to re-sign the retailers it lost to Valassis (Pl. 56.1 Opp. ¶ 210), and it currently faces no significant competition in the third-party ISP market (Pl. 56.1 Opp. ¶ 212). See Interface Grp. v. Mass Port Auth., 816 F.2d 9, 11 (1st Cir. 1987) (Breyer, J.) ("Exclusive dealing arrangements may sometimes be found unreasonable under the antitrust laws because they may place enough outlets . . . in the hands of a single firm . . . to make it difficult for new, potentially competing firms to penetrate the market . . . [T]he arrangements may 'foreclose' outlets or supplies to potential entrants, thereby raising entry barriers."); see Areeda & Hovenkamp, Antitrust Law 1802(c), at 64 (2d ed. 2002) (noting that a dominant firm may be able to foreclose rival suppliers from a large enough portion of the market to deprive such rivals of the opportunity to achieve the minimum economies of scale necessary to compete).

   News Corp. contends that its exclusive contracts are procompetitive because CPGs benefit from retail exclusivity. However, on the current record, this Court cannot conclude as a matter of law that the procompetitive benefits of the exclusive contracts are outweighed by the harm to competition. Accordingly, News Corp.'s motion for summary judgment as to Section One of the Sherman Act is denied.[4]

---

[3] News Corp. disagrees and contends that Valassis failed because of its own strategy. But that is a fact question for the jury.

[4] The proscriptions of Section One of the Sherman Act are narrower than Section Three of the Clayton Act. See Tampa Elec. Co., 365 U.S. at 335 ("We need not discuss the respondents' further contention that the contract also violates s 1 and s 2 of the Sherman Act, for if it does not fall within the broader proscription of s 3 of the Clayton Act it follows that it is not forbidden by those of the former."). Because News Corp.'s motion is denied with respect to Plaintiffs' Sherman Act Section One claims, News Corp.'s motion is also denied under Section Three of the Clayton Act.

C.  Monopolization Under Section Two of the Sherman Act

Section Two of the Sherman Act makes it illegal for any person "to monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several states." 15 U.S.C. § 2.  To prevail, Plaintiffs must prove:  (1) News Corp.'s possession of monopoly power in the third-party ISP market; and (2) the "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."  United States v. Grinnell Corp., 384 U.S. 563, 570–71 (1966); LePage's Inc. v. 3M, 324 F.3d 141, 147 (3d Cir. 2003) ("A monopolist willfully acquires or maintains monopoly power when it competes on some basis other than the merits.").

i.    Relevant Product Market

As a threshold matter, this Court must assess whether a genuine issue of fact exists as to the relevant product market News Corp. is allegedly monopolizing.  News Corp. contends that the evidence in the record is insufficient to support Plaintiffs' narrowly drawn product market definition.  Plaintiffs' "pre-checkout" "third-party" product market includes "print and electronic signage, end-of-aisle displays, freezer displays, floor signage, and cart advertising." (Fourth Amended Complaint ¶¶ 54–55.)  Their product market excludes "trade promotion arrangements where individual CPGs have contracts with individual retailers to promote their products[,]" all forms of out-of-store and digital marketing and product promotion, as well as promotional products offered at checkout.  (Fourth Amended Complaint ¶ 56.)

A properly defined market includes "all products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404 (1956).  "In

economists' terms, two products or services are reasonably interchangeable where there is sufficient cross-elasticity of demand.  Cross-elasticity of demand exists if consumers would respond to a slight increase in the price of one product by switching to another product." AD/SAT, Div. of Skylight, Inc. v. Assoc. Press, 181 F.3d 216, 227 (2d Cir. 1999).

Market definition "is a highly factual one best allocated to the trier of fact." Meredith Corp. v. SESAC LLC, 1 F. Supp. 3d 180, 219 (S.D.N.Y. 2014); see ABA Section on Antitrust Law, Antitrust Law Developments 620 (6th ed. 2007) ("Definition of the relevant market is generally considered a question for the trier of fact . . . .  The jury may accept the market definition proposed by either party or may develop its own definition based upon the evidence."); see also Lewis v. Philip Morris Inc., 355 F.3d 515, 533 (6th Cir. 2004) ("defining the product market . . . is a factual inquiry for the jury; the court may not weigh evidence or judge witness credibility.") (internal quotations marks and citations omitted).  Considering the evidence in the light most favorable to Plaintiffs, a jury could adopt Plaintiffs' third-party ISP market definition—and that is all that is required to survive summary judgment.  See Meredith Corp., 1 F. Supp. 3d at 219.

