**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE DIAL CORPORATION, *et al.*, | |
| Individually and on behalf of Similarly Situated Companies, | |
| Plaintiffs, | Civil Action No. 13-cv-06802-WHP |
| v. | |
| NEWS CORPORATION, *et al.*, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARDS TO CLASS REPRESENTATIVES**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

THE WORK UNDERTAKEN BY PLAINTIFFS' COUNSEL ................................... 3

    A.    Case Investigation and Pleadings ........................................................ 3

    B.    Discovery Efforts ................................................................................ 4

    C.    Expert Work ........................................................................................ 5

    D.    Class Certification .............................................................................. 5

    E.    Summary Judgment and Daubert Motions .......................................... 6

    F.    Motions *in Limine* and Trial ............................................................. 6

ARGUMENT ...................................................................................................... 8

THE FEE REQUEST IS FAIR AND REASONABLE ............................................. 8

    A.    The Requested Fee Is Reasonable and Appropriate Under the
           Second Circuit's Preferred Percentage-Based Method ........................ 8

          1.    Quality of Representation and Time Spent by Counsel ........... 11

          2.    Complexity of the Case ............................................................. 12

          3.    Litigation Risk ......................................................................... 13

          4.    The Fee Is Reasonable in Relation to the Settlement ............... 15

          5.    Public Policy ............................................................................ 15

    B.    The Lodestar Cross-Check Supports the Requested Fee ..................... 16

PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE .............................. 20

INCENTIVE AWARDS FOR CLASS REPRESENTATIVES ................................. 22

CONCLUSION ................................................................................................... 24

# TABLE OF AUTHORITIES

Page

## CASES

*Adelphia Commc'ns Corp. Sec. & Derivative Litig., In re*, No. 03 MD 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) ....................................................................9

*Air Cargo Shipping Servs. Antitrust Litig., In re*, No. 06 MD 1775:

    2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) ...................................................................9

    2011 WL 2909162 (E.D.N.Y. July 15, 2011) ...............................................................8, 9

    2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012) .....................................................................9

    2015 WL 5918273 (E.D.N.Y. Oct. 9, 2015) .............................................................23, 24

*Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...........................9

*Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.*, 481 F.2d 1045 (2d Cir. 1973) ...............................8

*Asare v. Change Grp. of N.Y., Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764 (S.D.N.Y. Nov. 18, 2013) ...........................................................................................17

*AT&T Mobility Wireless Data Servs. Sales Tax Litig., In re*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011)....................................................................................................9

*(Bank of Am.) Checking Account Overdraft Litig., In re*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011)$ .....................................................................................................9

*Beckman v. KeyBank, N.A.*, 293 F.R.D. 467 (S.D.N.Y. 2013) ......................................................17

*Cathode Ray Tube (CRT) Antitrust Litig., In re*, No. 1917, 2016 WL 153265 (N.D. Cal. Jan. 13, 2016) ............................................................................................24

*Cathode Ray Tube (CRT) Antitrust Litig., In re*, MDL No. 1917, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016) ..............................................................................................9

*Citigroup Inc. Sec. Litig., In re*, 965 F. Supp. 2d 369 (S.D.N.Y. 2013) .................................18, 19

*City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds, Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ......................14

*Colgate-Palmolive Co. ERISA Litig., In re*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) ...........................................................................................................16

*Credit Default Swaps, In re*, No. 13-MD-2476, 2016 WL 2731524
(S.D.N.Y. Apr. 26, 2016) .......................................................................9, 10, 16, 17, 18, 19

*Currency Conversion Fee Antitrust Litig., In re*, 263 F.R.D. 110 (S.D.N.Y. 2009),
*aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F. App'x 532 (2d Cir.
2010) ..............................................................................................15, 16, 19, 23, 24

*Donoghue v. Morgan Stanley High Yield Fund*, No. 10 Civ. 3131 (DLC), 2012 WL
6097654 (S.D.N.Y. Dec. 7, 2012) ...................................................................................8

*Dreyfus Aggressive Growth Mut. Fund Litig., In re*, No. 98 CV 4318 HB, 2001 WL
709262 (S.D.N.Y. June 22, 2001) ................................................................................13

*Excess Value Ins. Coverage Litig., In re*, 598 F. Supp. 2d 380 (S.D.N.Y. 2005) ........................12

*FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003 (2013) ...............................................16

*Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir. 1998) ...................................................................17

*Goldberger v. Integrated Res., Inc.*, 209 F.3d 43 (2d Cir. 2000) ...........................11, 13, 14, 15, 16

*Gulf Oil/Cities Serv. Tender Offer Litig., In re*, 142 F.R.D. 588 (S.D.N.Y. 1992) .......................1

*Hi-Crush Partners L.P. Sec. Litig., In re*, No. 12-CIV-8557 CM, 2014 WL 7323417
(S.D.N.Y. Dec. 19, 2014) ..............................................................................................17

*High-Tech. Emp. Antitrust Litig,, In re*, No. 11-CV-02509-LHK, 2015 WL 5158730
(N.D. Cal. Sept. 2, 2015) ..............................................................................................24

*Initial Pub. Offering Sec. Litig., In re*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) ...............................9

*LeBlanc-Stemberg v. Fletcher*, 143 F.3d 748 (2d Cir.1998) ......................................................17

*Maley v. Dale Global Techs. Corp.*, 186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................18

*Marchbanks Truck Serv. v. Comdata Network, Inc.*, Case No. 07-CV-1078
(E.D. Pa. July 14, 2014) ................................................................................................24

*Missouri v. Jenkins*, 491 U.S. 274 (1989) ................................................................................17

*NASDAQ Mkt.-Makers Antitrust Litig., In re*, 187 F.R.D. 465 (S.D.N.Y. 1998) .............12, 14, 18

*Oxford Health Plans. Inc. Sec Litig., In re*, MDL 1222, 2003 U.S. Dist. LEXIS
26795 (S.D.N.Y. June 12, 2003) .....................................................................................9

*Payment Card Interchange Fee & Merchant Discount Antitrust Litig., In re*, 991 F. Supp. 2d 437 (E.D.N.Y. 2014), *rev'd on other grounds*, No. 12-4671-CV, 2016 WL 3563719 (2d Cir. June 30, 2016) ............................................................8, 10, 18

*Plastic Tableware Antitrust Litig., In re*, No. 94 CV 3564, 1995 WL 723175 (E.D. Pa. Dec. 4, 1995) ......................................................................................................23

*Platinum & Palladium Commodities Litig., In re*, No. 10 CV 3617, 2015 WL 4560206 (S.D.N.Y. July 7, 2015)$ ........................................................................9, 16

*Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224 (2d Cir. 2006)...................................19

*Relafen Antitrust Litig., In re*, Master File No. 01-12239-WGY (D. Mass. 2004 & 2005) ........................................................................................................................9

*Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y.1997)........................................................23

*Telik , Inc. Sec. Litig., In re*, 576 F. Supp. 2d 570 (S.D.N.Y. 2008).......................................17, 19

