UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE DIAL CORPORATION, *et al.*,<br><br>Individually and on behalf of Similarly Situated Companies,<br><br>Plaintiffs,<br><br>v.<br><br>NEWS CORPORATION, *et al.*,<br><br>Defendants. | Civil Action No. 13-cv-06802-WHP |

**DECLARATION OF STEVEN F. BENZ IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND EXPENSES AND INCENTIVE AWARDS TO <u>CLASS REPRESENTATIVES</u>**

I, Steven F. Benz, declare and state as follows:

1.  I am a member of the law firm of Kellogg, Huber, Hansen, Todd, Evans and Figel, P.L.L.C., hereinafter referred to as ("Kellogg Huber"). I submit this declaration in support of Plaintiffs' Co-Lead Counsel's application for an award of attorneys' fees in connection with the services rendered in this litigation. I make this Declaration based on my personal knowledge and if called as a witness, I could and would competently testify to the matters stated herein.

2.  This Declaration summarizes the experience and competencies of my firm and its timekeepers, as well as the factual and procedural history of this litigation.

## My Expertise in Complex Litigation

3.  I represent corporations in antitrust, unfair competition, class action, and complex commercial cases in federal and state courts throughout the United States. I focus my practice on prosecuting and defending leading-edge cases involving the intersection of competition law and intellectual property rights, including monopolization, price fixing, and class actions under federal and state law; direct and indirect purchaser claims under state antitrust and unfair competition laws; and breach of contract, fraudulent transfer, and deceptive trade practices litigation. I have over twenty-five years of complex litigation experience throughout the United States and have served as counsel of record in over 150 litigated cases, trials, and appeals.

4.  I was one of the lead attorneys in *Conwood Co. v. United States Tobacco Co.,* 290 F.3d 768 (6th Cir. 2002), in which we won the largest Section 2 damages award in history for our client, Conwood Company. A jury awarded our client a monopolization judgment (after trebling) of $1.05 billion. This verdict was affirmed by the Sixth Circuit in 2002. *Id.*

5.      I was one of the lead counsel for the plaintiffs in *Coordination Proceedings Special Title (Rule 1550(b)) Microsoft I – V Cases,* Case No. J.C.C.P. No. 4106 (Cal. Super. Ct. City & County of San Fran. Aug. 29, 2000).  I investigated, drafted, and filed the complaint in *Lingo et al. v. Microsoft Corporation*, No. 301357 (Cal. Super. Ct., San Fran.), which became the lead case against Microsoft in California after consolidation, on February 18, 1999.  On January 10, 2003, Plaintiffs' Counsel and the Class Representatives reached an agreement with Microsoft on a settlement, which provided $1.1 billion in monetary benefits to California consumers and municipalities.  This settlement is, to the best of my knowledge, the largest recovery of a monopoly overcharge ever achieved in the United States and the largest recovery ever achieved under California's Cartwright Act or California's Unfair Competition Act.

6.      I achieved a significant ruling from the Federal Circuit in *Ritz Camera & Image, LLC v. SanDisk Corp.,* 700 F.3d 503 (Fed. Cir. 2012), when the Federal Circuit held that direct purchasers have standing to pursue Walker Process fraud on the Patent and Trademark Office antitrust claims.  Supporting amicus briefs were submitted by the Department of Justice and FTC, more than thirty state Attorneys General, and more than thirty law professors.

**My Firm's Expertise in Significant Litigation Matters**

7.      Kellogg Huber is a 67-attorney firm based in Washington, D.C.  Our clients have included more than a dozen Fortune 100 corporations in industries ranging from telecommunications, petroleum, computer manufacture, and electrical controls, to entertainment and recreation.  Kellogg Huber counts among its clients a leading cellular telephone engineering company, emerging biotechnology and telecommunications companies, a major health-care company, and a leading economic consulting firm.  We represent our clients in complex cases in trial and appellate courts throughout the United States.

