UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                           :

DIAL CORPORATION, *et al.*,

                                           :       13cv6802

                           Plaintiffs,

                                           :       <u>OPINION & ORDER</u>

              -against-

                                         :

NEWS CORPORATION, *et al.*,

                                         :

                           Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
WILLIAM H. PAULEY III, District Judge:

           Plaintiffs The Dial Corporation, Henkel Consumer Goods, Inc., Kraft Heinz

Foods Company f/k/a H.J. Heinz Company, Foster Poultry Farms, BEF Foods Inc., Smithfield

Foods Inc., and HP Hood LLC (the "Plaintiffs"), representing a class of non-retailer consumer

packaged-goods firms in the United States (the "Class" or "Class Members"), seek final approval

of a $244 million settlement with Defendants News Corporation, News America Incorporated,

News America Marketing In-Store Services, LLC, and News America Marketing FSI, LLC (the

"Defendants").  The proposed settlement (the "Settlement") resolves this class action involving

claims that Defendants monopolized the in-store promotion ("ISP") services market.  The five

law firms purporting to represent the Class—Berry Law PLLC ("Berry"), Kellogg Huber Hansen

Todd Evans & Figel PLLC ("Kellogg Huber"), Susman Godfrey LLP ("Susman Godfrey"),

Kramer Levin Naftalis & Frankel LLP ("Kramer Levin"), and McKool Smith ("McKool Smith")

(collectively, "Counsel")—also seek this Court's approval of their request for attorneys' fees and

expenses.

           For the following reasons, the motion for approval of the Settlement is granted,

and the motion for approval of attorneys' fees and expenses is granted in part and denied in part.

I.    Background

  A.    Investigation and Litigation Leading to Settlement

        The factual and procedural background undergirding this class action is described
in detail in this Court's prior opinions and orders.  See, e.g., Dial Corp. v. News Corp., 13-cv-
6802 (WHP), 2016 WL 690895 (S.D.N.Y. Feb. 9, 2016); Dial Corp. v. News Corp., 165 F. Supp.
3d 25 (S.D.N.Y. 2016); Dial Corp. v. News Corp., 314 F.R.D. 108 (S.D.N.Y. 2015).
Accordingly, a brief summary suffices for purposes of these motions.

        Beginning in 2010, Berry and Kellogg Huber devoted substantial resources and
hundreds of hours investigating Defendants' alleged monopolistic activities in the ISP market.
In December 2012, they filed an antitrust action in the Eastern District of Michigan, alleging
various state and federal antitrust claims against Defendants.  In 2013, that putative class action
was transferred to this district—where Defendants had filed a related declaratory judgment
action[1]—as three more law firms made appearances on behalf of several packaged goods
companies alleging injuries from Defendants' anticompetitive conduct.

        Because the allegations concerning anticompetitive conduct dated back to the
early aughts, discovery was breathtaking: 11 million documents were reviewed and exchanged;
dozens of current and former officers and employees were deposed; and six experts in economics
and marketing provided reports and testimony.  Numerous discovery disputes were resolved by
this Court over the course of the litigation.

        Motion practice was equally robust and class certification fiercely contested.
Eventually, the Class was certified but not before Defendants filed an unsuccessful interlocutory

---

[1]        That action was styled News America Marketing In-Store Servs. L.L.C. v. The Dial Corp., No. 13-cv-0055
(S.D.N.Y. 2013), and voluntarily dismissed on February 26, 2014.  (ECF No. 45.)

appeal of this Court's certification decision.  Defendants followed on with double-barreled motions for summary judgment and to exclude the testimony of Plaintiffs' experts at trial.  To suggest that those motions were extensively briefed and argued would be an understatement.  In January 2016, this Court denied both.  (ECF No. 420.)  With trial looming, the parties filed a barrage of 26 in limine motions (see ECF Nos. 461, 465, 471), and Defendants intensified their efforts to mount any challenge to Plaintiffs' claims, raising scores of issues concerning the class period, the admissibility of pre-class period evidence, and the effect of releases entered into between Defendants and various Class Members, to name just a few.

Against this backdrop, the parties explored the prospect of settlement.  Beginning in November 2015, Defendants sought to negotiate separate resolutions of these antitrust claims with 23 of the largest Class Members.  Those efforts, which were also the subject of motion practice, proved somewhat fruitful—by February 24, 2016, Defendants reported that they had entered into private, individual settlements totaling $30 million with five large, absent Class Members.

Settlement discussions between Counsel and Defendants reached a fever pitch in the days leading up to jury selection and trial.  After a concerted effort to negotiate a settlement in the courthouse, the parties executed a term sheet embodying the critical terms of the settlement at the end of the first day of trial.  Through March and April, the parties finalized the long form of the settlement and presented it to this Court for its review.  On June 2, 2016, this Court preliminarily approved the Settlement, and thereafter, notice of the Settlement was mailed to all Class Members.  On September 21, 2016, this Court conducted a final settlement hearing.

B.  Terms of the Settlement Agreement

The Settlement provides that Defendants will pay $244 million into a common

settlement fund (the "Fund") to be distributed on a <u>pro rata</u> basis to the Class determined by the amount of ISPs purchased by each Class Member during the class period.  After the initial distribution, any unclaimed funds will be distributed in subsequent rounds, <u>pro rata</u>, to Class Members that deposited previously distributed checks until all proceeds have been exhausted. No portion of the Fund will be returned to Defendants, nor will any remaining funds be subject to a <u>cy pres</u> provision.