Indeed, Plaintiffs point to evidence that their proposed product market—that is, in-store, shelf-based, advertisements provided by a third-party—demonstrate unique functions and uses that distinguish them from substitute products.  For instance, Plaintiffs highlight documents and testimony suggesting that CPGs consider the third-party ISP market to be distinct.  (Pl. 56.1 Opp. ¶ 218).  CPGs use third-party ISPs, as opposed to trade promotions or out-of-store tactics, because it is their last chance to communicate with consumers about their brands when they select the product off the shelf, at the "moment of truth."  (Pl. 56.1 Opp. ¶¶ 108, 219).  News Corp. advertises its products as allowing CPGs to speak to consumers at the

"moment of truth" when they select products (Pl. 56.1 Opp. ¶ 220), as opposed to TV, radio, magazines, and billboards, that do not confront consumers at the time of purchase. (Pl. 56.1 Opp. ¶ 221). And News Corp. markets itself as providing a different service than coupon providers. (Pl. 56.1 Opp. ¶ 225). Indeed, the court in Insignia Sys., Inc. v. News Am. Marketing In-Store, Inc. held that a nearly identical product market was sufficient to withstand summary judgment. 661 F. Supp. 2d 1039, 1059 (D. Minn. 2009) (noting that Insignia had brought forth "substantial evidence highlighting the claimed unique nature of an in-store, at-shelf, third-party advertising market" to generate a genuine issue of fact).

Plaintiffs' market definition is also supported by MacKie-Mason's economic analysis. MacKie-Mason analyzed whether third-party ISP constitutes a distinct market by employing the "SSNIP" (small but significant and non-transitory increase in price) test, which asks how a buyer would respond to a hypothetical monopolist's imposition of a small price increase. Meredith Corp., 1 F. Supp. 3d at 218. Applying such a test, MacKie-Mason used "critical loss analysis" to analyze demand elasticity to measure the loss in quantity demanded of all third-party ISP sold in the hypothetical relevant market if the pricing of the promotions were raised. (News Corp Ex. 4, Dr. MacKie-Mason Rpt. at 46–50.) MacKie-Mason concluded that the third-party ISP market alone composes the relevant product market.

News Corp.'s reliance on Menasha Corp. v. News America Marketing In-Store, Inc., 354 F.3d 661 (7th Cir. 2004) is misplaced. In Menasha, Judge Easterbrook found that plaintiff did not meet its burden of proving that the relevant market consisted of News Corp.'s at shelf-coupon dispensers. Judge Easterbrook found that plaintiff offered only "a potpourri of survey research and armchair economics" in place of econometric analysis. 354 F.3d at 664. In this case, Plaintiffs offer enough to survive summary judgment. Together, Plaintiffs' evidence

supplies an "ample factual basis" on which a jury could conclude that the relevant product market consists of pre-checkout third-party ISP. See Meredith Corp., 1 F. Supp. 3d 180, 218 (S.D.N.Y. 2014). This evidence is further confirmed by MacKie-Mason's SSNIP test, which was absent in Menasha.

ii.   News Corp.'s Monopoly Power

Plaintiffs contend that News Corp. possesses monopoly power in the third-party ISP market. By 2009, Plaintiffs argue that News Corp. had a 90.5% share of the third-party ISP market. (Pl. 56.1 Opp. ¶ 242.) By comparison, during that same time, Valassis had a 2.8% market share and Insignia had a 6.7% market share. (Pl. Ex. 4, MacKie-Mason Rpt. at Ex. 59.) While News Corp.'s share of the third-party ISP market dropped to its lowest level—79.4%—in 2013, its market share today has rebounded. (News Corp. Ex. 4, Dr. MacKie Mason Rep. at Ex. 59.) This Court can infer the existence of monopoly power from a predominant share of the market, Grinnell, 384 U.S. at 571, and the size of that share is a primary factor in determining whether monopoly power exists. See Dentsply, 399 F.3d at 187. "A share above 70% is usually strong evidence of monopoly power[.]" In re EVIC Class Action Litig., 00 Civ. 3811, 2002 WL 1766554, at *14 (S.D.N.Y. July 31, 2002).