*Titanium Dioxide Antitrust Litig., In re*, No. 10-CV-00318 RDB, 2013 WL 6577029 (D. Md. Dec. 13, 2013) ......................................................................................24

*Tricor Direct Purchaser Antitrust Litig., In re*, No. 05-340-SLR, Dkt. No. 543 (D. Del. Apr. 23, 2009) ..............................................................................................9

*Veeco Instruments Inc. Sec. Litig., In re*, No. 05 MDL 01695(CM), 2007 WL 4115808 (S.D.N.Y. 2007) ..................................................................................17

*Velez v. Novartis Pharm. Corp.*, No. 04 CIV 09194 CM, 2010 WL 4877852 (S.D.N.Y. Nov. 30, 2010) .................................................................................. 23-24

*Visa Check/Mastermoney Antitrust Litig., In re*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005)..........................................................................................14, 21

*Vitamins Antitrust Litig., In re*, Misc. No. 99-197 (TFH), 2001 WL 34312839 (D.D.C. July 16, 2001) ..............................................................................................9

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96 (2d Cir. 2005) ........................1, 7, 12, 21

*WorldCom, Inc., In re*, 388 F. Supp. 2d 319 (S.D.N.Y. 2005) .................................................8, 10

**STATUTES AND RULE**

15 U.S.C. § 1 ............................................................................................................3

15 U.S.C. § 2 ............................................................................................................3

Fed. R. Civ. P. Rule 23(h)........................................................................................1

**OTHER AUTHORITIES**

*Billing Rates Across the Country*, National Law J., Jan. 13, 2014,
      http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-
      Across-the-Country...........................................................................................19

Newberg on Class Actions § 15:83 (5th ed.) ...........................................................9

Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, Co-Lead Class Counsel respectfully move for an award of attorneys' fees and reimbursement of expenses from the common fund established by the class settlement, and incentive awards for the six class representatives.

## INTRODUCTION

In December 2012, Berry Law PLLC ("Berry Law") and Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C. ("Kellogg Huber") filed the initial complaints on behalf of Dial and Heinz in this multi-year, multi-million dollar effort to recover monopoly overcharges imposed by one of the world's largest media companies and to reform the contracting practices that created and sustained that monopoly.  The Susman Godfrey, LLP ("Susman Godfrey"), McKool Smith P.C. ("McKool Smith"), and Paul Hastings LLP ("Paul Hastings") firms joined as plaintiffs' counsel in mid-2013, along with named plaintiffs Foster Poultry Farms ("Foster Farms"), BEF Foods Inc. ("BEF"), HP Hood LLC ("HP Hood"), Smithfield Foods, Inc. ("Smithfield Foods"), and Spectrum Brands, Inc. ("Spectrum Brands").

Unlike many antitrust class actions that support substantial fee awards, this case did not have the advantage of *per se* claims against admitted—or even accused—conspirators. Plaintiffs' counsel did not piggy-back on the work of governmental enforcement efforts or benefit from cooperating amnesty applicants.  This was private enforcement from first to last. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 122 (2d Cir. 2005) (noting that "extraordinary fee" was warranted in part because "plaintiffs' counsel did not have the benefit of 'piggybacking' off of a previous [government action]."); *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 142 F.R.D. 588, 597 (S.D.N.Y. 1992) (Mukasey, J.) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  They did all the work on their own.").

1

The difficulty of the private enforcement task these plaintiffs and their counsel undertook is underscored by the complete lack of any copycat lawsuits.

The only certainty at the outset of this case was that even reaching class certification would require millions of dollars of expert economic analysis, investigation, and discovery. From its inception, this case faced significant legal hurdles and a tenacious, skilled, and well-funded opposition.  And unlike many class actions, this case did not settle after this Court certified the class.  Instead, Defendants appealed that decision, moved to disqualify both of Plaintiffs' antitrust and industry experts, and sought summary judgment on all claims.  When the Second Circuit rejected their appeal Defendants began directly negotiating settlements with the two dozen largest class members in an attempt to undermine the Class and Plaintiffs' Counsel's efforts on its behalf.

This case proceeded through jury selection before settling on the first trial day for $244,000,000 (the "Settlement Amount") and important reform of Defendants' contracting practices.  In consideration of this long fight and superior result, the six law firms that represented the Plaintiff class[1] respectfully request a fee award of $73,200,000 representing 30% of the common fund and a multiplier of 2.01 on Counsel's lodestar of $36,433,985.50.  Co-Lead Counsel also requests reimbursement of expenses incurred in the course of prosecuting these claims in the amount of $7,512,915.12, and incentive awards of $50,000 to each of the six named plaintiffs.

---

[1] The six firms that represented the named plaintiffs and certified class are:  Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Susman Godfrey, LLP, Kramer, Levin, Naftalis & Frankel, LLP, McKool Smith, P.C., Berry Law PLLC, and Paul Hastings LLP.  *See* the declarations of Steven Benz, James Southwick, Daniel Goldman, Lewis LeClair, and Steven Berry, filed contemporaneously herewith.

## THE WORK UNDERTAKEN BY PLAINTIFFS' COUNSEL

### A.    Case Investigation and Pleadings

In 2010 Berry Law and Kellogg Huber began investigating the antitrust claims that were ultimately brought to conclusion nearly six years later.  From 2010 to the filing of the first complaint, those two firms devoted hundreds of hours of attorney time to the investigation of Plaintiffs' claims.  *See* Berry Decl. ¶¶ 10-11; Benz Decl. ¶ 12.  On December 21, 2012, The Dial Corporation filed the first complaint in this action in the Eastern District of Michigan against Defendants, alleging federal and state antitrust claims relating to their provision of in-store promotions products ("ISPs") to customers.  (ECF No. 1.)  On December 27, 2012, H.J. Heinz Company (now renamed Kraft Heinz Food Company) joined the lawsuit in an Amended Complaint.  (ECF No. 3.)  On May 2, 2013, a Second Amended Complaint added Foster Farms as a plaintiff and made the first class allegations.  (ECF No. 24.)  In August 2013, three additional firms – Susman Godfrey, McKool Smith, and Paul Hastings – joined the case as plaintiffs' counsel and sought leave to file a third amended complaint.  (ECF No. 46.)  In September 2013, the case was transferred from the Eastern District of Michigan to this Court.  (ECF No. 50.)  Plaintiffs filed a Third Amended Complaint on October 24, 2013, adding HP Hood, BEF, Smithfield Foods, and Spectrum as plaintiffs.  (ECF No. 70.)  The Fourth Amended Complaint was filed on April 8, 2014 and asserts causes of action for (1) exclusive dealing in the ISP market in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1; and (2) monopolization of the ISP market in violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. (ECF No. 111.)[2]

---

[2] The Complaint also asserted causes of action for monopolization of the free-standing insert market, and for violations of Michigan and New York state antitrust laws.  With the Court's permission, Plaintiffs later voluntarily dismissed those claims.  (ECF No. 543.)