8. In *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26 (1998), Kellogg Huber transformed the practice of multidistrict litigation nationwide. We obtained a reversal in the U.S. Supreme Court of a decades-long practice in the lower courts of retaining cases for trial that had been transferred and consolidated by the MDL panel for pre-trial proceedings. Following remand of that case, our firm won the largest abuse-of-process verdict in history for its client.

9. Kellogg Huber represented the petitioner in *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, 540 U.S. 398 (2004), participating in the case before the trial court, the Second Circuit, and the Supreme Court, and helping to secure dismissal of plaintiff's antitrust claims under Section 2 of the Sherman Act.

10. In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), Kellogg Huber represented the petitioner before the Supreme Court. We won dismissal of plaintiff's antitrust conspiracy claim on the pleadings. "Twombly motions" are now a standard part of civil litigation in federal courts.

**History and Risks of the Litigation**

11. I have been personally involved in this litigation since 2010, when I began working with Steve Berry to investigate the claims that would eventually constitute the complaint in this action. Mr. Berry's firm and my firm expended significant resources to the early investigation of this action and its prosecution to date.

12. I have been involved in this litigation from its beginning to its conclusion. I worked with our clients on the pre-filing investigation and the preparation and filing of the initial and subsequent complaints. As Plaintiffs' Co-Lead Counsel, I was intimately involved in discovery and motions practice, the trial and settlement. I have been uniquely well-positioned to

3

oversee all of the work undertaken for the benefit of the Class, and to understand the strengths and weaknesses of Plaintiffs' case.

13. In order to best serve the Class and efficiently handle tasks throughout the litigation, Plaintiffs' Co-Lead Counsel, James Southwick of Susman Godfrey LLP, and I worked closely and efficiently with Plaintiffs' Counsel — Kramer Levin & Naftalis, LLP; McCool Smith PC; and Berry Law PLLC — throughout the litigation and for the common benefit of the Class.

14. As a result, work was largely divided by task, with changing emphases based on the firms' various core competencies as the litigation progressed. This division of labor helped to mitigate the risk of duplicated efforts. Additionally, each firm utilized lower cost staff and contract attorneys whenever possible to minimize expense to the Class.

15. Plaintiffs' Counsel have worked cooperatively throughout this litigation to assign tasks, monitor the quality of work performed, and above all to ensure that no efforts were duplicated. Each firm has kept detailed contemporaneous records of hours billed, and all monthly billing and expense records have been shared among and between Plaintiffs' Counsel throughout the litigation.

16. I have reviewed those billing records to ensure that efforts were not duplicated, that all counsel were billing for legitimate work that inured to the common benefit of the Class, and that claimed expenses were reasonably charged to the case. I reviewed all of my firm's daily time and expense records to ensure that there were no billing errors, and deleted any entries that were not sufficiently documented or were otherwise in error. I also reviewed all of the daily time and expense reports of all other Plaintiffs' Counsel for similar deficiencies.

17. Based on my review of these records, Plaintiffs' Counsel had collectively billed 69,218.95 hours, representing $36,433,985.50 in fees at current rates for each timekeeper.

18. The billing rates charged by Plaintiffs' Counsel are reasonable, with a blended hourly billing rate of $526.35 at current rates.

19. This total number of hours and corresponding fee is, in my experience, very low for a case of this magnitude settled at trial, and reflects the highly efficient use of attorney resources throughout the litigation and reasonable hourly rates. Plaintiffs' Counsel had to undertake substantial work throughout the litigation; by the time of settlement, Counsel had secured Class Certification; undertaken substantial fact and expert discovery; fully briefed summary judgment motions, motions *in limine*, and *Daubert* motions; and selected a jury. That counsel did so in so few hours over more than four years speaks to the efficiency of their representation of the Class.

20. In vigorously prosecuting the claims of the Class, Plaintiffs' Counsel had collectively:

- Taken or defended 48 depositions totaling over 182 hours.

- Reviewed 10,867,210 produced documents, representing 48,440,389 pages.

- Filed summary judgment motions and responses of hundreds of pages with more than 400 exhibits.

- Filed 9 motions *in limine*, and oppositions to 17 and a motion to exclude evidence of allegedly released claims.