   The Settlement also features several forms of structural relief designed to protect Plaintiffs against the anticompetitive conduct alleged in this action.  For the next five years, Defendants will not: (i) enter into any exclusive ISP contract with a retailer for a term longer than 30 months other than to meet competition or at the written request of the retailer; (ii) enter into a binding renewal of any contract with a retailer for more than 18 months before the expiration of the contract unless the retailer requests an earlier renewal; and (iii) prohibit retailers from disclosing the termination dates of their ISP contracts to prospective competitors of Defendants.

   The Settlement contains an alternative dispute resolution (ADR) clause requiring any dispute involving the Settlement or any antitrust, competition, or comparable claim that accrues five years after approval of the Settlement to be submitted to mediation, and if not resolved by mediation, to binding arbitration.  But any dispute relating to Defendants' compliance with the structural relief more than three years after approval of the Settlement is not subject to arbitration.  Finally, the Settlement prohibits any additional opportunity to opt out, and forecloses any admission of liability by Defendants.

   Notice of the Settlement was sent to Class Members soon after the Court entered its preliminary approval order.  It established a deadline to file objections and proofs of claim.

In the Claims Administrator's latest filing with the Court, 317 claims (45.35% of the Class) were submitted, representing 87.44% of Defendants' purchases.  (Sept. 20, 2016 Declaration of Rachel Christman ("Christman Decl.") at ¶ 3, ECF No. 594.)  On September 30, 2016, Counsel provided an updated count, and the number of filed claims increased marginally to 328 although it is impossible to determine the percentage of qualifying purchases (as determined by Defendants' purchase records) covered by those claims.  In the same filing, Counsel provided a list of unfiled claims but noted that several companies associated with some of the largest unfiled claims—amounting to at least $63 million in qualifying purchases at issue—have indicated that they will file late claims or had settled their claims outside of the Class.  (See ECF No. 603.)

   C.   Attorneys' Fees and Expenses

Plaintiffs' Counsel seeks an award of $73.2 million, or 30% of the Fund.  Over six years of investigating the claims and litigating this action, Counsel collectively billed a staggering 69,128.95 hours[2]—which equates to more than 35 billable years by "Big Law" standards.  At each of the firms' current customary billing rates—a combined blended rate of $526.35 per hour—those hours represent a lodestar of $36,433,985.50.  Thus, Counsel's fee request is enhanced by a lodestar multiplier of approximately 2.01.  Notably, the lodestar does not account for time billed by independent contract attorneys, which were instead earmarked as an expense.  Those costs and other standard out-of-pocket litigation expenses total $7,512,915.20.

In addition to the fees associated with their work on behalf of the Class, Counsel

---

[2]      This figure does not include approximately 25,000 hours billed for contract attorney time.

note that they will receive a $6 million payment for Defendants' settlements with five absent Class Members totaling $30 million.  While those fees are not a part of the Fund, any payment thereof is contingent upon final approval of the Class Settlement.

Finally, Berry has agreed to reimburse a total of $948,110 in fees that he received from five named Plaintiffs for his work during the first few years investigating and litigating the underlying claims.  Reimbursement of those fees will put the named Plaintiffs on an even footing with the rest of the Class to ensure that the total fee award does not exceed $73.2 million.

## II.   Settlement Approval

For class action settlements, a "district court must determine whether both the negotiating process leading to a settlement and the settlement itself are fair, adequate and reasonable."  In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110, 122 (S.D.N.Y. 2009) (citing D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001)).

### A.   Procedural Fairness

Negotiation of a settlement is presumed fair when the settlement is "reached in arm's length negotiations conducted by experienced, capable counsel after meaningful discovery."  Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 116 (2d Cir. 2005).  The parties here were represented by highly skilled attorneys who have substantial experience in class actions.  Counsel engaged in arms-length, painstaking negotiations from November 2015 through February 29, 2016, and eventually struck a deal that will substantially benefit the Class. This Court is mindful of Counsel's ability to assess the potential risks and rewards of litigation, and finds that the negotiations were fair, adequate and reasonable.  See Wal-Mart, 396 F.3d at 116.

B.   <u>Substantive Fairness</u>

In assessing the substantive fairness of a settlement, this Court must consider the following factors:  (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; and (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.  <u>City of Detroit v. Grinnell Corp.</u>, 495 F.2d 448, 463 (2d Cir. 1974).  "[N]ot every factor must weigh in favor of settlement, rather the court should consider the totality of these factors in light of the particular circumstances."  <u>In re Global Crossing Sec. and ERISA Litig.</u>, 225 F.R.D. 436, 456 (S.D.N.Y. 2004) (citation omitted).

1.   <u>Complexity, Expense and Likely Duration of the Litigation</u>

This antitrust action was exceptionally complex.  It was fueled by Counsel's grassroots investigation of the ISP market unaided by a parallel government inquiry.  Litigation ensued, involving the filing of four operative complaints, fact and expert discovery, class certification and an interlocutory appeal, summary judgment, motions <u>in limine</u>, and extensive trial preparation.  This case spanned years of hard fought litigation that "impose[d] great expense on all parties as well as huge burdens on the Court."  <u>Global Crossing</u>, 225 F.R.D. at 456.  The Settlement obviates the need for a trial, calculation of damages, and any post-verdict appeals.  This factor weighs strongly in favor of approval.

2. <u>Reaction of the Class</u>

There were no objections to the Settlement.  While less than half of the Class appear to have filed proofs of claim, the filed claims nonetheless represent more than 87% of purchases made by Plaintiffs during the relevant period.  (<u>See</u> Christman Decl. at ¶ 3.)