iii.   News Corp.'s Anticompetitive Conduct

Under the antitrust laws, an overwhelmingly large market share alone—even one as large as 90.5%—does not equal an antitrust violation. The Supreme Court has defined anticompetitive conduct under Section Two in the following way:

> The question whether [a defendant's] conduct may properly be characterized as exclusionary cannot be answered by simply considering its effect on [a plaintiff]. In addition, it is relevant to consider its impact on consumers and whether it has impaired competition in an unnecessarily restrictive way. If a firm has been "attempting to exclude rivals on some

basis other than efficiency," it is fair to characterize its behavior as predatory.

Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 605 (1985) (internal citation omitted).

Courts should condemn aggressive, exclusionary conduct by a monopolist, but encourage aggressive, competitive conduct. As Judge Easterbrook has noted, there is only one problem: "competitive and exclusionary conduct look alike." On Identifying Exclusionary Conduct, 61 Notre Dame L. Rev. 972, 972 (1986). And as one court of appeals has stated: "'Anticompetitive conduct' can come in too many different forms, and is too dependent upon context, for any court or commentator ever to have enumerated all the varieties." Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC, 148 F.3d 1080, 1087 (D.C. Cir. 1998).

To prove unlawful exclusive dealing under Section Two, Plaintiffs need to show that the probable effect of News Corp.'s conduct is to harm the competitive process. See Microsoft, 253 F.3d at 58. The standard for exclusive dealing under Section Two of the Sherman Act is lower than under Section One. See Microsoft, 253 F.3d at 70 (noting that a monopolist's use of exclusive dealing may give rise to a Section Two violation even without a level of foreclosure that could support a Section One claim). Plaintiffs allege that News Corp.'s exclusive contracts closed a substantial percentage of the available opportunities for competitors in the third-party ISP business. This Court concludes that evidence of News Corp.'s exclusive contracts with retailers, as described above, raises a genuine issue of fact as to whether News Corp.'s conduct excluded competition in an effort to acquire and maintain monopoly power.

Moreover, "evidence of intent" may be relevant "to the question of whether the challenged conduct is fairly characterized as 'exclusionary' or 'anticompetitive.'" See Aspen

Skiing, 472 U.S. at 602.  And Plaintiffs present ample evidence that News Corp. intended to use their exclusive retailer contracts to do just that—to exclude rivals.  (See Caughey Decl. Ex. 83 ("[W]e have a proven strategy in place when it comes to our retail network.  Our strategy is to secure long term retail deals . . . . We also stagger the deals to prevent a large percentage of the network from being vulnerable at any specific point in time . . . This method allows us to concentrate on our key negotiations.  It also means that any competitor who wants to develop critical mass for their network would have to dedicate a lot of money over a considerable amount of time in order to break into the in-store game in any significant way"); Caughey Decl. Ex. 172 ("What we do know is that our network of stores is over 50,000 strong, most of them are under long-term agreements with us, and the renewal dates of those agreements are staggered so we are well-prepared to weather . . . competitive challenges.").)

Plaintiffs seek to bolster their Section Two claim by presenting evidence that News Corp. acquired and maintained its monopoly through a series of exclusionary acts, including, inter alia, that News Corp. hacked into Floorgraphics computer systems (Pl. 56.1 Opp. ¶ 185), News Corp. defaced Floorgraphics products in retailers and used the photographs of the defaced products in sales pitches to retailers (Pl. 56.1 Opp. ¶ 189), News Corp. obtained Insignia's confidential information and used it to compete against Insignia (Pl. 56.1 Opp. ¶ 191), and News Corp. retained former Valassis Employee, Larry Mortimer, as its "black knight" to dislodge Valassis from retailer Winn Dixie (Pl. 56.1 Opp. ¶ 207).