### B. Discovery Efforts

Fact discovery began in October 2013.  Because Plaintiffs alleged anticompetitive conduct dating back to News's efforts to crush competition in the early 2000s, document discovery was extensive:  a total of 10,867,210 documents were produced, representing 48,440,389 pages.  This total comprised:

- 5,793,586 documents from Defendants (22,943,421 pages)

- 3,443,921 documents from Plaintiffs (12,445,706 pages)

- 1,629,703 documents from non-parties (13,051,262 pages)

The temporal scope and rule of reason nature of the claims required extensive deposition testimony:  the parties took and defended 48 depositions in the case.  Benz Decl. ¶ 20.  The deponents included Defendants' current and former employees, officers, and corporate designee, as well as Defendants' principal competitor, Valassis Corp.  Southwick Decl. ¶¶ 16, 17.  Plaintiffs' Counsel also took the depositions of Defendants' four expert witnesses, Dr. Dennis Carlton, Dr. Sanjay Dhar, Dr. Jerry Hausman, and Dr. Kevin Murphy, and defended multiple depositions of their own experts, Dr. Jeffrey MacKie-Mason and Dr. Paul Farris.  Benz Decl. ¶ 21; Berry Decl. ¶ 11; Goldman Decl. ¶ 6; LeClair Decl. ¶¶ 5-7; Southwick Decl. ¶¶ 16, 17.  Plaintiffs' Counsel defended depositions of current and former employees of Class Plaintiffs and participated in the depositions of current and former employees of non-party CPGs, retailers, and other former competitors of the Defendants.  Benz Decl. ¶ 21; Berry Decl. ¶ 11; LeClair Decl. ¶¶ 5, 7, 8; Southwick Decl. ¶¶ 16-17.  Together, the parties served approximately 20 non-party subpoenas and 10 expert reports, along with multiple report supplements and expert declarations.  Benz Decl. ¶ 20.

In April 2015, with just days to go before discovery was to close and with depositions nearly complete, Defendants informed the Court that they had failed to produce more than one million emails relevant to the case and would endeavor to produce those emails in the coming weeks.  (ECF Nos. 222, 224.)  As a result, the case schedule was extended and Plaintiffs' Counsel began an intensive effort over the summer of 2015 to review and analyze the late wave of Defendants' emails that were not produced until after discovery was supposed to have been complete.

### C.   Expert Work

Simultaneous with document discovery and depositions, Plaintiffs' Counsel worked with two experts to establish key facets of class certification (common impact, predominance, common approach to damages) and their affirmative case (market definition, liability, and damages).  These experts provided critical opinion evidence on the business context of the use of third-party ISPs offered by News and sound economic theory to establish liability and quantify damages for the class.  Plaintiffs describe those experts' qualifications and opinions in the Declaration of Steven F. Benz.  Benz Decl. ¶¶ 22-24.

### D.   Class Certification

On August 11, 2014, Plaintiffs moved the Court under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure for an order certifying the case as a class action.  (ECF No. 141.)  On June 18, 2015, the Court granted Class Plaintiffs' motion and certified a class of "[n]on-retailer consumer packaged goods firms residing in the United States which have directly purchased in-store promotions from News Corp. at any time on or after April 5, 2008, and were not subject to mandatory arbitration clauses."  (ECF No. 243, at 23.)  Defendants petitioned to

appeal the Court's class certification order under Rule 23(f), (ECF No. 248), which the Second Circuit denied.  (ECF No. 327.)

The Court approved a September 21, 2015 opt-out deadline.  (ECF Nos. 266, 304.)  Only one small putative Class Member opted out.  (ECF No. 304-1.)  The Court subsequently amended the start of the Class period to April 26, 2009.  (ECF No. 484.)

### E.   Summary Judgment and Daubert Motions

On September 30, 2015, Defendants moved for summary judgment and sought to bar testimony of both of Plaintiffs' experts.  (ECF Nos. 282–295.)  Those motions, as well as Plaintiffs' responses, were supported by extensive expert reports, exhibits, and declarations.  (*See id.*)  On January 15, 2016, the Court denied Defendants' motion for summary judgment and motions to exclude the testimony of Professors MacKie-Mason and Farris.  (ECF No. 420.)

### F.   Motions *in Limine* and Trial

From December 2015 through February of this year, the parties negotiated and filed all the required pre-trial materials, including a proposed jury questionnaire, jury instructions, verdict forms, *voir dire* questions, and motions *in limine*.  (ECF Nos. 285, 286, 462, 471, 474, 538-540.) The Court held several pre-trial conferences, in court and by telephone, on important pre-trial issues, such as the parties motions *in limine*, including critical issues such as the admissibility of pre-class period evidence and the effect of releases entered into between Defendants and various Class Members at various times.  (*See, e.g.*, ECF Nos. 365, 484, 520, 523.)  In the lead-up to trial, Plaintiffs' Counsel prepared for and conducted a mock trial; selected, exchanged, and objected to trial exhibits; designated and objected to deposition designations; and prepared their trial witnesses to testify.  Benz Decl. ¶ 20; Goldman Decl. ¶¶ 12-13; LeClair Decl. ¶¶ 6-8, 10-11.

Throughout these months of trial preparation, Plaintiffs' Counsel was actively involved in discussions with most of the two dozen large class members with whom Defendants were trying to negotiate non-class settlements.  (ECF No. 339.)  On February 24, less than a week before trial, Defendants informed Plaintiffs' Counsel of settlements worth more than $30 million it had struck the previous day with five substantial class members. (ECF No. 542.)  And as described in Plaintiffs' motion for preliminary approval, during January and February of this year Lead Counsel were actively negotiating to settle the Class's claims.  (ECF No. 565.)

On February 29 of this year, a *venire* was brought in and the parties proceeded through *voir dire* and jury empanelment.  Counsel proceeded to give opening statements to the jury before reaching, and then briefing the Court on the details of, the parties' settlement.  The Court preliminarily approved the settlement on June 2, 2016.  (ECF No. 571.)  On June 15, 2016, notice was mailed to all Class Members.

Every minute of work and every dollar of expense incurred by the firms of Kellogg Huber, Susman Godfrey, McKool Smith, Kramer Levin, and Paul Hastings was entirely at risk. Benz Decl. ¶ 43; Goldman Decl. ¶ 5; LeClair Decl. ¶¶ 18-19; Southwick Decl. ¶ 9.  The six class representatives paid Berry Law a total of $918,110 during the course of Mr. Berry's pre-suit investigation and during the pendency of the case; all of Berry Law's time in excess of these payments were at risk.  Berry Decl. ¶ 15.  Ultimately, 80% of Berry Law's lodestar, and 97% of Plaintiffs' Counsel's combined lodestar was undertaken on a contingency basis.  Benz Decl. ¶ 17; Berry Decl. ¶ 16.