- Served, with Defendants, 20 non-party subpoenas and 10 expert reports, along with multiple report supplements and expert declarations.

- Prepared for and participated in a mock trial.

- Marked thousands of exhibits for trial and engaged in intensive negotiations with Defense Counsel to appropriately narrow the scope of trial exhibits.

- Collaborated with Defense Counsel to prepare a jury questionnaire for the first phase of *voir dire*.

21.     Plaintiffs' Counsel also took the depositions of Defendant's four expert witnesses (Dr. Dennis Carlton, Dr. Sanjay Dhar, Dr. Jerry Hausman, and Dr. Kevin Murphy) and defended depositions of their own expert witnesses (Dr. Jeffrey MacKie-Mason and Dr. Paul Farris).

22.     Plaintiffs' Counsel worked extensively with their two retained experts to develop the Class's case.  Their curricula vitae are attached hereto as Exhibit 1.

23.     Professor Farris is the Landmark Communications Professor at the University of Virginia's Darden School of Business Administration and an expert in marketing.  He was retained on behalf of Plaintiffs to opine on three questions:  (1) how CPGs use third party ISPs sold by the Defendants; (2) whether other marketing, advertising, or promotional tactics are competitive substitutes to third party ISPs; and (3) the degree to which third party ISPs complement other forms of advertising and promotion services.  Professor Farris drew on his expertise and experience to analyze relevant data and produce opinions on those three questions, all of which would have been extremely helpful to any potential deliberations about the scope of the relevant product market in this case.  Professor Farris provided these opinions by identifying five factors in the marketing literature that concern how businesses view different types of marketing.  Professor Farris then compared third party ISPs and other types of marketing on each of those five factors to determine that Class Members do not view other marketing products as substitutes to third party ISPs.  These opinions were important proof, both on their own and as a partial basis for the opinions of Dr. MacKie-Mason.

24.     Professor MacKie-Mason is the University Librarian and Chief Digital Scholarship Officer at the University of California at Berkeley.  Professor MacKie-Mason began

his analysis by looking at how CPGs and Defendants view third-party in-store promotions and at ISP's characteristics as compared to other forms of marketing. Based on his review of the direct evidence in the record, he concluded that TPISPs was the relevant antitrust market. He then confirmed that conclusion by performing a cross-check against a statistical critical loss analysis, which calculates the magnitude of sales a firm would lose due to a small but significant price increase ("SSNIP"). Professor MacKie-Mason then examined record evidence—including Defendants' contract terms, CPG testimony about market choice, the volume of retailers in Defendants' network and their share of the ISP market, and Defendants' profit margins, among other factors—to determine that Defendants have market power. He then examined evidence of Defendants' conduct in the market, including contracts with retailers, how they deal with their competitors, and statements by their executives as to what they were doing, why they were doing it, and what effect they believed those actions had, to determine that Defendants acted in an anticompetitive manner. Finally, he determined the extent of the Class' injury from that anticompetitive conduct by calculating the overcharge for purchased products that stemmed from Defendants' monopoly. All of these opinions were critical to the Class for certification, overcoming summary judgment, and if the case were to have continued to a verdict.

25. Plaintiffs faced significant risks attendant to bringing a complex case all the way to trial in the face of fierce opposition from Defendants. Liability itself was hotly contested, with Defendants disputing nearly every aspect of Plaintiffs' affirmative case, from market definition to anticompetitive conduct.

26. Throughout the litigation, each Class Representative provided substantial support to the prosecution of the Class's claims by way of expended man hours and efforts to make former and current employees and executives available for deposition. In my experience in class

7

action litigation, these efforts were far beyond what is typically required of a lead plaintiff in a class action. Moreover, the Class Representatives were highly involved throughout the litigation, and assisted in investigating the case and shaping strategy for the litigation from the inception of the case to its settlement. This extraordinary commitment was reflected both in their regular communication with Counsel and in their regularly attending important hearings in the case.

## Settlement

27. The Settlement is the result of arm's-length negotiations between Plaintiffs' Co-Lead Counsel, who have significant experience in complex class action antitrust litigation, and Defendants and their experienced counsel.