Moreover, according to Counsel's most recent submission, there are additional companies that have expressed their intention to file late proofs of claim reflecting sizeable purchases in the relevant period.  (<u>See</u> ECF No. 603.)  Certainly more Class Members could file proofs of claim.  This Court believes that the value in providing a further opportunity to file a proof of claim far outweighs not doing it.  As such, this Court orders the Claims Administrator to mail another set of notices, and follow up with a phone call, to potential members of the Class who possess valid claims and have not submitted a proof of claim, to be filed no later than December 1, 2016.

Notwithstanding the additional notice to the Class, the absence of objections "by the class is extraordinarily positive" and "weighs in favor of settlement."  <u>Global Crossing,</u> 263 F.R.D. at 123; <u>In re Giant Interactive Grp., Inc. Sec. Litig.,</u> 279 F.R.D. 151, 161 (S.D.N.Y. 2011) ("the reaction of the class to date supports approval of the Settlement" where "[n]o class members have objected to the Settlement.").

3. <u>Stage of Proceedings and Amount of Discovery</u>

This action settled at a very advanced stage of the proceedings: the jury trial, anticipated to last at least four weeks, had started.  Counsel for both sides had multiple opportunities to appraise the strength of their respective claims and defenses, and were prepared to test their case at trial.  But they also took stock of "the factual landscape and the uncertainties confronting them," <u>Currency Conversion,</u> 263 F.R.D. at 123 (S.D.N.Y. 2009), and determined

that settlement was in the best interests of the Class. Accordingly, this factor supports approval.

### 4. Risks of Establishing Liability and Damages and Maintaining Class Action Through Trial

Courts generally consider the fourth, fifth, and sixth Grinnell factors together in "assess[ing] the risks of litigation against the certainty of recovery under the proposed settlement." Global Crossing, 225 F.R.D. at 459. The complexity of Plaintiffs' claims shrouded this case with uncertainty. At trial, Plaintiffs faced substantial challenges to establishing liability—namely, that Defendants' contracting practices in the defined market were exclusionary and harmed Plaintiffs. See Wal-Mart, 396 F.3d at 118 ("[E]stablishing liability was no sure thing for plaintiffs."). But even assuming the jury rendered a favorable verdict, Plaintiffs would have encountered additional challenges to proving damages given the parties' dueling expert reports. As a result, Plaintiffs remained alert to the possibility that they would recover nothing, and constantly operated under the specter of decertification. Factors 4–6 weigh in favor of approval.

### 5. Ability of Defendants to Withstand a Greater Judgment

Defendants are part of a multi-billion dollar conglomerate recognized as one of the world's largest and most powerful enterprises. In the course of this multi-year litigation, Defendants spared no expense in defending the case at every stage. Although they have now resolved this action through a $244 million settlement, the notion that Defendants could withstand a judgment in the amount of Plaintiffs' damages estimate is not far-fetched. But even if they could, that factor, "standing alone, does not suggest that settlement is unfair." D'Amato, 236 F.3d at 86.

6. <u>Range of Reasonableness of the Settlement Funds in Light of the Best Possible Recovery and All the Attendant Risks of Litigation</u>

The final two <u>Grinnell</u> factors are typically considered together.  The $244 million Settlement, in contrast to the $355 million in single damages under their expert's "core" theory, or even the $674 million in single damages under their "adjusted" theory, represents an outstanding result.  Again, even if Plaintiffs prevailed on establishing liability at trial, their estimated damages were susceptible to attack by Defendants' experts, leaving them with nothing.  And that is not surprising, given that "the history of antitrust litigation is replete with cases in which antitrust plaintiffs succeeded at trial on liability, but recovered no damages, or only negligible damages, at trial or on appeal."  <u>In re NASDAQ Market-Makers Antitrust Litig.</u>, 187 F.R.D. 465, 476 (S.D.N.Y. 1998).

Notably, the Settlement also features structural relief designed to bring transparency to the ISP market and the way retailer contracts are negotiated.  This type of relief squarely addresses Plaintiffs' claims that the length, renewal period, and confidentiality clauses of Defendants' contracts with retailers created barriers to entry and suppressed prices.  While those forms of relief are intended to protect Plaintiffs for at least five years, the ADR clause provides that any dispute arising from the Settlement—including Defendants' compliance with the structural relief within three years of the final settlement approval—are subject to mediation and arbitration.

In essence, this Court—having supervised this action for four years and becoming intimately familiar with the parties, issues, and facts of this case—must cede its authority to adjudicate any disputes relating to the very issues that gave rise to the action.  The ADR clause affords Defendants a non-public forum to litigate any non-compliance with the structural relief.

And once the settlement is approved, and the distribution of funds completed, the clarity forged by the adversarial process melts away.

But judicial decisions addressing court-approved class settlement agreements with ADR clauses, let alone rejecting them solely on that basis, are scant. Defendants rely principally on Meredith Corp. v. SESAC, LLC, 87 F. Supp. 3d 650 (S.D.N.Y. 2015), as precedent in this district for ceding the judge's authority to an ADR forum. In Meredith, the classwide settlement in an antitrust action provided substantial monetary relief as well as "forward-looking conduct restrictions" tantamount to the structural relief in this action. In finding that the settlement was fair, reasonable, and adequate, the court held that the "compulsory arbitration term supplies a fair proxy." Meredith, 87 F. Supp. 3d at 666; cf. Charron v. Pinnacle Grp. N.Y. LLC, 874 F. Supp. 2d 179, 204 (S.D.N.Y. 2012) (finding that class settlement providing alternative forums to resolving rent-related claims, including by arbitration, is permissible).