"The Sherman Act is not a panacea for all evils that may affect business life." Berkey Photo, Inc. v. Eastman Kodak, Co., 603 F.2d 263, 288 n.41 (2d Cir. 1979).  It is well settled that "employing tactics that undermine one's competitors—even unfairly—does not violate the antitrust laws."  S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC, No. 06 Civ.

15357, 2008 WL 540091, at *6 (S.D.N.Y. Feb. 27, 2008).  Moreover, false and misleading

statements are presumed to have a de minimis effect on competition for purposes of the Sherman

Act.  See Reed Const. Data Inc. v. McGraw-Hill Cos., Inc., 49 F. Supp. 3d 385, 420 (S.D.N.Y.

2015).

   However, in conjunction with News Corp.'s exclusive contracts with retailers,

Plaintiffs present evidence sufficient to withstand summary judgment that News Corp.'s

exclusionary acts may be anticompetitive.  See, e.g., Conwood Co., L.P. v. U.S. Tobacco Co.,

290 F.3d 768, 783 (6th Cir. 2002), cert. denied, 537 U.S. 1148, 123 (2003) (holding evidence of

defendant's exclusionary conduct sufficient to support a Section 2 violation where defendant: (1)

removed and destroyed or discarded racks that displayed defendant's products from stores; (2)

trained its operatives to take advantage of inattentive store clerks with various 'ruses'; (3)

provided misleading information to retailers in an effort to dupe them into carrying defendant's

products; and (4) entered into exclusive agreements with retailers in an effort to exclude rivals'

products).

   Further, News Corp. contends that most of Plaintiffs' identified tortious conduct

occurred before 2008—the beginning of the damages period—and is therefore irrelevant.  But a

monopoly which is "maintained" during the damages period would need to be created before the

damages period, and anticompetitive conduct before the limitations period may be material to a

showing that Plaintiffs were injured during the damages period.  See, e.g., Berkey Photo, 603

F.2d at 296 ("The taint of an impure origin does not dissipate after four years if a monopolist

continues to extract excessive prices because of it.").

D.  Injury and Damages

News Corp. contends that summary judgment should be granted for the

independent reason that Plaintiffs cannot prove injury or damages.  "[C]ourts have allowed

antitrust plaintiffs considerable latitude in proving the amount of damages.  Proof of amount of

damages thus need not conform to a particular theory or model[.]"  U.S. Football League v. Nat'l

Football League, 842 F.2d 1335, 1378 (2d Cir. 1988).  However, damages awards must be, to

some degree, traceable to unlawful acts.  See U.S. Football League, 842 F.2d at 1378–79 ("A

plaintiff's proof of amount of damages thus must provide the jury with a reasonable basis upon

which to estimate the amount of its losses caused by other factors, such as management

problems, a general recession or lawful factors.").

Citing Berkey Photo, News Corp. argues that Plaintiffs' benchmark model

calculates generalized monopoly profits, not damages directly flowing from anticompetitive

conduct, as required by law.  The defendant in Berkey Photo had acquired monopoly power in

significant part through its skill and foresight rather than through illegal activities.  In light of

that determination, the Second Circuit found that Plaintiffs may "recover only for the price

increment that 'flows from' the distortion of the market caused by the monopolist's

anticompetitive conduct."  See Berkey Photo, 603 F.2d at 297–98 ("But the Sherman Act does,

as we have said, tolerate the lawfully acquired and maintained monopoly.  This principle would

be undercut if a monopolist whose position has for the most part been attained legitimately is

required to forfeit all fruits of its success because its power has merely been supplemented by

improper conduct.").

Plaintiffs' economist, MacKie-Mason, concludes that the generalized monopoly

profits obtained by News Corp. are a result of—and "flow from"—its exclusive deals with

retailers and other tactics which form the basis of News Corp.'s alleged anticompetitive conduct. Plaintiffs will need to prove this at trial. Indeed, whether some, all, or none of News Corp.'s conduct is anticompetitive is precisely the question of fact that a jury will decide. And it will be Plaintiffs' burden to demonstrate to the jury that its requested damages flow from conduct the jury finds anticompetitive.