# ARGUMENT

## THE FEE REQUEST IS FAIR AND REASONABLE

**A.      The Requested Fee Is Reasonable and Appropriate Under the Second Circuit's Preferred Percentage-Based Method**

The total requested amount of fees is $73,200,000, 30% of the $244 million common fund created by the settlement.  Applying the "percentage method" of fee calculation favored in this Circuit confirms that the requested fee is reasonable.  *See Wal-Mart*, 396 F.3d at ("The trend in this Circuit is toward the percentage method").  The percentage method provides "appropriate financial incentives" necessary to "attract well-qualified plaintiffs' counsel who are able to take a case to trial," and "directly align[s] [the] interests of the class and its counsel."  *WorldCom, Inc., In re*, 388 F. Supp. 2d 319, 355 (S.D.N.Y. 2005).  Without "adequate attorneys' fee awards, many antitrust actions would not be commenced, since the claims of individual litigants, when taken separately, often hardly justify the expense of litigation."  *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775 (JG), 2011 WL 2909162, at *6 (E.D.N.Y. July 15, 2011) (quoting *Alpine Pharmacy, Inc. v. Chas. Pfizer & Co.*, 481 F.2d 1045, 1050 (2d Cir. 1973)).

The fee request for Plaintiffs' Counsel here totals 30% of the common fund, which is reasonable on its face.  *Donoghue v. Morgan Stanley High Yield Fund*, No. 10 Civ. 3131 (DLC), 2012 WL 6097654, at *2 (S.D.N.Y. Dec. 7, 2012) (Cote, J.) ("attorney[s]'s fees of one-third or less of the settlement amount are customarily found to be reasonable.") (collecting cases).  "Even in large-value cases, courts have sometimes awarded contingency fees exceeding 30% of the overall fund."  *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 991 F. Supp. 2d 437, 447 n.11 (E.D.N.Y. 2014) (collecting cases), *rev'd on other grounds*, No. 12-4671-CV, 2016 WL 3563719 (2d Cir. June 30, 2016).

Thirty percent of a common fund is squarely within the percentage range of fees that courts in this circuit have approved as reasonable in recent large antitrust cases:

| Case | Recovery | Percentage |
|---|---|---|
| *In re Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476, 2016 WL 2731524 (S.D.N.Y. Apr. 26, 2016) (Cote, J.) | $1.86 billion | 13.61% |
| *In re Platinum & Palladium Commodities Litig.*, No. 10 CV 3617, 2015 WL 4560206 (S.D.N.Y. July 7, 2015) (Pauley, J.) (fee award for Futures Class Counsel) | $72.5 million | 22.5% |
| *Id.* (fee award for Physical Class Counsel) | $12.1 million | 33.3% |
| *In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775, 2012 WL 3138596 (E.D.N.Y. Aug. 2, 2012), 2011 WL 2909162 (E.D.N.Y. July 15, 2011), 2009 WL 3077396 (E.D.N.Y. Sept. 25, 2009) (Gleeson, J.) | $422.2 million | 25% |
| *In re Initial Pub. Offering Sec. Litig.*, 671 F. Supp. 2d 467 (S.D.N.Y. 2009) (Scheindlin, J.) | $510 million | 33.3% |
| *In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, No. 03 MD 1529 (LMM), 2006 WL 3378705 (S.D.N.Y. Nov. 16, 2006) (Scheindlin, J.) | $455 million | 21.4% |
| *In re Oxford Health Plans. Inc. Sec Litig.*, MDL 1222, 2003 U.S. Dist. Lexis 26795 (S.D.N.Y. June 12, 2003) (Brieant, J.) | $300 million | 28% |

*See generally* Newberg on Class Actions § 15:83 (5th ed.) (mean fee award percentage for 26.9% in Second Circuit for 2006-2011 period). Awards in "megafund" cases in other circuits confirm the reasonableness of a 30% award here.

| Case | Recovery | Percentage |
|---|---|---|
| *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 721680 (N.D. Cal. Jan. 28, 2016) | $576 million | 30% |
| *In re AT&T Mobility Wireless Data Servs. Sales Tax Litig.*, 792 F. Supp. 2d 1028 (N.D. Ill. 2011) | $956 million | 20% |
| *In re (Bank of Am.) Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330 (S.D. Fla. 2011) | $410 million | 30% |
| *In re Tricor Direct Purchaser Antitrust Litig.*, No. 05-340-SLR, Dkt. No. 543 (D. Del. Apr. 23, 2009) | $250 million | 33.33% |
| *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006) | $1.06 billion | 31.33% |
| *In re Relafen Antitrust Litig.*, Master File No. 01-12239-WGY (D. Mass. 2004 & 2005) | $250 million | 33% |
| *In re Vitamins Antitrust Litig.*, Misc. No. 99-197 (TFH), 2001 WL 34312839 (D.D.C. July 16, 2001) | $365 million | 34.06% |

Notably, in all but two of the cases above[3], settlement was achieved comparatively early in the case—before class certification, summary judgment, *Daubert* motions, and trial.  The increased risks and difficulty posed by taking the case further here warrants a higher fee award relative to similar cases settled earlier in the course of litigation.  *See Credit Default Swaps*, 2016 WL 2731524, at *17 n.24 (privately negotiated fee schedule increased rate as litigation advanced); *WorldCom*, 388 F. Supp. 2d at 355 (fee schedule "allows Lead Counsel to collect a higher fee for recoveries achieved in later stages of the litigation"); *see also Payment Card Interchange Fee*, 991 F. Supp. 2d at 446 ("Privately negotiated fees in complex cases . . . often include a higher fee for cases that proceed past a motion to dismiss, discovery, summary judgment, or other benchmarks; the *Goldberger* factors also dictate a smaller fee for less work.").  In light of awards in other cases of similar scale but requiring comparatively less work, the requested fee is eminently reasonable.

Two additional case-specific issues should be noted in considering this fee request.  First, five of the named plaintiffs paid Berry Law a total of $948,110 in fees during the investigation and litigation of this case.  Berry Decl. ¶¶ 14, 15.  Plaintiffs' counsel will reimburse those fees to the named plaintiffs out of any award of fees to Plaintiffs' Counsel.  The repayment will put those Plaintiffs on even footing with the rest of the Class in terms of proportion of individual damages recovered, and will ensure the total fee to Plaintiffs' Counsel from the Class does not exceed the requested $73,200,000.

Second, in addition to the $244 million payment to the Class, Defendants settled with five class members in the week before trial for $30 million cash plus certain future price discounts and true-up payments to match any class settlement.  (ECF No. 542.)  The class settlement

---

[3] *Oxford Health* and *Allapattah Servs.*, which settled in the pre-trial phase and after trial and appeals, respectively.

agreement includes a payment to Plaintiffs' Counsel of $6 million as a fee related to work that resulted in those individual settlements. The $6 million fee does not come from the common fund and is thus separate from this fee request, but is contingent on final approval of the class settlement. This $6 million fee should not reduce the fee requested in this motion because if the five settling entities had remained in the Class, Class Counsel would have demanded a correspondingly larger class settlement payment and the percentage fee would also be correspondingly larger. Although $6 million represents only 20% of the individual settlements, that fee is not akin to a market rate negotiation with a client, reflects the marginally lower work contributed to the individual settlements, the lack of structural relief in the individual settlements, and the benefit to Plaintiffs' Counsel of being saved the effort of pursuing their due compensation for those settlements in separate actions.