28. James Southwick of Susman Godfrey LLP and I, in our roles as Plaintiffs' Co-Lead Counsel, conducted settlement negotiations on behalf of the Class, in consultation with our Class Representatives.

29. Defendants retained Daniel J. Kramer a senior litigation partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP, as their dedicated settlement counsel.

30. Plaintiffs' Counsel first inquired about the possibility of settling the case shortly after the Court's class certification order in June 2015 but received no response.

31. Although Defendants began efforts to settle individually with 23 of the largest Class Members in November 2015 after the court authorized that conduct, Defendants did not engage in discussions to settle with the Certified Class until the second half of January 2016, after the Court denied Defendants' motions for summary judgment and to exclude Plaintiffs' experts.

8

32. Mr. Southwick and I engaged in multiple rounds of written and oral discussions with Mr. Kramer from late January through all of February, with negotiation of the class-wide settlement continuing through to the first day of trial.

33. Despite this continuous effort, Mr. Southwick and I were not able to reach an agreement with Mr. Kramer on behalf of the Class regarding the final critical terms, including the amount of cash consideration, until a series of discussions at the courthouse that included News Corporation's General Counsel on February 29.

34. As a result of these final discussions, the Term Sheet memorializing the parties' agreements was finalized and executed at the courthouse on February 29, 2016.

35. The long-form Settlement Agreement which finalized the full terms of settlement was negotiated during March and April 2016. The final agreement was signed on May 2, 2016.

36. The detailed terms and conditions of the Settlement are set forth in the Settlement Agreement. The principal terms of the Settlement are:

- A $244 million cash payment.
- For five years, Defendants will not enter into an exclusive contract with any retailer for ISP with a term of longer than 30 months, other than to meet competition or where the retailer makes a written bona fide request for a longer term.
- For five years, Defendants will not enter into a binding renewal of any Retailer Contract more than 18 months before the expiration of the prior Retailer Contract, unless the retailer makes a written bona fide request for an earlier renewal.
- For five years, Defendants' Retailer Contracts will not preclude retailers from disclosing the termination dates of their contracts to a bona fide competitor or

prospective competitor of Defendants who is seeking to negotiate its own contract with the retailer.

- Class Members' acknowledgment that Defendants' compliance with the structural relief does not constitute an antitrust violation.

- Mutual releases of claims.

- No second opt-out opportunity.

- Arbitration of antitrust claims accruing in the next five years and agreement that evidence of Defendants' conduct predating the settlement is inadmissible. However, claims concerning Defendants' compliance with the structural relief arising more than three years after the settlement need not be arbitrated.

37. Plaintiffs' expert Dr. MacKie-Mason had prepared two alternate damages calculations for trial: a core damages calculation based on the anticompetitive conduct alleged in the Fourth Amended Complaint and an adjusted version of the core damages calculation should the jury find that the guaranteed retailer payments Defendants made to retailers after Valassis entered the market for third-party in-store promotions products were also anticompetitive. The adjusted version of the core damages calculation resulted in a higher damages value but, based on my experience, had a lower chance of success at trial. Mr. Southwick and I determined that, after February 24, 2016, when the final extent of the Class was known, the Class's single damages under the core calculation were $230 million, and were $466 million under the adjusted version of the core calculation.

38. The cash consideration for the settlement, $244 million, represents 106% of the core damage calculation and 54% of the adjusted calculation. In my experience as a litigator in antitrust and class action cases, exceeding single damages is an excellent recovery for the Class

10

in light of the risks of maintaining the case through judgment and appeal, both on the merits and with respect to class certification.

39. In my opinion, based on my extensive experience in antitrust and class action litigation, the structural relief in the Settlement Agreement is valuable to Class Members going forward, as the terms directly address and seek to remedy several of the behaviors that served as the basis for the Class's claims in this case.  Specifically, the structural relief addresses the length, renewal timeline, and confidentiality of termination dates of Defendants' contracts with retailers.  By limiting contract length, prohibiting non-competitive early renewal of existing contracts, and increasing information in the marketplace regarding contract renewal points, the structural relief should substantially enhance the viability of new competitors in the provision of third-party in-store promotions.  I believe that, should this structural relief succeed in bringing competitors into the marketplace for third-party in-store promotions, Class Members will see a reduction in prices as a result of increased competition.