This Court's concerns regarding the ADR provision are mitigated by the fact that the Class is comprised of sophisticated businesses far better equipped than the average individual to litigate with Defendants in an opaque arbitral forum should the need arise. Moreover, none of the Class Members, after having adequate time to review the Settlement, objected to its terms. Further, Defendants insisted on adding an arbitration clause, and without it, may not have agreed to the Settlement. (See Sept. 21, 2016 Tr. at 16:6–10 ("Without the arbitration we wouldn't have a deal.").) The ADR provision, while not ideal in this Court's view, represents a "fair proxy" for future disputes.

After weighing all of the Grinnell factors, this Court finds that the Settlement is fair, reasonable, and adequate.

11

III.     Approval of Attorneys' Fees, Expenses, and Incentive Awards

     A.   Attorneys' Fees

In awarding attorneys' fees, especially in the context of a class action, a court must "ensure that the interests of the class members are not subordinated to the interests of . . . class counsel." Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1078 (2d Cir. 1995). As a fiduciary for the Class, a court must assess the fee request with "a jealous regard to [class members'] rights." Goldberger v. Integrated Res., Inc., 209 F.3d 43, 53 (2d Cir. 2000); McDaniel v. Cty. of Schenectady, 595 F.3d 411, 419 (2d Cir. 2010) (noting that, in approving fees, it is the "district court's duty to act as a fiduciary who must serve as a guardian of the rights of absent class members") (internal quotation marks and citation omitted).

Courts traditionally have employed two methods to calculate reasonable attorneys' fees in class action litigation: (1) the percentage of the fund approach, and (2) the lodestar approach. The percentage of fund approach assigns a proportion of the common settlement fund toward payment of attorneys' fees. The lodestar approach calculates the total amount of fees billed by multiplying the number of hours expended by counsel by a reasonable hourly rate. The lodestar is typically enhanced by an appropriate multiplier which accounts for a number of factors unique to the case, including the contingent nature of success and the quality of counsel's work. While this Court has the discretion to choose between either method, the prevailing trend in the Second Circuit is the percentage method because it "directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." In re WorldCom, Inc. ERISA Litig., No. 02-cv-4816 (DLC), 2005 WL 3101769, at *7 (S.D.N.Y. Nov. 21, 2005). However, the lodestar approach provides an effective "cross-check on the reasonableness of the requested percentage."

Goldberger, 209 F.3d at 50 (2d Cir. 2000).

Under the percentage of fund method, the Court considers the six Goldberger factors: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations.  Goldberger, 209 F.3d at 50. There is no "one-size-fits-all 'benchmark' in determining the appropriate fee"—in fact, courts should avoid that practice because it "'could easily lead to routine windfalls where the recovered fund runs into the multi-millions.'"  In re Visa Check/Mastermoney Antitrust Litig., 297 F. Supp. 2d 503, 521 (E.D.N.Y. 2003) (quoting Nasdaq, 187 F.R.D. at 486).  Further, in mega-fund settlements totaling more than $100 million, courts have "traditionally accounted for these economies of scale by awarding fees in the lower ranges."  Goldberger, 209 F.3d at 52.

### 1.  Time and Labor Expended by Counsel

The time and labor expended by Counsel in this matter was extraordinary.  Even before the first operative complaint, Berry and Kellogg Huber conducted a two-year long investigation into the ISP market.  While many class actions are filed on the heels of a government investigation, the claims in this case were formulated entirely from the findings of a private investigation.  See In re Gulf Oil/Cities Serv. Tender Offer Litig., 142 F.R.D. 588, 597 (S.D.N.Y. 1992) ("[T]his is not a case where plaintiffs' counsel can be cast as jackals to the government's lion, arriving on the scene after some enforcement or administrative agency has made the kill.  They did all the work on their own.").  As recounted previously, Counsel worked through fact and expert discovery, class certification, dispositive motions, and trial.  They surmounted significant challenges and avoided potential setbacks at every turn.

But this Court would be remiss if it did not highlight the fact that the time and

labor expended by five law firms—three more than this Court appointed—most certainly led to a duplication of effort and multiplication of attorneys' fees. Some of that redundancy stems from Counsel's circumvention of this Court's initial appointment order, and is therefore self-inflicted. After this Court denied two requests for the appointment of all five law firms as joint lead counsel, Counsel proposed the appointment of Susman Godfrey and Kellogg Huber as co-lead counsel. Satisfied that its message had been received, this Court appointed them. However, Counsel did not apprise this Court that one day before proposing Susman Godfrey and Kellogg Huber as co-lead counsel, they engineered a private work-around among themselves designating Kramer Levin and McKool Smith as co-lead trial and settlement counsel. See Dial Corp. v. News Corp., No. 13-cv-6802 (WHP), 2015 WL 7180667, at *1 (S.D.N.Y. Oct. 15, 2015). Months later, by serendipity, this Court learned of Counsel's subterfuge. At that time, it could have vacated the July 2015 Order. But, to avoid upsetting intricate financial arrangements among the Plaintiffs and delaying trial, this Court opted for a "pragmatic approach." Dial, 2015 WL 7180667, at *2. It permitted Susman Godfrey and Kellogg Huber to "keep their title, even if it [was] just an ornament," and Kramer Levin and McKool Smith to proceed in their role as co-lead trial and settlement counsel. See Dial, 2015 WL 7180667, at *2.