News Corp. also argues that Plaintiffs' benchmark model is deficient because the model "can't sort out" the effects of any particular form of allegedly anticompetitive conduct. See Areeda & Hovenkamp, Antitrust Law ¶ 657b1 (3d ed. 2008) ("If the plaintiff's expert's damage study cannot segregate lawful from unlawful practices, then no damages may be awarded on the basis of that study."). But calculating damages in antitrust cases is not an exact science. See, e.g., Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 264 (1946) ("An antitrust plaintiff must thus provide only sufficient evidence to support a 'just and reasonable estimate' of damages."). And if a jury were to find News Corp.'s actions taken as a whole to be a violation of Section Two of the Sherman Act, disaggregating the monopolist's lawful actions from its unlawful actions for the purpose of calculating damages may be "unnecessary, if not impossible." See LePage's, 324 F.3d at 166.

E.   State Law Claims

Plaintiffs assert state law claims under the New York Donnelly Act and the Michigan Antitrust Reform Act for exclusive dealing and monopolization. The relevant state law provisions are interpreted in the same manner as their federal counterparts. See Eatoni Ergonomics, Inc. v. Research in Motion Corp., 826 F. Supp. 2d 705, 708 (S.D.N.Y. 2011); Little Caesar Enters., Inc. v. Smith, 895 F. Supp. 884, 898 (E.D. Mich. 1995). Thus, News Corp.'s motion for summary judgment is also denied with respect to the state law claims.

II.     NEWS CORP.'S MOTIONS IN LIMINE

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert and other scientific or technical expert testimony, and states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In determining whether expert testimony is admissible, the Court must assume a gatekeeper function to determine whether "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); accord Campbell v. Metro. Prop. & Cas. Ins. Co., 239 F.3d 179, 184 (2d Cir. 2001). Although the Daubert analysis was initially developed to examine scientific testimony, Daubert applies with equal force to other types of expert testimony including that of economists. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999). The proponent of the testimony must establish admissibility by a preponderance of the evidence. Bourjaily v. United States, 483 U.S. 171, 175–76 (1988). And this Court has broad discretion in determining whether to admit expert testimony. Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).

## DISCUSSION

A.  News Corp.'s Motion to Exclude the Testimony of Dr. Paul Farris

News Corp. moves to exclude the testimony of Plaintiffs' industry expert, Dr. Paul Farris. Farris is the Landmark Communications Professor at the University of Virginia's Darden School of Business Administration, where he has taught since 1980. Farris was retained by Plaintiffs to opine on: (1) how CPGs use third-party ISP sold by News Corp.; (2) whether

other marketing, advertising, or promotional tactics are competitive substitutes to third-party ISP; and (3) the degree to which third-party ISP complement other forms of advertising and promotion services.  (Michael Decl. Ex. 79.)  Farris identified five criteria to assess the substitutability of third-party ISP for other advertising methods, such as traditional out-of-store consumer promotions.

   News Corp. contends that Farris' opinions are not supported by academic literature, are undermined by the record in this case, and are at odds with his prior testimony in other actions.  But in his report, Farris presents a table identifying sufficient support for his methodology in academic literature and practitioner studies.  (Michael Decl. Ex. 79, Farris Rpt. at Table 1.)  That no published study has used the same five criteria employed by Farris is not fatal to the admissibility of his opinion.  Amorgianos v. National R.R. Passenger Corp., 303 F.3d 256, 266–67 (2d Cir. 2002).  ("This is not to suggest that an expert must back his or her opinion with published studies that unequivocally support his or her conclusions.").  Whether the documentary evidence is inconsistent with Farris' opinion, or whether Farris' testimony in prior litigation is at odds with his current testimony, are matters for cross-examination at trial.

   Further, News Corp. contends that Farris' opinions are irrelevant because they do not address the appropriate product market inquiry, namely, what products are "reasonably interchangeable."  But Farris' opinions concerning the key criteria considered by CPGs when selecting promotional tactics—and the substitutability of those tactics—are relevant to that issue. A jury may consider the testimony of industry experts regarding product substitutability.  Accord ABA Model Jury Instructions in Civil Antitrust Cases (2005), at C-7 ("In evaluating whether various products are reasonably interchangeable or are reasonable substitutes for each other, you

may also consider . . . the perceptions of either industry or the public as to whether the products are in separate markets.").