The reasonableness of the requested fee award is also confirmed using the six-factor test promulgated in *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000). Under that test, courts weigh "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.* at 50.

### 1.  Quality of Representation and Time Spent by Counsel

"[T]he quality of representation is best measured by results." *Goldberger*, 209 F.3d at 55. As detailed in Plaintiffs' Motion for Preliminary Approval, ECF No. 565, Plaintiffs' Counsel obtained a cash recovery of $244,000,000 for the Class, in excess of the conservative single damages calculated by Dr. MacKie-Mason. (ECF No. 565, at 12.) In addition, Plaintiffs' Counsel secured structural reform of Defendants' contracting procedures, which could

substantially reinvigorate competition in the third-party ISP market.  *See In re Excess Value Ins.*
*Coverage Litig.*, 598 F. Supp. 2d 380, 388 (S.D.N.Y. 2005) (Berman, J.) (holding that when
injunctive relief confers substantial benefit upon the class but cannot be ascribed specific
monetary value, appropriate to award higher percentage of common fund as attorneys' fees).

This result was achieved efficiently even though Plaintiffs' Counsel faced tenacious, and
at times contentious, opposition from one of the nation's largest and best regarded defense firms.
*See In re NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. 465, 489 (S.D.N.Y. 1998) (Sweet,
J.) (noting as factor in reasonableness of hours expended that defense counsel included "the
nation's biggest and best defense firms operating on a seemingly unlimited budget over a period
of four years").  Indeed, a report in the Wall Street Journal, a publication owned by Defendant
News Corp, indicated that Defendants had spent nearly $35 million in legal fees in just the last
year of litigation.  *See* Benz Decl. Ex. 8, *News Corp Settles In-Store Ads Class-Action Suit*, Wall
St. J., Feb. 29, 2016 ("The legal fees have been significant—around $35 million last year."),
*available at* http://www.wsj.com/articles/news-corp-settles-in-store-ads-class-action-
1456796184.  If accurate, Defendants' fees for 2015 dwarf the lodestar of Plaintiffs' Counsel for
the same period and nearly matches the entire $37.3 million lodestar for Plaintiffs' Counsel for
the roughly five years of this litigation.  *See infra* Part I.D.

### 2. Complexity of the Case

"[A]ntitrust cases, by their nature, are highly complex."  *Wal-Mart*, 396 F.3d at 122.
This case was no exception, and involved an alleged monopolization and the interplay of
multiple contracts to restrain trade in a complicated, multi-part marketplace, with conduct
spanning more than a decade.  As described above, discovery was extensive and made more

complicated by Defendants' production of over one million emails after depositions were nearly completed.

The merits of this rule of reason monopolization case required extensive work with economists and marketing experts to analyze Defendants' contracting practices and to define the relevant market and determine whether Defendants' contracting practices were exclusionary or pro-competitive.  Unlike *per se* cases, there are no bright lines in a rule of reason analysis that identify prohibited practices.  Each alleged bad act needed to be analyzed in conjunction with the other alleged improper behavior in the context of the relevant market to support an argument why Defendants' conduct, taken as a whole, was anti-competitive and why Defendants' proffered explanations were pretext.

Plaintiffs' Counsel also faced novel statute of limitations questions, complicated not only by ambiguous tolling agreements, but also by many of the hundreds of contracts at issue having contractual provisions purporting to shorten the limitations period to bring a claim.  Plaintiffs had to deal with the late surprise assertion by Defendants, only weeks before the trial, that certain Class members had previously released their claims.  (ECF No. 429.)  Plaintiffs' Counsel also faced the hurdle of preparing for trial and attempting to negotiate a class-wide settlement while also responding to numerous inquiries from the two-dozen largest class members as they were directly courted by Defendants for individual settlements.  This substantially increased the difficulty of both the class settlement negotiations and trial preparation.

### 3.  Litigation Risk

"Contingency risk is the principal . . . factor courts should consider in their determination of attorneys' fees."  *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 CV 4318 HB, 2001 WL 709262, at *6 (S.D.N.Y. June 22, 2001) (Baer, J.); *see also Goldberger*, 209 F.3d at 54

(identifying risk as "perhaps the foremost factor to be considered in determining whether to award an enhancement") (internal citation and quotations omitted).  An evaluation of the risks undertaken by Plaintiffs' Counsel in prosecuting this action supports the reasonableness of the fee request.

"It is well-established that litigation risk must be measured as of when the case is filed," not when the fee application is adjudicated.  *Goldberger*, 209 F.3d at 55.  Here, all of Plaintiffs' Counsel's time, with the exception of 20% of Berry Law's time, was undertaken entirely on contingency, risking all of their time and paying out millions of dollars in expenses.  Even with the roughly $1 million that class representatives paid to Berry Law during the course of the case, $36 million of the $37.3 million in lodestar was entirely at risk, or 97% of all Plaintiffs' Counsel's time was fully at risk.

Even "despite the most vigorous and competent of efforts, success is never guaranteed." *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 471 (2d Cir. 1974), *abrogated on other grounds*, *Goldberger*, 209 F.3d 43.  In antitrust class actions in particular, "[t]he risks of establishing liability and damages at trial" are substantial.  *In re Visa Check/Mastermoney Antitrust Litig.* 297 F. Supp. 2d 503, 511 (E.D.N.Y. 2003), *aff'd sub nom. Wal-Mart*, 396 F.3d 96; *see also NASDAQ Mkt.-Makers Antitrust Litig.*, 187 F.R.D. at 476 ("[T]he history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial, or on appeal.").

Plaintiffs' Counsel faced risks associated with taking on one of the largest and most powerful corporations in the world, one with extensive resources to support the litigation.  The case has thus far taken almost six years to come from investigation to conclusion, with Plaintiffs' Counsel collectively laying out 69,000 hours—representing over $36 million in expended man-

14

hours that may never have been collected.  Benz Decl. ¶ 17; Berry Decl. ¶¶ 12, 13; Goldman

Decl. ¶¶ 24, 38; LeClair Decl. ¶ 15; Southwick Decl. ¶ 12.  Counsel also invested over $7

million in expenses that they may have never recovered but for a successful outcome.  Okada

Decl. ¶ 9; Benz Decl. ¶¶ 51-52; Berry Decl. ¶ 14; Goldman Decl. ¶¶ 25, 26; LeClair Decl. ¶¶ 19,

21; Southwick Decl. ¶ 18.

      The case itself posed substantial burdens for successful prosecution.  Plaintiffs' Counsel

had to overcome motions for summary judgment, a motion for class certification and an appeal,

*Daubert* motions, and various motions *in limine*, any of which could have crippled or outright

terminated the action.  Plaintiffs' Counsel thus faced, and succeeded in overcoming, substantial

legal and procedural obstacles to successfully bring the action to the point of settlement.