40. The Settlement Agreement also provides that Defendants will pay $6 million in attorneys' fees and expenses, separate from the cash payment to the Class, in consideration of Plaintiffs' Counsel's contributions to Defendants' February 23, 2016 Settlements with individual Class Members.  This payment is compensation for the years of work by Plaintiffs' Counsel in litigating the case to the eve of trial before those post-opt-out settlements were reached with class members.  This amount was offered separately by Defendants, and the subject was raised only after Plaintiffs' Co-Lead Counsel and Defendants had reached agreement on the principal terms of the class-wide settlement, including the amount of the cash payment to the Class.

41. To date, none of the 699 class members have registered objections to the settlement. Conversely, many have reached out to Plaintiffs' Counsel to express their satisfaction with the result.

### Kellogg Huber's Role in this Litigation

42. My firm has served as counsel to HP Hood LLC and as counsel for the Class throughout the course of this litigation. The background and experience of Kellogg Huber and its attorneys are summarized in the curriculum vitae attached hereto as Exhibit 2.

43. Kellogg Huber has prosecuted this litigation solely on a contingent-fee basis, and has been at risk that it would not receive any compensation for prosecuting claims against Defendants. While Kellogg Huber devoted its time and resources to this matter, it has foregone other legal work for which it would have been compensated.

44. During the pendency of the litigation, a small team of attorneys from Kellogg Huber performed the following work, amounting to 65% of the firm's lodestar:

a. I, Steven F. Benz, Kellogg Huber's lead partner on the matter, was designated Co-Lead Class Counsel by the Court to direct the litigation. In that role, I participated in class-wide strategy sessions, coordinated the responsibilities of co-counsel, and drafted key pleadings. I directed the review of the millions of pages of document discovery by clerical staff, paralegals, and staff attorneys to prepare deposition materials for use with Defense and third-party witnesses. Kellogg Huber, under my direction, prepared and defended the depositions of class representative HP Hood and its employees Christopher Ross, Patrick Maguire, and Melissa Gilreath. Along with Co-Lead Class Counsel James T. Southwick, I conducted the settlement negotiations that ultimately resulted in the Settlement Agreement. I received my J.D. from

Stanford Law School, where I was President of the Stanford Law Review, and my B.A. from Johns Hopkins University.

b. William J. Conyngham, a partner, received his J.D. Degree from Catholic University, his M.B.A. from the University of Texas and his A.B. from Georgetown University. Mr. Conyngham supervised review of defendant-produced materials by staff attorneys, contract attorneys and agency temporary attorneys throughout the case.

c. Benjamin P. Taibleson, a former associate, received his J.D. degree from Yale Law School and his B.S. degree from the University of Wisconsin. Prior to joining Kellogg Huber, Mr. Taibleson served as a law clerk to the Honorable Merrick Garland, in the U.S. Court of Appeals for the District of Columbia Circuit, and served as Counsel to the Honorable Patti Saris, Chair of the United States Sentencing Commission. Mr. Taibleson contributed substantial effort to the prosecution of this litigation, and to that end performed legal research, drafted numerous motions, prepared discovery requests and responses, and both took and defended depositions of multiple witnesses.

d. Frederick G. Hall, an associate, received his J.D. degree from the Georgetown University Law Center, and his B.A. from Princeton University. Prior to joining the firm, Mr. Hall served as a law clerk, first to the Honorable James S. Gwin of the U.S. District Court for the Northern District of Ohio, and then for the Honorable D. Michael Fisher of the U.S. Court of Appeals for the Third Circuit. In his role in this litigation, Mr. Hall performed legal research, drafted numerous motions and opposition filings, participated in late depositions, and oversaw substantial portions of

   the exhibit exchanges in the course of summary judgment briefing and lead up to trial, as well as crafting and overseeing the settlement's notice program.