Nevertheless, this Court cautioned Counsel repeatedly "to avoid duplication of effort and multiplication of attorneys' fees." Dial, 2015 WL 7180667, at *2; see also Dial, 314 F.R.D. at 121 (appointment of five firms would not serve to streamline proceedings nor would it introduce efficiencies into case management).

A review of Counsel's time records validates this Court's concern that allowing five firms to represent the Class would result in a duplication of effort and a multiplication of attorneys' fees. From July to December 2014, for example, it appears the five firms staffed nine

partners, nine associates, five staff attorneys, and a few paralegals who spent over 1,900 hours briefing and arguing the class certification motion, leaving this Court wondering why so many attorneys—let alone partners—were staffed on the task.

In October 2015, all five firms staffed 12 partners, 10 associates, two staff attorneys, and a handful of paralegals who spent 1,100 hours briefing Plaintiffs' opposition to summary judgment. That too, is beyond the pale. Opposing summary judgment is a fundamental task in any complex litigation—one that readily could have been assumed by the two very capable firms the Court originally appointed for a fraction of the cost and time.

And for the first two months in 2016, the 13 partners, 11 associates, and several paralegals from the five firms logged over 5,300 hours preparing for trial. It was a curious arrangement, given this Court's October 15 order explicitly designating only two of the firms as co-lead trial and settlement counsel. See Dial, 2015 WL 7180667, at *2. But the lawyers from those two firms—Kramer Levin and McKool Smith—appear to have billed a little more than half the hours involved in the final preparation for trial and settlement negotiations.

Moreover, Counsel's allocation of time is heavily weighted towards partners. Such a division of labor is atypical in practice. In such instances, "[c]ourts have reduced the fee percentage requested where, as here, the lodestar value reflects an over-allocation of work to more expensive partners." In re Platinum and Palladium Commodities Litig., No. 10-cv-3617 (WHP), 2015 WL 4560206, at *4 (S.D.N.Y. July 7, 2015) (citing In re Dreyfus Aggressive Growth Mut. Fund Litig., 98-cv-4318 (HB), 2001 WL 709262 (S.D.N.Y. June 22, 2001); Ryan v. Allied Interstate, Inc., 882 F. Supp. 2d 628 (S.D.N.Y. 2012)). Accordingly, this factor weighs against the approval of the Plaintiffs' fee request.

2.  <u>Magnitude and Complexities of Litigation</u>

"Federal antitrust cases are complicated, lengthy, and bitterly fought."  <u>Wal-Mart</u>,

396 F.3d at 118.  These monopolization claims were highly nuanced.  Plaintiffs showcased

theories of liability that were sharply contested by Defendants, and required both sides to work

extensively with economists and marketing experts to define the relevant market and analyze

Defendants' contracting practices.  This case had far-reaching implications posing an existential

threat to Defendants' business model.  But even if Plaintiffs prevailed on liability, they faced a

serious challenge to establishing damages and the looming threat of decertification.  And after

deftly navigating the numerous pitfalls and traps set by Defendants' counsel, Plaintiffs were also

confronted with the risk that their victories could be overturned on appeal.  Accordingly, this

factor weighs in favor of approval of Counsel's fee request.

3.  <u>Risk of Litigation</u>

The parties faced formidable challenges in litigating the action to a verdict and

then prevailing on appeal.  Counsel prosecuted this case largely on contingency and assumed the

risk of recovering nothing if the claims were dismissed at various stages.  Both Counsel and their

clients waged a battle against one of the largest corporations in the world, knowing full well that

dismissal of the suit could have widespread consequences to their future business.  Even at such

an advanced stage of litigation, serious obstacles remained.  For those reasons, the substantial

risks in this litigation should be credited as "the foremost factor to be considered in determining

whether to award an enhancement" of fees.  <u>Goldberger</u>, 209 F.3d at 54.

4.  <u>Quality of Representation</u>

Plaintiffs were represented by some of the finest antitrust lawyers in the nation.

Counsel tirelessly litigated this case against Defendants' lawyers, who were of equally high

caliber.  The results achieved through the efforts of Counsel are a "critical element in determining the appropriate fee to be awarded," and the settlement here will undoubtedly have widespread benefits to the Class.  See Maley v. Del Global Tech. Corp., 186 F. Supp. 2d 358, 373 (S.D.N.Y. 2002).

5.  Requested Fee in Relation to Settlement

"To avoid routine windfalls where the recovered fund runs into the multi-millions, courts typically decrease the percentage of the fee as the size of the fund increases."  In re Interpublic Sec. Litig., No. 02-cv-6527 (DLC), 2004 WL 2397190, at *11 (S.D.N.Y. Oct. 26, 2004) (internal quotation marks and citations omitted).  In mega-fund cases such as this, several courts in this Circuit have subscribed to the view that "the percentage used in calculating any given fee award must follow a sliding-scale and must bear an inverse relationship to the amount of the settlement."  In re Indep. Energy Holdings PLC, No. 00-cv-6689 (SAS), 2003 WL 22244676, at *6 (S.D.N.Y. Sept. 29, 2003); see also Nasdaq, 187 F.R.D. at 486 (noting that in cases "where a class recovers more than $75–$200 million . . . fees in the range of 6–10 percent and even lower are common"); Platinum and Palladium, 2015 WL 4560206, at *4 ("To avoid a windfall where the recovered funds run into the tens of millions, courts typically decrease the percentage of fee as the size of the fund increases."); Carlson v. Xerox Corp., 596 F. Supp. 2d 400, 404 (D. Conn. 2009) ("[L]ower percentages of the fund" should be awarded "as the size of the fund increase[s].").