As Plaintiffs point out, Farris does not opine on the ultimate conclusion of the relevant product market definition. On the contrary, his testimony is but "one piece" —along with MacKie-Mason's critical loss analysis and other evidence—supporting Plaintiffs' definition of the relevant product market. (Pl. Opp. Br. at 20.)

B. News Corp.'s Motion to Exclude Portions of the Testimony of Dr. Jeffery MacKie-Mason

News Corp. also moves to exclude portions of the testimony of Plaintiffs' economist, Dr. Jeffrey MacKie-Mason. In particular, News Corp. argues that: (1) MacKie-Mason's damages "benchmark" model is inadequate; (2) MacKie-Mason's opinions on liability are inappropriately based on News Corp.'s "intent" to harm competitors; and (3) MacKie-Mason's relevant product market definition is not supported by the "Lerner Index."

In its class certification decision, this Court rejected News Corp.'s argument that MacKie-Mason's damages "benchmark" model is inadequate because of his selection of benchmark firms. As this Court explained:

> Because News Corp. has allegedly maintained a monopoly in the market for ISPs since at least 2000, creating a benchmark using News Corp.'s prices during a time of 'robust competition' is not feasible. (MacKie-Mason Rebuttal at 29.) And as Plaintiffs point out, the selection of perfectly comparable benchmark firms aside from News Corp. is impossible where News Corp.'s alleged monopoly prevents comparable firms from operating within the market. Indeed, the twenty benchmark firms selected by Dr. MacKie-Mason were not chosen arbitrarily: he chose the firms based on their capital intensity, growth, and size. (See MacKie-Mason Rebuttal Rpt. at 29–31.)

Dial Corp., 2015 WL 4104624, at *10. News Corp. presents nothing new in its motion in limine to persuade this Court to revisit its earlier ruling. And once again, it is not dispositive that

MacKie Mason's benchmark model has not been cited in peer reviewed economic literature. See Astra Aktiebolag v. Andrx Pharm., Inc., 222 F. Supp. 2d 423, 489 (S.D.N.Y. 2002) ("[T]he mere fact that an expert's findings have not been peer-reviewed or published is not a sufficient reason to exclude it."). News further contends that MacKie-Mason should have used Catalina Marketing ("Catalina"), a company which sells coupons distributed at checkout counters (see News Corp. 56.1 ¶ 94), as a benchmark firm. But Plaintiffs counter that Catalina went private in 2007 and ended public disclosure of its financial results. Thus, MacKie-Mason could not have used Catalina as a benchmark. (See Benz Decl. Ex. 9.)[5]

Additionally, News Corp. objects to MacKie-Mason's decision to average the margins of his benchmark firms, and his failure to control for differences between the benchmark firms and News Corp. But MacKie-Mason testified that "the average is an unbiased estimator" where, as here, he did not have any reason to think that there was "bias in the draw." (See Benz Decl. Ex. 8, MacKie-Mason Tr. at 211:13–212:7); see also In re Wellbutrin XL Antitrust Litig., 282 F.R.D. 126, 144 (E.D. Pa. 2011) ("The use of averages in this case does not mask meaningful variations in overcharges, and it provides a reliable method to provide a reasonable estimate of the damages based on relevant purchase data.").

News Corp. also argues that MacKie-Mason's opinions with respect to liability are improperly based on his findings that News Corp. acted with anticompetitive "intent." Plaintiffs dispute this characterization and point out that MacKie-Mason's opinion rests on an economic analysis of News Corp.'s market domination and how it foreclosed competition. (See

---

[5]    Plaintiffs also point out that MacKie-Mason presents an "alternative benchmark" consisting of firms that the "data vendor Capital IQ identified as "similar to News [Corp.]." (Michael Decl. Ex 48, MacKie-Mason Rebuttal Rpt. at 54.)