### 4.  The Fee Is Reasonable in Relation to the Settlement

      Courts in this Circuit generally examine the reasonableness of a requested fee in relation

to the size of the settlement fund by comparing the fee sought with the requested fee in other

similarly sized settlements.  *See, e.g.*, *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D.

110, 129 (S.D.N.Y. 2009) (Pauley, J.), *aff'd sub nom. Priceline.com, Inc. v. Silberman*, 405 F.

App'x 532 (2d Cir. 2010); *but see Goldberger*, 209 F.3d at 53 ("a fee award should be assessed

based on scrutiny of the unique circumstances of each case").  As shown above at 7-11, a fee

award representing 30% of a common fund of this size is well in line with practice in the federal

courts where a class action has progressed to trial.

### 5.  Public Policy

      Finally, public policy strongly favors the award of the requested fee in order to

adequately incentivize lawyers to pursue challenging and high risk work in the antitrust context

vital to the proper functioning of the economy.  As Judge Cote recently wrote, "[i]t is important

to encourage top-tier litigators to pursue challenging antitrust cases such as this one.  Our antitrust laws address issues that go to the heart of our economy.  Our economic health, and indeed our stability as a nation, depend upon adherence to the rule of law and our citizenry's trust in the fairness and transparency of our marketplace." *Credit Default Swaps,* 2016 WL 2731524, at *18 (citing *FTC v. Phoebe Putney Health Sys., Inc.,* 133 S. Ct. 1003, 1010 (2013) (noting the "fundamental national values of free enterprise and economic competition that are embodied in the federal antitrust laws").

### B.     The Lodestar Cross-Check Supports the Requested Fee

The lodestar fee calculation method has "fallen out of favor particularly because it encourages bill-padding and discourages early settlements."  *In re Colgate-Palmolive Co. ERISA Litig.*, 36 F. Supp. 3d 344, 353 (S.D.N.Y. 2014) (Schofield, J.).  At most, the lodestar method should be used as a cross-check to ensure the award here is not an "unwarranted windfall." *Goldberger,* 209 F.3d at 49-50.  "[W]here used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  *Id.* at 50.

"Under the lodestar method, the Court examines the fee petition to ascertain the number of hours reasonably billed to the plaintiff and multiplies that figure by an appropriate hourly rate and a multiplier."  *Currency Conversion Fee*, 263 F.R.D. at 128.  "Courts applying the lodestar method generally apply a multiplier to take into account the contingent nature of the fee, the risks of non-payment, the quality of representation, and the results achieved."  *Platinum & Palladium Commodities Litig.*, 2015 WL 4560206, at *3.

Plaintiffs' Counsel collectively billed 69,218.95 hours to this matter over roughly six years.  Benz Decl. ¶ 17.  At each firms' current customary rates, those hours represent $36,433,985.50 in total lodestar as of June 30, 2016.  *Id*.  Plaintiffs' Counsel's request for

$73,200,000 in attorneys' fees for Plaintiffs' Counsel thus represents a multiplier of approximately 2.01. Plaintiffs' Counsel has deducted from this lodestar the time of any lawyer, legal assistant, or other timekeeper who billed less than 20 hours to the case. Benz Decl. ¶ 48; LeClair Decl. ¶ 15; Southwick Decl. ¶ 12. This time excludes all of the time spent on this motion or supporting declarations. Benz Decl. ¶ 46.

The lodestar is calculated using current rates according to Second Circuit precedent. "[T]he use of current rates to calculate the lodestar figure has been endorsed repeatedly by the Supreme Court, the Second Circuit and district courts within the Second Circuit as a means of accounting for the delay in payment inherent in class actions and for inflation." *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CIV-8557 CM, 2014 WL 7323417, at *15 & n.9 (S.D.N.Y. Dec. 19, 2014) (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989) (endorsing "an appropriate adjustment for delay in payment" by applying "current" rate)), *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir. 1998) (rates "should be 'current rather than historic'"), *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 764 (2d Cir. 1998) (current rates "should be applied in order to compensate for the delay in payment"), *In re Telik, Inc. Sec. Litig.*, 576 F. Supp. 2d 570, 589 n.10 (S.D.N.Y. 2008) (McMahon, C.J.) (same), and *In re Veeco Instruments Inc. Sec. Litig.*, 05 MDL 01695(CM), 2007 WL 4115808, at *9 (S.D.N.Y. 2007) (same).

A multiplier of 2.01x is at the low end for a case of this scale, expense, duration, and complexity. *See, e.g.*, *Asare v. Change Grp. New York, Inc.*, No. 12 Civ. 3371 (CM), 2013 WL 6144764, at *19 (S.D.N.Y. Nov. 18, 2013) (McMahon, C.J.) ("Typically, courts use multipliers of 2 to 6 times the lodestar."); *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 481-82 (S.D.N.Y. 2013) ("Courts regularly award lodestar multipliers of up to eight times the lodestar, and in some cases, even higher multipliers."); *Credit Default Swaps*, 2016 WL 2731524, at *17 (approving

17

fees constituting a "multiple of just over 6" times the lodestar with $1.9 billion settlement fund);

*Payment Card Interchange Fee*, 991 F. Supp. 2d at 448 (multiplier of 3.41 with $5.7 billion

fund);  *Maley v. Dale Global Techs. Corp.*, 186 F. Supp. 2d 358, 371 (S.D.N.Y. 2002) ("in

'cross-checking' the percentage fee against the lodestar-multiple, it clearly appears that the

modest multiplier of 4.65 is fair and reasonable."); *NASDAQ Mkt.-Makers Antitrust Litig.*, 187

F.R.D. at 489 (awarding fees representing a 3.97 multiplier of $36,191,751 lodestar, noting that

"multipliers of between 3 and 4.5 have become common.").

By way of comparison to another recent antitrust class action in this Court, Plaintiffs'

Counsel in *In re Credit Default Swaps* produced a lodestar over $41 million in just over two

years of litigation, 2016 WL 2731524, at *17, when the action settled mid-way through

discovery and before briefing class certification or summary judgment.  *See generally In re*

*Credit Default Swaps Antitrust Litig.*, No. 13-MD-2476 (S.D.N.Y).  In approving the requested

fee award, Judge Cote approved a lodestar multiplier of 6.18.  *See Credit Default Swaps*, 2016

WL 2731524, at *17.  Plaintiffs' Counsel successfully settled this action with a lodestar $4

million less than that total.  This was achieved despite comparable scale of discovery,[4] over

nearly twice the span of time,[5] and despite the lodestar here including full briefing for class

certification, summary judgment, and *Daubert* motion practice, as well as preparation for trial up

to the point of jury empanelment and opening statements.

Plaintiffs' Counsel's combined blended rate of $526.35 per hour is below the market

average for representation of this caliber in the Southern District of New York.[6]  *See, e.g., Credit*

---

[4] Forty-eight million pages of documents, Benz Decl. ¶ 20, compared to roughly fifty million in *Credit Default Swaps*, 2016 WL 2731524, at *2.