   e. Benjamin L. Rudofsky, an associate, received his J.D. degree from Cornell Law School, and his B.A. from Northwestern University. Prior to joining the firm, Mr. Rudofsky served as a law clerk to the Honorable Rya W. Zobel of the U.S. District Court for the District of Massachusetts. Mr. Rudofsky provided extensive research support, drafted multiple motions, and made substantial contributions to the exchange of exhibits in the lead up to trial.

   f. Kimberly Briggs, a staff attorney, oversaw review of discovery documents, managing offensive and defensive review of all defendants' and subpoenaed document productions and affirmative productions for class representatives, and identified key documents. Ms. Briggs also drafted privilege logs, assisted with deposition preparation, discovery motions, and summary judgment, and assisted with the preparation of trial exhibits and drafting of the trial exhibit list.

45. In addition to that core group of attorneys, where appropriate I assigned tasks such as document review to other non-partnership track staff and contract attorneys employed by my firm. Two other former associates, Drew A. Navikas and Alexander S. Edelson, also contributed to the case before leaving the firm. Also at my direction paralegals, researchers, and clerks made substantial contributions to the litigation in non-attorney roles.

46. Attached hereto as Exhibit 3 is a summary of my firm's total hours by timekeeper, computed at current rates, from February 8, 2010 through June 30, 2016. The total number of hours spent by Kellogg Huber's timekeepers during this period of time was 26,250.50 with a corresponding lodestar of $9,894,812.50. The lodestar amount reflected in Exhibit 3 is for work

performed by professional staff at my law firm for the benefit of the Class, and does not include any work performed for the motion for attorneys' fees and costs.

47. Kellogg Huber utilized a small team approach to prosecute the case in order to enhance continuity and subject-matter expertise. The firm kept the average hourly rate for requested fees below $375.79 dollars per hour.

48. My firm removed or wrote-down all billed time recorded by timekeepers of any rank with approximately 20 or fewer hours worked on the case, and removed or wrote-down selected entries which reflected ministerial or excess time. This time totaled 558.4 hours of work undertaken for the Class, with a corresponding lodestar value of $70,270.50. This represents a 2% reduction in total hours billed and a .7% reduction in lodestar. These write-downs are reflected in the spreadsheet attached as Exhibit 4.

49. In order to further reduce costs to the Class, my firm retained outside document reviewers from Compliance Discovery Solutions at a blended rate of $39 per hour to perform the vast majority of the necessary document review for the case. These attorneys contributed a total of 26,003.25 hours of work not counted in my firm's lodestar. The $1,014,156 cost of these contract attorneys was borne as an expense by Plaintiffs' Counsel and does not reflect any surcharge or profit for any of the firms. Their bills are attached hereto as Exhibit 5.

50. The hourly rates for the attorneys and professional support staff in my firm included in Exhibit 3 are the usual and customary hourly rates charged by Kellogg Huber.

**EXPENSES**

51. My firm has expended a total of $1,544,835.44 in costs and expenses in connection with the prosecution of this litigation. This total includes $124,419.54 of "carried costs" that my firm incurred and did not seek reimbursement for from the joint fund established

15

and funded by Plaintiffs' Counsel to share costs between the firms. These costs and expenses are broken down in the chart attached hereto as Exhibit 6. They were incurred on behalf of the Class by my firm on a contingent basis and are listed as actual costs with no administrative overhead applied. The expenses incurred in this action are reflected on the books and records of my firm. These books and records are prepared from expense vouchers, check records, and other source materials and they represent an accurate recordation of the expenses incurred.

52. I have reviewed the time and expenses reported by my firm in this case which are included in this declaration, and I affirm that they are true and accurate. In my experience litigating complex class actions, the expenses reflected in my firm's records are reasonable. The firm's contemporaneous time and expense records are attached hereto as Exhibit 7.

53. Attached hereto as Exhibit 8 is a copy of a news article appearing on the website of the Wall Street Journal on February 29, 2016, titled "News Corp Settles In-Store Ads Class-Action Suit."

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. Executed on July 13, 2016, at Washington, District of Columbia.

_____
Steven F. Benz