Counsel cite a number of decisions in support of their view that 30% of the Fund is reasonable.  (See Pl. Mot. for Attorneys' Fees and Expenses and Incentive Awards at 9 ("Pl. Mot. for Fees") (collecting cases).)  But those opinions span a broad range, with some awarding proportions that are well below 30%.  (Pl. Mot. for Fees at 9–10 (fees representing 13% to 34%

of settlement funds totaling anywhere from $12.1 million to $1.86 billion).)  And they also stand

in stark contrast to other decisions in this Circuit decreasing the amount of fees as the settlement

recoveries increase.  See In re Citigroup Inc. Bond Litig., 988 F. Supp. 2d 371, 374 (S.D.N.Y.

2013) ("the percentage fee awarded in settlements as large as this one is typically lower—

[sometimes] substantially lower—than 20%.") (collecting cases); In re IndyMac Mortgage-

Backed Sec. Litig., 385 F. Supp. 2d 363 (S.D.N.Y. 2015) (awarding 12% of $75 million

settlement); In re Bristol-Meyers Squibb Sec. Litig., 361 F. Supp. 2d 229 (S.D.N.Y. 2005)

(awarding 3% of $300 million settlement); In re Payment Card Interchange Fee & Merch. Disc.

Antitrust Litig., 991 F. Supp. 2d 437 (E.D.N.Y. 2014) (awarding 9.6% of $5.7 billion

settlement).

        As one Class Member, PepsiCo, expressed to this Court, a "fee of 30 percent

exceeds the range that this Court has awarded to class counsel in connection with other

settlements."  (ECF No. 590.)  Indeed, this Court has previously held that fee requests of "27.5%

[or higher] of the net fund is on the high end of the range of fee awards." Currency Conversion,

263 F.R.D. at 129 (collecting cases).  And in earlier class action settlements ranging from $15

million to $336 million, this Court cabined awards to between 12% to 28% of the funds.  See

Platinum and Palladium, 2015 WL 4560206 (reducing request from 29.5% to 22.5% of $72.5

million fund); In re Currency Conversion Fee Antitrust Litig., 263 F.R.D. 110 (S.D.N.Y. 2009)

(reducing fee request from 25.5% to 15.5% in $336 million fund); In re Bayer AG Sec. Litig.,

03-cv-1546 (WHP), 2008 WL 5336691 (S.D.N.Y. Dec. 15, 2008) (approving 12% of 18.5

million fund); In re Polaroid ERISA Litig., No. 03-cv-8335 (WHP), 2007 WL 2116398

(S.D.N.Y. July 19, 2007) (reducing request from 30% to 28% of $15 million fund).

Accordingly, this Court declines to adopt wholesale Counsel's notion that a 30% fee award is

reasonable in relation to a mega-fund settlement.

6. Public Policy Considerations

Public policy encourages the award of reasonable attorneys' fees, but courts must also "guard against providing a monetary windfall to class counsel to the detriment of the plaintiff class." In re NTL Inc. Sec. Litig., No. 02-cv-3013 (LAK), 2007 WL 1294377, at *8 (S.D.N.Y. May 2, 2007) (internal quotation marks omitted). On the one hand, Counsel should be rewarded for concentrating their time, effort, and resources in successfully representing the Class on a contingent basis. On the other hand, permitting five law firms that undermined this Court's appointment order to reap a fee based, in part, on an inflated lodestar would run contrary to public policy. And doing so would impair the Court's "duty to avoid any sense of vicarious generosity or to permit the lodestar to be enhanced without restraint above a fair and reasonable amount under all the facts and circumstances." In re Sumitomo Copper Litig., 74 F. Supp. 2d 393, 396 (S.D.N.Y. 1999).

In applying the Goldberger factors, this Court concludes that the first factor—labor and time expended by Counsel—warrants a reduction in the requested fee. While there is no question that this case involved a substantial investment of time and labor, a portion was duplicative. On multiple occasions, this Court warned Counsel, in the plainest terms, to avoid duplication of effort. (See Sept. 16, 2015 Tr., at 3 ("if this case is settled or if the case is tried and the plaintiffs prevail, I am going to be called upon to determine attorneys' fees in this case . . . I am not going to permit the multiplication of counsel in a case.").) See also Dial Corp., 2015 WL 7180667, at * 2 (reminding Counsel of "their duty to avoid duplication of effort and multiplication of attorneys' fees."). This Court's rationale in appointing only two law firms as class counsel was based on a reasonable and prescient concern that having too many lawyers in

one case, no matter how large the case, inevitably invites duplication of tasks with a concomitant escalation of fees.

The lodestar in this action is inflated, and therefore serves no useful purpose as a "cross-check" to the requested fee. The lodestar of $36,433,985.50 was calculated by multiplying 69,218.95 hours billed with a "combined blended rate [among the firms] of $526.35 per hour." (Pl. Mot. for Fees at 18.) But there are many anomalies in the blended rate. First, it is freighted with an inordinate number of partners and overweighted with partner time. For example, five partners at Susman Godfrey billed 42.5% of the firm's total time; four partners at Kramer Levin logged 37% of their firm's total time; and four partners at McKool Smith expended 30% of their firm's total time. (ECF Nos. No. 577-1, 578, 579-1.) Second, the blended rate is enhanced by inflated billing rates. Some mid-level and senior associates billed at rates as high as $855 per hour, and some paralegals billed at a lofty $280 per hour. (See ECF Nos. 578, 579-1, 579-4.) This kind of billing warrants an aggregate, "across-the-board" haircut of at least $2.5 million, resulting in a revised lodestar of $33,900,000. See Capitol Records, Inc. v. MP3tunes, LLC, No. 07-cv-9931 (WHP), 2015 WL 7271565, at *5 (S.D.N.Y. Nov. 12, 2015) (noting that aggregate reductions appropriate where "a precise hour-for-hour reduction would be unwieldy or potentially inaccurate."); Kahlil v. Original Old Homestead Restaurant, Inc., 657 F. Supp. 2d 470, 477 (S.D.N.Y. 2009) ("It is well established that across-the-board reductions are appropriate when billing records are voluminous and numerous billing entries are in dispute.").