Michael Decl. Ex. 4 MacKie-Mason Rpt. at 56–72, 75–91.)  And there is nothing inadmissible about MacKie-Mason's reliance on evidence of News Corp.'s statements regarding its strategies. See, e.g., United States v. Mulder, 273 F. 3d 91, 102 (2d Cir. 2001) (permitting expert testimony that "bore on the issue of intent").  Indeed, MacKie-Mason's testimony is distinguishable from other cases in which expert testimony is plainly untethered to any economic analysis. Cf. In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d 531, 546–47 & n.40 (S.D.N.Y. 2004) (precluding expert testimony on intent where expert admitted that "he ha[d] no factual or scientific basis for his views regarding intent, motive or state of mind[.]").

News Corp. objects to MacKie-Mason's use of "critical loss analysis" in defining the relevant product market.  Plaintiffs contend that MacKie-Mason employs an approach to the product market definition, the SSNIP test, advocated "by the DOJ Guidelines."  (Michael Decl. Ex. 4, MacKie-Mason Rpt. at 30–31 (citing DOJ and FTC, Horizontal Merger Guidelines (2010)).  To implement this test, MacKie-Mason employs a critical loss analysis, developed in Joseph Farrell and Carl Shapiro, Improving Critical Loss Analysis, The Antitrust Source 4 (Feb. 2008).  The parties disagree over the proper application of this critical loss analysis.  News Corp. contends that MacKie-Mason should have calculated the actual loss as part of the analysis.  In lieu of calculating actual loss, which Plaintiffs contend would have been impossible, MacKie-Mason employs a critical loss analysis involving the estimation News Corp.'s margin above marginal cost and the aggregate diversion ratio (the fraction of the reduction in demand for News Corp.'s brand of in-store promotions in response to an increase in News Corp.'s prices that would be captured by other third-party ISP providers).  (Michael Decl. Ex. 4, MacKie-Mason Rpt. at 47.)

Finally, News Corp. objects to Plaintiffs' use of the "Lerner Index," which MacKie-Mason uses to determine the margin variable in his critical loss analysis. News Corp.'s contention that the Second Circuit rejected the "Lerner Index" in all circumstances overstates United States v. Eastman Kodak Co., 63 F. 3d 95, 109 (2d Cir. 1995). There, the Second Circuit rejected use of the "Lerner Index" under the particular facts of that case. See Eastman Kodak, 63 F.3d at 109 ("[T]he contention that Kodak film is differentiated from the film sold by its rivals is directly contradicted by the district court's findings . . . . Accordingly, we believe that the use of the Lerner index in this manner rests on unwarranted factual assumptions.").[6]

Ultimately, the parties' many disagreements over MacKie-Mason's methodologies go to the weight, not admissibility of MacKie-Mason's testimony. See, e.g., In re Vitamin C Antitrust Litig., 06 MD 1738, 2012 WL 6675117, at *8 ("[Movants'] motion asks the Court to take sides in a dispute between experts about the intricacies of economic modeling. That is not the proper function of a Daubert motion. This is not a case in which an expert is unable to articulate a rationale for his methodology; nor is it a case where the proffered rationale is patently flawed or unreasonable."). Where, as here, MacKie-Mason's methodologies are not clearly unsound or unreasonable, this Court declines to exclude his testimony on a Daubert motion.

---

[6]     News Corp. also challenges the portions of MacKie-Mason's testimony in which he suggests that News Corp.'s high profit margins necessarily indicate market power. But, as Plaintiffs point out, MacKie-Mason opines that News Corp.'s "persistently high" profit margins are but one indicator of market power. (Michael Decl. Ex. 4, MacKie-Mason Rpt. at 71). This testimony is admissible. See, e.g., MacDermid Printing Solutions, Inc. v. Cortron Corp., No. 08 Civ. 1649, 2014 WL 2615361, at *5 (D. Conn. June 12, 2014) (noting that profit margins may "indirectly" speak to market definition).

<u>CONCLUSION</u>

For the foregoing reasons, Defendants News Corporation, News America Inc., News America Marketing FSI L.L.C., and News America Marketing In-Store Services L.L.C.'s motion for summary judgment dismissing this antitrust action is denied. In addition, Defendants' motions <u>in limine</u> to exclude portions of the testimony of Dr. Jeffrey MacKie-Mason, and all of the testimony of Dr. Paul Farris, are denied.

The Clerk of Court is directed to terminate the motions pending at ECF Nos. 282, 285, and 286.

Dated: January 15, 2016
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record (via ECF).*

-27-