[5] Forty months of litigation here vs. twenty four months in CDS.  *Compare* 1:13-cv-06802 (S.D.N.Y.) to 13-MD-2476 (S.D.N.Y.)

[6] If the time of outside document reviewers were included in Plaintiffs' Counsel's lodestar, rather than passed through as an expense at no mark-up, the blended rate would be only $393.27 per hour.  Benz Decl. ¶ 49.

*Default Swaps*, 2016 WL 2731524, at *17 (blended hourly rate was roughly $440/hour at

historical rates); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 394 (S.D.N.Y. 2013)

(Stein, J.) ("[T]he proposed rates for firm attorneys are reasonable.  The blended hourly rate for

associates here is $402, and the blended rate for partners and counsel is $632."); *Currency*

*Conversion Fee*, 263 F.R.D. at 128 ("The blended hourly rate of some of the law firms

[representing plaintiffs] was above $500.  Class Counsel reduced those blended rates to $490 per

hour.  This resulted in a final blended hourly rate of $416."); *Telik, Inc. Sec. Litig.*, 576 F. Supp.

2d at 589 (eight years ago, partner rates ranging "from $700 to $750 . . . [fell] within the norm . .

. Likewise, associate rates . . . . rang[ing] from a low of $300 per hour to a high of $550 per

hour. . . . [we]re consistent with rates charged by the defense bar for similar work."); *see also*

*Billing Rates Across the Country*, National Law J., Jan. 13, 2014,

http://www.nationallawjournal.com/id=1202636785489/Billing-Rates-Across-the-Country (for

2014, Paul Weiss average associate rate was $600/hr and average partner rate $1040/hr.  The

national average partner cost was $604/hour, while the average associate cost was $370/hr); *see*

*generally Reiter v. MTA New York City Transit Auth.*, 457 F.3d 224, 232 (2d Cir. 2006) ("The

lodestar figure should be based on market rates in line with those rates prevailing in the

community for similar services by lawyers of reasonably comparable skill, experience, and

reputation.").  Each hour billed is supported by detailed contemporaneous records.  *See* Benz

Decl. Ex. 7; Berry Decl. Ex. 1; Goldman Decl. Exs. 3, 6; LeClair Decl. Ex. 1; Southwick Decl.

Ex. 2.

        The lead partners from each firm conferred weekly to ensure the minimum possible

overlap in efforts, and work was largely divided by task and/or phase of litigation to mitigate risk

of duplication of efforts, with lower cost staff and contract attorneys used as appropriate.

Southwick Decl. ¶¶ 10-11.  Independent contract attorneys were retained at an average rate of $39/hour without any mark-up applied, and their 26,003.25 hours were accounted as an expense rather than included in the lodestar.  Benz Decl. ¶ 49; *cf. Citigroup*, 965 F. Supp. 2d at 398 (approving $200 as "appropriate blended hourly rate for . . . contract-attorney services").

## PLAINTIFFS' COUNSEL'S EXPENSES ARE REASONABLE

Over the course of five years of investigation and litigation, Plaintiffs' Counsel incurred out-of-pocket expenses totaling $7,512,915.12.  *See* Okada Decl. ¶ 9; Benz Decl. ¶¶ 51-52; Berry Decl. ¶ 17; Goldman Decl. ¶¶ 25, 26; LeClair Decl. ¶¶ 19, 21; Southwick Decl. ¶ 18.  Because all Plaintiffs' Counsel advanced those funds themselves and carried the costs for years with no certainty of recovery, these expenses were undertaken only when it was deemed warranted to advance the cause of the litigation.

| Category | Amount |
|---|---|
| Experts | $3,913,551.43 |
| Contract Attorneys – Document Review | $1,014,156.00 |
| Electronic Discovery and Document Management (Outside) | $940,045.91 |
| Travel/Lodging | $520,603.87 |
| Graphics/Trial Consultants | $435,443.16 |
| On-Line Research (Pacer/Lexis/Westlaw) | $199,544.78 |
| Copying/Printing (Outside) | $149,915.15 |
| Court Reporters | $139,550.82 |
| Litigation Support-Data Hosting and Document Management (Internal) | $97,562.29 |
| Copying (Internal) | $62,298.59 |
| Postage/FedEx/UPS | $14,716.29 |
| Courier Service | $8,674.31 |
| Court Fees | $5,604.20 |
| Telephone | $5,201.91 |
| Deposition Logistics | $3,354.83 |
| Process Servers | $1,696.80 |
| Witness Fees | $649.28 |
| Office Supplies | $303.74 |
| Publications | $41.76 |

| TOTAL | $7,512,915.12 |
|---|---|

Okada Decl. ¶ 9.

Roughly half of these expenses were incurred in retaining two expert witnesses, Professors Paul Farris and Jeffrey MacKie-Mason, whose *curricula vitae* are attached in Exhibit 1 to the Benz Declaration.  Okada Decl. ¶ 6.  These two experts and their extensive reports and testimony were essential to the case, including getting the Class certified, defeating Defendants' motion for summary judgment, and in preparing Plaintiffs' affirmative case for trial.  *See* Benz Decl. ¶¶ 22-24.  Costs stemming directly from discovery, such as document review and electronic document management, were the next largest cost base.  *See* Benz Decl. ¶ 49; Okada Decl. ¶¶ 6, 9.  Lead Counsel monitored the major expenses as they were incurred and believe the expenses are reasonable and in line with what experience indicates are required to advance these claims.  Benz Decl. ¶¶ 15, 16; Southwick Decl. ¶ 24.

The remaining expenses were industry-standard expenses, such as travel and lodging, deposition transcription and videotaping, outside contractors for document review, document imaging and copying, online legal research fees, and other miscellaneous litigation support services.  Plaintiffs' Counsel monitored and reviewed these expenses as well, and found them reasonable.  Benz Decl. ¶ 16; Southwick Decl. ¶ 24.  There is "no reason to depart from the common practice in this circuit of granting expense requests."  *Visa Check*, 297 F. Supp. 2d at 525 (granting $18.7 million expense request where "lion's share of these expenses reflects the costs of experts and consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses.

## INCENTIVE AWARDS FOR CLASS REPRESENTATIVES

Plaintiffs' Co-Lead Counsel also requests incentive awards of $50,000 for each of the class representatives:  the Dial Corporation, Henkel Consumer Goods Inc., Kraft Heinz Foods Co. and H.J. Heinz Co. L.P., Foster Poultry Farms, Smithfield Foods, Inc., HP Hood LLC, and BEF Foods Inc. (collectively, "the Class Representatives").  These awards are justified to compensate these companies for the time and expense they incurred pursuing this case and as a reward for risking Defendants' retaliation for bringing claims against the sole source of a product vital to their ability to compete in the marketplace.