Then, there is the separate question of why the bloated billing did not end after this Court's July 2015 Order appointing Susman Godfrey and Kellogg Huber as the only firms authorized to represent the Class. (See ECF No. 257.) Despite that Order, all five firms continued to bill for work in this action. This Court will also account for any duplicative work

billed from that day forward in reducing the fee.

Counsel billed approximately 20,190 hours from July 10, 2015 to June 30, 2016. Based on their blended rate of $526.35, the firms billed approximately $10,627,006.50 in fees for work in connection with summary judgment, expert testimony, motions in limine, trial preparation, and settlement negotiations, among other things. This Court, in its discretion, will only credit two-fifths of that amount ($4,250,802.60) as original work on the basis that the remaining three-fifths of those fees ($6,376,203.90) are presumptively multiplicative and superfluous. The lodestar should therefore be further adjusted downward by approximately $6 million to $27,900,000.

And even after this Court's October 15, 2015 order acquiescing in Counsel's decision to deputize Kramer Levin and McKool Smith as lead trial and settlement counsel, it is impossible to determine who actually did what. For example, in the January–February 2016 time frame, co-lead counsel Susman Godfrey and Kellogg Huber should have had little to do, since they had ceded responsibility for trial and settlement to Kramer Levin and McKool Smith. See Dial, 2015 WL 7180667, at *2. But Susman Godfrey appears to have logged more hours than McKool Smith during a period devoted substantially to trial preparation. And Kellogg Huber was a close second. Moreover, Kramer Levin billed disproportionately more than McKool Smith for trial preparation—roughly 2,550 hours versus 875 hours. Knowing the consequences, Counsel nevertheless continued to operate under their own byzantine and exquisite arrangement.

A reasonable multiplier enhancing the lodestar is appropriate in this action because it accounts for "the riskiness of the litigation and quality of the attorneys." Wal-Mart, 396 F.3d at 121. But because Counsel's original lodestar was premised on a blended billing rate saturated by excessive partner time and timekeeper rates, and further bloated by time records

reflecting an inscrutable division of labor among the five firms, this Court reduces the multiplier from 2.01 to 1.75.  A multiplier of 1.75 recognizes the risk in this litigation, and falls within the range of multipliers awarded in cases of this magnitude.  See In re IndyMac Mortgage-Backed Sec. Litig., 94 F. Supp. 3d 517, 528 (S.D.N.Y. 2015) (finding multiplier of 1.33 for $346 million settlement reasonable); Platinum and Palladium, 2015 WL 4560206, at *4 (reducing multiplier from 2.6 to 1.9 on $72.5 million fund); Currency Conversion, 263 F.R.D. at 130 (reducing multiplier from 2.69 to 1.6 on $336 million fund); Penny v. Jenkens & Gilchrist, 230 F.R.D. 317, 352-54 (S.D.N.Y. 2005) (reducing multiplier from 2.04 to 1.5 on $81.5 million settlement); see also In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 742 (3d Cir. 2001) (noting multipliers range from 1.35 to 2.99 based on survey of cases with mega-funds exceeding $100 million).  A lodestar of $27.9 million multiplied by 1.75 results in a fee award of $48,825,000.

Accordingly, the "principles of moderation" urged by the Goldberger court, the Court's duty to protect the Class from "the danger of routine overcompensation . . . in the context of mega fund class actions," In re Citigroup Sec. Litig., 965 F. Supp. 2d 369, 401 (S.D.N.Y. 2013), and the broad discretion of this Court compel a fee award of no more than $48,825,000, or 20% of the Settlement.[3]

---

[3]      This is not inconsistent with the proportion of fees that Counsel will receive from News Corp. in connection with the settlement benefiting the five absent Class members (20% of $30 million).  The reasons justifying an award in either settlement are not materially different.  Simply put, the Goldberger factors, namely risk, complexity, time, and resources in litigating the claims to such an advanced stage of litigation—all of which were satisfied before any one of the settlements were negotiated—serve as the primary basis on which Counsel is entitled to a fee from both the private settlement and the Class settlement.  Counsel attempt to distinguish their fee in the private settlement on the basis that it was not derived from "a market rate negotiation with a client, reflects marginally lower work contributed to the individual settlements," lacks the structural relief contained in the Class settlement, and saves them the opportunity cost of pursuing fees relating to that settlement in a separate action.  (Pl. Mot. for Fees at 11.)  But all of those reasons are settlement-specific, and have no bearing on the Goldberger factors, which are what entitle them to any fee in the first place.