Each Class Representative donated substantial time and support to the prosecution of the Class's claims.  Five of them advanced substantial fees as noted above.  The Class Representatives willingly aided the entire Class, which includes those Representatives' principal competitors.  The Class Representatives gave needed and valuable contributions to the pursuit of this litigation, both by spending many total hours of executive and employee time, and by directly incurring unreimbursed costs in searching and gathering documents, preparing for and giving multiple depositions, and preparing and being ready to testify at trial.

| Class Representative | Number of Records Produced (Pages) | Witnesses Provided (Title) | Duration of Deposition |
|---|---|---|---|
| BEF Foods | 178,580 records (616,847 pages) | Dave Brotherton (Senior Brand Manager); | 5 hrs 23 mins |
| | | Theodor Muir (Senior Director of Marketing) | 4 hrs 51 mins |
| Foster Poultry Farms | 449,218 records (1,829,066 pages) | Jennifer Corsiglia-Keim (Senior Marketing Manager) | 6 hrs 9 mins |
| Kraft & Heinz | 603,275 records (2,564,015 pages) | Marion Findlay (Group Leader – Licensing, Multi-Brand Partnerships) | 8 hrs 8 mins |
| Henkel & Dial | 933,025 records (3,603,814 pages) | Henry Hendrix (Former Senior Brand Manager) | 7 hrs 2 mins |
| | | Andrea Jeannet (Senior Manager Media and Integrated Marketing) | 5 hrs 22 mins |

| | | Wendy Warus (Vice President of Sales for eCommerce) | 6 hrs 57 mins |
|---|---|---|---|
| | | Karen Welch (Purchasing Manager) | 6 hrs 26 mins |
| HP Hood | 24,857 records (500,017 pages) | Melissa Gilreath (Senior Marketing Manager) | 6 hrs 21 mins |
| | | Patrick Maguire (Senior Marketing Manager) | 5 hrs 27 mins |
| | | Christopher Ross (Vice President of Marketing) | 6 hrs 57 mins |
| Smithfield Foods | 767,168 records (2,059,093 pages) | Erin Turley (Senior Director, Innovation and Commercialization) | 5 hrs 44 mins |
| | | Charles Gitkin (Vice President of Marketing, Innovation, and R&D for The John Morrell Food Group) | 4 hrs 51 mins |

The Class Representatives should be given incentive awards to avoid discouraging corporate class representatives from leading a future meritorious case, and because otherwise their net recovery could be substantially less than those absent class members who bore no risk of antagonizing an important business partner. *See In re Air Cargo Shipping Servs. Antitrust Litig.*, No. 06 MD 1775, 2015 WL 5918273, at *4 (E.D.N.Y. Oct. 9, 2015) ("Payments to class representatives can be properly included in class action settlements to the extent they are needed to fairly compensate the named plaintiffs for the efforts they have made on behalf of the class."); *In re Plastic Tableware Antitrust Litig.*, No. 94 CV 3564, 1995 WL 723175, at *2 (E.D. Pa. Dec. 4, 1995) (incentive awards to named plaintiffs appropriate "as a reward for public service and for the conferring of a benefit on the entire class").

The $300,000 total requested for incentive awards is .12% of the common fund, small in relation to the expected average recovery of the Class and the total size of the fund. *See Currency Conversion Fee*, 263 F.R.D. at 131 (noting relative size of incentive awards to average recovery and common fund size as factors for approval, and that "0.1% of the total Fund . . . is similar to other cases") (citing *Roberts v. Texaco, Inc.*, 979 F. Supp. 185 (S.D.N.Y. 1997) (permitting incentive award of 0.18% of the settlement fund)); *Velez v. Novartis Pharm. Corp.*,

No. 04 CIV 09194 CM, 2010 WL 4877852, at *4, *8, *28 (S.D.N.Y. Nov. 30, 2010) (McMahon, C.J.) (awarding $125,000 to named plaintiffs from $175 million settlement); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, MDL No. 1917, 2016 WL 153265, at *3 (N.D. Cal. Jan. 13, 2016) (incentive awards totaling $250,000 "spread among ten named plaintiffs is still only 0.196%" of then $127.45 million common fund); *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) ("service awards of $120,000 and $80,000 are in line with awards in other 'megafund' cases."); *Marchbanks Truck Serv., Inc. v. Comdata Network, Inc.*, Case No. 07-CV-1078, ECF No. 713, at 2, 8 (E.D. Pa. July 14, 2014) (approving $130 million class action settlement, including service award of $150,000 to one class representative and service awards of $75,000 to two other class representatives); *In re Titanium Dioxide Antitrust Litig.*, No. 10-CV-00318 RDB, 2013 WL 6577029, at *1 (D. Md. Dec. 13, 2013) (awarding $125,000 to lead class representative out of $163.5 million settlement).

Given the duration, expense, and risk involved in leading a case of this magnitude from inception to trial, these incentive awards are appropriate to ensure parity of recovery within the Class and to create proper incentives for future potential antitrust plaintiffs to bring meritorious claims. *See, e.g.*, *Air Cargo Shipping Servs.*, 2015 WL 5918273, at *6 (granting $540,000 in incentive awards out of a total settlement of approximately $330 million); *Currency Conversion Fee*, 263 F.R.D. at 131 (noting "case law supports payments of between $2,500 and $85,000 to [each] representative plaintiff[] in class actions").

## **CONCLUSION**

For the foregoing reasons, Co-Lead Class Counsel respectfully request that the Court award Plaintiffs' Counsel attorneys' fees of $73,200,000, equaling 30 percent of the common

fund, for reimbursement of $7,512,915.12 in costs, and for incentive awards of $50,000 each to

the six named plaintiffs.


**KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC**

Steven F. Benz (*pro hac vice*)
1615 M Street, N.W., Suite 400
Washington, DC 20036
Phone: (202) 326-7900
sbenz@khhte.com

**SUSMAN GODFREY, LLP**

James T. Southwick
Richard W. Hess (*pro hac vice*)
Ryan V. Caughey (*pro hac vice*)
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Phone: (713) 651-9366
jsouthwick@susmangodfrey.com
rhess@susmangodfrey.com
rcaughey@susmangodfrey.com

*Plaintiffs' Co-Lead Counsel*

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

Daniel B. Goldman
1177 Avenue of the Americas
New York, NY 10036
Phone: (212) 715-9162
dgoldman@kramerlevin.com

**BERRY LAW PLLC**

R. Stephen Berry *(pro hac vice)*
1717 Pennsylvania Ave., NW, Suite 450
Washington, DC 20006
Phone: (202)296-3038
sberry@berrylawpllc.com

**MCKOOL SMITH, PC**

Lewis T. LeClair (*pro hac vice*)
300 Crescent Court, Suite 1500
Dallas, Texas 75201
Phone: (214) 978-4984
lleclair@mckooksmith.com

**MCKOOL SMITH, PC**

John C. Briody
James H. Smith
One Bryant Park, 47th Floor
New York, NY 10036
Phone: (212) 402-9438
jbriody@mckoolsmith.com
smith@mckoolsmith.com

*Plaintiffs' Counsel*