B.  <u>Expenses</u>

Plaintiffs seek reimbursement of $7,512,915.12 in expenses.  The vast majority of those expenses arise from costs associated with retaining two expert witnesses and retaining contract attorneys to review millions of documents.  (Pl. Mot. for Fees at 20.)  The contract attorney fees, amounting to a little more than $1 million and were billed "at an average rate of $39/hour without any mark-up applied."  (Pl. Mot. for Fees at 20.)  Simple math reveals that more than 25,000 hours of attorney time were expended.  To Counsel's credit, this attorney time was "accounted as an expense rather than included in the lodestar."  (Pl. Mot. for Fees at 20.) That fact weighs heavily in favor of granting the expenses.  While courts in this Circuit have permitted attorneys to garnish their lodestars with marked-up contract attorney fees, this Court appreciates Counsel's decision to treat these contractor fees as an expense.  It saves the Court from having to "determine a correct spread between the contract attorney's cost and his or her hourly rate and his or her salary."  <u>Citigroup Sec. Litig.</u>, 965 F. Supp. 2d at 394.  This Court encourages the Plaintiffs' class action bar to consider adopting this practice in future actions.

Accordingly, because the "lion's share of these expenses reflect the costs of experts, consultants, litigation and trial support services, document imaging and copying, deposition costs, online legal research, and travel expenses," the court will not "depart from the common practice in this circuit of granting expense requests."  <u>Visa Check</u>, 297 F. Supp. 2d at 525.

C.  <u>Incentive Awards</u>

Plaintiffs request incentive awards of $50,000 each for the six class representatives: (1) Dial Corporation and Henkel Consumer Goods; (2) Kraft Heinz Foods and H.J. Heinz; (3) Foster Poultry Farms; (4) Smithfield Foods; (5) HP Hood; and (6) BEF Foods.

(Pl. Mot. for Fees at 22.)  The incentive awards in the aggregate amount of $300,000 represent 0.12% of the Fund.  Plaintiffs contend that the awards are justified in view of each company's investment of resources in pursuing the claims and "risking Defendants' retaliation for bringing claims against the sole source of a product vital to their ability to compete in the marketplace." (Pl. Mot. for Fees at 22.)  They also count the "many total hours of executive and employee time," and the "unreimbursed costs in searching and gathering documents . . . preparing for and giving multiple depositions . . . [and] preparing and being ready to testify at trial," as examples of the investment they made in prosecuting this case.  (Pl. Mot. for Fees at 22.)  Moreover, five of the companies advanced significant fees to Berry for the first few years of the investigation and litigation.

Class representatives may receive an incentive award in addition to their allocable share of the ultimate recovery, but the decision to grant the award, and the amount thereof, rests solely within the discretion of the Court.  See Roberts v. Texaco, 979 F. Supp. 185, 200 (S.D.N.Y. 1997).  The "guiding standard in determining an incentive award is broadly stated as being the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff . . . and, of course, the ultimate recovery."  Roberts, 979 F. Supp. at 200.

Awards on an individualized basis have generally ranged from $2,500 to $85,000. See Dornberger v. Metro. Life Ins. Co., 203 F.R.D. 118, 125 (S.D.N.Y. 2001).  While many of these awards are usually given to individual plaintiffs who have incurred significant personal risk in representing a class, a few courts have recognized the efforts of corporate representatives in

granting incentive awards.  In re Cardizem CD Antitrust Litig., 218 F.R.D. 508, 535 (E.D. Mich. 2003) ($75,000 each to two corporations); Enterprise Energy Corp. v. Columbia Gas Transmission Corp., 137 F.R.D. 240, 252 (S.D. Ohio 1991) ($50,000 each to six corporations); In re Prandin Direct Purchaser Antitrust Litig., 2015 WL 1396473, at *5 (E.D. Mich. Jan. 20, 2015) ($50,000 each to two corporations).  In Cardizem, for example, corporate representatives dedicated "hundreds of hours of time to the prosecution of these cases and responses to discovery," provided the services of their general counsel, senior executives, and other employees during the litigation, investigated the claims with outside counsel, and participated meaningfully in the negotiation of settlement.  218 F.R.D. at 535–36.

Here, five of the six representatives fronted almost $1 million in attorneys' fees for the investigation and early prosecution of the action.  Together, they provided more than a million documents in discovery, and made several of their employees and executives available for fact investigation, depositions, and trial.  (Pl. Mot. for Fees at 22–23.)  Moreover, while this case exclusively involved major companies that arguably were better suited to assume the risk of waging an expensive litigation against a multinational corporation, the decision to fire the first shot on behalf of the Class was fraught with risks.  Notably, the named Plaintiffs in this case assumed a substantial risk in antagonizing a longstanding, powerful business partner and suffering sweeping consequences in the marketplace as a result of filing this action.  Finally, the size of the incentive awards, relative to the Fund, is consistent with what other courts have awarded in cases of this magnitude.  See Roberts, 979 F. Supp. at 200 (0.18% of a $115 million Fund).  Accordingly, this Court approves incentive awards in the amount of $50,000 to the six named Class representatives.

<u>CONCLUSION</u>

For the foregoing reasons, in its informed discretion, this Court grants final approval of the Settlement, and awards attorneys' fees in the amount of $48,825,000, expenses in the amount of $7,512,915.12, and incentive awards in the amount of $50,000 each to Henkel Consumer Goods, Inc. f/k/a The Dial Corporation; Kraft Heinz Foods Co. f/k/a H.J. Heinz Company; Foster Poultry Farms; Smithfield Foods, Inc.; HP Hood LLC; and BEF Foods. Further, the Claims Administrator is directed to send another set of notices, and to follow-up with a phone call, informing potential Class Members that have not filed a proof of claim that they may file a late proof of claim by December 1, 2016.

Counsel is directed to submit a revised proposed final judgment forthwith. The Clerk of Court is directed to terminate motions pending at ECF Nos. 574 and 584.

Dated: October 31, 2016
        New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.